RANDYE B. SOREF (State Bar No. 99146)
rsoref@polsinelli.com
TANYA BEHNAM (State Bar No. 322593)
tbehnam@polsinelli.com
Polsinelli LLP
2049 Century Park East, Suite 2900
Los Angeles, CA 90067
Telephone:   (310) 556-1801
Facsimile:    (310) 556-1802

JERRY L. SWITZER, JR. (*pro hac vice pending*)
jswitzer@polsinelli.com
JEAN SOH (*pro hac vice pending*)
jsoh@polsinelli.com
Polsinelli PC
150 North Riverside Plaza, Suite 3000
Chicago, IL 60606
Telephone:   (312) 819-1900
Facsimile:    (312) 819-1910

*Attorneys for Busey Bank*

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:**<br><br>**BENJA INCORPORATED,**<br><br>　　　　　　**Debtor.** | Case No. 20-30819<br><br>Chapter 11<br><br>Judge Dennis Montali<br><br>**CREDITOR BUSEY BANK'S MOTION FOR THE APPOINTMENT OF A CHAPTER 11 TRUSTEE OR, IN THE ALTERNATIVE, FOR CONVERSION OF CASE TO CHAPTER 7 OF THE BANKRUPTCY CODE; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:　　TBD<br>Time:　　TBD<br>Place:　　TBD |

Polsinelli LLP
2049 Century Park East, Suite 2900
Los Angeles, CA 90067
310.556.1801

Creditor Busey Bank (the "Bank") hereby files this motion for an order for the appointment of a Chapter 11 Trustee (the "Motion") for the Debtor Benja Incorporated ("Benja" or the "Debtor") and its estate. In the alternative, the Bank requests conversion of the Debtor's case to a case under Chapter 7 of the Bankruptcy Code. This Motion is based upon the attached Memorandum of Points and Authorities, the Declarations of Joe Alouf, the former Interim President and Chief Financial Officer of the Debtor and Michael McElhone, Vice President and Special Assets Officer of the Bank, filed concurrently herewith, the entire record in this case, the statements, arguments and representations of counsel to be made at the hearing on the Motion, and any other evidence properly presented to the Court at or prior to the hearing on the Motion.

75117909.3
Case: 20-30819    Doc# 19    Filed: 10/20/20    Entered: 10/20/20 17:40:32    Page 2 of 32

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................1

II.    STATEMENT OF FACTS ...................................................2

    A.    The Debtor and Its Chief Executive Officer ....................2

    B.    Debtor's Loan from the Bank .........................................2

    C.    Debtor's Multiple Events of Default Under the Loan Documents ..............4

    D.    Debtor's Evasiveness in Pending Litigation with the Bank........................5

    E.    Fraud or Other Misconduct Committed by Chapin Against the Bank, Other Lenders and Investors ........................................6

        1.    Chapin Caused the Debtor to Enter into Junior Loans in Violation of the Bank's Loan Documents........................................6

        2.    Chapin Submitted a Falsified Debtor 2018 Tax Return When He Applied for the Loan from the Bank........................................6

        3.    Chapin Falsified Bank Statements Presented to Lenders and Investors ........................................7

        4.    Chapin Submitted Fraudulent Borrowing Base Certificates to the Bank ........................................7

        5.    Chapin Created a False Financial Statement, Which Did Not Reflect Outstanding Loans from the Bank or Empowerment..........8

        6.    Chapin Made Misrepresentations to Lenders and Investors When He Sought Loans and Investments....................................8

        7.    The Bank Advances Were Not Used for Debtor Business Operations, and Instead Were Diverted ............................9

        8.    Chapin Caused the Debtor to Open an Unauthorized Bank Account at Chase to Help Conceal His Fraud ...............................10

        9.    Debtor Raised $1 Million Equity Based on Chapin's False Certification that the Debtor Was Not in Default on Its Borrowing Obligations ........................................11

        10.   Chapin Manipulated the Debtor's Corporate Governance to Facilitate His Deception................................11

III.   ARGUMENT ........................................................12

    A.    The Standard for Appointment of a Chapter 11 Trustee............................12

    B.    There Is Abundant "Cause" Within the Meaning of 11 U.S.C. § 1104(a)(1) to Appoint a Chapter 11 Trustee................................14

    C.    Appointment of a Trustee under 11 U.S.C. § 1104(a)(2) is in the Interests

Polsinelli LLP
2049 Century Park East, Suite 2900
Los Angeles, CA 90067
310.556.1801

i

75117909.5

of Creditors and the Estate.........................................................................17

      1.     The Debtor Cannot Be Trusted to Carry Out Its Fiduciary Duties.17

      2.     The Bank Lacks Confidence in the Debtor......................................18

D.    In the Alternative, Cause Exists to Convert the Case to One Under Chapter 7 of the Bankruptcy Code ........................................................................18

      1.     There is Evidence of Diminution of the Estate and No Reasonable Likelihood of Rehabilitation as Contemplated in § 1112(b)(4)(A) 19

      2.     There is Evidence of Gross Mismanagement of the Estate ............20

      3.     The Debtor Has Misappropriated the Bank's Cash Collateral........22

IV.    CONCLUSION.......................................................................................................23

Polsinelli LLP
2049 Century Park East, Suite 2900
Los Angeles, CA 90067
310.556.1801

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Bellevue Place Assocs.*,
    171 B.R. 615 (Bankr. N.D. Ill. 1994) ...............................................................13, 14

*In re Chochise College Park, Inc.*,
    703 F.2d 1339 (9th Cir. 1983); ......................................................................13, 16

*In re Colorado-Ute Elec. Ass'n, Inc.*,
    120 B.R. 164 (Bankr. D. Colo. 1990) ...................................................................13

*Commodity Future Trading Comm'n v. Weintraub*,
    471 U.S. 343 (1985)...........................................................................................12, 16

*In re Consolidated Pioneer Mortgage Entities*,
    248 B.R. 368 (9th Cir. B.A.P. 2000).....................................................................20

*In re Corona Care Convalescent Corp.*,
    527 B.R. 379 (Bankr. C.D. Cal. 2015)..................................................................13

*In re Count Liberty, LLC*,
    370 B.R. 259 (Bankr. C.D. Cal. 2007)..................................................................18

*In re Deena Packaging Industries, Inc.*,
    29 B.R. 705 (Bankr. S.D.N.Y.)............................................................................16

*In re Devers*,
    759 F.2d 751 (9th Cir. 1985) ...............................................................................19

*In re Domiano*,
    442 B.R. 97 (M.D. Penn. 2010) ...........................................................................19

*In re East Coast Airways, Ltd.*,
    146 B.R. 325 (Bankr. E.D.N.Y. 1992)..................................................................18

*In re Evans*,
    48 B.R. 46 (Bankr. W.D. Tex. 1985)....................................................................13

*In re Fall*,
    405 B.R. 863 (Bankr. N.D. Ohio 2009) ................................................................18

*In re Halal 4 U LLC*,
    2010 WL 3810860 (Bankr. S.D.N.Y. 2010) .........................................................19

*In re Ho*,
    274 B.R. 867 (B.A.P. 9th Cir. 2002).....................................................................17

Polsinelli LLP
2049 Century Park East, Suite 2900
Los Angeles, CA 90067
310.556.1801

Polsinelli LLP
2049 Century Park East, Suite 2900
Los Angeles, CA 90067
310.556.1801

*In re Intercat, Inc.*,
  247 B.R. 911 (Bankr. S.D. Ga. 2000) .............................................................12

*In re Johnson*,
  397 B.R. 486 (Bankr. E.D. Cal. 2008) ...........................................................17

*In re Kanterman*,
  88 B.R. 26 (S.D.N.Y. 1988) ............................................................................18

*Kingsway Capital Partners, LLC v. Sosa*,
  549 B.R. 897 (N.D. Cal. 2016) ........................................................................19

*In re Main Line Motors*,
  9 B.R. 782 (Bankr. E.D. Pa 1981) ..................................................................13

*In re McTiernan*,
  519 B.R. 860 (Bankr. D. Wyo. 2014) ..............................................................18

*In re Mesne*,
  509 B.R. 269 (Bankr. C.D. Cal. 2014) ............................................................18

*In re Morpheus Lights, Inc.*,
  228 B.R. 449 (Bankr. N.D. Cal. 1998) ............................................................12

*In re Nelson*,
  343 B.R. 671 (B.A.P. 9th Cir. 2006) ...............................................................17

*Fall v. Farmers & Merchants State Bank*,
  2009 WL 974538 (N.D. Ohio Apr. 9, 2009) ....................................................18

*In re Oklahoma Refining Co.*,
  838 F.2d 1133 (10th Cir. 1988) ................................................................13, 16

*Petit v. New England Mortg. Services, Inc.*,
  182 B.R. 64 (D. Me. 1995) ..............................................................................19

*In re Prods. Int'l Co.*,
  395 B.R. 101 (Bankr. D. Ariz. 2008) ..............................................................18

*In re Sharon Steel*,
  86 B.R. 455 (Bankr. W.D. Pa. 1988) ..............................................................13

*In re Thompson*,
  110 F.3d 47 (9th Cir. 1997), cert. denied, 522 U.S. 966 (1997) .....................18

*In re V. Savino Oil & Heating Co., Inc.*,
  99 B.R. 518 (Bankr. E.D.N.Y. 1989) ..........................................................12, 14

*Wolf v. Weinstein*,
  372 U.S. 633 (1963) ........................................................................................12

iv

Case: 20-30819     Doc# 19     Filed: 10/20/20     Entered: 10/20/20 17:40:32     Page 6 of 32

*In re Woodson*,
   839 F.2d 610 (9th Cir.1988) ................................................................. 19

**Statutes**

11 U.S.C. 1112(b)(1) ........................................................................... 19

11 U.S.C. § 1104(a) ............................................................................ 12

11 U.S.C. § 1104(a)(1) ..................................................................... 12, 14

11 U.S.C. § 1104 (a)(2) ..................................................................... 13, 16

11 U.S.C. § 1112 ................................................................................. 17

11 U.S.C. § 1112(b)(1) ........................................................................ 17

11 U.S.C. § 1112(b)(4) ........................................................................ 18

Polsinelli LLP
2049 Century Park East, Suite 2900
Los Angeles, CA 90067
310.556.1801

v

Polsinelli LLP
2049 Century Park East, Suite 2900
Los Angeles, CA 90067
310.556.1801

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.        INTRODUCTION

The Debtor has committed extensive fraudulent actions against the Bank, other lenders and investors by and through Andrew J. Chapin ("Chapin"), the Debtor's purported Chief Executive Officer and Director. The Debtor's skeleton bankruptcy filing is a desperate attempt to forestall the disclosure of Chapin's extensive fraudulent and deceitful actions ostensibly in furtherance of the Debtor's business, to the detriment of the Bank and the Debtor's other creditors and investors. Chapin now seeks to use the chapter 11 process and this Court to thwart the Bank's legitimate creditor enforcement efforts, filing its petition on the day of the scheduled hearing on the Bank's Motion for Appointment of General Receiver.[1]

Chapin and the Debtor have been evading the Bank's attempts to preserve its security interests in collateral held by the Debtor since the Bank notified the Debtor and Guarantors (including Chapin) of various Events of Default under the Loan Documents since September of this year.[2] Chapin has engaged, and has caused the Debtor to engage, in an extensive pattern of malfeasance and fraud, as set forth in the Alouf Declaration, which necessarily requires investigation by a trustee.

The Bank has discovered that Chapin put forth fake financial documents of the Debtor to support his false representations to lenders and investors. Among other things, Chapin fraudulently doctored Busey Bank Statements of the Debtor's deposit account with the Bank to reflect numerous large and fictitious deposits to inflate the Debtor's bank balances in order to raise capital. Chapin also corresponded with investors using a fictitious Debtor e-mail account for the Debtor's purported bookkeeper as well as a fake email account for a large firm lawyer he falsely presented as representing the Debtor in an investment transaction. These fake documents and communications were used by Chapin to generate funds to rob Peter to pay Paul. As described below, the record is

---

[1] Capitalized terms used in this Introduction shall have the meaning provided *infra*.

[2] The parties are involved in a lawsuit filed in Missouri state court, Case No. 20SL-CC05024 (the "State Court Litigation"), which was removed by the Debtor and Chapin to U.S. District Court for the Eastern District of Missouri, Case No. 20-cv-01473 ("Federal Court Removal").

replete with instances of fraud. The only way to protect the interests of creditors and investors is the immediate appointment of an independent fiduciary to oversee the administration of the Debtor's estate and investigate and pursue claims and causes of action against Chapin and those persons and entities that received the benefit of the loans and investments he fraudulent obtained from the Bank, other lenders and investors.

## II. STATEMENT OF FACTS

### A. The Debtor and Its Chief Executive Officer

Chapin is the purported Chief Executive Officer and sole Director of the Debtor, a Delaware corporation. However, it is not clear whether Chapin is properly acting in those offices, as he previously resigned from those positions and then reinstated himself based on his authority as the purported majority shareholder of the Debtor. Various documents provided by Chapin since 2018 reflect that he only holds about 25% of the Debtor's equity. For example, Chapin provided Mr. Alouf the Debtor's capitalization table dated August 2020 reflecting that Chapin holds only 23.3% of the equity in the Debtor. Alouf Decl., Ex. G. Despite this fact, Chapin completely controls and dominates the Debtor, so there is no one to stop his fraud, mismanagement, self-dealing, and consistent lack of candor to creditors and investors unless a trustee is appointed.

### B. Debtor's Loan from the Bank

In approximately July 2019, the Debtor entered into negotiations with the Bank for an asset-based loan secured by all of the Debtor's assets. In connection with the Loan, the Debtor executed a Promissory Note in favor of the Bank dated as of July 16, 2019, in the principal amount of $1,000,000.00, as replaced and superseded by a Promissory Note dated as of February 28, 2020, executed by the Debtor in favor of the Bank in the original principal amount of $3,000,000.00, as further replaced and superseded by a Promissory Note dated as of August 20, 2020, executed by the Debtor in favor of the Bank in the original principal amount of $5,000,000.00 (collectively, the "Note") evidencing a loan (the "Loan") in the same amounts. McElhone Decl. Ex. 1.

Polsinelli LLP
2049 Century Park East, Suite 2900
Los Angeles, CA 90067
310.556.1801

The Loan is also evidenced by a Business Loan Agreement (Asset Based) dated July 16, 2019, executed by the Debtor and the Bank, as amended by a Modification to Business Loan Agreement (Asset Based) dated as of February 28, 2020, executed by the Debtor in favor of the Bank in the original principal amount of $3,000,000.00, as further replaced and superseded by a Business Loan Agreement (Asset Based) dated as of August 20, 2020, executed by the Debtor in favor of the Bank in the original principal amount of $5,000,000.00 (collectively, the "BLA"). McElhone Decl. Ex. 2.

The Note is secured by a Commercial Security Agreement dated July 16, 2019 (the "Security Agreement") executed by the Debtor in favor of the Bank. Under the Security Agreement, and as security for the Loan, the Debtor granted to the Bank a security interest in the Collateral (as defined and as more particularly described therein), including, but not limited to, all of the Debtor's inventory, equipment, accounts, chattel paper, instruments, letters of credit, documents, deposit accounts, investment property, money, other rights to payment and performance, and general intangibles, and all proceeds, additions, substitutions, and replacements thereof. McElhone Decl. Ex. 3.

To perfect the security interest arising under the Security Agreement, the Bank caused a UCC Financing Statement to be filed on July 19, 2019, with the Delaware Department of State as File Number 20195005348 (the "UCC Filing" and, together with the Security Agreement, the "Security Documents"), with respect to all assets and property of the Debtor as described therein. McElhone Decl. Ex. 4.

The Debtor maintains a deposit account number XXXXX4766 at the Bank that is and has been used by the Debtor in connection its business. (The foregoing account, and any other accounts of the Debtor at the Bank, are collectively referred to herein as the "Bank Deposit Account"). The

3
MOTION FOR AN ORDER FOR APPOINTMENT OF A CHAPTER 11 TRUSTEE

75117909.5

Bank funded the Loan by depositing monies directly into the Bank Deposit Account. The Bank Deposit Account and the funds on deposit therein are part of the Collateral securing the Loan.

The Note is also secured by a Commercial Guaranty executed by Chapin on or about July 16, 2019 (the "Chapin Guaranty"). McElhone Decl. The Note is further secured by a Commercial Guaranty executed by Thomas L. Goode III ("Goode") on or about July 16, 2019 (the "Goode Guaranty" and, together with the Chapin Guaranty, the "Guarantees"). McElhone Decl.

The Note, BLA, Guarantees, Security Agreement, the UCC Filing, and all other agreements, instruments, and documents evidencing, securing, or otherwise relating to the Loan are collectively referred to herein as the "Loan Documents." Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to such terms in the Loan Documents.

### C. Debtor's Multiple Events of Default Under the Loan Documents

Pursuant to a letter dated September 29, 2020 (the "Default Letter"), the Bank notified the Debtor and Guarantors of various Events of Default under the Loan Documents and reserved all rights and remedies on account thereof under the Loan Documents, at law or in equity. As reflected in the Default Letter, the outstanding Events of Default include, without limitation, that the Debtor violated the BLA and Security Agreement in the following respects:

a. the Debtor borrowed money from First Corporate Solutions and E-Revshare Core, LLC (i.e., Empowerment (as defined below)), and in connection therewith granted security interests to those lenders in assets of the Debtor.

b. the Debtor allowed certain state tax liens in favor of the California Employment Development Department to be recorded against the Debtor and its assets on or about January 14, 2020, and March 9, 2020.

c. the Debtor allowed a judgment in favor of Peter A. Manderino to be recorded against the Debtor and its assets on or about October 30, 2018.

Polsinelli LLP
2049 Century Park East, Suite 2900
Los Angeles, CA 90067
310.556.1801

d. Additionally, as reflected in the Default Letter, Goode contends that he did not execute and/or is not bound by the Goode Guaranty.

e. Finally, as reflected in the Default Letter, the Debtor violated the BLA by maintaining an operating account at JPMorgan Chase Bank N.A. ("Chase"), and not with the Bank, as the BLA requires that the Debtor maintain the Bank as its primary depository and cash management services institution.

McElhone Decl. Ex. 5.

As of October 1, 2020, the total balance due under the Note, exclusive of applicable late charges, default interest, and costs, expenses and attorneys' fees incurred by the Bank, is as follows:

| | |
|---|---|
| Principal: | $4,999,999.50 |
| Regular Interest: | $   26,656.53 |
| **Total:** | **$5,026,656.03** |

Additionally, interest continues to accrue under the Note from and after October 1, 2020. McElhone Decl. ¶ 15.

**D.     Debtor's Evasiveness in Pending Litigation with the Bank**

After providing notice of default to the Debtor, on October 9, 2020, the Bank commenced the State Court Litigation, suing for breach of the Note and the Chapin Guaranty, and seeking appointment of a general receiver. The State Court set a hearing on the Bank's receiver request on the morning of October 13, 2020. The afternoon before the Debtor and Chapin filed a motion to substitute judge, which was granted as of right at the October 13 hearing. Immediately thereafter the Bank scheduled a hearing on the receiver request for later that afternoon before the Chief Judge of the State Court, but shortly before that hearing the Debtor and Chapin filed a notice effectuating the Federal Court Removal. The District Court then set the hearing on the receiver request for the morning of October 15, 2020, but shortly before the hearing was to commence the Debtor filed its bankruptcy petition in this Court. Accordingly, the hearing on the Bank's receiver request did not go forward.

Polsinelli LLP
2049 Century Park East, Suite 2900
Los Angeles, CA 90067
310.556.1801

The Bank has had communications with the Debtor's former Interim President and Chief Financial Officer, Joe Alouf, who has advised the Bank of his significant concerns regarding potential fraud committed by Chapin against the Bank, other lenders and investors, as set forth in the concurrently filed Alouf Declaration. The Bank has engaged in its own investigation, and has discovered additional evidence of Chapin's fraudulent conduct, as set forth in the concurrently filed McElhone Declaration. Examples of Chapin's improper conduct are set forth below.

1. **Chapin Caused the Debtor to Enter into Junior Loans in Violation of the Bank's Loan Documents**

On or about June 5, 2020, the Debtor entered into a $1 million secured loan transaction with E-Revshare Core, LLC d/b/a Empowerment Capital ("Empowerment"). Chapin did not disclose this loan to the Bank, which is a violation of the Bank's Loan Documents. The Bank later learned that Chapin also caused the Debtor to borrow approximately $3.5 million from MHC Financial Services, Inc. ("MHC"), which further violated the Bank's Loan Documents. The Busey Bank Statements (as defined below) reflect that proceeds of the Bank's Loan were used to repay the improper MHC loan. When confronted with the MHC loan, Chapin falsely claimed to Mr. Alouf that the MHC loan had been paid off the year before with proceeds from the Bank's Loan. Alouf Decl. ¶ 20; McElhone Decl. Ex. 8.

It also appears that Chapin did not advise Empowerment or MHC of the Debtor's Loan with the Bank. In fact, Chapin did not disclose the loans from the Bank or Empowerment to the financing consultant that Chapin had hired to source financing for the Debtor purportedly to repay the MHC loan. Alouf Decl. ¶ 18.

2. **Chapin Submitted a Falsified Debtor 2018 Tax Return When He Applied for the Loan from the Bank**

When the Debtor originally applied for the Loan, Chapin provided to the Bank a copy of

6

MOTION FOR AN ORDER FOR APPOINTMENT OF A CHAPTER 11 TRUSTEE

75117909.5

the Debtor's purported 2018 federal tax return. That return indicates that it was prepared by a Tom Dunn at Numbrstudio Financial Group, LLC ("Numbrstudio"). Mr. Alouf recently contacted the founder of Numbrstudio (Jennifer Li), who confirmed that there is no Tom Dunn affiliated with Numbrstudio, that Numbrstudio does not prepare tax returns (it outsources that work to another firm), and that the return appears to be fraudulent. McElhone Decl. ¶ 26, Ex. 10; Alouf Dec. ¶ 45, Exs. H, I.

### 3. Chapin Falsified Bank Statements Presented to Lenders and Investors

As outlined in the Alouf Affidavit, Empowerment sent Mr. Alouf copies of monthly statements of the Debtor's Bank Deposit Account for the months of April through August 2020, which Empowerment had received from Chapin and which Mr. Alouf later forwarded to the Bank (collectively, the "Chapin Bank Statements"). McElhone Decl. Ex. 7. The Bank and Mr. Alouf compared the Chapin Bank Statements to the actual bank statements for the Bank Deposit Account during the same time period (collectively, the "Busey Bank Statements"). Alouf Decl. ¶¶ 36-37, Exs. E, F; McElhone Decl. ¶¶ 21-22, Exs. 8, 9. They discovered that Chapin had altered the Chapin Bank Statements to reflect numerous large deposits to the Bank Deposit Account from purported customers that do not appear in the actual Busey Bank Statements, the result of which is to substantially inflate the account balances appearing in the Chapin Bank Accounts by hundreds of thousands or millions of dollars, including by over $4.8 million in the June 2020 statement and approximately $1.27 million in the last (August 2020) statement. Chapin provided the falsified Chapin Bank Statements to Empowerment and other creditors and investors. Alouf Decl. ¶ 36.

### 4. Chapin Submitted Fraudulent Borrowing Base Certificates to the Bank

Chapin executed and delivered to the Bank monthly borrowing base certificates and provided related accounts receivable aging reports from March to July 2020 reflecting accounts receivable totaling between $4.7 million to $6 million. McElhone Decl. ¶ 24, Ex. 9. Based on its

Polsinelli LLP
2049 Century Park East, Suite 2900
Los Angeles, CA 90067
310.556.1801

7

Polsinelli LLP
2049 Century Park East, Suite 2900
Los Angeles, CA 90067
310.556.1801

investigation, the Bank determined that the borrowing base certificates and related accounts receivable aging reports are very likely materially inaccurate. For example, the Busey Bank Statements do not reflect any deposits made to the Bank Deposit Account from the purported customers appearing in the borrowing base certificates and related accounts receivable aging reports indicating that the accounts receivable are real. McElhone Decl. ¶ 24. In fact, the monthly statements for the Bank Deposit Account dating from the inception of the Loan in July 2019 do not reflect any deposits from any of the purported customers appearing in the borrowing base certificates and related accounts receivable aging reports the Bank received from Chapin since that date. McElhone Decl. ¶ 24. Additionally, Mr. Alouf has had access to see the transactions occurring in the Debtor's recently opened Chase account (referenced below), and no deposits from purported customers have been made to that account in the past few months. Alouf Decl. ¶ 40. The lack of customer deposits in these accounts is extremely troubling, as the Debtor's accounts receivable were to be the primary collateral for the Bank's Loan. McElhone Decl. ¶ 24.

> ### 5. Chapin Created a False Financial Statement, Which Did Not Reflect Outstanding Loans from the Bank or Empowerment

In late July 2020, to prepare for a call with Empowerment, Mr. Alouf requested a copy of the Debtor's financial statements. Chapin sent to Mr. Alouf a copy of a Debtor balance sheet dated as of June 30, 2020, which Mr. Alouf discovered did not reflect the outstanding loans from either the Bank or Empowerment, nor the outstanding $3.5 million loan from MHC or other loans from individuals to the company. Alouf Dec., ¶13, Ex. A.

> ### 6. Chapin Made Misrepresentations to Lenders and Investors When He Sought Loans and Investments

Chapin made misrepresentations to lenders and investors that the Debtor had a Chief Financial Officer that could provide them financial information regarding the Debtor. First, Chapin misrepresented that a Jennifer Li served as the Debtor's CFO. Alouf Decl., ¶ 11. In fact, Ms. Li did

8

75117909.5

little work for the Debtor and was never granted access to the Debtor's financial records. Alouf Decl., ¶ 11. Chapin even went so far as to create a fake Debtor email account for Ms. Li and then impersonated her by sending emails to creditors or investors under her name attaching purported financial information of the Debtor. Alouf Decl., ¶ 11. This is consistent with Chapin's actions in impersonating an attorney from the Armstrong Teasdale LLP law firm in connection with raising equity for the Debtor. Alouf Decl., ¶ 32. Chapin also falsely claimed that the Bank's security interests were limited, purportedly supported by a legal option from Fenwick & West, who had actually never worked on any matter related to the Bank. Alouf Decl. ¶ 13. Also, as noted above, Chapin misrepresented in the Debtor's purported 2018 tax return provided to the Bank that it had been prepared by Numbrstudio, which Ms. Li had founded. Ms. Li has confirmed that the tax return was not prepared by Numbrstudio and is likely fraudulent. Alouf Decl., ¶ 45. Ex. I.

Chapin also misrepresented to Empowerment that Mr. Alouf was the Debtor's CFO. In fact, at the time Chapin had hired Mr. Alouf solely as a consultant on a trial basis to review and comment on the proposed Empowerment transaction. Alouf Decl., ¶ 8. After Empowerment contacted Mr. Alouf for financial information under the belief that Mr. Alouf was the CFO, Chapin caused the Debtor to retain Mr. Alouf as CFO, but Chapin never provided Mr. Alouf access to the Debtor's financial records so that Mr. Alouf could do his job or provide financial information to Empowerment or other parties. Alouf Decl., ¶¶ 10-11, 17.

### 7. The Bank Advances Were Not Used for Debtor Business Operations, and Instead Were Diverted

The Bank's Loan Documents require that the proceeds of the Loan be used solely for the Debtor's business operations. McElhone Decl., Ex. 2. However, a former director and shareholder of the Debtor, Brett Bureck, acknowledged to Mr. Alouf that he, either directly or through his company, Taco Corporation of America ("<u>TCA</u>"), had received approximately $4.6 million from the Debtor over the preceding year, apparently in repayment of his equity interests in the company,

<br>9

<br>

Case 20-30819    Doc# 19    Filed: 10/20/20    Entered: 10/20/20 17:40:32    Page 16 of 32

Polsinelli LLP
2049 Century Park East, Suite 2900
Los Angeles, CA 90067
310.556.1801

75117909.5

which consisted of transfers made immediately after the Bank made advances under the Loan which were deposited into the Bank Deposit Account. McElhone Decl. ¶ 25; Alouf Decl. ¶ 40. The Busey Bank Statements reflect numerous large transfers to Mr. Bureck and TCA. McElhone Decl. ¶ 25. The advances by the Bank were intended to fund the Debtor's business operations, not to be diverted to an unknown individual and his company on account of his purported equity interest in the company.

### 8. Chapin Caused the Debtor to Open an Unauthorized Bank Account at Chase to Help Conceal His Fraud

Approximately three months ago, Chapin caused the Debtor to open a separate account at Chase, which was not permitted under the Bank's Loan Documents. Mr. Alouf was able to gain limited access to the activity in the Chase account, and there is no indication that customer deposits have been made to that account. While reviewing activity in the Chase account, Mr. Alouf discovered that a $600,000 deposit was made to the Chase account on September 25, 2020, from TCA. Alouf Decl. ¶ 41. Immediately after that deposit, a $387,000 transfer was made out of the Chase account to a personal Chapin account at Chase. Alouf Decl. ¶ 41. When Mr. Alouf raised this transfer with Chapin, he claimed that he needed $250,000 in order to return an equity investment from a Tom Peters in connection with a recent equity raise (as described below). Alouf Decl. ¶ 41. Chapin claimed he couldn't make the transfer out of the Debtor's Chase account because the withdrawal would require two signatures. Alouf Decl. ¶ 41. Chapin claimed he needed the extra $100,000 to repay an additional amount owed to MHC. Alouf Decl. ¶ 41.

As part of Chapin agreeing to step down (as described below), Mr. Alouf contacted Chase to have signature authority transferred over to him. However, after Chapin reinstated himself as CEO, he contacted Chase to reassert control over the account. Similar action took place in connection with the payroll account. Alouf Decl. ¶ 42.

75117909.5

Polsinelli LLP
2049 Century Park East, Suite 2900
Los Angeles, CA 90067
310.556.1801

**9. Debtor Raised $1 Million Equity Based on Chapin's False Certification that the Debtor Was Not in Default on Its Borrowing Obligations**

In mid-September, the Debtor sought to raise $1.5 million in equity of which about $1 million was already funded. Alouf Decl. ¶ 22. In connection with the equity raise, Chapin was required to certify on behalf of the Debtor that it was not in default on any loans. Alouf Decl. ¶ 22. At the time, however, the loans from the Bank, Empowerment and MHC were all in default. Alouf Decl. ¶ 22. In fact, at the time MHC had made a demand for payment and the Debtor and MHC had entered into a standstill agreement. Alouf Decl. ¶ 18.

**10. Chapin Manipulated the Debtor's Corporate Governance to Facilitate His Deception**

On or about September 26, 2020, Directors of the Debtor, Scott Sklar and Nick Floppe, another shareholder, Pano Anthos, and the Debtor's then-counsel, Scott Olson of Vedder Price, advised Chapin that he needed to resign as CEO and Director of the Debtor given the developing situation with Chapin's improper actions, and that an interim officer should be appointed in his place. Alouf Decl. ¶ 29. They demanded that Chapin immediately relinquish all financial oversite of the business and provide Mr. Alouf full access to the Debtor's books and records, tax returns, bank accounts, payroll system, etc. Alouf Decl. ¶ 29. Chapin agreed with the plan and committed to provide this access. On September 29, 2020, Mr. Olson prepared the corporate documents to effectuate the management changes pursuant to which Chapin resigned as CEO and Director, Mr. Alouf was appointed as Interim President (in addition to being CFO), and Mr. Anthos was appointed as Board Chairman, which Chapin signed. Alouf Decl. ¶ 30, Ex. B.

The following day, September 30, 2020, Chapin reversed course and announced that he intended, as majority shareholder, to reinstate himself as CEO and sole Director of the Debtor. Alouf Decl. ¶ 33. In the Board resolutions he prepared, he stated, among other things, that Mr. Alouf had resigned, which was not the case. Alouf Decl. ¶ 33. Moreover, it is not at all clear whether

11

Polsinelli LLP
2049 Century Park East, Suite 2900
Los Angeles, CA 90067
310.556.1801

Chapin is in fact the majority shareholder of the Debtor and has the ability to take this action. Various documents previously provided by Chapin since 2018 have all shown that he holds about 25% of the equity. Alouf Decl. ¶ 33.

As a result of Chapin's actions, Debtor's counsel withdrew time and time again. Vedder Price withdrew as the Debtor's counsel on the same day. Alouf Decl. ¶ 34. The Debtor's predecessor counsel, Fenwick & West, had also resigned based on concerns regarding Chapin's conduct. Alouf Decl. ¶ 26. Likewise, the Debtor's successor counsel, Wilson Sonsini Goodrich & Rosati, refused to proceed with its representation of the Debtor, presumably due to their concerns regarding Chapin's conduct. Alouf Decl. ¶ 43.

## III.    ARGUMENT

### A.    The Standard for Appointment of a Chapter 11 Trustee

While there is generally a presumption that the debtor is entitled to remain in possession during a chapter 11 case, section 1104(a) of the Bankruptcy Code provides for – and in some cases mandates – the appointment of a trustee under certain facts and circumstances. *See, e.g., In re Intercat, Inc.*, 247 B.R. 911, 920 (Bankr. S.D. Ga. 2000) ("[I]n the appropriate case, the appointment of a trustee is a power which is critical for the Court to exercise in order to preserve the integrity of the bankruptcy process and to insure that the interest of creditors are served"). The Supreme Court has explained that "[t]he willingness of courts to leave debtors in possession 'is premised upon an assurance that officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee." *Commodity Future Trading Comm'n v. Weintraub*, 471 U.S. 343, 335 (1985) (quoting *Wolf v. Weinstein*, 372 U.S. 633, 649-652 (1963)). When there is doubt that the debtor's management can fulfill this responsibility, the appointment of a trustee is the appropriate remedy. See, e.g., *In re Morpheus Lights, Inc.*, 228 B.R. 449, 454 (Bankr. N.D. Cal. 1998) ("the proper remedy of a creditor when confronted with a debtor in possession who declines to perform fiduciary duties [...] is to petition for appointment of a trustee").

MOTION FOR AN ORDER FOR APPOINTMENT OF A CHAPTER 11 TRUSTEE

75117909.5

Case: 20-30819    Doc# 19    Filed: 10/20/20    Entered: 10/20/20 17:40:32    Page 19 of 32

Section 1104(a)(1) provides that the Court shall order the appointment of a chapter 11 trustee "for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case." 11 U.S.C. § 1104(a)(1). Once the Court has found that "cause" exists under section 1104, the Bankruptcy Code mandates the appointment of a trustee. *See In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 525-26 (Bankr. E.D.N.Y. 1989) ("Once a court has found that cause exists under § 1104(a)(1); there is no discretion; an independent trustee must be appointed"). The list of examples in section 1104(a)(1) is not exhaustive and, in practice, the standard for appointment of a trustee for cause is quite flexible, resting "within the discretion of the court [based on] various interests involved in the bankruptcy proceeding." *In re Bellevue Place Assocs.*, 171 B.R. 615, 623 (Bankr. N.D. Ill. 1994). The Court may consider both pre-petition and post-petition activity. *See In re Oklahoma Refining Co.*, 838 F.2d 1133, 1136 (10th Cir. 1988) (citing *In re Main Line Motors*, 9 B.R. 782 (Bankr. E.D. Pa 1981)). "Cause" is frequently found to exist where there is "gross mismanagement and incompetence." *In re Sharon Steel*, 86 B.R. 455, 458 (Bankr. W.D. Pa. 1988) (finding appointment of a trustee mandatory due to, among other reasons, conclusive evidence of self-dealing and failure to adequately track month-to-month profits); *see In re Oklahoma Refining Co.*, 838 F.2d 1133, 1136 (10th Cir. 1988) ("failure to keep adequate records and make prompt and complete reports justifies appointment of a trustee").

Additionally, subsection (a)(2) allows the court to appoint a trustee, in the absence of cause, "if such appointment is in the interests of creditors, any equity holders, and other interests of the estate". 11 U.S.C. § 1104 (a)(2). The court has "particularly wide discretion" to order such appointment, even absent wrongdoing or mismanagement. *In re Bellevue Place Assocs.*, 171 B.R. 615, 623 (Bankr. N.D. Ill. 1994). In determining which option is in the best interest of creditors, the court evaluates the prospects for collection and payment of the claims of creditors. *In re Corona Care Convalescent Corp.*, 527 B.R. 379, 384 (Bankr. C.D. Cal. 2015). The traditional factors used to determine whether appointment of a chapter 11 trustee is in the best interest of the creditors include: (1) the debtor's trustworthiness; (2) the debtor-in-possession's past and present performance and prospects for the debtor's rehabilitation; (3) confidence—or lack thereof—of the

13

Polsinelli LLP
2049 Century Park East, Suite 2900
Los Angeles, CA 90067
310.556.1801

75117909.5

business community and of creditors in present management; and (4) benefits derived by the appointment of a trustee to balance against the costs of appointment. *See, e.g., In re Colorado-Ute Elec. Ass'n, Inc.*, 120 B.R. 164, 176 (Bankr. D. Colo. 1990); *In re Evans*, 48 B.R. 46 (Bankr. W.D. Tex. 1985) (applying substantially similar factors).

A debtor-in-possession in a chapter 11 case has the same fiduciary duties to its creditors as a trustee appointed by the court. *In re Cochise College Park, Inc.*, 703 F.2d 1139 (9th Cir. 1983). Importantly, the debtor-in-possession owes fiduciary duties of both care and loyalty to all of its creditors and equity holders. *In re Bellevue Place Assocs.*, 171 B.R. 615 (Bankr. N.D. Ill. 1994). The duty of loyalty includes the duty not to engage in self-dealing, meaning that the debtor-in-possession may not act solely in its self-interest to the exclusion of the other interests which the debtor-in-possession has the fiduciary duty to protect. *In re Bellevue Place Assoc.*, 171 B.R. 615, 623 (Bankr. N.D. Ill. 1994). Failure to disclose material and relevant information to the Court and creditors requires appointment of a trustee. *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989) ("[o]pen, honest and straightforward disclosure to the Court and creditors is intrinsic to the entire reorganization process and begins on day one, with the filing of the Chapter 11 petition").

**B.** **There Is Abundant "Cause" Within the Meaning of 11 U.S.C. § 1104(a)(1) to Appoint a Chapter 11 Trustee**

Chapin, the Debtor's self-proclaimed Chief Executive Officer and Director caused Debtor to conduct itself in a dishonest and fraudulent manner. As noted above, and in the McElhone and Alouf Declarations, Chapin caused the Debtor to:

- Grant the Bank's pledged collateral to other lenders by representing that the Bank was not secured by all assets of the Debtor, in violation of the Loan Documents;

- Facilitate those junior loans and other investments by altering Busey Bank Statements to inflate the Bank Deposit Account balance by millions of dollars, create financial statements that did not reflect the Debtor's true liabilities, impersonate the Debtor's CFO and purported outside counsel to correspond with

Polsinelli LLP
2049 Century Park East, Suite 2900
Los Angeles, CA 90067
310.556.1801

14

Polsinelli LLP
2049 Century Park East, Suite 2900
Los Angeles, CA 90067
310.556.1801

investors, and submit a tax return purportedly signed by a bookkeeping firm, without its knowledge;

- Allow state tax liens and judgments to be recorded against the Debtor and its assets in violation of the Loan Documents;

- Provide materially inaccurate borrowing base certificates and accounts receivable aging reports reflecting improbable and inflated receivables totaling between $4.7 million to $6 million;

- Maintain an operating account at another lending institution (Chase) in violation of the Loan Documents, and facilitate the transfer of funds to Chapin's personal account from that institution;

- Divert Loan proceeds, which were not used to fund the Debtor's business operations and instead service junior debt and transfer millions to a company affiliated with a former director and shareholder of the Debtor in apparent repayment of his equity interests in the Debtor, immediately after the Bank funded advances under the Loan;

- Sustain an equity raise for the Debtor, despite being unable to meet the certification disclosure to its investors that the Debtor was not in default of any loans; and

- Refuse to honor an agreement with Board members to effectuate management changes to remove Chapin as CEO and Director, and allow Chapin to reinstate himself in control, despite documentary evidence showing that he is not the majority shareholder of the Debtor.

Debtor actively concealed from the Bank the various liens filed against its collateral in violation of the Loan Documents, leaving the Bank to discover Debtor's bad conduct on its own. In violation of the BLA and Security Agreement, Chapin allowed the Bank's collateral to be compromised when he caused the Debtor to grant other lenders security interests in the same collateral and further imperiled the Bank's secured position when the Debtor allowed a judgment lien and tax liens to be recorded against the Debtor and in favor of a judgment creditor and the California Employment Development Department, respectively. These defaults are, of course, in

15

Polsinelli LLP
2049 Century Park East, Suite 2900
Los Angeles, CA 90067
310.556.1801

addition to the over $5 million owed to the Bank, with respect to which the entire balance is now due and owing.

Meanwhile, Chapin had the audacity to have Debtor engage in what was initially a $1 million secured loan transaction with Empowerment, despite the Bank's lien on all of the Debtor's assets, in violation of the Loan Documents. Chapin lied to the Debtor's CFO, Mr. Alouf, about the extent and scope of the Bank's lien on the Debtor's assets and did not disclose that at the time the Empowerment loan was funded on June 5, 2020, the Debtor had other creditors, including MHC with significant debt outstanding as of that date. Upon learning of Chapin's falsehoods, Mr. Alouf attempted to renegotiate the Empowerment loan to reflect that loan as unsecured, or provide for a second lien behind the Bank. In August, unbeknownst to Mr. Alouf or the Board at the time, Chapin caused the Debtor to borrow an additional $2 million from the Bank, bringing the total outstanding Bank loan to $5 million.

Chapin continued to seek additional funding from lenders, including UMB Bank and MidFirst Bank. Mr. Alouf then learned that this proposed loan was intended to pay off another outstanding loan to MHC of approximately $3.5 million, which was in default. When confronted, Chapin said the MHC loan had been paid off with funds from the Bank's Loan. During this time, the Debtor was campaigning to raise equity, despite the Debtor's default under its loans to the Bank, Empowerment and MHC, all in an elaborate Ponzi scheme.

Importantly, the Debtor actively concealed these unauthorized additional liens on the Bank's collateral, leaving the Bank to discover Chapin's bad acts after he had tapped into the Bank's outstanding line of credit, and used the Loan proceeds to make payment to, among others, a former director and shareholder of the Debtor, instead of for its dedicated use for the Debtor's business operations. Other funds were improperly held at Chase, and Chapin transferred funds from this account to himself, among others.

Chapin facilitated this ruse by creating fake financial and other documents for the Debtor to support false representations to lenders and investors. Chapin impersonated counsel and the

16

75117909.5

Debtor's CFO to provide legitimacy to his fraud. When confronted by Mr. Alouf and the Board, Chapin sought to remove disruptive Board members and fired Mr. Alouf as CFO. To date, the Debtor has failed to disclose, and still fails to disclose, various documents reasonably requested by Mr. Alouf, and Chapin has refused to step down in his managerial roles with the Debtor. It is imperative a trustee be appointed to preserve, investigate and pursue claims and causes of action against Chapin and others that received the benefit of Mr. Chapin's fraud. The Bank is concerned that without a trustee, the loss of documentary evidence, including e-mail may be ongoing.

The Debtor's dishonest and misleading statements and actions, including its well-documented financial mismanagement and gross incompetence supports appointment of a Chapter 11 Trustee. *See In re Deena Packaging Industries, Inc.*, 29 B.R. 705, 706-708 (Bankr. S.D.N.Y.) (cause to appoint a trustee existed where debtor failed to include relevant financial data in the petition and schedules, raising "questions of dishonest conduct"). In sum, the Debtor's behavior rises to a level of gross financial mismanagement and/or incompetence, which requires appointment of a trustee.

### C. Appointment of a Trustee under 11 U.S.C. § 1104(a)(2) is in the Interests of Creditors and the Estate

#### 1. The Debtor Cannot Be Trusted to Carry Out Its Fiduciary Duties

All of these facts above give ample reason for the Bank's grave concern as to Chapin's ability to carry out his fiduciary duties to the estate. Among other duties, a debtor's fiduciary duty of loyalty to the estate requires it to refrain from self-dealing and treat all parties fairly. *See, e.g., In re Chochise College Park, Inc.*, 703 F.2d 1339, 1357 (9th Cir. 1983); *Commodity Future Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985).

On September 25, 2020, a $600,000 deposit was made by TCA, which is affiliated with a former shareholder and director, Brett Brueck. Alouf Decl. ¶ 40. Mr. Brueck advised that the deposit was a secured loan made at Chapin's request and he admitted that he had received approximately $4.6 million from the Debtor, apparently in repayment of his equity interests in the company. Alouf Decl. ¶ 40; McElhone Decl. ¶ 25. Chapin also received a portion of the Debtor's

Polsinelli LLP
2049 Century Park East, Suite 2900
Los Angeles, CA 90067
310.556.1801

17

75117909.5

Polsinelli LLP
2049 Century Park East, Suite 2900
Los Angeles, CA 90067
310.556.1801

1   largesse, receiving a $387,000 transfer out of the Chase account in his personal account. Alouf

2   Decl. ¶ 41. The Busey Bank Statements also reflect numerous large transfers to Chapin over time.

3   The existence of insider creditors having received preferential treatment on their substantial claims

4   all point towards a serious conflict of interest and potential self-dealing and suggests that the Debtor

5   cannot meet its fiduciary duties.

6        An independent trustee must be appointed where, as here, a debtor and its

7   management/insiders suffer from material conflicts of interest and cannot be trusted to properly

8   and fairly distribute the assets of the estate. *See, e.g., In re Oklahoma Refining Co.*, 838 F.2d 1133

9   (10th Cir. 1988) ("a history of transactions with companies affiliated with the debtor company is

10  sufficient cause for the appointment of a trustee where the best interests of the creditors require").

11       **2.**     **The Bank Lacks Confidence in the Debtor**

12       The Debtor, Chapin and the Bank have already been embroiled in contentious litigation

13  regarding the Loan. After the Bank issued the Default Letter, the Bank filed suit against the Debtor

14  and Chapin. The Debtor sought to forestall the Bank's attempt to appoint a receiver, even though

15  such appointment is authorized upon the occurrence of an Event of Default under the Loan

16  Documents. Rationalizing its decision to appoint a trustee, the Eastern District of California

17  Bankruptcy Court noted that "the warring parties were so enmeshed in intertwined disputes that

18  further progress towards a confirmable plan of reorganization required that a neutral party be at the

19  helm." *In re Johnson*, 397 B.R. 486, 488 (Bankr. E.D. Cal. 2008).

20       Furthermore, the Bank is not the only creditor to have lost trust in the Debtor. Counsel for

21  Empowerment has informed the Bank's counsel that they support the appointment of a trustee.

22  Counsel for certain defrauded investors has also told the Bank's counsel that they support the

23  trustee appointment. Appointment of a trustee is necessary to provide creditors and investors with

24  the reassurance that a fair and independent fiduciary is finally managing the Debtor. Appointment

25  of a trustee will enable an efficient and equitable resolution of this case for all parties in interest.

26       **D.**     **In the Alternative, Cause Exists to Convert the Case to One Under Chapter 7 of the Bankruptcy Code**

27

28

Pursuant to 11 U.S.C. § 1112, the Court shall, for cause, dismiss or convert to a case under chapter 7, whichever is in the best interests of creditors and the estate. 11 U.S.C. § 1112(b)(1). Motions under this section require a two-step analysis. "First, it must be determined that there is 'cause' to act. Second, once a determination of 'cause' has been made, a choice must be made between conversion and dismissal based on the 'best interests of the creditors and the estate.'" *In re Nelson*, 343 B.R. 671, 675 (B.A.P. 9th Cir. 2006) (quoting *In re Ho*, 274 B.R. 867, 877 (B.A.P. 9th Cir. 2002)). The Bankruptcy Code provides a non-exclusive list of actions that constitute "cause" for conversion or dismissal, including:

> (A)  substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;
>
> (B)  gross mismanagement of the estate; ...
>
> (D)  unauthorized use of cash collateral substantially harmful to 1 or more creditors;

11 U.S.C. § 1112(b)(4).

The Ninth Circuit Bankruptcy Appellate Panel in *In re Consolidated Pioneer Mortgage Entities*, 248 B.R. 368 (9th Cir. B.A.P. 2000) in finding cause addressed those factors and held that they are not exhaustive, but rather that a Court can " . . . consider other factors as they arise, and use its equitable powers to reach an appropriate result in individual cases." Id. at 375. Moreover, it held that the Court must consider the interests of all creditors when contemplating such a ruling. In re Owens, 552 F.3d 958, 961 (9th Cir. 2009), adding that: "The bankruptcy court is given wide discretion to convert a chapter 11 case to chapter 7 for cause", citing *Greenfield Drive Storage Park*, 207 B.R. 913, 916 (9th Cir. BAP 1997). As discussed in further detail below, conversion is appropriate here because the Debtor has engaged in numerous activities which constitute "cause" pursuant to this section.

### 1. There is Evidence of Diminution of the Estate and No Reasonable Likelihood of Rehabilitation as Contemplated in § 1112(b)(4)(A)

Under § 1112(b)(4)(A), cause includes "a substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." With respect to the first element, "[t]here need not be a significant diminution in the estate to satisfy Section 1112(b)[1]."

Polsinelli LLP
2049 Century Park East, Suite 2900
Los Angeles, CA 90067
310.556.1801

MOTION FOR AN ORDER FOR APPOINTMENT OF A CHAPTER 11 TRUSTEE

75117909.5

*In re Mesne*, 509 B.R. 269, 284 (Bankr. C.D. Cal. 2014) (quoting *In re East Coast Airways, Ltd.*, 146 B.R. 325, 336 (Bankr. E.D.N.Y. 1992)). "All that need to be found is that the estate has suffered some diminution in value." *Id.* (quoting *In re East Coast Airways, Ltd.*, 146 B.R. 325, 336 (Bankr. E.D.N.Y. 1992); also citing *In re Kanterman*, 88 B.R. 26, 29 (S.D.N.Y. 1988)).

The Debtor's ongoing improper actions (through Chapin) to operate a Ponzi scheme reflect there is a real danger of diminishing returns to the Bank and other creditors and investors. Chapin has used the proceeds of loans and investments to pay the debt to certain junior creditors without regard to the Bank's senior secured status, as well as make millions of dollars of transfers to a former shareholder and director of the Debtor as well as himself.

The facts and circumstances suggest that there may be no actual business of the Debtor to reorganize, suggesting that conversion of this case to one under Chapter 7 may be preferable to the appointment of a chapter 11 trustee. Whereas the monthly borrowing base certificates and related accounts receivable aging reports provided to the Bank list accounts receivable totaling between $4.7 million to $6 million (suggesting the possibility of an actual business), the Busey Bank Statements for the Bank Deposit Account dating from the inception of the Loan in July 2019 do not show any deposits from any of the purported customers appearing in the borrowing base certificates and the related accounts receivable aging reports. McElhone Decl. ¶ 24. No one, not even the Debtor's former CFO, Mr. Alouf, has seen the Debtor's books and records. And, this case was filed without any financial disclosures. Thus, in the absence of any evidence from the Debtor itself that there is an actual business to operate, conversion of this case to one under Chapter 7 should be ordered by the Court.

### 2. There is Evidence of Gross Mismanagement of the Estate

Under § 1112(b)(4)(B), "cause" to dismiss or convert also exists where there has been gross mismanagement of the estate. This inquiry typically focuses on how the debtor (or his agents) have managed the estate's assets or business during the pendency of the Chapter 11 proceeding and how they have reported and handled postpetition income and expenses derived from the assets/business. *See In re Grego* (citing *In re McTiernan*, 519 B.R. 860, 866–67 (Bankr. D. Wyo. 2014); *In re Fall*,

Polsinelli LLP
2049 Century Park East, Suite 2900
Los Angeles, CA 90067
310.556.1801

20

Case 20-30819    Doc# 19    Filed: 10/20/20    Entered: 10/20/20 17:40:32    Page 27 of 32

75117909.5

405 B.R. 863, 868 (Bankr. N.D. Ohio 2009) aff'd sub nom. *Fall v. Farmers & Merchants State Bank*, 2009 WL 974538 (N.D. Ohio Apr. 9, 2009); *In re Prods. Int'l Co.*, 395 B.R. 101, 111 (Bankr. D. Ariz. 2008)).

It is well established that a debtor in possession owes a fiduciary duty to its creditors. *See In re Count Liberty, LLC*, 370 B.R. 259, 275–76 (Bankr. C.D. Cal. 2007); *In re Thompson*, 110 F.3d 47, 50 (9th Cir. 1997) (stating that chapter 11 debtors in possession "were fiduciaries of their own estate owing a duty of care and loyalty to the estate's creditors"), *cert. denied*, 522 U.S. 966 (1997); *In re Woodson*, 839 F.2d 610, 614 (9th Cir.1988) ("As debtor in possession he is the trustee of his own estate and therefore stands in a fiduciary relationship to his creditors" (footnote omitted)); *In re Devers*, 759 F.2d 751, 754 (9th Cir. 1985) ("A debtor-in-possession has the duty to protect and conserve property in his possession for the benefit of creditors"). By filing its voluntary Chapter 11 petition and assuming the role of a debtor-in-possession, the Debtor assumed a fiduciary duty to the Bank, its other creditors, and the Court.

A debtor-in-possession also has a duty to keep the court and its creditors informed regarding the status and condition of its business. *See In re Domiano*, 442 B.R. 97, 105 (M.D. Penn. 2010); *Petit v. New England Mortg. Services, Inc.*, 182 B.R. 64, 69 (D. Me. 1995). Failure of a debtor to properly report income and expenses constitutes evidence of "gross mismanagement" under § 1112(b)(4)(B). *In re Halal 4 U LLC*, 2010 WL 3810860, *4 (Bankr. S.D.N.Y. 2010); *see also Kingsway Capital Partners, LLC v. Sosa*, 549 B.R. 897, 901 (N.D. Cal. 2016) (finding, among other reasons, that a debtor's failure to provide "any credible evidence of [its] business's expenses or income" provided a basis for dismissal under 11 U.S.C. 1112(b)(1)).

Viewing its troublesome pre-petition behavior, Debtor has not satisfied its fiduciary duties to the Bank and its other creditors. As discussed above, Chapin consistently refused to give the Debtor's own CFO access the Debtor's books and records. The only financial documents that have been produced by the Debtor are the Bank's Loan Documents showing its primary secured status on the Debtor's assets. Otherwise, the Debtor has produced falsified bank and financial statements, including a balance sheet that does not reflect the Debtor's outstanding liabilities, leaving a host of creditors in its wake. As set forth previously, it is even unclear whether Chapin is properly directing

21

the Debtor as purported majority shareholder, in light of documents reflecting that Chapin holds only 25% of the Debtor's equity. Alouf Decl. ¶33. The petition does not reflect under what authority Chapin filed this case on behalf of the Debtor. The possibility that the filing was an *ultra vires* act and the uncertainty as to whom is properly in control of the Debtor give all the more reason to have a trustee appointed.

### 3. The Debtor Has Misappropriated the Bank's Cash Collateral

Cause for conversion also includes the unauthorized use of cash collateral substantially harmful to 1 or more creditors. Here, the Debtor has misappropriated the Bank's cash collateral by making unknown and unauthorized transfers of the Bank's Loan proceeds to various persons and entities not in connection with the operation of the Debtor's business as set forth above. Significantly, the Debtor improperly used the Bank's cash collateral when Chapin caused $4.6 million of Debtor funds to be transferred to a former director and shareholder of the Debtor, Brett Bureck, directly or through his company, TCA, apparently in repayment of his equity interests in the company. McElhone Decl. ¶ 25; Alouf Decl. ¶ 40. The Busey Bank Statements reflect numerous large transfers to Mr. Bureck and TCA. McElhone Decl. ¶ 25. The Busey Bank Statements also reflect numerous transfers to Chapin himself. Finally, the Debtor maintained an account at Chase, and not with the Bank, in contravention of the BLA, which requires that the Debtor maintain the Bank as its primary depository and cash management services institution. McElhone Decl. ¶ 14, Ex. 5. The Debtor used the Chase account to keep the Bank's cash collateral outside of the control of the Bank in violation of the Loan Documents. There is every reason to believe that Chapin will cause the Debtor to continue to misappropriate the Bank's cash collateral during the pendency of this case.

Polsinelli LLP
2049 Century Park East, Suite 2900
Los Angeles, CA 90067
310.556.1801

75117909.5

**IV.    CONCLUSION**

For the reasons described above, the Bank respectfully requests that this Court (A) grant the Motion, (B) appoint a chapter 11 trustee for the benefit of all creditors and parties in interest, or (C) in the alternative, convert the case to one under Chapter 7 of the Bankruptcy Code, and (D) grant such further relief as may be equitable and just.

Dated: October 20, 2020                                Respectfully submitted,

**POLSINELLI LLP**


By: _/s/ *Randye B. Soref*_
        Randye B. Soref
        Tanya Behnam

*Attorneys for Creditor Busey Bank*

Polsinelli LLP
2049 Century Park East, Suite 2900
Los Angeles, CA 90067
310.556.1801

23

# CERTIFICATE OF SERVICE

I, the undersigned, declare that I am employed in the County of Los Angeles. I am over the age of 18 years and not a party to the within entitled action. My business address is 2049 Century Park East, Suite 2900, Los Angeles, California 90067.

A true and correct copy of the foregoing document entitled (specify): **CREDITOR BUSEY BANK'S MOTION FOR THE APPOINTMENT OF A CHAPTER 11 TRUSTEE OR, IN THE ALTERNATIVE, FOR CONVERSION OF CASE TO CHAPTER 7 OF THE BANKRUPTCY CODE; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:
Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On October 20, 2020, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

&boxtimes;     Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**: On October 20, 2020, I served the document by placing a true copy thereof in a sealed envelope with postage thereon fully prepaid, in the United States Mail at Los Angeles, California, to all parties entitled to receive regularly mailed notices, addressed as follows:

&boxtimes;     Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL**
Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on October 20, 2020, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

VIA OVERNIGHT MAIL
Hon. Dennis Montali
U.S. Bankruptcy Judge
Mail Box 36099
450 Golden Gate Avenue
San Francisco, CA 94102

&boxtimes;     Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| October 20, 2020 | Cindy Cripe | *(signature)* |
| *Date* | *Printed Name* | *Signature* |

# ATTACHMENT TO SERVICE LIST

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**

Jared A. Day on behalf of U.S. Trustee Office of the U.S. Trustee / SF jared.a.day@usdoj.gov
ankey.to@usdoj.gov

Mark K. Slater on behalf of Debtor Benja Incorporated mslater@slaterhersey.com
amoses@slaterhersey.com

Office of the U.S. Trustee / SF USTPRegion17.SF.ECF@usdoj.gov

Paul E. Manasian on behalf of Debtor Benja Incorporated manasian@mrlawsf.com
gradl@mrlawsf.com

Randye B. Soref on behalf of Creditor Busey Bank rsoref@polsinelli.com

Tanya Behnam on behalf of Creditor Busey Bank tbehnam@polsinelli.com
tanyabehnam@gmail.com

2. **SERVED BY UNITED STATES MAIL**:

| Debtor | Debtor's Attorney | |
|---|---|---|
| Benja Incorporated | Paul E. Manasian, Esq. | |
| 26 Cragmont Avenue | Law Offices of Paul E. Manasian | |
| San Francisco, CA 94116 | 1310 65th Street | |
| | Emeryville, CA 94608 | |

3. **SERVED BY EMAIL**

*Jared.A.Day@usdoj.gov*
Jared A. Day
U.S. Department of Justice
Office of the U.S. Trustee, Region 17
300 Booth Street, Suite 3009
Reno, NV 89509

75152510.1   Case: 20-30819   Doc# 19   Filed: 10/20/20   Entered: 10/20/20 17:40:32   Page 32 of 32