1  RANDYE B. SOREF (State Bar No. 99146)
   rsoref@polsinelli.com
2  TANYA BEHNAM (State Bar No. 322593)
   tbehnam@polsinelli.com
3  Polsinelli LLP
   2049 Century Park East, Suite 2900
4  Los Angeles, CA 90067
   Telephone: (310) 556-1801
5  Facsimile:  (310) 556-1802
6
   JERRY L. SWITZER, JR. (pro hac vice pending)
7  jswitzer@polsinelli.com
   JEAN SOH (pro hac vice pending)
8  jsoh@polsinelli.com
   Polsinelli PC
9  150 North Riverside Plaza, Suite 3000
   Chicago, IL 60606
10 Telephone:   (312) 819-1900
   Facsimile:    (312) 819-1910
11 *Attorneys for Busey Bank*

12            **UNITED STATES BANKRUPTCY COURT**

13            **NORTHERN DISTRICT OF CALIFORNIA**

14            **SAN FRANCISCO DIVISION**

15

16 **In re:**                              | Case No. 20-30819

17 **BENJA INCORPORATED,**                 | Chapter 11

18          Debtor.                        | Judge Dennis Montali

19

20                                         | **DECLARATION OF MICHAEL
21                                         | MCELHONE IN SUPPORT OF
                                           | CREDITOR BUSEY BANK'S MOTION
22                                         | FOR THE APPOINTMENT OF A
                                           | CHAPTER 11 TRUSTEE OR, IN THE
23                                         | ALTERNATIVE, FOR CONVERSION
                                           | OF CASE TO CHAPTER 7 OF THE
24                                         | BANKRUPTCY CODE
25
26
27
28

Polsinelli LLP
2049 Century Park East, Suite 2900
Los Angeles, CA 90067
310.556.1801

## DECLARATION OF MICHAEL MCELHONE

Pursuant to 28 U.S.C. § 1764, Michael McElhone declares as follows under the penalty of perjury:

1. Except as otherwise indicated herein, I have personal knowledge of the matters set forth herein and, if called as a witness, would testify competently thereto.

2. I am a resident of the State of Missouri. I am over the age of twenty-one and have never been convicted of a felony or crime of moral turpitude.

3. I make this Declaration in support of the Motion for the Appointment of a Chapter 11 Trustee or, in the Alternative, for Conversion of Case to Chapter 7 of the Bankruptcy Code (the "Motion") filed by Busey Bank (the "Bank") in this action. Unless otherwise defined herein, capitalized terms have the meanings assigned to such terms in the Motion.

4. I am a Vice President and Special Assets Officer of the Bank. I am authorized to submit this Declaration on behalf of the Bank.

5. Each of the documents referred to herein (a) was made at or near the time specified herein; (b) was made by, or based on information transmitted from, a person with knowledge of the facts and matters set forth in each such document; (c) is kept by the Bank in the ordinary course of its regularly conducted business; and/or (d) was made as a part of the regularly conducted business of the Bank.

6. On July 16, 2019, Benja Incorporated ("Benja") executed a Promissory Note in favor of the Bank dated as of July 16, 2019, in the principal amount of $1,000,000.00, as replaced and superseded by a Promissory Note dated as of February 28, 2020, executed by Benja in favor of the Bank in the original principal amount of $3,000,000.00, as further replaced and superseded by a Promissory Note dated as of August 20, 2020, executed by Benja in favor of the Bank in the original principal amount of $5,000,000.00 (collectively, the "Note") evidencing a loan (the

"Loan") in the same amounts. A true and accurate copy of Note is attached hereto and incorporated herein by reference as **Exhibit 1**.

7.      The Loan is also evidenced by a Business Loan Agreement (Asset Based) dated July 16, 2019, executed by Benja and the Bank, as amended by a Modification to Business Loan Agreement (Asset Based) dated as of February 28, 2020, executed by Benja in favor of Bank in the original principal amount of $3,000,000.00, as replaced and superseded by a Business Loan Agreement (Asset Based) dated as of August 20, 2020, executed by Benja in favor of Bank in the original principal amount of $5,000,000.00 (collectively, the "**BLA**").  A true and accurate copy of the BLA is attached hereto and incorporated herein by reference as **Exhibit 2**.

8.      The Note is secured by a Commercial Security Agreement dated July 16, 2019 (the "Security Agreement") executed by Benja in favor of the Bank. Under the Security Agreement, and as security for the Loan, Benja granted to the Bank a security interest in the Collateral (as defined and as more particularly described therein), including, but not limited to, all of Benja's inventory, equipment, accounts, chattel paper, instruments, letters of credit, documents, deposit accounts, investment property, money, other rights to payment and performance, and general intangibles, and all proceeds, additions, substitutions, and replacements thereof. A true and accurate copy of the Security Agreement is attached hereto and incorporated herein by reference as **Exhibit 3**.

9.      To perfect the security interest arising under the Security Agreement, the Bank caused a UCC Financing Statement to be filed on July 19, 2019, with the Delaware Department of State as File Number 20195005348 (the "UCC Filing" and, together with the Security Agreement, the "Security Documents"), with respect to all assets and property of Benja as described therein. A true and accurate copy of the UCC Filing is attached hereto and incorporated herein by reference as **Exhibit 4**.

75119574.2

10.     Benja maintains a deposit account number XXXXX4766 at the Bank that is and has been used by Benja in connection its business. (The foregoing account, and any other accounts of Benja at the Bank, are collectively referred to herein as the "Bank Deposit Account"). The Bank funded the Loan by depositing monies directly into the Bank Deposit Account. The Bank Deposit Account and the funds on deposit therein are part of the Collateral securing the Loan.

11.     The Note is also secured by a Commercial Guaranty executed by Andrew J. Chapin ("Chapin") on or about July 16, 2019 (the "Chapin Guaranty"). Chapin is the founder of Benja, and at all relevant times (except as noted below) has acted as a Director and Chief Executive Officer of Benja.

12.     The Note is also secured by a Commercial Guaranty executed by Thomas L. Goode III ("Goode") on or about July 16, 2019 (the "Goode Guaranty" and, together with the Chapin Guaranty, the "Guarantees").

13.     The Note, BLA, Guarantees, Security Agreement, the UCC Filing, and all other agreements, instruments, and documents evidencing, securing, or otherwise relating to the Loan are collectively referred to herein as the "Loan Documents." Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to such terms in the Loan Documents.

14.     Pursuant to a letter dated September 29, 2020 (the "Default Letter"), the Bank notified Benja and the Guarantors of various Events of Default under the Loan Documents and reserved all rights and remedies on account thereof under the Loan Documents, at law or in equity. As reflected in the Default Letter, the outstanding Events of Default include, without limitation, that Benja violated the BLA and Security Agreement in the following respects:

Case: 20-30819     Doc# 20     Filed: 10/20/20     Entered: 10/20/20 17:46:10     Page 4 of 159
75119574.2

a.      Benja borrowed money from First Corporate Solutions and E-Revshare Core, LLC, and in connection therewith granted security interests to those lenders in assets of Benja.

b.      Benja allowed certain state tax liens in favor of the California Employment Development Department to be recorded against Benja and its assets on or about January 14, 2020, and March 9, 2020.

c.      Benja allowed a judgment in favor of Peter A. Manderino to be recorded against Benja and its assets on or about October 30, 2018.

d.      Additionally, as reflected in the Default Letter, Goode contends that he did not execute and/or is not bound by the Goode Guaranty.  Although the Bank disputes this contention, if it is ultimately determined that Goode did not execute and/or is not bound by the Goode Guaranty, Benja violated the BLA, which required the execution of the Goode Guaranty as a condition to the Bank making the Loan.[1]

e.      Finally, as reflected in the Default Letter, Benja violated the BLA by maintaining an operating account at JPMorgan Chase Bank, and not with the Bank, as the BLA requires that Benja maintain the Bank as its primary depository and cash management services institution.

A true and accurate copy of the Default Letter is attached hereto and incorporated herein by reference as **Exhibit 5**.

15.      As of October 1, 2020, the total balance due under the Note, exclusive of applicable late charges, default interest, and costs, expenses and attorneys' fees incurred by Busey Bank, is as follows:

---

[1] The Bank is currently investigating the issues raised by Goode with respect to the execution and enforceability of the Goode Guaranty, including Goode's belief that Chapin forged his signature to the Goode Guaranty.

| | |
|---|---|
| Principal: | $4,999,999.50 |
| Regular Interest: | <u>$26,656.53</u> |
| **Total:** | **$5,026,656.03** |

Additionally, interest continues to accrue under the Note from and after October 1, 2020.

16.     Following the issuance of the Default Letter, the Bank learned (and continues to learn) troubling information regarding the actions of Chapin on behalf of Benja.

17.     Starting in September 2020, I and other officers of the Bank had communications with the Chief Financial Officer of the Benja, Joe Alouf. Mr. Alouf alerted us to his concerns regarding potential fraud committed by Chapin against the Bank, other lenders and investors. Some of our conversations included Benja's then-outside counsel, Scott Olson of Vedder Price LLP, who expressed similar concerns regarding Chapin's conduct.

18.     We were advised that on September 28, 2020, Chapin had agreed to resign his positions as CEO and Director of Benja, and that Mr. Alouf would be appointed as Interim President (in addition to being CFO) and a shareholder, Pano Anthos, would be appointed as Board Chairman. However, we learned the following day, September 29, 2020, that Chapin had reversed course and announced that he intended, as majority shareholder, to reinstate himself as CEO and sole Director of Benja. As a result of Chapin's actions, Vedder Price withdrew as Benja's counsel.

19.     On October 1, 2020, the Bank received an email from Chapin announcing the foregoing management changes and that neither Mr. Anthos nor Mr. Alouf were authorized to speak for Benja. A true and correct copy of Chapin's email is attached hereto as **<u>Exhibit 6</u>**.

20.     During one of my conversations with Mr. Alouf, he advised me that he had received from another lender copies of monthly statements of Benja's Deposit Account at the Bank for the months of April through August 2020, which that lender had received from Chapin.

Case: 20-30819    Doc# 20    Filed: 10/20/20    Entered: 10/20/20 17:46:10    Page 6 of 159

75119574.2

Mr. Alouf forwarded the monthly statements to me, true and correct copies of which are attached hereto as **Exhibit 7** (collectively, the "Chapin Bank Statements").

21.    I then pulled copies of the actual monthly statements for the Bank Deposit Account for the months of April through August 2020, true and correct copies of which are attached hereto as **Exhibit 8** (collectively, the "Busey Bank Statements"). I sent the Busey Bank Statements to Mr. Alouf so that we could compare them to the Chapin Bank Statements I had received from him.

22.    Upon our review of both sets of bank statements, Mr. Alouf and I determined that Chapin had altered the Chapin Bank Statements to reflect numerous large deposits to the Bank account from purported customers that do not appear in the actual Busey Bank Statements, the result of which is to substantially inflate the account balances appearing in the Chapin Bank Accounts. Below are the month-end account balances as reflected in each set of bank statements:

|  | Account Balance in Busey Bank Statements | Account Balance in Chapin Bank Statements |
|---|---|---|
| April 30, 2020 | $195,406.71 | $1,371,516.57 |
| May 30, 2020 | $3,016.22 | $227,186.20 |
| June 30, 2020 | $17,983.54- | $4,804,007.63 |
| July 31, 2020 | $27,538.59- | $2,313,294.48 |
| August 31, 2020 | $1,974.80 | $1,272,044.92 |

23.    Thus, it appears that Chapin overstated the balance of the Bank account in the Chapin Bank Statements, which Mr. Alouf indicated that Chapin had provided to the other lender, creditors and investors, by hundreds of thousands or millions of dollars, including by over $4.8 million in the June 2020 statement and approximately $1.27 million in the last (August 2020) statement.

24.     Additionally, Chapin executed and delivered to the Bank monthly borrowing base certificates from March to July 2020 and provided related accounts receivable aging reports reflecting accounts receivable totaling between $4.7 million to $6 million, true and correct copies of which are attached hereto as **Exhibit 9**.  Based on my ongoing investigation, I have determined that the borrowing base certificates and related accounts receivable aging reports are very likely materially inaccurate.  For example, the attached Busey Bank Statements do not reflect any deposits made to the Bank Deposit Account from the purported customers appearing in the borrowing base certificates and related accounts receivable aging reports indicating that the accounts receivable are real.  In fact, I have reviewed the monthly statements for the Bank Deposit Account dating from the inception of the Loan in July 2019, and there are no deposits from any of the purported customers appearing in the borrowing base certificates and the related accounts receivable aging reports the Bank received from Chapin since that date.  This is extremely troubling to the Bank, as Benja's accounts receivable were to be the primary collateral for the Bank's Loan.

25.     I also learned from Mr. Alouf that he had conversations with a Brett Bureck, who apparently is a former director and shareholder of Benja, who acknowledged to Mr. Alouf that he, either directly or through his company, Taco Corporation of America ("TCA"), had received approximately $4.6 million from Benja over the preceding year, apparently in repayment of his equity interests in Benja.  I have reviewed the monthly statements of the Bank Deposit Account since the inception of the Loan, which reflect millions of dollars of transfers to Mr. Bureck and TCA.  Most of these transfers were made immediately after the Bank made advances under the Loan which were deposited into the Bank Deposit Account.  The advances by the Bank were intended to fund Benja's business operations, not to be diverted to an unknown individual and his company on account of his purported equity interest in Benja.

75119574.2

26.     Further, the Bank (through counsel) recently provided to Mr. Alouf a copy of Benja's 2018 federal tax return that Chapin had provided to the Bank when he originally applied for the Loan.  A true and correct copy of the tax return is attached hereto as **Exhibit 10**.  The tax return indicates that it was prepared by a Tom Dunn at Numbrstudio Financial Group, LLC ("Numbrstudio").  Mr. Alouf contacted the principal of Numbrstudio, who confirmed that there is no Tom Dunn affiliated with Numbrstudio, that Numbrstudio does not prepare tax returns (it outsources that work to another firm), and that the return appears to be fraudulent.

27.     The Bank continues to investigate what other documents and information provided by Chapin on behalf of Benja in connection with the origination of the Loan, and thereafter, are fraudulent.

28.     Based on the actions taken by Chapin to defraud the Bank (and other lenders and investors), the Bank believes that it is imperative for this Court to grant the Motion and appoint a trustee for Benja.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 20th day of October, 2020.

*/s/ Michael McElhone*
Michael McElhone

# EXHIBIT 1

00010



*00006706741601086 5#########095507162019*

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $1,000,000.00 | 07-16-2019 | 07-15-2020 | 10865 | 1301 | 7416 | 646 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "*****" has been omitted due to text length limitations.

**Borrower:**  Benja Incorporated
845 Market Street 450A
San Francisco, CA  94103

**Lender:**  BUSEY BANK, AN ILLINOIS BANKING CORPORATION
CREVE COEUR
12300 OLIVE BLVD.
CREVE COEUR, MO  63141

---

**Principal Amount:  $1,000,000.00**  **Date of Note:  July 16, 2019**

**PROMISE TO PAY.**  Benja Incorporated ("Borrower") promises to pay to BUSEY BANK, AN ILLINOIS BANKING CORPORATION ("Lender"), or order, in lawful money of the United States of America, the principal amount of One Million & 00/100 Dollars ($1,000,000.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance.  Interest shall be calculated from the date of each advance until repayment of each advance.

**PAYMENT.**  Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on July 15, 2020.  In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning August 16, 2019, with all subsequent interest payments to be due on the same day of each month after that.  Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any late charges; and then to any unpaid collection costs.  Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**VARIABLE INTEREST RATE.**  The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the one month London interbank offered rate as published in the Money Rates section of the Wall Street Journal (or such other rate that is widely recognized as the successor to the London interbank offered rate, as published by the Wall Street Journal or another comparable service determined by Lender in its sole discretion, for the purpose of displaying the rates at which U.S. Dollars deposits are offered by leading banks in the London interbank deposit market or, if no such widely recognized successor rate exists at such time, such other rate as published by the Wall Street Journal or another comparable service that reflects an alternative index rate designated by Lender in its sole discretion); provided that in no event shall such rate be less than 0.00% (the "Index").  The Index is not necessarily the lowest rate charged by Lender on its loans.  If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower.  Lender will tell Borrower the current Index rate upon Borrower's request.  The interest rate change will not occur more often than each month on anniversary date of note.  Borrower understands that Lender may make loans based on other rates as well.  **The Index currently is 2.379% per annum.**  Interest on the unpaid principal balance of this Note will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 3.000 percentage points over the Index, resulting in an initial rate of 5.379%.  NOTICE:  Under no circumstances will the interest rate on this Note be more than the maximum rate allowed by applicable law.

**INTEREST CALCULATION METHOD.**  Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding.  All interest payable under this Note is computed using this method.  This calculation method results in a higher effective interest rate than the numeric interest rate stated in this Note.

**PREPAYMENT.**  Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law.  Except for the foregoing, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due.  Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest.  Rather, early payments will reduce the principal balance due.  Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language.  If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender.  **All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to:  Chief Credit Officer, Busey Bank, 100 W. University Ave. Champaign, IL  61820.**

**LATE CHARGE.**  If a payment is more than 10 days late, Borrower will be charged **5.000% of the unpaid portion of the regularly scheduled payment or $10.00, whichever is greater.**

**INTEREST AFTER DEFAULT.**  Upon default, including failure to pay upon final maturity, the interest rate on this Note shall be increased by adding an additional 5.000 percentage point margin ("Default Rate Margin").  The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default.  However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

**DEFAULT.**  Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.**  Borrower fails to make any payment when due under this Note.

**Other Defaults.**  Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.**  Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.**  Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false

or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Change In Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**COLLATERAL.** Borrower acknowledges this Note is secured by or may be secured by prior or subsequent security documents notwithstanding that such security is not indicated herein.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses whether or not there is a lawsuit, including attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

**GOVERNING LAW. This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Missouri without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of Missouri.**

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of ST. LOUIS County, State of Missouri.

**DISHONORED ITEM FEE.** Borrower will pay a fee to Lender of $30.00 if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**LINE OF CREDIT.** This Note evidences a revolving line of credit. Advances under this Note may be requested either orally or in writing by Borrower or as provided in this paragraph. Lender may, but need not, require that all oral requests be confirmed in writing. All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office shown above. The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority: **Andrew J. Chapin, President & CEO of Benja Incorporated and such other persons as may be designated in writing by any previously authorized person or persons in accordance with Borrower's resolutions.** Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs. Lender will have no obligation to advance funds under this Note if: (A) Borrower or any guarantor is in default under the terms of this Note or any agreement that Borrower or any guarantor has with Lender, including any agreement made in connection with the signing of this Note; (B) Borrower or any guarantor ceases doing business or is insolvent; (C) any guarantor seeks, claims or otherwise attempts to limit, modify or revoke such guarantor's guarantee of this Note or any other loan with Lender; (D) Borrower has applied funds provided pursuant to this Note for purposes other than those authorized by Lender; or (E) Lender in good faith believes itself insecure.

**SECURITY INTEREST IN DEPOSIT ACCOUNTS.** Borrower grants to Lender a contractual security interest in, and hereby assigns, conveys, delivers, pledges, and transfers to Lender all Borrower's right, title and interest in and to, Borrower's deposit accounts with Lender (whether checking, savings, or some other account), including without limitation all deposit accounts held jointly with someone else and all deposit accounts Borrower may open in the future, including however all IRA and Keogh accounts, and all trust accounts for which the grant of a security interest would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such deposit accounts.

**USA PATRIOT ACT NOTICE.** Lender hereby notifies Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L 107 56 (signed into law October 26, 2001) (the Patriot Act)), it is required to obtain, verify and record information that identifies Borrower, which information includes the name and address of Borrower and other information that will allow Lender to identify Borrower in accordance with the Patriot Act.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or

Case: 20-30819    Doc# 20    Filed: 10/20/20    Entered: 10/20/20 17:46:10    Page 12 of 159

00012

endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

ORAL OR UNEXECUTED AGREEMENTS OR COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT INCLUDING PROMISES TO EXTEND OR RENEW SUCH DEBT ARE NOT ENFORCEABLE, REGARDLESS OF THE LEGAL THEORY UPON WHICH IT IS BASED THAT IS IN ANY WAY RELATED TO THE CREDIT AGREEMENT. TO PROTECT YOU (BORROWER(S)) AND US (CREDITOR) FROM MISUNDERSTANDING OR DISAPPOINTMENT, ANY AGREEMENTS WE REACH COVERING SUCH MATTERS ARE CONTAINED IN THIS WRITING, WHICH IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN US, EXCEPT AS WE MAY LATER AGREE IN WRITING TO MODIFY IT.

JURY WAIVER. Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:

BENJA INCORPORATED

By: _____
     Andrew J. Chapin, President/Secretary of Benja
     Incorporated

Case: 20-30819    Doc# 20    Filed: 10/20/20    Entered: 10/20/20 17:46:10    Page 13 of
159
00013


ORIGINAL



*6706744910865%#########%0955%02282020*

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $3,000,000.00 | 02-28-2020 | 02-27-2021 | 6706744910865 | 130 | | *** | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Benja Incorporated
845 Market Street 450A
San Francisco, CA 94103

**Lender:** BUSEY BANK, AN ILLINOIS BANKING CORPORATION
CREVE COEUR
12300 OLIVE BLVD.
CREVE COEUR, MO 63141

---

**Principal Amount: $3,000,000.00**                    **Date of Note: February 28, 2020**

**PROMISE TO PAY.** Benja Incorporated ("Borrower") promises to pay to BUSEY BANK, AN ILLINOIS BANKING CORPORATION ("Lender"), or order, in lawful money of the United States of America, the principal amount of Three Million & 00/100 Dollars ($3,000,000.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance.

**PAYMENT.** Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on February 27, 2021. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning March 28, 2020, with all subsequent interest payments to be due on the same day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any late charges; and then to any unpaid collection costs. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the one month London interbank offered rate as published in the Money Rates section of the Wall Street Journal (or such other rate that is widely recognized as the successor to the London interbank offered rate, as published by the Wall Street Journal or another comparable service determined by Lender in its sole discretion, for the purpose of displaying the rates at which U.S. Dollars deposits are offered by leading banks in the London interbank deposit market or, if no such widely recognized successor rate exists at such time, such other rate as published by the Wall Street Journal or another comparable service that reflects an alternative index rate designated by Lender in its sole discretion); provided that in no event shall such rate be less than 0.00% (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each month on anniversary date of note. Borrower understands that Lender may make loans based on other rates as well. **The Index currently is 1.647% per annum.** Interest on the unpaid principal balance of this Note will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 4.000 percentage points over the Index (the "Margin"), resulting in an initial rate of 5.647%. If Lender determines, in its sole discretion, that the Index has become unavailable or unreliable, either temporarily, indefinitely, or permanently, during the term of this Note, Lender may amend this Note by designating a substantially similar substitute index. Lender may also amend and adjust the Margin to accompany the substitute index. The change to the Margin may be a positive or negative value, or zero. In making these amendments, Lender may take into consideration any then-prevailing market convention for selecting a substitute index and margin for the specific Index that is unavailable or unreliable. Such an amendment to the terms of this Note will become effective and bind Borrower 10 business days after Lender gives written notice to Borrower without any action or consent of the Borrower. NOTICE: Under no circumstances will the interest rate on this Note be more than the maximum rate allowed by applicable law.

**INTEREST CALCULATION METHOD.** Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method. This calculation method results in a higher effective interest rate than the numeric interest rate stated in this Note.

**PREPAYMENT.** Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. **All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Chief Credit Officer, Busey Bank, 100 W. University Ave. Champaign, IL 61820.**

**LATE CHARGE.** If a payment is more than 10 days late, Borrower will be charged **5.000% of the unpaid portion of the regularly scheduled payment or $10.00, whichever is greater.**

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, the interest rate on this Note shall be increased by adding an additional 5.000 percentage point margin ("Default Rate Margin"). The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Change in Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses whether or not there is a lawsuit, including attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

**GOVERNING LAW. This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Missouri without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of Missouri.**

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of ST. LOUIS County, State of Missouri.

**DISHONORED ITEM FEE.** Borrower will pay a fee to Lender of $30.00 if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the debt against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**COLLATERAL.** Borrower acknowledges this Note is secured by or may be secured by prior or subsequent security documents notwithstanding that such security is not indicated herein.

**LINE OF CREDIT.** This Note evidences a revolving line of credit. Advances under this Note may be requested either orally or in writing by Borrower or as provided in this paragraph. Lender may, but need not, require that all oral requests be confirmed in writing. All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office shown above. The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority: **Andrew J. Chapin, President/Secretary of Benja Incorporated, and such other persons as may be designated in writing by any previously authorized person or persons in accordance with Borrower's resolutions.** Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs. Lender will have no obligation to advance funds under this Note if: (A) Borrower or any guarantor is in default under the terms of this Note or any agreement that Borrower or any guarantor has with Lender, including any agreement made in connection with the signing of this Note; (B) Borrower or any guarantor ceases doing business or is insolvent; (C) any guarantor seeks, claims or otherwise attempts to limit, modify or revoke such guarantor's guarantee of this Note or any other loan with Lender; (D) Borrower has applied funds provided pursuant to this Note for purposes other than those authorized by Lender; or (E) Lender in good faith believes itself insecure.

**SECURITY INTEREST IN DEPOSIT ACCOUNTS.** Borrower grants to Lender a contractual security interest in, and hereby assigns, conveys, delivers, pledges, and transfers to Lender all Borrower's right, title and interest in and to, Borrower's deposit accounts with Lender (whether checking, savings, or some other account), including without limitation all deposit accounts held jointly with someone else and all deposit accounts Borrower may open in the future, excluding however all IRA and Keogh accounts, and all trust accounts for which the grant of a security interest would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on this Note against any and all such deposit accounts.

**USA PATRIOT ACT NOTICE.** Lender hereby notifies Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L 107 56) (signed into law October 26, 2001) (the Patriot Act)), it is required to obtain, verify and record information that identifies Borrower, which information includes the name and address of Borrower and other information that will allow Lender to identify Borrower in accordance with the Patriot Act.

**PRIOR NOTE.** This Note represents a renewal, extension and modification of that Promissory Note dated July 16, 2019 of Borrower payable to Lender in the maximum principal amount of $1,000,000.00 (the "Prior Note"). This Note does not constitute a novation, payment and reborrowing, or termination of any of Borrower's obligations under the Prior Note and Borrower's obligations under the Prior Note are in all respects continuing (as renewed, extended and modified by this Note).

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

**ORAL OR UNEXECUTED AGREEMENTS OR COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT INCLUDING PROMISES TO EXTEND OR RENEW SUCH DEBT ARE NOT ENFORCEABLE, REGARDLESS OF THE LEGAL THEORY UPON WHICH IT IS BASED THAT IS IN ANY WAY RELATED TO THE CREDIT AGREEMENT. TO PROTECT YOU (BORROWER(S)) AND US (CREDITOR) FROM MISUNDERSTANDING OR DISAPPOINTMENT, ANY AGREEMENTS WE REACH COVERING SUCH MATTERS ARE CONTAINED IN THIS WRITING, WHICH IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN US, EXCEPT AS WE MAY LATER AGREE IN WRITING TO MODIFY IT.**

**JURY WAIVER.** Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.

**PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.**

**BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.**

**BORROWER:**

BENJA INCORPORATED

By: _____
Andrew J. Chapin, President/Secretary of Benja Incorporated

LaserPro, Ver. 19.4.0.030  Copr. Finastra USA Corporation 1997, 2020.  All Rights Reserved.  - MO  C:\CFIWIN\CFI\LPL\D20.FC  TR-95379  PR-771

Case: 20-30819    Doc# 20    Filed: 10/20/20    Entered: 10/20/20 17:46:10    Page 16 of 159

00016



*6706744910865%#########%0955%08202020*

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $5,000,000.00 | 08-20-2020 | 02-27-2021 | 6706744910865 | 130 | | *** | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Benja Incorporated
845 Market Street 450A
San Francisco, CA 94103

**Lender:** BUSEY BANK, AN ILLINOIS BANKING CORPORATION
CLAYTON
175 CARONDELET PLAZA
CLAYTON, MO 63105

**Principal Amount: $5,000,000.00** **Date of Note: August 20, 2020**

**PROMISE TO PAY. Benja Incorporated ("Borrower") promises to pay to BUSEY BANK, AN ILLINOIS BANKING CORPORATION ("Lender"), or order, in lawful money of the United States of America, the principal amount of Five Million & 00/100 Dollars ($5,000,000.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance.**

**PAYMENT. Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on February 27, 2021. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning August 28, 2020, with all subsequent interest payments to be due on the same day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any late charges; and then to any unpaid collection costs. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.**

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the rate of interest specified as the London Interbank offered rate for a one-month period in the "Money Rates" section of The Wall Street Journal or its successors or another comparable service determined by Lender in its sole discretion (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each month on the same day as the date of this note. Borrower understands that Lender may make loans based on other rates as well. **The Index currently is 0.152% per annum.** Interest on the unpaid principal balance of this Note will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 4.000 percentage points over the Index (the "Margin"), adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 4.152%. Notwithstanding anything herein to the contrary, in the event that Lender, in its sole judgment, determines that (a) the Index is permanently or indefinitely unavailable or unascertainable, or the Index administrator or its successor has ceased or will cease publishing the Index, permanently or indefinitely, (b) the Index is determined to be no longer representative by the regulatory supervisor of the Index administrator or its successor, (c) the Index can no longer be lawfully relied upon in contracts of this nature by one or both of the parties, (d) the Index does not accurately or fairly reflect the cost of making or maintaining the type of loans under this Note, or (e) U.S. dollar-denominated credit facilities are being executed or amended, as applicable, to incorporate or adopt a new benchmark interest rate to replace the Index, then, at the election of Lender, all references to the Index herein will instead be to a replacement index determined by Lender in its sole judgment, including any adjustment to the replacement index to reflect a different credit spread, term or other mathematical adjustment deemed necessary by Lender in its sole judgment. Lender will provide reasonable notice to Borrower of such replacement rate and the date on which it will become effective. In no event shall the Index or any replacement index be less than 0.00%. Lender's determination of the Index or any replacement rate shall be conclusive, absent manifest error.
NOTICE: Under no circumstances will the interest rate on this Note be less than 3.500% per annum or more than the maximum rate allowed by applicable law.

**INTEREST CALCULATION METHOD. Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method. This calculation method results in a higher effective interest rate than the numeric interest rate stated in this Note.**

**PREPAYMENT.** Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. **All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Chief Credit Officer, Busey Bank, 100 W. University Ave. Champaign, IL 61820.**

**LATE CHARGE.** If a payment is more than 10 days late, Borrower will be charged **5.000% of the unpaid portion of the regularly scheduled payment or $10.00, whichever is greater.**

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, the interest rate on this Note shall be increased by adding an additional 5.000 percentage point margin ("Default Rate Margin"). The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

# PROMISSORY NOTE
## (Continued)

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Change in Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses whether or not there is a lawsuit, including attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

**GOVERNING LAW. This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Missouri without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of Missouri.**

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of ST. LOUIS County, State of Missouri.

**DISHONORED ITEM FEE.** Borrower will pay a fee to Lender of $30.00 if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the debt against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**COLLATERAL.** Borrower acknowledges this Note is secured by or may be secured by prior or subsequent security documents notwithstanding that such security is not indicated herein.

**LINE OF CREDIT.** This Note evidences a revolving line of credit. Advances under this Note may be requested either orally or in writing by Borrower or as provided in this paragraph. Lender may, but need not, require that all oral requests be confirmed in writing. All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office shown above. The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority: Andrew J. Chapin, President/Secretary of Benja Incorporated and such other persons as may be designated in writing by any previously authorized person or persons in accordance with Borrower's resolutions. Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs. Lender will have no obligation to advance funds under this Note if: (A) Borrower or any guarantor is in default under the terms of this Note or any agreement that Borrower or any guarantor has with Lender, including any agreement made in connection with the signing of this Note; (B) Borrower or any guarantor ceases doing business or is insolvent; (C) any guarantor seeks, claims or otherwise attempts to limit, modify or revoke such guarantor's guarantee of this Note or any other loan with Lender; (D) Borrower has applied funds provided pursuant to this Note for purposes other than those authorized by Lender; or (E) Lender in good faith believes itself insecure.

**SECURITY INTEREST IN DEPOSIT ACCOUNTS.** Borrower grants to Lender a contractual security interest in, and hereby assigns, conveys, delivers, pledges, and transfers to Lender all Borrower's right, title and interest in and to, Borrower's deposit accounts with Lender (whether checking, savings, or some other account), including without limitation all deposit accounts held jointly with someone else and all deposit accounts Borrower may open in the future, excluding however all IRA and Keogh accounts, and all trust accounts for which the grant of a security interest would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on this Note against any and all such deposit accounts.

**USA PATRIOT ACT NOTICE,** Lender hereby notifies Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L 107 56 (signed into law October 26, 2001) (the Patriot Act)), it is required to obtain, verify and record information that identifies Borrower, which information includes the name and address of Borrower and other information that will allow Lender to identify Borrower in accordance with the Patriot Act.

**PRIOR NOTE.** This Note is an renewal, extension and/or modification of that Promissory Note dated February 28, 2020 of Borrower

# PROMISSORY NOTE
## (Continued)

payable to Lender in the maximum principal amount of $3,000,000.00 (the "Prior Note"). This Note does not constitute a novation, payment and reborrowing, or termination of any of Borrower's obligations under the Prior Note and Borrower's obligations under the Prior Note are in all respects continuing (as renewed, extended and modified by this Note).

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

**ORAL OR UNEXECUTED AGREEMENTS OR COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT INCLUDING PROMISES TO EXTEND OR RENEW SUCH DEBT ARE NOT ENFORCEABLE, REGARDLESS OF THE LEGAL THEORY UPON WHICH IT IS BASED THAT IS IN ANY WAY RELATED TO THE CREDIT AGREEMENT. TO PROTECT YOU (BORROWER(S)) AND US (CREDITOR) FROM MISUNDERSTANDING OR DISAPPOINTMENT, ANY AGREEMENTS WE REACH COVERING SUCH MATTERS ARE CONTAINED IN THIS WRITING, WHICH IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN US, EXCEPT AS WE MAY LATER AGREE IN WRITING TO MODIFY IT.**

**JURY WAIVER.** Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.

**PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.**

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

**BORROWER:**

**BENJA INCORPORATED**

By: _____
    Andrew J. Chapin, President/Secretary of Benja
    Incorporated

LaserPro, Ver 20.2.20.003 Copr Finastra USA Corporation 1997, 2020. All Rights Reserved. - MO C:\CFI\PA\CFI\LPL\D20.FC TR-87331 PR-771

# EXHIBIT 2

00020





*00006706741601086S#########007007162019*

# BUSINESS LOAN AGREEMENT (ASSET BASED)

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-------------|---------|---------|----------|
| $1,000,000.00 | 07-16-2019 | 07-15-2020 | 10865 | 1301 | 7416 | 646 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** Benja Incorporated
845 Market Street 450A
San Francisco, CA 94103

**Lender:** BUSEY BANK, AN ILLINOIS BANKING CORPORATION
CREVE COEUR
12300 OLIVE BLVD.
CREVE COEUR, MO 63141

**THIS BUSINESS LOAN AGREEMENT (ASSET BASED)** dated July 16, 2019, is made and executed between Benja Incorporated ("Borrower") and BUSEY BANK, AN ILLINOIS BANKING CORPORATION ("Lender") on the following terms and conditions. Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement. Borrower understands and agrees that: (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement; (B) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and (C) all such Loans shall be and remain subject to the terms and conditions of this Agreement.

**TERM.** This Agreement shall be effective as of July 16, 2019, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until such time as the parties may agree in writing to terminate this Agreement.

**ADVANCE AUTHORITY.** The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority: **Andrew J. Chapin, President & CEO of Benja Incorporated** and such other persons as may be designated in writing by any previously authorized person or persons in accordance with Borrower's resolutions.

**LINE OF CREDIT.** Lender agrees to make Advances to Borrower from time to time from the date of this Agreement to the Expiration Date, provided the aggregate amount of such Advances outstanding at any time does not exceed the Borrowing Base. Within the foregoing limits, Borrower may borrow, partially or wholly prepay, and reborrow under this Agreement as follows:

**Conditions Precedent to Each Advance.** Lender's obligation to make any Advance to or for the account of Borrower under this Agreement is subject to the following conditions precedent, with all documents, instruments, opinions, reports, and other items required under this Agreement to be in form and substance satisfactory to Lender:

(1) Lender shall have received evidence that this Agreement and all Related Documents have been duly authorized, executed, and delivered by Borrower to Lender.

(2) Lender shall have received such opinions of counsel, supplemental opinions, and documents as Lender may request.

(3) The security interests in the Collateral shall have been duly authorized, created, and perfected with first lien priority and shall be in full force and effect.

(4) All guaranties required by Lender for the credit facility(ies) shall have been executed by each Guarantor, delivered to Lender, and be in full force and effect.

(5) Lender, at its option and for its sole benefit, shall have conducted an audit of Borrower's Accounts, books, records, and operations, and Lender shall be satisfied as to their condition.

(6) Borrower shall have paid to Lender all fees, costs, and expenses specified in this Agreement and the Related Documents as are then due and payable.

(7) There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement, and Borrower shall have delivered to Lender the compliance certificate called for in the paragraph below titled "Compliance Certificate."

**Making Loan Advances.** Advances under this credit facility, as well as directions for payment from Borrower's accounts, may be requested orally or in writing by authorized persons. Lender may, but need not, require that all oral requests be confirmed in writing. Each Advance shall be conclusively deemed to have been made at the request of and for the benefit of Borrower when (1) when credited to any deposit account of Borrower maintained with Lender or (2) when advanced in accordance with the instructions of an authorized person. Lender, at its option, may set a cutoff time, after which all requests for Advances will be treated as having been requested on the next succeeding Business Day.

**Mandatory Loan Repayments.** If at any time the aggregate principal amount of the outstanding Advances shall exceed the applicable Borrowing Base, Borrower, immediately upon written or oral notice from Lender, shall pay to Lender an amount equal to the difference between the outstanding principal balance of the Advances and the Borrowing Base. On the Expiration Date, Borrower shall pay to Lender in full the aggregate unpaid principal amount of all Advances then outstanding and all accrued unpaid interest, together with all other applicable fees, costs, and charges, if any, not yet paid.

**Loan Account.** Lender shall maintain on its books a record of account in which Lender shall make entries for each Advance and such other debits and credits as shall be appropriate in connection with the credit facility. Lender shall provide Borrower with periodic statements of Borrower's account, which statements shall be considered to be correct and conclusively binding on Borrower unless Borrower notifies Lender to the contrary within thirty (30) days after Borrower's receipt of any such statement which Borrower deems to be incorrect.

**COLLATERAL.** To secure payment of the Primary Credit Facility and performance of all other Loans, obligations and duties owed by Borrower to Lender, Borrower (and others, if required) shall grant to Lender Security Interests in such property and assets as Lender may require. Lender's Security Interests in the Collateral shall be continuing liens and shall include the proceeds and products of the Collateral, including without

limitation the proceeds of any insurance. With respect to the Collateral, Borrower agrees and represents and warrants to Lender:

**Perfection of Security Interests.** Borrower agrees to execute all documents perfecting Lender's Security Interest and to take whatever actions are requested by Lender to perfect and continue Lender's Security Interests in the Collateral. Upon request of Lender, Borrower will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Borrower will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. Contemporaneous with the execution of this Agreement, Borrower will execute one or more UCC financing statements and any similar statements as may be required by applicable law, and Lender will file such financing statements and all such similar statements in the appropriate location or locations. Borrower hereby appoints Lender as its irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect or to continue any Security Interest. Lender may at any time, and without further authorization from Borrower, file a carbon, photograph, facsimile, or other reproduction of any financing statement for use as a financing statement. Borrower will reimburse Lender for all expenses for the perfection, termination, and the continuation of the perfection of Lender's security interest in the Collateral. Borrower promptly will notify Lender before any change in Borrower's name including any change to the assumed business names of Borrower. Borrower also promptly will notify Lender before any change in Borrower's Social Security Number or Employer Identification Number. Borrower further agrees to notify Lender in writing prior to any change in address or location of Borrower's principal governance office or should Borrower merge or consolidate with any other entity.

**Collateral Records.** Borrower does now, and at all times hereafter shall, keep correct and accurate records of the Collateral, all of which records shall be available to Lender or Lender's representative upon demand for inspection and copying at any reasonable time. With respect to the Accounts, Borrower agrees to keep and maintain such records as Lender may require, including without limitation information concerning Eligible Accounts and Account balances and agings. Records related to Accounts (Receivables) are or will be located at Borrower's address as identified in this Agreement. The above is an accurate and complete list of all locations at which Borrower keeps or maintains business records concerning Borrower's collateral.

**Collateral Schedules.** Concurrently with the execution and delivery of this Agreement, Borrower shall execute and deliver to Lender schedules of Accounts and schedules of Eligible Accounts in form and substance satisfactory to the Lender. Thereafter supplemental schedules shall be delivered according to the following schedule: With respect to Eligible Accounts, schedules shall be delivered 15 days after each month end.

**Representations and Warranties Concerning Accounts.** With respect to the Accounts, Borrower represents and warrants to Lender: (1) Each Account represented by Borrower to be an Eligible Account for purposes of this Agreement conforms to the requirements of the definition of an Eligible Account; (2) All Account information listed on schedules delivered to Lender will be true and correct, subject to immaterial variance; and (3) Lender, its assigns, or agents shall have the right at any time and at Borrower's expense to inspect, examine, and audit Borrower's records and to confirm with Account Debtors the accuracy of such Accounts.

**REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

**Organization.** Borrower is a corporation for profit which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of Delaware. Borrower is duly authorized to transact business in all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business. Specifically, Borrower is, and at all times shall be, duly qualified as a foreign corporation in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Borrower has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Borrower maintains an office at 845 Market Street 450A, San Francisco, CA 94103. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's state of organization or any change in Borrower's name. Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

**Assumed Business Names.** Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business: **None.**

**Authorization.** Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) Borrower's articles of incorporation or organization, or bylaws, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

**Financial Information.** Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

**Legal Effect.** This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

**Hazardous Substances.** Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and

ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, and Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**Compliance with Laws.** Borrower has complied in all material respects with all laws, orders, regulations, fees, decrees and ordinances affecting to any extent or in any manner it or any aspect of its business. There are no existing or, to Borrower's knowledge, proposed laws, orders, regulations, rules, decrees or ordinances of such a nature as could be expected to materially adversely affect the continued conduct of its business in the manner presently being carried on and operated.

**Permits.** Borrower possesses all material permits, licenses, registrations, consents, certificates, authorizations, orders and approvals required under applicable law in connection with the ownership and operation of its business. All such permits have been legally and validly obtained and are in full force and effect, no suspension or cancellation of such permit is pending or has been threatened, and there is no fact, event or condition which would cause any such permit not to be renewed upon expiration, except where failure to maintain any such permit could not reasonably be expected to have a material adverse effect on Borrower's financial condition.

**Business Loan.** The Advances, including interest rate, fees and charges as contemplated hereby, (a) are business loans within the purview of 815 ILCS 205/4(1)(c), as amended from time to time, (b) are an exempted transaction under the Truth in Lending Act, 15 U.S.C. 1601 et seq., as amended from time to time, and (c) do not, and when disbursed will not, violate the provisions of the Illinois usury laws, any consumer credit laws or the usury laws of any state which may have jurisdiction over this transaction, Borrower or any Collateral.

**Accuracy of Information.** No information provided to Lender by or on behalf of Borrower or any Guarantor contains any untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary in order to make the statements contained therein, in light of the circumstances under which they were made, not misleading. There is no material fact known to Borrower or any Guarantor which has not been disclosed in writing to Lender, which has or, insofar as a Borrower or any Guarantor can reasonably foresee, is likely to have a material adverse effect on the financial condition of Borrower or any Guarantor. No representation or warranty made by Borrower or any Guarantor set forth herein or in any Related Document, or in any schedule hereto or thereto, or in any supplement to any schedule contains or will contain any untrue statement of a material fact, or omits to state any material fact, necessary in order to make the statement therein, in light of the circumstances in which it was made, not misleading.

**Anti-Corruption Laws and Sanctions.** Borrower, its subsidiaries and their respective officers and employees and, to the knowledge of Borrower, its directors and agents, are in compliance in all material respects with (1) all laws, rules, and regulations of any jurisdiction applicable to Borrower or its affiliates from time to time concerning or relating to bribery or corruption (collectively, "Anti-Corruption Laws") and (2) applicable economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury ("OFAC") or the U.S. Department of State or (b) the United Nations Security Council, the European Union, any European Union member state or Her Majesty's Treasury of the United Kingdom (collectively, "Sanctions"). None of (1) Borrower, any subsidiary of Borrower or to the knowledge of Borrower or such subsidiary any of their respective directors, officers or employees, or (2) to the knowledge of Borrower, any agent of Borrower or any subsidiary of Borrower that will act in any capacity in connection with or benefit from the credit facility established hereby, is (a) any person listed in any Sanctions-related list of designated persons maintained by OFAC, the U.S. Department of State, the United Nations Security Council, the European Union or any EU member state, (b) any person operating, organized or resident in a country or territory which is itself the subject or target of any Sanctions or (c) any person owned or controlled by any such person or persons described in the foregoing clauses (a) or (b). No Advance or use of proceeds of the Loan will violate any Anti-Corruption Law or applicable Sanctions.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with the following:

**Additional Requirements.** As soon as available, but in no event later than one hundred and twenty (120) days after the end of each fiscal year, Borrower's balance sheet and income statement for the year ended to be provided in form satisfactory to Lender.

As soon as available, but in no event later than one hundred and twenty (120) days after the end of each calendar year, Borrower(s)' Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender.

As soon as available, but in no event later than thirty (30) days after the end of each month end, Borrower(s)' accounts receivable aging and borrowing base certificate to be provided in form satisfactory to Lender when there is a principal balance.

As soon as available, but in no event later than one hundred and twenty (120) days after the end of each calendar year, Guarantor(s)' Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender.

As soon as available, but in no event later than thirty (30) days after the end of each calendar year, Guarantor(s)' personal financial statement to be provided in form satisfactory to Lender.

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.**  Furnish such additional information and statements, as Lender may request from time to time.

**Insurance.**  Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender.  Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days prior written notice to Lender.  Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person.  In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.**  Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following:  (1)  the name of the insurer;  (2)  the risks insured;  (3)  the amount of the policy;  (4)  the properties insured;  (5)  the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and  (6)  the expiration date of the policy.  In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral.  The cost of such appraisal shall be paid by Borrower.

**Guaranties.**  Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loans in favor of Lender, executed by the guarantors named below, on Lender's forms, and in the amounts and under the conditions set forth in those guaranties.

| Names of Guarantors | Amounts |
|---|---|
| Andrew J. Chapin | Unlimited |
| Thomas L. Goode III | Unlimited |

**Other Agreements.**  Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.**  Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.**  Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits.  Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as  (1)  the legality of the same shall be contested in good faith by appropriate proceedings, and  (2)  Borrower shall have established on Borrower's books adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with GAAP.

**Performance.**  Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender.  Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.**  Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.**  Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Compliance with Governmental Requirements.**  Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act.  Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized.  Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Inspection.**  Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records.  If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Compliance Certificates.**  Unless waived in writing by Lender, provide Lender within one hundred twenty (120) days after the end of each fiscal year, with a certificate executed by Borrower's chief financial officer, or other officer or person acceptable to Lender, certifying that the representations and warranties set forth in this Agreement are true and correct as of the date of the certificate and further certifying that, as of the date of the certificate, no Event of Default exists under this Agreement.

**Environmental Compliance and Reports.**  Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property

Case: 20-30819   Doc# 20   Filed: 10/20/20   Entered: 10/20/20 17:46:10   Page 24 of
159

00024

owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**Primary Depository.** Maintain Lender as its primary depository and cash management services financial institution for Borrower.

**Expenses.** Pay: (1) all reasonable out-of-pocket expenses incurred by Lender (including the reasonable fees, charges and disbursements of counsel), in connection with the documentation or administration of the credit facilities provided for herein, and any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated); and (2) all out-of-pocket expenses incurred by Lender (including the fees, charges and disbursements of any counsel for Lender) in connection with the enforcement or protection of its rights in connection with this Agreement and the other Related Documents. The provisions of this section of the Agreement shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Indemnification.** Indemnify and defend Lender and each director, officer, employee, agent and advisor of Lender (Lender and each such person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all claims, losses, liabilities, damages, penalties and expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), and shall indemnify, defend and hold harmless each Indemnitee from all fees and time charges and disbursements for attorneys, incurred by any Indemnitee or asserted against any Indemnitee by any third party or by Borrower or any Guarantor arising out of, in connection with, or as a result of: (1) the execution or delivery of this Agreement, any other Related Document or any document contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby; (2) any Advance or the use or proposed use of the proceeds therefrom; or (3) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by Borrower or any Guarantor, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such claims, losses, liabilities damages, penalties and expenses have been determined by a court of competent jurisdiction to result from the gross negligence or willful misconduct of such Indemnitee. The provisions of this section of the Agreement, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**RECOVERY OF ADDITIONAL COSTS.** If the imposition of or any change in any law, rule, regulation, guideline, or generally accepted accounting principle, or the interpretation or application of any thereof by any court, administrative or governmental authority, or standard-setting organization (including any request or policy not having the force of law) shall impose, modify or make applicable any taxes (except federal, state or local income or franchise taxes imposed on Lender), reserve requirements, capital adequacy requirements or other obligations which would (A) increase the cost to Lender for extending or maintaining the credit facilities to which this Agreement relates, (B) reduce the amounts payable to Lender under this Agreement or the Related Documents, or (C) reduce the rate of return on Lender's capital as a consequence of Lender's obligations with respect to the credit facilities to which this Agreement relates, then Borrower agrees to pay Lender such additional amounts as will compensate Lender therefor, within five (5) days after Lender's written demand for such payment, which demand shall be accompanied by an explanation of such imposition or charge and a calculation in reasonable detail of the additional amounts payable by Borrower, which explanation and calculations shall be conclusive in the absence of manifest error.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**Indebtedness and Liens.** (1) Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (3) sell with recourse any of Borrower's accounts, except to Lender.

**Loans, Acquisitions and Guaranties.** (1) Loan, invest in or advance money or assets to any other person, enterprise or entity, (2) purchase, create or acquire any interest in any other enterprise or entity, or (3) incur any obligation as surety or guarantor other than in the ordinary course of business.

**Agreements.** Enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

**CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (B) Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt; (C) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or (D) any Guarantor seeks, claims or otherwise attempts to limit, modify or

revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or (E) Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Loan.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Change in Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Change in Ownership.** Any change of twenty-five percent (25%) or more in the legal or beneficial ownership of Borrower without Lender's prior written consent.

**EFFECT OF AN EVENT OF DEFAULT.** If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**REST PERIOD.** Borrower must maintain a principal balance of $0.00 for thirty (30) consecutive days during the term of the Note.

**MINIMUM FIXED CHARGE COVERAGE RATIO.** Borrower shall not permit the Fixed Charge Coverage Ratio for any 12-month period ending on the last day of a fiscal year to be less than 1.50 to 1. "Fixed Charge Coverage Ratio" means, for any 12-month period, the ratio of (a) the sum of the following for such period (and without duplication): (i) Borrower's consolidated net income (or loss) for such period (excluding (A) gains (or losses) from the sale or disposition of assets outside the ordinary course of business, (B) gains (or losses) from discontinued operations, and (C) extraordinary gains (or losses)), plus (ii) to the extent deducted in determining such net income: (A) interest expense, (B) net income tax expense and (C) depreciation and amortization, minus (iii) the sum of Borrower's consolidated amounts of the following items for such period (and without duplication): (A) the aggregate capital expenditures (other than capital expenditures financed with the proceeds of purchase money debt or capital leases), plus (B) the aggregate income taxes paid or payable in cash, plus (C) the aggregate dividends, distributions, redemptions or repurchases on or with respect to Borrower's equity in each case paid in cash, plus (D) the aggregate increase in any loans and/or advances made by Borrower to any of Borrower's equity holders or affiliates divided by (b) the aggregate scheduled or required principal and interest payments during such period on Borrower's consolidated capital leases, subordinated debt and other debt.

**CONTINUITY OF OPERATIONS.** Borrower agrees that it shall not (A) engage in any business activities substantially different than those in which Borrower is presently engaged or (B) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change its name, dissolve or transfer or sell Collateral out of the ordinary course of business.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**Governing Law. This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Missouri without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Missouri.**

**Choice of Venue.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of ST. LOUIS County, State of Missouri.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Subsidiaries and Affiliates of Borrower.** To the extent the context of any provisions of this Agreement makes it appropriate, including without limitation any representation, warranty or covenant, the word "Borrower" as used in this Agreement shall include all of Borrower's subsidiaries and affiliates. Notwithstanding the foregoing however, under no circumstances shall this Agreement be construed to require Lender to make any Loan or other financial accommodation to any of Borrower's subsidiaries or affiliates.

**Successors and Assigns.** All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.** Borrower understands and agrees that in extending Loan Advances, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the extension of Loan Advances and delivery to Lender of the Related Documents, shall be continuing in nature, shall be deemed made and redated by Borrower at the time each Loan Advance is made, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Account.** The word "Account" means a trade account, account receivable, other receivable, or other right to payment for goods sold or services rendered owing to Borrower (or to a third party grantor acceptable to Lender).

**Account Debtor.** The words "Account Debtor" mean the person or entity obligated upon an Account.

**Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf under the

terms and conditions of this Agreement.

**Agreement.** The word "Agreement" means this Business Loan Agreement (Asset Based), as this Business Loan Agreement (Asset Based) may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement (Asset Based) from time to time.

**Borrower.** The word "Borrower" means Benja Incorporated and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Borrowing Base.** The words "Borrowing Base" mean, as determined by Lender from time to time, the lesser of (1) **$1,000,000.00** or (2) **80.000%** of the aggregate amount of Eligible Accounts.

**Business Day.** The words "Business Day" mean a day on which commercial banks are open in the State of Missouri.

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise. The word "Collateral" also includes without limitation all collateral described in the Collateral section of this Agreement.

**Eligible Accounts.** The words "Eligible Accounts" mean at any time, all of Borrower's Accounts which contain selling terms and conditions acceptable to Lender. The net amount of any Eligible Account against which Borrower may borrow shall exclude all returns, discounts, credits, and offsets of any nature. Unless otherwise agreed to by Lender in writing, Eligible Accounts do not include:

(1) Accounts with respect to which the Account Debtor is employee or agent of Borrower.

(2) Accounts with respect to which the Account Debtor is a subsidiary of, or affiliated with Borrower or its shareholders, officers, or directors.

(3) Accounts with respect to which goods are placed on consignment, guaranteed sale, or other terms by reason of which the payment by the Account Debtor may be conditional.

(4) Accounts with respect to which the Account Debtor is not a resident of the United States, except to the extent such Accounts are supported by insurance, bonds or other assurances satisfactory to Lender.

(5) Accounts with respect to which Borrower is or may become liable to the Account Debtor for goods sold or services rendered by the Account Debtor to Borrower.

(6) Accounts which are subject to dispute, counterclaim, or setoff.

(7) Accounts with respect to which the goods have not been shipped or delivered, or the services have not been rendered, to the Account Debtor.

(8) Accounts with respect to which Lender, in its sole discretion, deems the creditworthiness or financial condition of the Account Debtor to be unsatisfactory.

(9) Accounts of any Account Debtor who has filed or has had filed against it a petition in bankruptcy or an application for relief under any provision of any state or federal bankruptcy, insolvency, or debtor-in-relief acts; or who has had appointed a trustee, custodian, or receiver for the assets of such Account Debtor; or who has made an assignment for the benefit of creditors or has become insolvent or fails generally to pay its debts (including its payrolls) as such debts become due.

(10) Accounts with respect to which the Account Debtor is the United States government or any department or agency of the United States.

(11) Accounts which have not been paid in full within **90 days** from the invoice date.

(12) That portion of the Accounts of any single Account Debtor which exceeds **25.000%** of all of Borrower's Accounts.

(13) All Accounts of an Account Debtor for which more than 25% of its total Accounts have not been paid in full within 90 days from the invoice date.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Expiration Date.** The words "Expiration Date" mean the date of termination of Lender's commitment to lend under this Agreement.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and

interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means BUSEY BANK, AN ILLINOIS BANKING CORPORATION, its successors and assigns.

**Loan.** The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.** The word "Note" means the Note dated July 16, 2019 and executed by Benja Incorporated in the principal amount of $1,000,000.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Permitted Liens.** The words "Permitted Liens" mean (1) liens and security interests securing Indebtedness owed by Borrower to Lender; (2) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith; (3) liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (4) purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens"; (5) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and (6) those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Primary Credit Facility.** The words "Primary Credit Facility" mean the credit facility described in the Line of Credit section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

ORAL OR UNEXECUTED AGREEMENTS OR COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT INCLUDING PROMISES TO EXTEND OR RENEW SUCH DEBT ARE NOT ENFORCEABLE, REGARDLESS OF THE LEGAL THEORY UPON WHICH IT IS BASED THAT IS IN ANY WAY RELATED TO THE CREDIT AGREEMENT. TO PROTECT YOU (BORROWER(S)) AND US (CREDITOR) FROM MISUNDERSTANDING OR DISAPPOINTMENT, ANY AGREEMENTS WE REACH COVERING SUCH MATTERS ARE CONTAINED IN THIS WRITING, WHICH IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN US, EXCEPT AS WE MAY LATER AGREE IN WRITING TO MODIFY IT.

WAIVE JURY. All parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT (ASSET BASED) AND BORROWER AGREES TO ITS TERMS. THIS BUSINESS LOAN AGREEMENT (ASSET BASED) IS DATED JULY 16, 2019.

BORROWER:

BENJA INCORPORATED

By: _____
     Andrew J. Chapin, President/Secretary of Benja
     Incorporated

LENDER:

BUSEY BANK, AN ILLINOIS BANKING CORPORATION

By: _____
     Authorized Signer

LaserPro, Ver. 18.2.0.042 Copr. Finastra USA Corporation 1997, 2019.  All Rights Reserved.  - MO  C:\CFI\WIN\CFI\LPL\C40.FC  TR-N2547  PR-525

# MODIFICATION OF BUSINESS LOAN AGREEMENT (ASSET BASED)

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-------------|---------|---------|----------|
| $3,000,000.00 | 02-28-2020 | 02-27-2021 | 6706744910865 | 130 | | *** | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Benja Incorporated
845 Market Street 450A
San Francisco, CA 94103

**Lender:** BUSEY BANK, AN ILLINOIS BANKING CORPORATION
CREVE COEUR
12300 OLIVE BLVD.
CREVE COEUR, MO 63141

ORIGINAL

Principal Amount: 3,000,000.00                                    Date of Agreement: February 28, 2020

**DESCRIPTION OF EXISTING BUSINESS LOAN AGREEMENT (ASSET BASED).** Business Loan Agreement (Asset Based) dated July 16, 2019 between Borrower and Lender (the "Loan Agreement").

**DESCRIPTION OF CHANGE IN TERMS.**

1. **The Minimum Fixed Charge Coverage Ratio (Before Distributions).** covenant is hereby amended as follows:

**Minimum Fixed Charge Coverage Ratio (Before Distributions).** Beginning December 31, 2020, Borrower shall not permit the Fixed Charge Coverage Ratio for any 12-month period ending on the last day of a fiscal year to be less than 2.00 to 1. "Fixed Charge Coverage Ratio" means, for any 12-month period, the ratio of (a) the sum of the following for such period (and without duplication): (i) Borrower's consolidated net income (or loss) for such period (excluding (A) gains (or losses) from the sale or disposition of assets outside the ordinary course of business, (B) gains (or losses) from discontinued operations, and (C) extraordinary gains (or losses)), plus (ii) to the extent deducted in determining such net income: (A) interest expense, (B) net income tax expense and (C) depreciation and amortization, minus (iii) the sum of Borrower's consolidated amounts of the following items for such period (and without duplication): (A) the aggregate capital expenditures (other than capital expenditures financed with the proceeds of purchase money debt or capital leases), plus (B) the aggregate income taxes paid or payable in cash divided by (b) the aggregate scheduled or required principal and interest payments during such period on Borrower's consolidated capital leases, subordinated debt and other debt.

2. **The Minimum EBITDA.** covenant is hereby added as follows:

**Minimum EBITDA.** Beginning December 31, 2020, Borrower shall not permit consolidated EBITDA for the 12-month period ending on such day to be less than $2 million. "Consolidated EBITDA" means, for any 12-month period, the sum of the following for such period (and without duplication): (i) Borrower's consolidated net income (or loss) for such period (excluding (A) gains (or losses)), plus (ii) to the extent deducted in determining such net income: (A) interest expense, (B) net income tax expense and (C) depreciation and amortization.

**CONTINUING VALIDITY.** Except as expressly changed by this Modification, the terms of the Loan Agreement remain unchanged and in full force and effect and all terms, conditions and provisions thereof are hereby affirmed except as specifically modified herein. Consent by Lender to this Modification does not waive Lender's right to strict performance of the Loan Agreement as changed above, nor obligate Lender to make any future modifications. Nothing in this Modification will constitute a satisfaction of the obligations arising under the Loan Agreement or the Related Documents (as defined in the Loan Agreement). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligations under the Loan Agreement and the Related Documents, including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Modification. If any person who signed the original obligation does not sign this Modification below, then all persons signing below acknowledge that this Modification is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Modification or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

**PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.**

**BORROWER:**

**BENJA INCORPORATED**

By: _____
Andrew J. Chapin, President/Secretary of Benja Incorporated

**LENDER:**

**BUSEY BANK, AN ILLINOIS BANKING CORPORATION**

X _____
Authorized Signer

LaserPro, Ver. 19.4.0.030  Copr. Finastra USA Corporation 1997, 2020  All Rights Reserved.  - MO  C:\CFIWIN\CFI\LPL\G60.FC  TR-95379  PR-771



*6706744910865%#########%0070%08202020*

# BUSINESS LOAN AGREEMENT (ASSET BASED)

| Principal $5,000,000.00 | Loan Date 08-20-2020 | Maturity 02-27-2021 | Loan No 6706744910865 | Call / Coll 130 | Account | Officer *** | Initials |
|---|---|---|---|---|---|---|---|

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Benja Incorporated
845 Market Street 450A
San Francisco, CA 94103

**Lender:** BUSEY BANK, AN ILLINOIS BANKING CORPORATION
CLAYTON
175 CARONDELET PLAZA
CLAYTON, MO 63105

---

THIS BUSINESS LOAN AGREEMENT (ASSET BASED) dated August 20, 2020, is made and executed between Benja Incorporated ("Borrower") and BUSEY BANK, AN ILLINOIS BANKING CORPORATION ("Lender") on the following terms and conditions. Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement. Borrower understands and agrees that: (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement; (B) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and (C) all such Loans shall be and remain subject to the terms and conditions of this Agreement.

**TERM.** This Agreement shall be effective as of August 20, 2020, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until such time as the parties may agree in writing to terminate this Agreement.

**ADVANCE AUTHORITY.** The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority: **Andrew J. Chapin, President/Secretary of Benja Incorporated and such other persons as may be designated in writing by any previously authorized person or persons in accordance with Borrower's resolutions.**

**LINE OF CREDIT.** Lender agrees to make Advances to Borrower from time to time from the date of this Agreement to the Expiration Date, provided the aggregate amount of such Advances outstanding at any time does not exceed the Borrowing Base. Within the foregoing limits, Borrower may borrow, partially or wholly prepay, and reborrow under this Agreement as follows:

**Conditions Precedent to Each Advance.** Lender's obligation to make any Advance to or for the account of Borrower under this Agreement is subject to the following conditions precedent, with all documents, instruments, opinions, reports, and other items required under this Agreement to be in form and substance satisfactory to Lender:

(1) Lender shall have received evidence that this Agreement and all Related Documents have been duly authorized, executed, and delivered by Borrower to Lender.

(2) Lender shall have received such opinions of counsel, supplemental opinions, and documents as Lender may request.

(3) The security interests in the Collateral shall have been duly authorized, created, and perfected with first lien priority and shall be in full force and effect.

(4) All guaranties required by Lender for the credit facility(ies) shall have been executed by each Guarantor, delivered to Lender, and be in full force and effect.

(5) Lender, at its option and for its sole benefit, shall have conducted an audit of Borrower's Accounts, books, records, and operations, and Lender shall be satisfied as to their condition.

(6) Borrower shall have paid to Lender all fees, costs, and expenses specified in this Agreement and the Related Documents as are then due and payable.

(7) There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement, and Borrower shall have delivered to Lender the compliance certificate called for in the paragraph below titled "Compliance Certificate."

**Making Loan Advances.** Advances under this credit facility, as well as directions for payment from Borrower's accounts, may be requested orally or in writing by authorized persons. Lender may, but need not, require that all oral requests be confirmed in writing. Each Advance shall be conclusively deemed to have been made at the request of and for the benefit of Borrower (1) when credited to any deposit account of Borrower maintained with Lender or (2) when advanced in accordance with the instructions of an authorized person. Lender, at its option, may set a cutoff time, after which all requests for Advances will be treated as having been requested on the next succeeding Business Day.

**Mandatory Loan Repayments.** If at any time the aggregate principal amount of the outstanding Advances shall exceed the applicable Borrowing Base, Borrower, immediately upon written or oral notice from Lender, shall pay to Lender an amount equal to the difference between the outstanding principal balance of the Advances and the Borrowing Base. On the Expiration Date, Borrower shall pay to Lender in full the aggregate unpaid principal amount of all Advances then outstanding and all accrued unpaid interest, together with all other applicable fees, costs and charges, if any, not yet paid.

**Loan Account.** Lender shall maintain on its books a record of account in which Lender shall make entries for each Advance and such other debits and credits as shall be appropriate in connection with the credit facility. Lender shall provide Borrower with periodic statements of Borrower's account, which statements shall be considered to be correct and conclusively binding on Borrower unless Borrower notifies Lender to the contrary within thirty (30) days after Borrower's receipt of any such statement which Borrower deems to be incorrect.

**COLLATERAL.** To secure payment of the Primary Credit Facility and performance of all other Loans, obligations and duties owed by Borrower to Lender, Borrower (and others, if required) shall grant to Lender Security Interests in such property and assets as Lender may require. Lender's Security Interests in the Collateral shall be continuing liens and shall include the proceeds and products of the Collateral, including without

limitation the proceeds of any insurance. With respect to the Collateral, Borrower agrees and represents and warrants to Lender:

**Perfection of Security Interests.** Borrower agrees to execute all documents perfecting Lender's Security Interest and to take whatever actions are requested by Lender to perfect and continue Lender's Security Interests in the Collateral. Upon request of Lender, Borrower will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Borrower will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. Contemporaneous with the execution of this Agreement, Borrower will execute one or more UCC financing statements and any similar statements as may be required by applicable law, and Lender will file such financing statements and all such similar statements in the appropriate location or locations. Borrower hereby appoints Lender as its irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect or to continue any Security Interest. Lender may at any time, and without further authorization from Borrower, file a carbon, photograph, facsimile, or other reproduction of any financing statement for use as a financing statement. Borrower will reimburse Lender for all expenses for the perfection, termination, and the continuation of the perfection of Lender's security interest in the Collateral. Borrower promptly will notify Lender before any change in Borrower's name including any change to the assumed business names of Borrower. Borrower also promptly will notify Lender before any change in Borrower's Social Security Number or Employer Identification Number. Borrower further agrees to notify Lender in writing prior to any change in address or location of Borrower's principal governance office or should Borrower merge or consolidate with any other entity.

**Collateral Records.** Borrower does now, and at all times hereafter shall, keep correct and accurate records of the Collateral, all of which records shall be available to Lender or Lender's representative upon demand for inspection and copying at any reasonable time. With respect to the Accounts, Borrower agrees to keep and maintain such records as Lender may require, including without limitation information concerning Eligible Accounts and Account balances and agings. Records related to Accounts (Receivables) are or will be located at Borrower's address as identified in this Agreement. The above is an accurate and complete list of all locations at which Borrower keeps or maintains business records concerning Borrower's collateral.

**Collateral Schedules.** Concurrently with the execution and delivery of this Agreement, Borrower shall execute and deliver to Lender schedules of Accounts and schedules of Eligible Accounts in form and substance satisfactory to the Lender. Thereafter supplemental schedules shall be delivered according to the following schedule: With respect to Eligible Accounts, schedules shall be delivered 30 days after each month end.

**Representations and Warranties Concerning Accounts.** With respect to the Accounts, Borrower represents and warrants to Lender: (1) Each Account represented by Borrower to be an Eligible Account for purposes of this Agreement conforms to the requirements of the definition of an Eligible Account; (2) All Account information listed on schedules delivered to Lender will be true and correct, subject to immaterial variance; and (3) Lender, its assigns, or agents shall have the right at any time and at Borrower's expense to inspect, examine, and audit Borrower's records and to confirm with Account Debtors the accuracy of such Accounts.

**REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

**Organization.** Borrower is a corporation for profit which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of Delaware. Borrower is duly authorized to transact business in all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business. Specifically, Borrower is, and at all times shall be, duly qualified as a foreign corporation in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Borrower has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Borrower maintains an office at 845 Market Street 450A, San Francisco, CA 94103. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's state of organization or any change in Borrower's name. Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

**Assumed Business Names.** Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business: **None.**

**Authorization.** Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) Borrower's articles of incorporation or organization, or bylaws, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

**Financial Information.** Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

**Legal Effect.** This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

**Hazardous Substances.** Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and

Case: 20-30819   Doc# 20   Filed: 10/20/20   Entered: 10/20/20 17:46:10   Page 32 of 159

ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior to or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**Compliance with Laws.** Borrower has complied in all material respects with all laws, orders, regulations, fees, decrees and ordinances affecting to any extent or in any manner it or any aspect of its business. There are no existing or, to Borrower's knowledge, proposed laws, orders, regulations, rules, decrees or ordinances of such a nature as could be expected to materially adversely affect the continued conduct of its business in the manner presently being carried on and conducted.

**Permits.** Borrower possesses all material permits, licenses, registrations, consents, certificates, authorizations, orders and approvals required under applicable law in connection with the ownership and operation of its business. All such permits have been legally and validly obtained and are in full force and effect, no suspension or cancellation of such permit is pending or has been threatened, and there is no fact, event or condition which would cause any such permit not to be renewed upon expiration, except where failure to maintain any such permit could not reasonably be expected to have a material adverse effect on Borrower's financial condition.

**Accuracy of Information.** No information provided to Lender by or on behalf of Borrower or any Guarantor contains any untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary in order to make the statements contained therein, in light of the circumstances under which they were made, not misleading. There is no material fact known to Borrower or any Guarantor which has not been disclosed in writing to Lender, which has or, insofar as a Borrower or any Guarantor can reasonably foresee, is likely to have a material adverse effect on the financial condition of Borrower or any Guarantor. No representation or warranty made by Borrower or any Guarantor set forth herein or in any Related Document, or in any schedule hereto or thereto, or in any supplement to any schedule contains or will contain any untrue statement of a material fact, or omits to state any material fact, necessary in order to make the statement therein, in light of the circumstances in which it was made, not misleading.

**Anti-Corruption Laws and Sanctions.** Borrower, its subsidiaries and their respective officers and employees and, to the knowledge of Borrower, its directors and agents, are in compliance in all material respects with (1) all laws, rules, and regulations of any jurisdiction applicable to Borrower or its affiliates from time to time concerning or relating to bribery or corruption (collectively, "Anti-Corruption Laws") and (2) applicable economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury ("OFAC") or the U.S. Department of State or (b) the United Nations Security Council, the European Union, any European Union member state or Her Majesty's Treasury of the United Kingdom (collectively, "Sanctions"). None of (1) Borrower, any subsidiary of Borrower or to the knowledge of Borrower or such subsidiary any of their respective directors, officers or employees, or (2) to the knowledge of Borrower, any agent of Borrower or any subsidiary of Borrower that will act in any capacity in connection with or benefit from the credit facility established hereby, is (a) any person listed in any Sanctions-related list of designated persons maintained by OFAC, the U.S. Department of State, the United Nations Security Council, the European Union or any EU member state, (b) any person operating, organized or resident in a country or territory which is itself the subject or target of any Sanctions or (c) any person owned or controlled by any such person or persons described in the foregoing clauses (a) or (b). No Advance or use of proceeds of the Loan will violate any Anti-Corruption Law or applicable Sanctions.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with the following:

**Annual Statements.** As soon as available, but in no event later than one-hundred-twenty (120) days after the end of each fiscal year, Borrower's balance sheet and income statement for the year ended, reviewed by a certified public accountant satisfactory to Lender.

**Interim Statements.** As soon as available, but in no event later than thirty (30) days after the end of each fiscal quarter, Borrower's balance sheet and profit and loss statement for the period ended, prepared by Borrower in form satisfactory to Lender.

**Additional Requirements.** As soon as available, but in no event later than one hundred and twenty (120) days after the end of each calendar year, Borrower(s) Federal and Filed governmental tax returns prepared by a tax professional satisfactory to Lender.

Case 19-12153 Doc 33 Filed 10/29/2024 Page 159

As soon as available, but in no event later than thirty (30) days after the end of each month end, Borrower(s)' accounts receivable aging and borrowing base certificate to be provided in form satisfactory to Lender when line is in use.

As soon as available, but in no event later than one hundred and twenty (120) days after the end of each calendar year, Guarantor(s)' Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender.

As soon as available, but in no event later than thirty (30) days after the end of each calendar year, Guarantor(s)' personal financial statement to be provided in form satisfactory to Lender.

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.** Furnish such additional information and statements, as Lender may request from time to time.

**Insurance.** Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the properties insured; (5) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

**Guaranties.** Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loans in favor of Lender, executed by the guarantors named below, on Lender's forms, and in the amounts and under the conditions set forth in those guaranties.

| Names of Guarantors | Amounts |
|---|---|
| Andrew J. Chapin | Unlimited |
| Thomas L. Goode III | Unlimited |

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.** Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits. Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as (1) the legality of the same shall be contested in good faith by appropriate proceedings, and (2) Borrower shall have established on Borrower's books adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with GAAP.

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Compliance with Governmental Requirements.** Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Compliance Certificates.** Unless waived in writing by Lender, provide Lender within one hundred twenty (120) days after the end of each fiscal year, with a certificate executed by Borrower's chief financial officer, or other officer or person acceptable to Lender, certifying that the representations and warranties set forth in this Agreement are true and correct as of the date of the certificate and further certifying that, as of the date of the certificate, no Event of Default exists under this Agreement.

**Environmental Compliance and Reports.** Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental

00034

authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**Primary Depository.** Maintain Lender as its primary depository and cash management services financial institution for Borrower.

**Expenses.** Pay: (1) all reasonable out-of-pocket expenses incurred by Lender (including the reasonable fees, charges and disbursements of counsel), in connection with the documentation or administration of the credit facilities provided for herein, and any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated); and (2) all out-of-pocket expenses incurred by Lender (including the fees, charges and disbursements of any counsel for Lender) in connection with the enforcement or protection of its rights in connection with this Agreement and the other Related Documents. The provisions of this section of the Agreement shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Indemnification.** Indemnify and defend Lender and each director, officer, employee, agent and advisor of Lender (Lender and each such person being called an "<u>Indemnitee</u>") against, and hold each Indemnitee harmless from, any and all claims, losses, liabilities, damages, penalties and expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), and shall indemnify, defend and hold harmless each Indemnitee from all fees and time charges and disbursements for attorneys, incurred by any Indemnitee or asserted against any Indemnitee by any third party or by Borrower or any Guarantor arising out of, in connection with, or as a result of: (1) the execution or delivery of this Agreement, any other Related Document or any document contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby; (2) any Advance or the use or proposed use of the proceeds therefrom; or (3) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by Borrower or any Guarantor, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such claims, losses, liabilities damages, penalties and expenses have been determined by a court of competent jurisdiction to result from the gross negligence or willful misconduct of such Indemnitee. The provisions of this section of the Agreement, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**RECOVERY OF ADDITIONAL COSTS.** If the imposition of any change in any law, rule, regulation, guideline, or generally accepted accounting principle, or the interpretation or application of any thereof by any court, administrative or governmental authority, or standard-setting organization (including any request or policy not having the force of law) shall impose, modify or make applicable any taxes (except federal, state or local income or franchise taxes imposed on Lender), reserve requirements, capital adequacy requirements or other obligations which would (A) increase the cost to Lender for extending or maintaining the credit facilities to which this Agreement relates, (B) reduce the amounts payable to Lender under this Agreement or the Related Documents, or (C) reduce the rate of return on Lender's capital as a consequence of Lender's obligations with respect to the credit facilities to which this Agreement relates, then Borrower agrees to pay Lender such additional amounts as will compensate Lender therefor, within five (5) days after Lender's written demand for such payment, which demand shall be accompanied by an explanation of such imposition or charge and a calculation in reasonable detail of the additional amounts payable by Borrower, which explanation and calculations shall be conclusive in the absence of manifest error.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**Indebtedness and Liens.** (1) Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (3) sell with recourse any of Borrower's accounts, except to Lender.

**Loans, Acquisitions and Guaranties.** (1) Loan, invest in or advance money or assets to any other person, enterprise or entity, (2) purchase, create or acquire any interest in any other enterprise or entity, or (3) incur any obligation as surety or guarantor other than in the ordinary course of business.

**Agreements.** Enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

**CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (B) Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt; (C) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or (D) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or (E) Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether

checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the debt against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Loan.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Change in Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Change in Ownership.** Any change of twenty-five percent (25%) or more in the legal or beneficial ownership of Borrower without Lender's prior written consent.

**EFFECT OF AN EVENT OF DEFAULT.** If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**REST PERIOD.** Borrower must maintain a principal balance of $0.00 for thirty (30) consecutive days during the term of the Note.

**MINIMUM FIXED CHARGE COVERAGE RATIO.** Borrower shall not permit the Fixed Charge Coverage Ratio for any 12-month period ending on the last day of a fiscal year to be less than 2.00 to 1. "Fixed Charge Coverage Ratio" means, for any 12-month period, the ratio of (a) the sum of the following for such period (and without duplication): (i) Borrower's consolidated net income (or loss) for such period (excluding (A) gains (or losses) from the sale or disposition of assets outside the ordinary course of business, (B) gains (or losses) from discontinued operations, and (C) extraordinary gains (or losses)), plus (ii) to the extent deducted in determining such net income: (A) interest expense, (B) net income tax expense and (C) depreciation and amortization, minus (iii) the sum of Borrower's consolidated amounts of the following items for such period (and without duplication): (A) the aggregate capital expenditures (other than capital expenditures financed with the proceeds of purchase money debt or capital leases), plus (B) the aggregate income taxes paid or payable in cash, plus (C) the aggregate dividends, distributions, redemptions or repurchases on or with respect to Borrower's equity in each case paid in cash, plus (D) the aggregate increase in any loans and/or advances made by Borrower to any of Borrower's equity holders or affiliates divided by (b) the aggregate scheduled or required principal and interest payments during such period on Borrower's consolidated capital leases, subordinated debt and other debt.

**CONTINUITY OF OPERATIONS.** Borrower agrees that it shall not (A) engage in any business activities substantially different than those in which Borrower is presently engaged or (B) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change its name, dissolve or transfer or sell Collateral out of the ordinary course of business.

**MINIMUM EBITDA.** Borrower shall not permit Consolidated EBITDA for any 12-month period ending on the last day of a fiscal year to be less than $2,000,000.00. "Consolidated EBITDA" means, for any 12-month period, the sum of the following for such period (and without duplication): (i) Borrower's consolidated net income (or loss) for such period (excluding (A) gains (or losses) from the sale or disposition of assets outside the ordinary course of business, (B) gains (or losses) from discontinued operations, and (C) extraordinary gains (or losses)), plus (ii) to the extent deducted in determining such net income: (A) interest expense, (B) net income tax expense and (C) depreciation and amortization.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**Governing Law. This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Missouri without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Missouri.**

**Choice of Venue.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of ST. LOUIS County, State of Missouri.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Subsidiaries and Affiliates of Borrower.** To the extent the context of any provisions of this Agreement makes it appropriate, including without limitation any representation, warranty or covenant, the word "Borrower" as used in this Agreement shall include all of Borrower's subsidiaries and affiliates. Notwithstanding the foregoing however, under no circumstances shall this Agreement be construed to require Lender to make any Loan or other financial accommodation to any of Borrower's subsidiaries or affiliates.

**Successors and Assigns.** All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.** Borrower understands and agrees that in extending Loan Advances, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the extension of Loan Advances and delivery to Lender of the Related Documents, shall be continuing in nature, shall be deemed made and redated by Borrower at the time each Loan Advance is made, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Account.** The word "Account" means a trade account, account receivable, other receivable, or other right to payment for goods sold or

services rendered owing to Borrower (or to a third party grantor acceptable to Lender).

**Account Debtor.** The words "Account Debtor" mean the person or entity obligated upon an Account.

**Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf under the terms and conditions of this Agreement.

**Agreement.** The word "Agreement" means this Business Loan Agreement (Asset Based), as this Business Loan Agreement (Asset Based) may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement (Asset Based) from time to time.

**Borrower.** The word "Borrower" means Benja Incorporated and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Borrowing Base.** The words "Borrowing Base" mean, as determined by Lender from time to time, the lesser of (1) **$5,000,000.00** or (2) **80.000%** of the aggregate amount of Eligible Accounts.

**Business Day.** The words "Business Day" mean a day on which commercial banks are open in the State of Missouri.

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise. The word Collateral also includes without limitation all collateral described in the Collateral section of this Agreement.

**Eligible Accounts.** The words "Eligible Accounts" mean at any time, all of Borrower's Accounts which contain selling terms and conditions acceptable to Lender. The net amount of any Eligible Account against which Borrower may borrow shall exclude all returns, discounts, credits, and offsets of any nature. Unless otherwise agreed to by Lender in writing, Eligible Accounts do not include:

(1) Accounts with respect to which the Account Debtor is employee or agent of Borrower.

(2) Accounts with respect to which the Account Debtor is a subsidiary of, or affiliated with Borrower or its shareholders, officers, or directors.

(3) Accounts with respect to which goods are placed on consignment, guaranteed sale, or other terms by reason of which the payment by the Account Debtor may be conditional.

(4) Accounts with respect to which the Account Debtor is not a resident of the United States, except to the extent such Accounts are supported by insurance, bonds or other assurances satisfactory to Lender.

(5) Accounts with respect to which Borrower is or may become liable to the Account Debtor for goods sold or services rendered by the Account Debtor to Borrower.

(6) Accounts which are subject to dispute, counterclaim, or setoff.

(7) Accounts with respect to which the goods have not been shipped or delivered, or the services have not been rendered, to the Account Debtor.

(8) Accounts with respect to which Lender, in its sole discretion, deems the creditworthiness or financial condition of the Account Debtor to be unsatisfactory.

(9) Accounts of any Account Debtor who has filed or has had filed against it a petition in bankruptcy or an application for relief under any provision of any state or federal bankruptcy, insolvency, or debtor-in-relief acts; or who has had appointed a trustee, custodian, or receiver for the assets of such Account Debtor; or who has made an assignment for the benefit of creditors or has become insolvent or fails generally to pay its debts (including its payrolls) as such debts become due.

(10) Accounts with respect to which the Account Debtor is the United States government or any department or agency of the United States.

(11) Accounts which have not been paid in full within **90 days** from the invoice date.

(12) That portion of the Accounts of any single Account Debtor which exceeds **25.000%** of all of Borrower's Accounts.

(13) All Accounts of an Account Debtor for which more than 25% of its total Accounts have not been paid in full within 90 days from the invoice date.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Expiration Date.** The words "Expiration Date" mean the date of termination of Lender's commitment to lend under this Agreement.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or

Case: 20-30819   Doc# 20   Filed: 10/20/20   Entered: 10/20/20 17:46:10   Page 38 of
159
00038

waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means BUSEY BANK, AN ILLINOIS BANKING CORPORATION, its successors and assigns.

**Loan.** The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.** The word "Note" means the Note dated August 20, 2020 and executed by Benja Incorporated in the principal amount of $5,000,000.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Permitted Liens.** The words "Permitted Liens" mean (1) liens and security interests securing Indebtedness owed by Borrower to Lender; (2) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith; (3) liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (4) purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens"; (5) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and (6) those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Primary Credit Facility.** The words "Primary Credit Facility" mean the credit facility described in the Line of Credit section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

**ORAL OR UNEXECUTED AGREEMENTS OR COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT INCLUDING PROMISES TO EXTEND OR RENEW SUCH DEBT ARE NOT ENFORCEABLE, REGARDLESS OF THE LEGAL THEORY UPON WHICH IT IS BASED THAT IS IN ANY WAY RELATED TO THE CREDIT AGREEMENT. TO PROTECT YOU (BORROWER(S)) AND US (CREDITOR) FROM MISUNDERSTANDING OR DISAPPOINTMENT, ANY AGREEMENTS WE REACH COVERING SUCH MATTERS ARE CONTAINED IN THIS WRITING, WHICH IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN US, EXCEPT AS WE MAY LATER AGREE IN WRITING TO MODIFY IT.**

**WAIVE JURY.** All parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT (ASSET BASED) AND BORROWER AGREES TO ITS TERMS. THIS BUSINESS LOAN AGREEMENT (ASSET BASED) IS DATED AUGUST 20, 2020.**

**BORROWER:**

**BENJA INCORPORATED**

By: _____
Andrew J. Chapin, President/Secretary of Benja
Incorporated

**LENDER:**

**BUSEY BANK, AN ILLINOIS BANKING CORPORATION**

By: _____
Authorized Signer

Case: 20-30819    Doc# 20    Filed: 10/20/20    Entered: 10/20/20 17:46:10    Page 39 of 159

00039

# EXHIBIT 3

00040





ORIGINAL

*00006706741601O865#########023507162019*

# COMMERCIAL SECURITY AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $1,000,000.00 | 07-16-2019 | 07-15-2020 | 10865 | 1301 | [redacted]7416 | 646 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "****" has been omitted due to text length limitations.

**Grantor:** Benja Incorporated
845 Market Street 450A
San Francisco, CA 94103

**Lender:** BUSEY BANK, AN ILLINOIS BANKING CORPORATION
CREVE COEUR
12300 OLIVE BLVD.
CREVE COEUR, MO 63141

## THE LIEN GRANTED PURSUANT TO THIS AGREEMENT MAY ALSO SECURE FUTURE ADVANCES

**THIS COMMERCIAL SECURITY AGREEMENT dated July 16, 2019, is made and executed between Benja Incorporated ("Grantor") and BUSEY BANK, AN ILLINOIS BANKING CORPORATION ("Lender").**

**GRANT OF SECURITY INTEREST. For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.**

**COLLATERAL DESCRIPTION.** The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

> **All inventory, equipment, accounts (including but not limited to all health-care-insurance receivables), chattel paper, instruments (including but not limited to all promissory notes), letter of credit rights, letters of credit, documents, deposit accounts, investment property, money, other rights to payment and performance, and general intangibles (including but not limited to all software and all payment intangibles); all attachments, accessions, accessories, fittings, increases, tools, parts, repairs, supplies, and commingled goods relating to the foregoing property, and all additions, replacements of and substitutions for all or any part of the foregoing property; all insurance refunds relating to the foregoing property; (all goodwill relating to the foregoing property; all records and data and embedded software relating to the foregoing property,) and all equipment, inventory and software to utilize, create, maintain and process any such records and data on electronic media; and all supporting obligations relating to the foregoing property; all whether now existing or hereafter arising, whether now owned or hereafter acquired or whether now or hereafter subject to any rights in the foregoing property; and all products and proceeds (including but not limited to all insurance payments) of or relating to the foregoing property; whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; all proceeds relating to any of the foregoing (including insurance, general intangibles, and account proceeds).**

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

(A) All accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the collateral described herein, whether added now or later.

(B) All products and produce of any of the property described in this Collateral section.

(C) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

(D) All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(E) All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

**CROSS-COLLATERALIZATION.** In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

**FUTURE ADVANCES.** In addition to the Note, this Agreement secures all future advances made by Lender to Grantor regardless of whether the advances are made a) pursuant to a commitment or b) for the same purposes.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Grantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Grantor holds jointly with someone else and all accounts Grantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.** With respect to the Collateral, Grantor represents

and promises to Lender that:

**Perfection of Security Interest.** Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. **This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Grantor may not be indebted to Lender.**

**Notices to Lender.** Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Grantor's name; (2) change in Grantor's assumed business name(s); (3) change in the management of the Corporation Grantor; (4) change in the authorized signer(s); (5) change in Grantor's principal office address; (6) change in Grantor's state of organization; (7) conversion of Grantor to a new or different type of business entity; or (8) change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender. No change in Grantor's name or state of organization will take effect until after Lender has received notice.

**No Violation.** The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its certificate or articles of incorporation and bylaws do not prohibit any term or condition of this Agreement.

**Enforceability of Collateral.** To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. At the time any account becomes subject to a security interest in favor of Lender, the account shall be a good and valid account representing an undisputed, bona fide indebtedness incurred by the account debtor, for merchandise held subject to delivery instructions or previously shipped or delivered pursuant to a contract of sale, or for services previously performed by Grantor with or for the account debtor. So long as this Agreement remains in effect, Grantor shall not, without Lender's prior written consent, compromise, settle, adjust, or extend payment under or with regard to any such Accounts. There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

**Location of the Collateral.** Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral (or to the extent the Collateral consists of intangible property such as accounts or general intangibles, the records concerning the Collateral) at Grantor's address shown above or at such other locations as are acceptable to Lender. Upon Lender's request, Grantor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following: (1) all real property Grantor owns or is purchasing; (2) all real property Grantor is renting or leasing; (3) all storage facilities Grantor owns, rents, leases, or uses; and (4) all other properties where Collateral is or may be located.

**Removal of the Collateral.** Except in the ordinary course of Grantor's business, including the sales of inventory, Grantor shall not remove the Collateral from its existing location without Lender's prior written consent. To the extent that the Collateral consists of vehicles, or other titled property, Grantor shall not take or permit any action which would require application for certificates of title for the vehicles outside the State of Missouri, without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

**Transactions Involving Collateral.** Except for inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. While Grantor is not in default under this Agreement, Grantor may sell inventory, but only in the ordinary course of its business and only to buyers who qualify as a buyer in the ordinary course of business. A sale in the ordinary course of Grantor's business does not include a transfer in partial or total satisfaction of a debt or any bulk sale. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

**Title.** Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

**Repairs and Maintenance.** Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

**Taxes, Assessments and Liens.** Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Lender cash, a sufficient corporate surety bond or other security satisfactory to Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

**Compliance with Governmental Requirements.** Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all laws or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultural product or commodity. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

**Hazardous Substances.** Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify and defend shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

**Maintenance of Casualty Insurance.** Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

**Application of Insurance Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Collateral, whether or not such casualty or loss is covered by insurance. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

**Insurance Reserves.** Lender may require Grantor to maintain with Lender reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Grantor of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Grantor shall upon demand pay any deficiency to Lender. The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest-bearing account which Lender may satisfy by payment of the insurance premiums required to be paid by Grantor as they become due. Lender does not hold the reserve funds in trust for Grantor, and Lender is not the agent of Grantor for payment of the insurance premiums required to be paid by Grantor. The responsibility for the payment of premiums shall remain Grantor's sole responsibility.

**Insurance Reports.** Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however not more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

**Financing Statements.** Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest. At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Property. Grantor will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs. Grantor irrevocably appoints Lender to execute documents necessary to transfer title if there is a default. Lender may file a copy of this Agreement as a financing statement.

**GRANTOR'S RIGHT TO POSSESSION AND TO COLLECT ACCOUNTS.** Until default and except as otherwise provided below with respect to accounts, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. Until otherwise notified by Lender, Grantor may collect any of the Collateral consisting of accounts. At any time and even though no Event of Default exists, Lender may exercise its rights to collect the accounts and to notify account debtors to make payments directly to Lender for application to the Indebtedness. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**REINSTATEMENT OF SECURITY INTEREST.** If payment is made by Grantor, whether voluntarily or otherwise, or by guarantor or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment (A) to Grantor's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, (B) by reason of any judgment, decree or order of any court or administrative body having jurisdiction over Lender or any of Lender's property, or (C) by reason of any settlement or compromise of

Case: 20-30819    Doc# 20    Filed: 10/20/20    Entered: 10/20/20 17:46:10    Page 43 of
159

00043

any claim made by Lender with any claimant (including without limitation Grantor), the Indebtedness shall be considered unpaid for the purpose of enforcement of this Agreement and this Agreement shall continue to be effective or shall be reinstated, as the case may be, notwithstanding any cancellation of this Agreement or of any note or other instrument or agreement evidencing the Indebtedness and the Collateral will continue to secure the amount repaid or recovered to the same extent as if that amount never had been originally received by Lender, and Grantor shall be bound by any judgment, decree, order, settlement or compromise relating to the Indebtedness or to this Agreement.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**Default in Favor of Third Parties.** Any guarantor or Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of any guarantor's or Grantor's property or ability to perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Insolvency.** The dissolution or termination of Grantor's existence as a going business, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or Guarantor dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the Missouri Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

**Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment penalty which Grantor would be required to pay, immediately due and payable, without notice of any kind to Grantor.

**Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

**Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

**Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Grantor for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this

Agreement. Grantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Grantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Grantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Governing Law. This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Missouri without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Missouri.**

**Choice of Venue.** If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the courts of ST. LOUIS County, State of Missouri.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Power of Attorney.** Grantor hereby appoints Lender as Grantor's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other secured parties. Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Grantor will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Agreement.** The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

**Borrower.** The word "Borrower" means Benja Incorporated and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

**Default.** The word "Default" means the Default set forth in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Grantor.** The word "Grantor" means Benja Incorporated.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents. Specifically, without limitation, Indebtedness includes the future advances set forth in the Future Advances provision, together with all interest thereon and all amounts that may be indirectly secured by the Cross-Collateralization provision of this Agreement.

**Lender.** The word "Lender" means BUSEY BANK, AN ILLINOIS BANKING CORPORATION, its successors and assigns.

**Note.** The word "Note" means the Note dated July 16, 2019 and executed by Benja Incorporated in the principal amount of $1,000,000.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Property.** The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Collateral Description" section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**WAIVE JURY.** All parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

GRANTOR HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED JULY 16, 2019.

GRANTOR:

BENJA INCORPORATED

By: _____
    Andrew J. Chapin, President/Secretary of Benja
    Incorporated

LaserPro, Ver. 19.2.0.042 Copr. Finastra USA Corporation 1997, 2019. All Rights Reserved. - MO C:\CFIWIN\CFI\LPL\E40.FC TR-50587 PR-528

# EXHIBIT 4

00047

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Phone: (800) 331-3282 Fax: (818) 662-4141

B. E-MAIL CONTACT AT FILER (optional)
CLS-CTLS_Glendale_Customer_Service@wolterskluwer.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)    49152 - Busey Bank

Lien Solutions
P.O. Box 29071
Glendale, CA  91209-9071

70865712

DEDE

File with: Secretary of State, DE

Lien Solutions
Representation of filing

**This filing is Completed**
File Number : 20195005348
File Date   : 19-Jul-2019

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| BENJA INCORPORATED | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 845 Market Street 450A | San Francisco | CA | 94103 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Busey Bank | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 12300 Olive Blvd | Creve Coeur | MO | 63141 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

All assets of debtor

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
70865712               33500                                                    Dan Saettele

Case: 20-30019   Doc# 20   Filed: 10/20/20   Entered: 10/20/20 17:46:10   Page 48 of
159

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

Prepared by Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (80

00048

# EXHIBIT 5

00049



150 N. Riverside Plaza, Suite 3000, Chicago, IL 60606 • (312) 819-1900

September 29, 2020

Jerry L. Switzer Jr.
(312) 873-3626
(312) 893-2005  Direct Fax
jswitzer@polsinelli.com

**Via Certified Mail/Return Receipt Requested**

Benja Incorporated
845 Market Street, 450A
San Francisco, CA 94103
Attn:  Joe Alouf

Andrew J. Chapin, Jr.
26 Cragmont Avenue
San Francisco, CA 94116

Thomas L. Goode, III
2901 Barton Skyway, #3002
Austin, TX 78746

> **Re:** **Outstanding Loan Owed to Busey Bank**
> **Borrower:**  Benja Incorporated
> **Guarantors:**  Andrew J. Chapin, Jr., and Thomas L. Goode, III

Gentlemen:

We represent Busey Bank ("Lender") in connection with the revolving loan referenced below (the "Loan") made by Lender to Benja Incorporated ("Borrower") and guaranteed by Andrew J. Chapin, Jr. ("Chapin") and Thomas L. Goode, III ("Goode" and, together with Chapin, "Guarantors") (Borrower and Guarantors shall be collectively referred to herein as "Borrower Parties").

Reference is made to the following notes, loan agreements, guarantees, security agreements, pledge agreements, mortgages, assignments of rents, and other agreements, instruments and documents by and between Lender and Borrower Parties, among others, evidencing, securing or otherwise relating to the Loan (collectively, the "Loan Documents"):

- a Business Loan Agreement (Asset Based) dated as of July 16, 2019, executed by Borrower in favor of Lender in the original principal amount of $1,000,000.00, as amended by a Modification to Business Loan Agreement (Asset Based) dated as of February 28, 2020, executed by Borrower in favor of Lender in the original principal amount of $3,000,000.00, as

polsinelli.com

Atlanta    Boston    Chicago    Dallas    Denver    Houston    Kansas City    Los Angeles    Miami    Nashville    New York
Phoenix    St. Louis    San Francisco    Seattle    Silicon Valley    Washington, D.C.    Wilmington
Polsinelli PC, Polsinelli LLP in California
74927984.1



Benja Incorporated
September 29, 2020
Page 2

replaced and superseded by a Business Loan Agreement (Asset Based) dated as of August 20, 2020, executed by Borrower in favor of Lender in the original principal amount of $5,000,000.00 (collectively, the "<u>BLA</u>");

- a Promissory Note dated as of July 16, 2019, executed by Borrower in favor of Lender in the original principal amount of $1,000,000.00, as replaced and superseded by a Promissory Note dated as of February 28, 2020, executed by Borrower in favor of Lender in the original principal amount of $3,000,000.00, as replaced and superseded by a Promissory Note dated as of August 20, 2020, executed by Borrower in favor of Lender in the original principal amount of $5,000,000.00 (collectively, the "<u>Note</u>");

- a Commercial Security Agreement dated as of July 16, 2019, executed by Borrower in favor of Lender (the "<u>Security Agreement</u>"), pursuant to which Borrower granted a first lien and security interest in favor of Lender against all of Borrower's assets and property to secure the Loan;

- a Commercial Guaranty dated July 16, 2019, executed by Chapin in favor of Lender which secures the Loan; and

- a Commercial Guaranty dated July 16, 2019, executed by Goode in favor of Lender which secures the Loan.

The BLA provides in relevant part that:

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

> **Indebtedness and Liens.** (1) Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (3) sell with recourse any of Borrower's accounts, except to Lender.

(*See* BLA, at p. 5.) The Security Agreement includes similar provisions in the "Grantor's Representations and Warranties With Respect to the Collateral" section under the headings "Transactions Involving Collateral" and "Title". (*See* Security Agreement, at pp. 1-2.) Please be advised that Borrower has violated the foregoing provisions of the BLA and Security Agreement. In particular, Borrower has incurred borrowed money debt from First Corporate Solutions and E-Revshare Core, LLC, and in connection therewith granted security interests in favor of these lenders in assets of Borrower. Lender understands that these unauthorized secured loans remain outstanding. Additionally, Borrower obtained other unauthorized secured loans from C&S Associates, Inc., Gibraltar Business Capital, LLC, and UMB Bank, N.A., which



Benja Incorporated
September 29, 2020
Page 3

Lender understands have since been repaid and the related UCC financing statements terminated. Finally, the U.S. Small Business Administration filed a financing statement against Borrower on or about May 29, 2020, which remains pending.

Additionally, the BLA provides in relevant part that:

**Taxes, Charges and Liens.** [Borrower shall] pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or it properties, income, or profits, prior to the date on which penalties would attach…

(*See* BLA, at p. 4.) The Security Agreement includes a similar provision in the "Grantor's Representations and Warranties With Respect to the Collateral" section under the heading "Taxes, Assessments and Liens". (*See* Security Agreement, at p. 2.) Please be advised that Borrower has violated the foregoing provisions of the BLA and Security Agreement. In particular, Borrower has allowed certain state tax liens in favor of the California Employment Development Department to be recorded against Borrower and its assets on or about January 14, 2020, and March 9, 2020, and a judgment in favor of a Peter A. Manderino to be recorded against Borrower and its assets on or about October 30, 2018, which remain outstanding.

Further, the BLA provides in relevant part that:

**Guaranties.** Prior to disbursement of any Loan proceeds, [Borrower shall] furnish executed guaranties of the Loans in favor of Lender, executed by the guarantors named below, on Lender's forms, and in the amounts and under the conditions set forth in those guaranties.

| Names of Guarantors | Amounts |
|---|---|
| **Andrew J. Chapin** | **Unlimited** |
| **Thomas L. Goode III** | **Unlimited** |

(*See* BLA, at p. 4.) Please be advised that Goode contends that he did not execute and/or is not bound by his Commercial Guaranty referenced above. Although Lender disputes Goode's contention, if it is ultimately determined that Goode did not execute and/or is not bound by his Commercial Guaranty, Borrower has violated the aforementioned provision of the BLA.

Finally, the BLA further provides in relevant part that:

**Primary Depository.** [Borrower shall] [m]aintain Lender as its primary depository and cash management services institution for Borrower.

74927984.1

00052



(*See* BLA, at p. 5.)  Please be advised that Borrower has violated the foregoing provision of the BLA because it is currently maintaining its operating and other accounts at JPMorgan Chase Bank, not with Lender.

Please be advised that Borrower's violations of the aforementioned provisions of the BLA, Security Agreement and other Loan Documents constitute Events of Default under the BLA, Security Agreement, Note and other Loan Documents.  Lender reserves the right to exercise any and all rights and remedies available to it under the BLA, Security Agreement, Note and other Loan Documents or at law or in equity, without further notice or demand.  Nothing herein shall constitute a waiver or a commitment to waive by Lender of its rights and remedies due to such Events of Default or any other existing or future Defaults or Events of Default or an agreement by Lender to forbear from exercising any of its rights or remedies arising out of the Events of Default or any other existing or future Defaults or Events of Default.

Any past or future negotiations between Borrower Parties or their representatives or agents on the one hand, and Lender and its representatives or agents on the other, do not and shall not constitute a waiver of Lender's right to exercise its rights and remedies under the Loan Documents or at law or in equity.  Any alleged waiver of any of Lender's rights shall not be effective unless in writing duly executed by an authorized representative of Lender.  Borrower Parties and any other obligor for the indebtedness owed under the Loan Documents are not entitled to rely upon any oral statements made or purported to be made by or on behalf of Lender or its agents in connection with any alleged agreement by or on behalf of Lender to refrain from exercising any of Lender's rights under the Loan Documents or otherwise at law or in equity.

Nothing set forth in this letter, no delay on the part of Lender in enforcing its rights with respect to any default, and no discussions between Lender and Borrower Parties regarding the matters addressed in this letter, the Loan Documents, or any other subject matter, are intended (and none shall be deemed) to modify, limit, release, reduce, or waive any of Lender's rights, remedies, or privileges under the Loan Documents, or at law or in equity, all of which are hereby specifically reserved.  Furthermore, the enumeration of any specific default herein is not intended and shall not be deemed to waive other defaults that may currently exist under the Loan Documents.

Sincerely,

/s/ Jerry L. Switzer, Jr.
Jerry L. Switzer Jr.

cc:     Steve Henderson (via email)
        Larry Johnson (via email)
        Michael McElhone (via email)
        Mike Peluso (via email)

74927984.1

00053



Benja Incorporated
September 29, 2020
Page 5

John Powers (via email)
Scott H. Olson, Esq. (via email)
Johnny K. Merritt, Esq. (via email)

# EXHIBIT 6

**From:** Andrew Chapin <andrew@benja.co>
**Date:** October 1, 2020 at 11:54:55 AM CDT
**To:** "Ricke, Patrick" <Patrick.Ricke@busey.com>
**Cc:** Joe Alouf <alouf@benja.co>, Pano Anthos <pano@xrclabs.com>
**Subject: State of Benja**

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Patrick,

As you are likely aware, there were a few management changes at Benja the last few days.

A long story made short — I am writing to inform you the move made early in the week (appointing Pano Anthos to the Board of Directors and Joe Alouf as Interim President) has been undone by vote of the majority of shareholders. I have returned to each of those roles effective yesterday.

Mr. Anthos and Mr. Alouf are no longer authorized to speak on behalf of Benja as it relates to this matter.

I would like to discuss the state of affairs between Benja and Busey. I come bearing a plan for resolution - and the sooner we can connect, the sooner we can put this in motion.

I'm available at (203) 695 4167 or (415) 326 4167. Give me a call, would be good to touch base briefly before a call with the full group.

Best,

**Andrew J. Chapin**
Co-Founder
Benja Incorporated

The information contained in this e-mail is privileged and confidential. Unless otherwise indicated or obvious from the message, this is intended only for the individual(s) listed above. Please see our Privacy Notices at http://www.busey.com.

# EXHIBIT 7

00057



100 W University Ave
Champaign IL 61820

| 7283947 | Date 4/30/2020 | Page 1 |
|---|---|---|
| BENJA INC | Primary Account | 4766 |
| 845 MARKET ST 450A | | |
| SAN FRANCISCO CA 94103 | | |

## CHECKING ACCOUNT SUMMARY & DETAIL

| BUSINESS ANALYSIS | | Number of Enclosures | 0 |
|---|---|---|---|
| Account Number | 4766 | Statement Dates | 4/01/20 thru 4/30/20 |
| Previous Balance | 353,222.03 | Days in the statement period | 30 |
| 19 Deposits/Credits | 1,944,608.17 | Average Ledger | 862,369.30 |
| 4 Checks/Debits | 926,313.63 | Average Collected | 862,369.30 |
| Service Charge | .00 | | |
| Interest Paid | .00 | | |
| Ending Balance | 1,371,516.57 | | |

| | Total For This Period | Total Year-to-Date |
|---|---|---|
| Overdraft Item Fees | $.00 | $.00 |
| Returned Item Fees | $.00 | $.00 |

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|---|---|---|---|
| 4/1 | STRIPE TRANSFER X | TRANSFER | 1,250.00 |
| 4/1 | STRIPE TRANSFER X | TRANSFER | 1,990.00 |
| 4/1 | STRIPE TRANSFER X | TRANSFER | 3,734.22 |
| 4/1 | STRIPE TRANSFER X | TRANSFER | 15,630.00 |
| 4/1 | UNDER ARMOUR INC ACH/CRED 200401 OFA58223889962 | TRANSFER | 39,442.01 |
| 4/1 | ZAPPOS.COM, INC. ACH/CRED 200401 OFA51566133585 | TRANSFER | 49,100.65 |
| 4/1 | PATAGONIA INTERNATIONAL, INC. ACH/CRED 200401 OFA99403294665 | TRANSFER | 102,184.75 |

Case: 20-30819   Doc# 20   Filed: 10/20/20   Entered: 10/20/20 17:46:10   Page 58 of 159
00058



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766 (Continued)

| DEPOSITS AND OTHER CREDITS | | |
|---|---|---|
| **DATE** | **TRANSACTION DESCRIPTION** | **AMOUNT** |
| 4/1 | COLUMBIA SPORTSWEAR CO ACH/CRED 200401 OFA82401998473    TRANSFER | 166,474.00 |
| 4/1 | NEW BALANCE ATHLETICS, INC ACH/CRED 200401 OFA83394855793    TRANSFER | 322,445.49 |
| 4/1 | BACKCOUNTRY.COM, LLC. ACH/CRED 200401 OFA87411909044    TRANSFER | 357,309.60 |
| 4/2 | FANATICS INC. ACH/CRED  200402 OFA78016096012    TRANSFER | 479,383.68 |
| 4/30 | STRIPE TRANSFER X    TRANSFER | 1,990.00 |
| 4/30 | STRIPE TRANSFER X    TRANSFER | 1,998.75 |
| 4/30 | STRIPE TRANSFER X    TRANSFER | 3,425.50 |
| 4/30 | HELLY HANSEN LEISURE INC. ACH/CRED 200430 OFA69938477483    TRANSFER | 16,780.00 |
| 4/30 | UNDER ARMOUR INC ACH/CRED 200430 OFA33412878394    TRANSFER | 46,862.86 |
| 4/30 | ZAPPOS.COM, INC. ACH/CRED 20430 OFA34851134728    TRANSFER | 53,091.76 |
| 4/30 | PATAGONIA INTERNATIONAL, INC. ACH/CRED 200430 OFA92715807823    TRANSFER | 101,176.50 |
| 4/30 | COLUMBIA SPORTSWEAR CO ACH/CRED 200430 OFA86925798887    TRANSFER | 180,338.40 |



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766 (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|------|------------------------|---|--------|
| 4/1 | BILL PAY FLIPBOARD BENJA CK ON 200401 | PAYMENT | 158,424.00– |
| 4/30 | Amazon Az 3600037 EDI PYMNTS BENJA INCOR OFA04166994160 | PAYMENT | 76,715.43– |
| 4/30 | BILL PAY FLIPBOARD BENJA CK ON 200430 | PAYMENT | 152,904.00– |
| 4/30 | BILL PAY PINTEREST INC BENJA CK ON 200430 | PAYMENT | 538,270.30– |



100 W University Ave
Champaign IL 61820

```
     7990492                    Date 5/31/2020        Page      1
     BENJA INC                  Primary Account              4766
     845 MARKET ST 450A
     SAN FRANCISCO CA 94103
```

## CHECKING ACCOUNT SUMMARY & DETAIL

```
BUSINESS ANALYSIS                     Number of Enclosures               0
Account Number                 4766   Statement Dates    5/01/20 thru 5/31/20
Previous Balance          1,371,516.57 Days in the statement period      31
        9 Deposits/Credits 1,659,965.67 Average Ledger           799,351.39
        9 Checks/Debits    2,804,296.04 Average Collected         799,351.39
Service Charge                     .00
Interest Paid                      .00
Ending Balance              227,186.20
```

|  | Total For This Period | Total Year-to-Date |
|---|---|---|
| Overdraft Item Fees | $.00 | $.00 |
| Returned Item Fees | $.00 | $.00 |

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|---|---|---|---|
| 5/1 | STRIPE TRANSFER X | TRANSFER | 2,317.50 |
| 5/1 | STRIPE TRANSFER X | TRANSFER | 3,984.12 |
| 5/1 | WOLVERINE WORLD WIDE C ACH/CRED 200501 OFA18474943192 | TRANSFER | 16,248.00 |
| 5/1 | STRIPE TRANSFER X | TRANSFER | 76,455.00 |
| 5/1 | NEW BALANCE ATHLETICS, INC ACH/CRED 200501 OFA47918205132 | TRANSFER | 324,408.11 |
| 5/1 | BACKCOUNTRY.COM, LLC. ACH/CRED 200501 OFA20349940646 | TRANSFER | 357,309.60 |

Case: 20-30819   Doc# 20   Filed: 10/20/20   Entered: 10/20/20 17:46:10   Page 61 of 159



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766 (Continued)

| DEPOSITS AND OTHER CREDITS | | |
|---|---|---|
| **DATE** | **TRANSACTION DESCRIPTION** | **AMOUNT** |
| 5/1 | NIKE INC. ACH/CRED 200501 OFA95740208255  TRANSFER | 374,652.53 |
| 5/1 | FANATICS INC. ACH/CRED  200501 OFA31706715418  TRANSFER | 483,094.95 |
| 5/2 | STRIPE TRANSFER X  TRANSFER | 1,250.00 |



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766 (Continued)

| **CHECKS AND OTHER DEBITS** | | |
|---|---|---|
| **DATE** | **TRANSACTION DESCRIPTION** | **AMOUNT** |
| 5/1 | GUSTO Benja Incorporated n60lttz0rr8 | PAYMENT | 124,332.29− |
| 5/1 | Online Domestic Wire Transfer Via:MUFG UNION BANK/122000496 A/C: JOMBOY MEDIA INC. | PAYMENT | 160,000.00− |
| 5/1 | Online Domestic Wire Transfer Via:Silvergate Lajolla/322286803.. | PAYMENT | 263,271.44− |
| 5/1 | BILL PAY SPORTSILLU xxxBENJA ON | PAYMENT | 576,807.00− |
| 5/31 | Amazon Az 3600037 EDI PYMNTS BENJA INCOR OFA42515646530 | PAYMENT | 79,198.13− |
| 5/31 | BILL PAY FLIPBOARD BENJA CK ON 200531 | PAYMENT | 164,447.70− |
| 5/31 | Online Domestic Wire Transfer Via:Silvergate Lajolla/322286803.. | PAYMENT | 274,654.84− |
| 5/31 | BILL PAY PINTEREST INC BENJA CK ON 200531 OFA68401088588 | PAYMENT | 583,664.64− |
| 5/31 | BILL PAY SPORTSILLU xxxBENJA ON | PAYMENT | 613,961.25− |



100 W University Ave
Champaign IL 61820

| 8020564 | Date 6/30/2020 | Page 1 |
|---|---|---|
| BENJA INC | Primary Account | 4766 |
| 845 MARKET ST 450A | | |
| SAN FRANCISCO CA 94103 | | |

## CHECKING ACCOUNT SUMMARY & DETAIL

| BUSINESS ANALYSIS | | Number of Enclosures | 0 |
|---|---|---|---|
| Account Number | 4766 | Statement Dates | 6/01/20 thru 6/30/20 |
| Previous Balance | 227,186.20 | Days in the statement period | 30 |
| 43 Deposits/Credits | 6,324,533.45 | Average Ledger | 1,483,076.64 |
| 8 Checks/Debits | 1,747,711.92 | Average Collected | 1,483,076.64 |
| Service Charge | .00 | | |
| Interest Paid | .00 | | |
| Ending Balance | 4,804,007.73 | | |

| | Total For This Period | Total Year-to-Date |
|---|---|---|
| Overdraft Item Fees | $.00 | $.00 |
| Returned Item Fees | $.00 | $.00 |

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|---|---|---|---|
| 6/1 | STRIPE TRANSFER X | TRANSFER | 1,250.00 |
| 6/1 | STRIPE TRANSFER X | TRANSFER | 2,011.91 |
| 6/1 | STRIPE TRANSFER X | TRANSFER | 2,019.80 |
| 6/1 | STRIPE TRANSFER X | TRANSFER | 2,463.75 |
| 6/1 | STRIPE TRANSFER X | TRANSFER | 3,484.49 |
| 6/1 | STRIPE TRANSFER X | TRANSFER | 4,019.82 |
| 6/1 | HELLY HANSEN LEISURE INC. ACH/CRED 200601 OFA89924079043 | TRANSFER | 17,083.40 |
| 6/1 | WOLVERINE WORLD WIDE C ACH/CRED 200601 OFA49389309622 | TRANSFER | 17,400.00 |
| 6/1 | STRIPE TRANSFER X | TRANSFER | 20,582.88 |

Case: 20-30819   Doc# 20   Filed: 10/20/20   Entered: 10/20/20 17:46:10   Page 64 of 159

00064



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766 (Continued)

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|------|------------------------|--|--------|
| 6/1 | UNDER ARMOUR INC ACH/CRED 200601 OFA60545457583 | TRANSFER | 53,676.20 |
| 6/1 | ZAPPOS.COM, INC. ACH/CRED 200601 OFA61339634857 | TRANSFER | 53,837.69 |
| 6/1 | PATAGONIA INTERNATIONAL, INC. ACH/CRED 200601 OFA584739079394 | TRANSFER | 96,218.50 |
| 6/1 | COLUMBIA SPORTSWEAR CO ACH/CRED 200601 OFA54480887555 | TRANSFER | 212,473.85 |
| 6/1 | NEW BALANCE ATHLETICS, INC ACH/CRED 200601 OFA20683754258 | TRANSFER | 324,805.50 |
| 6/1 | BACKCOUNTRY.COM, LLC. ACH/CRED 200601 OFA60406856944 | TRANSFER | 358,864.45 |
| 6/1 | NIKE INC. ACH/CRED 200601 OFA54571761717 | TRANSFER | 380,281.86 |
| 6/1 | FANATICS INC. ACH/CRED  200601 OFA77381734722 | TRANSFER | 462,183.93 |
| 6/5 | WIRE TRANSFER ... | TRANSFER | 1,000,000.00 |
| 6/9 | ADVANCE TO ***4766 ADVANCE FROM ***0865 | TRANSFER | 1,100,000.00 |
| 6/30 | STRIPE TRANSFER X | TRANSFER | 1,250.00 |
| 6/30 | STRIPE TRANSFER X | TRANSFER | 2,140.03 |

## DEPOSITS AND OTHER CREDITS



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766 (Continued)

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|------|------------------------|--|--------|
| 6/30 | STRIPE TRANSFER X | TRANSFER | 2,194.00 |
| 6/30 | STRIPE TRANSFER X | TRANSFER | 2,514.94 |
| 6/30 | STRIPE TRANSFER X | TRANSFER | 3,660.44 |
| 6/30 | STRIPE TRANSFER X | TRANSFER | 4,199.00 |
| 6/30 | STRIPE TRANSFER X | TRANSFER | 5,055.12 |
| 6/30 | COLUMBIA SPORTSWEAR CO ACH/CRED 200630 OFA29775116753 | TRANSFER | 13,967.72 |
| 6/30 | HELLY HANSEN LEISURE INC. ACH/CRED 200630 OFA23541722980 | TRANSFER | 17,255.90 |
| 6/30 | WOLVERINE WORLD WIDE C ACH/CRED 200630 OFA39202182771 | TRANSFER | 17,927.22 |
| 6/30 | PATAGONIA INTERNATIONAL, INC. ACH/CRED 200630 OFA60924447472 | TRANSFER | 18,768.25 |
| 6/30 | NEW BALANCE ATHLETICS, INC ACH/CRED 200630 OFA9647096787 | TRANSFER | 21,069.78 |
| 6/30 | STRIPE TRANSFER X | TRANSFER | 21,540.84 |
| 6/30 | NIKE INC. ACH/CRED 200630 OFA59642156022 | TRANSFER | 24,636.71 |
| 6/30 | BACKCOUNTRY.COM, LLC. ACH/CRED 200630 OFA49415436471 | TRANSFER | 24,847.80 |
| 6/30 | ZAPPOS.COM, INC. ACH/CRED 200630 OFA62443625650 | TRANSFER | 54,729.73 |
| 6/30 | UNDER ARMOUR INC ACH/CRED 200401 OFA58223889962 | TRANSFER | 55,206.36 |
| 6/30 | CHECK DEP | TRANSFER | 89,118.00 |

Case: 20-30819   Doc# 20   Filed: 10/20/20   Entered: 10/20/20 17:46:10   Page 66 of 159



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766 (Continued)

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|------|------------------------|--|--------|
| 6/30 | PATAGONIA INTERNATIONAL, INC. ACH/CRED 200630 OFA96259626036 | TRANSFER | 102,018.25 |
| 6/30 | COLUMBIA SPORTSWEAR CO ACH/CRED 200630 OFA94483634455 | TRANSFER | 208,453.60 |
| 6/30 | NEW BALANCE ATHLETICS, INC ACH/CRED 200630 OFA61261172972 | TRANSFER | 316,963.13 |
| 6/30 | NIKE INC. ACH/CRED 200630 OFA20383116002 | TRANSFER | 368,265.59 |
| 6/30 | BACKCOUNTRY.COM, LLC. ACH/CRED 200630 OFA42685451429 | TRANSFER | 371,854.80 |
| 6/30 | FANATICS INC. ACH/CRED 200630 OFA36495538206 | TRANSFER | 464,238.21 |



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                 4766 (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|------|------------------------|--|--------|
| 6/1 | Amazon Az 3600037 EDI PYMNTS BENJA INCOR OFA81030497279 | PAYMENT | 98,364.57- |
| 6/1 | GUSTO Benja Incorporated n60lttz0rr8 | PAYMENT | 124,332.29- |
| 6/1 | CK #5009 | PAYMENT | 140,000.00- |
| 6/1 | BILL PAY PINTEREST INC BENJA CK ON 200102 OFA68401088588 | PAYMENT | 146,520.33- |
| 6/1 | Online Domestic Wire Transfer Via:MUFG UNION BANK/122000496 A/C: JOMBOY MEDIA INC. | PAYMENT | 170,000.00- |
| 6/1 | BILL PAY SPORTSILLU xxxBENJA ON | PAYMENT | 598,647.00- |
| 6/30 | BILL PAY FLIPBOARD BENJA CK ON 200630 | PAYMENT | 189,710.81- |
| 6/30 | Online Domestic Wire Transfer Via:Silvergate Lajolla/322286803.. | PAYMENT | 280,136.92- |



100 W University Ave
Champaign IL 61820

| 8069609 | Date 7/31/2020 | Page | 1 |
| BENJA INC | Primary Account | | 4766 |
| 845 MARKET ST 450A | | | |
| SAN FRANCISCO CA 94103 | | | |

## CHECKING ACCOUNT SUMMARY & DETAIL

| BUSINESS ANALYSIS | | Number of Enclosures | 0 |
|---|---|---|---|
| Account Number | 4766 | Statement Dates | 7/01/20 thru 7/31/20 |
| Previous Balance | 4,804,007.73 | Days in the statement period | 31 |
| 1 Deposits/Credits | 88,794.00 | Average Ledger | 3,494,585.87 |
| 12 Checks/Debits | 2,579,507.25 | Average Collected | 3,494,585.87 |
| Service Charge | .00 | | |
| Interest Paid | .00 | | |
| Ending Balance | 2,313,294.48 | | |

| | Total For This Period | Total Year-to-Date |
|---|---|---|
| Overdraft Item Fees | $.00 | $.00 |
| Returned Item Fees | $.00 | $.00 |

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|---|---|---|---|
| 7/1 | COVERAGEGEAR ACH/CRED 200701 | TRANSFER | 88,794.00 |

Case: 20-30819   Doc# 20   Filed: 10/20/20   Entered: 10/20/20 17:46:10   Page 69 of 159

00069



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766 (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|------|------------------------|---------|--------|
| 7/1 | GUSTO Benja Incorporated | PAYMENT | 146,520.33– |
| 7/1 | PINTEREST INC BENJA CK ON PAYMENT OFA | PAYMENT | 585,795.60– |
| 7/2 | Amazon Az EDI PYMNTS BENJA INCOR PAYMENT OFA | PAYMENT | 95,509.47– |
| 7/2 | TIK TOK INC. TRANSFER OFA | PAYMENT | 138,000.00– |
| 7/2 | PINTEREST INC BENJA CK ON PAYMENT OFA | PAYMENT | 609,133.20– |
| 7/3 | NEXT DOOR BENJA CK ON PAYMENT | PAYMENT | 86,250.00– |
| 7/3 | Online Domestic Wire Transfer Via:MUFG UNION BANK A/C: JOMBOY MEDIA INC. | PAYMENT | 260,000.00– |
| 7/3 | CK PAYMENT | PAYMENT | 283,772.84– |
| 7/10 | Wire Transfer Debit E-Revshare Core LLC 121000248 1200787933 WELLS FARGO BANK,Benja June 2020 | PAYMENT | 3,597.44– |
| 7/14 | Wire Transfer Debit E-Revshare Core LLC 121000248 1200787933 WELLS FARGO BANK,20200714MMQFMP UN000137 | PAYMENT | 33,917.56– |
| 7/31 | SPOTIFY INT xxxBENJA ON PAYMENT | PAYMENT | 133,500.00– |
| 7/31 | FLIPBOARD CK ON PAYMENT | PAYMENT | 203,510.81– |



100 W University Ave
Champaign IL 61820

```
       8102849                    Date 8/31/2020         Page     1
       BENJA INC                  Primary Account              4766
       845 MARKET ST 450A
       SAN FRANCISCO CA 94103
```

## CHECKING ACCOUNT SUMMARY & DETAIL

```
BUSINESS ANALYSIS                    Number of Enclosures             0
Account Number              4766     Statement Dates   8/01/20 thru 8/31/20
Previous Balance      2,313,294.48   Days in the statement period    31
      23 Deposits/Credits 2,275,275.28   Average Ledger       2,400,566.19
      13 Checks/Debits   3,316,524.84   Average Collected     2,400,566.19
Service Charge                 .00
Interest Paid                  .00
Ending Balance        1,272,044.92
```

|  | Total For This Period | Total Year-to-Date |
|---|---|---|
| Overdraft Item Fees | $.00 | $.00 |
| Returned Item Fees | $.00 | $.00 |

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|---|---|---|---|
| 8/3 | STRIPE TRANSFER X | TRANSFER | 1,500.00 |
| 8/3 | STRIPE TRANSFER X | TRANSFER | 1,950.00 |
| 8/3 | STRIPE TRANSFER X | TRANSFER | 2,080.00 |
| 8/3 | STRIPE TRANSFER X | TRANSFER | 2,250.00 |
| 8/3 | NIKE INC. ACH/CRED TRANSFER OFA | TRANSFER | 2,397.50 |
| 8/3 | NEW BALANCE ATHLETICS, INC. ACH/CRED | TRANSFER | 2,441.11 |
| 8/3 | STRIPE TRANSFER X | TRANSFER | 4,080.00 |
| 8/3 | PATAGONIA TRANSFER INTERNATIONAL INC. ACH/CRED OFA | TRANSFER | 4,625.00 |
| 8/3 | STRIPE TRANSFER X | TRANSFER | 5,137.37 |

Case: 20-30819   Doc# 20   Filed: 10/20/20   Entered: 10/20/20 17:46:10   Page 71 of 159

00071



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS              4766 (Continued)

| DEPOSITS AND OTHER CREDITS | | |
|---|---|---|
| **DATE** | **TRANSACTION DESCRIPTION** | **AMOUNT** |
| 8/3 | SPORTSILLU xxxBENJA ON PAYMENT | TRANSFER | 5,542.08 |
| 8/3 | BACKCOUNTRY.COM LLC. ACH/CRED TRANSFER OFA | TRANSFER | 5,802.21 |
| 8/3 | HELLY HANSEN LEISURE INC. ACH/CRED TRANSFER OFA | TRANSFER | 16,090.00 |
| 8/3 | WOLVERWINE WORLD WIDE C ACH/CRED TRANSFER OFA | TRANSFER | 16,854.00 |
| 8/3 | STRIPE TRANSFER X | TRANSFER | 22,144.68 |
| 8/3 | FANATICS INC. ACH/CRED TRANSFER OFA | TRANSFER | 31,962.47 |
| 8/3 | COVERAGEGEAR ACH/CRED 200803 | TRANSFER | 89,946.00 |
| 8/3 | COLUMBIA SPORTSWEAR CO ACH/CRED | TRANSFER | 259,931.74 |
| 8/3 | NEW BALANCE ATHLETICS, INC. ACH/CRED | TRANSFER | 393,552.67 |
| 8/3 | NIKE INC. ACH/CRED TRANSFER OFA | TRANSFER | 451,048.68 |
| 8/3 | FANATICS INC. ACH/CRED TRANSFER OFA | TRANSFER | 457,464.90 |
| 8/3 | BACKCOUNTRY.COM LLC. ACH/CRED TRANSFER OFA | TRANSFER | 460,688.09 |
| 8/10 | Wire Transfer Credit WF EXC RTN TO SNDR 721 WIP MAC P6101-081 1300 SW 5TH AVE 8TH FL PORTLAND OR 97201-566720200810I1B7031 R011337 | TRANSFER | 37,386.78 |

Case: 20-30819   Doc# 20   Filed: 10/20/20   Entered: 10/20/20 17:46:10   Page 72 of 159



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766 (Continued)

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|------|------------------------|--|--------|
| 8/21 | Memo Credit PAYPAL TRANSFER ACH Entry | TRANSFER | 400.00 |

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|------|------------------------|--|--------|
| 8/3 | SPORTSILLU xxxBENJA ON PAYMENT | PAYMENT | 603,750.00– |
| 8/10 | Wire Transfer Debit E-Revshare Core LLC 121000248 026012881 WELLS FARGO BANK,20200810MMQFMP UN000097 | PAYMENT | 37,386.78– |
| 8/12 | Wire Transfer Debit E-Revshare Core LLC 121000248 1200787933 WELLS FARGO BANK,20200812MMQFMP UN000149 | PAYMENT | 37,386.78– |
| 8/31 | Amazon Az EDI PYMNTS BENJA INCOR PAYMENT OFA | PAYMENT | 96,758.43– |
| 8/31 | GUSTO Benja Incorporated | PAYMENT | 146,520.33– |
| 8/31 | NEXT DOOR BENJA CK ON PAYMENT OFA | PAYMENT | 149,533.00– |
| 8/31 | TIK TOK INC. TRANSFER OFA | PAYMENT | 164,000.00– |
| 8/31 | FLIPBOARD CK ON PAYMENT OFA | PAYMENT | 203,510.81– |
| 8/31 | CONDE xxxBENJA | PAYMENT | 208,484.54– |
| 8/31 | Online Domestic Wire Transfer Via:MUFG UNION BANK A/C: JOMBOY MEDIA INC. | PAYMENT | 260,000.00– |
| 8/31 | CK PAYMENT | PAYMENT | 283,772.84– |



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766 (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|------|------------------------|---------|--------|
| 8/31 | PINTEREST INC BENJA CK ON PAYMENT OFA | PAYMENT | 549,937.48– |
| 8/31 | SPOTIFY INT xxxBENJA ON PAYMENT | PAYMENT | 575,937.48– |

Case: 20-30819   Doc# 20   Filed: 10/20/20   Entered: 10/20/20 17:46:10   Page 74 of 159
00074

# EXHIBIT 8



100 W University Ave
Champaign IL 61820

15810992
BENJA INC
845 MARKET ST 450A
SAN FRANCISCO CA 94117

Date  8/31/20          Page      1
Primary Account              4766

## CHECKING ACCOUNT SUMMARY & DETAIL

| BUSINESS ANALYSIS | | Number of Enclosures | 2 |
|---|---|---|---|
| Account Number | 4766 | Statement Dates    8/03/20 thru  8/31/20 | |
| Previous Balance | 27,538.59- | Days in the statement period | 29 |
| 38 Deposits/Credits | 2,289,795.77 | Average Ledger | 8,477.06 |
| 35 Checks/Debits | 2,260,282.38 | Average Collected | 8,477.06 |
| Service Charge | .00 | | |
| Interest Paid | .00 | | |
| Ending Balance | 1,974.80 | | |

| | Total For This Period | Total Year-to-Date |
|---|---|---|
| Overdraft Item Fees | $.00 | $910.00 |
| Returned Item Fees | $.00 | $35.00 |

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | AMOUNT |
|---|---|---|
| 8/03 | CGUSABENJA          TRANSFER<br>ANDREW CHAPIN<br>ST-M2D0B0E2U5B4 | 77.21 |
| 8/04 | Reverse OD Item Charge | 35.00 |
| 8/04 | CGUSABENJA          TRANSFER<br>ANDREW CHAPIN<br>ST-C2I2I7X5Q0F3 | 273.50 |
| 8/05 | Reverse OD Item Charge | 35.00 |
| 8/05 | Reverse OD Item Charge | 35.00 |
| 8/05 | Reverse OD Item Charge | 35.00 |
| 8/05 | Reverse OD Item Charge | 35.00 |
| 8/05 | Wire Transfer Credit<br>ANDREW J CHAPIN<br>26 CRAGMONT AVE<br>SAN FRANCISCO CA 94116-1308 US<br>20200805B1QGC08C003144<br>20200805MMQFMPUN000082<br>08050914FT03 | 25,000.00 |
| 8/05 | CGUSABENJA          TRANSFER<br>ANDREW CHAPIN<br>ST-Q7Z8U4B8W7E5 | 127.47 |
| 8/06 | Reverse OD Item Charge | 35.00 |
| 8/06 | Reverse OD Item Charge | 35.00 |
| 8/06 | Wire Transfer Credit<br>ANDREW J CHAPIN | 20,000.00 |

## CHANGE OF ADDRESS FORM

Please notify us immediately of any address changes on your accounts..

Customer Name: _____

_____ (Account Number)

New Address: _____

(Street Address) _____ (Unit #)

(City) _____ (State) _____ (Zip Code)

Member FDIC

(Telephone Number) _____ (Social Security Number)

(Customer Signature)

**Please return this form to the address listed below or bring it to our office**

### THIS FORM WILL HELP YOU BALANCE YOUR CHECKBOOK

| CHECKS or WITHDRAWALS OUTSTANDING Not Charged To Your Account | | |
|---|---|---|
| Check No. | $ | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| TOTAL | $ | |

ENDING BALANCE
Shown On This Statement                                $ _____

ADD (+)
Deposits, Loan Advances, Credit Memos, And       $ _____
Other Automatic Deposits Not Shown On This       $ _____
Statement                                        $ _____

SUBTRACT (-)
Total of Checks Outstanding, Automatic Loan       $ _____
Payments, Automatic Savings Transfers, Service    $ _____
Charges, Debit Memos  And Other Automatic         $ _____
Deductions Not Shown On This Statement            $ _____

BALANCE                                           $ _____

Current Checkbook Balance                         $ _____

ADD (+)
Interest Earned From This Statement               $ _____

SUBTRACT (-)
Misc. Charges From This Statement                 $ _____

**NEW CHECKBOOK BALANCE**
Should Agree With BALANCE Line                    $ _____

### IMPORTANT INFORMATION

**In Case of General Statement Errors**

You must examine your statement of account with "reasonable promptness." If you discover (or reasonably should have discovered) any errors, unauthorized signatures, or alterations, you must promptly notify us of the relevant facts. You agree that the time you have to examine your statement and report to us will depend on the circumstances,but will not, in any circumstance, exceed a total of 30 days from when the statement is first sent or made available to you.

### IMPORTANT INFORMATION FOR CONSUMER ACCOUNTS

**In Case of Errors or Questions About Your Electronic Transactions**

Telephone or write us at the number or address listed below if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.
  (1)  Tell us your name and account  number.
  (2)  Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
  (3)  Tell us the date and the dollar amount of the suspected  error.
We will investigate your complaint and will correct any error promptly.If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation. To qualify for this recredit, we require a written notice of the problem or complaint within 10 business days of your telephone call to us.

**In Case of Errors or Questions About Your Line of Credit or Home Equity Loan**

If you think your bill is wrong, or if you need information about this loan or a transaction on this statement, please write to us at the address listed below. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights. In your letter, please give us the following information:
  (1)  Your name and account number.
  (2)  Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
  (3)  The date and the dollar amount of the suspected  error.
You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your questions, we cannot report you as delinquent or take any action to collect the amount you question.

**Balance Subject to Interest Rate for Line of Credit**

Balance Subject to Interest Rate / Average Daily Balance - We figure the interest charge on your account by applying the periodic rate to the 'AVERAGE DAILY BALANCE' of your account (including current transactions). To get the 'AVERAGE DAILY BALANCE', we take the beginning balance of your account each day, add any new advances and subtract any payments or credits, also subtracting any unpaid finance charges. The automatic minimum payment amount is excluded when calculating the 'AVERAGE DAILY BALANCE' and 'INTEREST CHARGE'. If the account does not have sufficient funds to cover payment and another advance is made to cover minimum payment, this is also excluded from figuring the 'AVERAGE DAILY BALANCE' but is reflected in the beginning balance of the next statement cycle. This gives us the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the 'AVERAGE DAILY BALANCE'. Written notification of any errors must be given to preserve your rights under the Truth in Lending Act. At any time the debtor may pay the aggregate balance or any portion of his/her indebtedness.

*We may report information about your account to credit bureaus.  Late payments, missed payments, or other defaults on your account may be reflected in your credit report.*

**Telephone Number and Address to Be Notified in the Event of Errors**

Call us at 800.672.8739 or write to us at Busey Bank, Attention: Customer Care Center, P.O. Box 4028, Champaign, IL 61824. You should also call us at this phone number or write to us at this address if you believe a transfer has been made using the information from your check without your permission.

00077



BUSINESS ANALYSIS              4766   (Continued)

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | AMOUNT |
|---|---|---|
| | 26 CRAGMONT AVE | |
| | SAN FRANCISCO CA 94116-1308 US | |
| | 20200806B1QGC03C005761 | |
| | 20200806MMQFMPUN000133 | |
| | 08061035FT03 | |
| 8/06 | CGUSABENJA      TRANSFER<br>ANDREW CHAPIN<br>ST-Y3N2O6U8G3E5 | 70.22 |
| 8/07 | Wire Transfer Credit<br>ANDREW J CHAPIN<br>26 CRAGMONT AVE<br>SAN FRANCISCO CA 94116-1308 US<br>20200807B1QGC05C009613<br>20200807MMQFMPUN000204<br>08071319FT03 | 134,000.00 |
| 8/07 | CGUSABENJA      TRANSFER<br>ANDREW CHAPIN<br>ST-W5G3P6P5G5R8 | 111.32 |
| 8/10 | Wire Transfer Credit<br>ANDREW J CHAPIN<br>26 CRAGMONT AVE<br>SAN FRANCISCO CA 94116-1308 US<br>20200810B1QGC06C002330<br>20200810MMQFMPUN000037<br>08100801FT03 | 25,000.00 |
| 8/10 | Wire Transfer Credit<br>WF EXC RTN TO SNDR 721 WIP<br>MAC P6101-081<br>1300 SW 5TH AVE 8TH FL<br>PORTLAND OR 97201-5667<br>20200810I1B7031R011337<br>20200810MMQFMPUN000177<br>08101335FT03 | 37,386.78 |
| 8/10 | CGUSABENJA      TRANSFER<br>ANDREW CHAPIN<br>ST-O6C6P2B7B2U4 | 20.21 |
| 8/11 | Wire Transfer Credit<br>ANDREW J CHAPIN<br>26 CRAGMONT AVE<br>SAN FRANCISCO CA 94116-1308 US<br>20200811B1QGC05C005373<br>20200811MMQFMPUN000141<br>08111113FT03 | 4,000.00 |
| 8/11 | CGUSABENJA      TRANSFER<br>ANDREW CHAPIN<br>ST-J9H7B0X1H0D5 | 155.35 |
| 8/12 | CGUSABENJA      TRANSFER<br>ANDREW CHAPIN | 49.67 |



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766  (Continued)

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | AMOUNT |
|------|----------------------|--------|
|      | ST-E1N1O8T8K9W6 | |
| 8/14 | CGUSABENJA       TRANSFER | 215.66 |
|      | ANDREW CHAPIN | |
|      | ST-B2I0O3L2W3X5 | |
| 8/17 | CGUSABENJA       TRANSFER | 112.19 |
|      | ANDREW CHAPIN | |
|      | ST-E5N8U1U0K8O3 | |
| 8/18 | Wire Transfer Credit | 11,000.00 |
|      | ANDREW J CHAPIN | |
|      | 26 CRAGMONT AVE | |
|      | SAN FRANCISCO CA 94116-1308 US | |
|      | 20200818B1QGC01C007938 | |
|      | 20200818MMQFMPUN000164 | |
|      | 08181252FT03 | |
| 8/18 | CGUSABENJA       TRANSFER | 418.48 |
|      | ANDREW CHAPIN | |
|      | ST-X6F7Z6A7F6Z3 | |
| 8/19 | Wire Transfer Credit | 20,803.49 |
|      | ANDREW J CHAPIN | |
|      | 26 CRAGMONT AVE | |
|      | SAN FRANCISCO CA 94116-1308 US | |
|      | 20200819B1QGC02C008957 | |
|      | 20200819MMQFMPUN000279 | |
|      | 08191531FT03 | |
| 8/19 | CGUSABENJA       TRANSFER | 181.67 |
|      | ANDREW CHAPIN | |
|      | ST-X3I1C7P0A7P8 | |
| 8/20 | CGUSABENJA       TRANSFER | 130.35 |
|      | ANDREW CHAPIN | |
|      | ST-U9Y3O6Y5T6X3 | |
| 8/20 | FROM LOAN 0865 | 1,979,296.50 |
| 8/21 | CGUSABENJA       TRANSFER | 93.62 |
|      | ANDREW CHAPIN | |
|      | ST-H5D2Y3E4J5I0 | |
| 8/21 | From L 6706744910865 | 20,803.00 |
|      | To DDA 500764766 | |
| 8/24 | CGUSABENJA       TRANSFER | 141.80 |
|      | ANDREW CHAPIN | |
|      | ST-Q0L0W9V7I0J7 | |
| 8/25 | CGUSABENJA       TRANSFER | 398.10 |
|      | ANDREW CHAPIN | |
|      | ST-K8G5M0Y6C8R5 | |
| 8/26 | CGUSABENJA       TRANSFER | 32.80 |
|      | ANDREW CHAPIN | |
|      | ST-H4R5F4Q7W9S8 | |
| 8/27 | PAYPAL           TRANSFER | 8,410.46 |
|      | ANDREW CHAPIN | |
|      | 1010139078579 | |



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766  (Continued)

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | AMOUNT |
|------|------------------------|--------|
| 8/28 | CGUSABENJA     TRANSFER | 85.56 |
|      | ANDREW CHAPIN |  |
|      | ST-L7S9T9J4R1Y0 |  |
| 8/31 | CGUSABENJA     TRANSFER | 155.36 |
|      | ANDREW CHAPIN |  |
|      | ST-D1V4E7Y2O4G4 |  |
| 8/31 | PAYPAL         TRANSFER | 1,000.00 |
|      | ANDREW CHAPIN |  |
|      | 1010179433893 |  |

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|-------------------------|--------|
| 8/03 | STRIPE          TRANSFER | 1,526.64- |
|      | ANDREW CHAPIN |  |
|      | ST-Y3D8S2F0R4C3 |  |
| 8/03 | Overdraft Item Charge | 35.00- |
| 8/04 | GUSTO          FEE 275077 | 111.00- |
|      | Benja Incorporated |  |
|      | 6semjooc091 |  |
| 8/04 | STRIPE          TRANSFER | 170.57- |
|      | ANDREW CHAPIN |  |
|      | ST-X4Q7W9P7X0R4 |  |
| 8/04 | SSBTRUSTOPS     P/R Contr | 5,703.75- |
|      | BENJA INCORPORAT |  |
| 8/04 | Overdraft Item Charge | 140.00- |
| 8/05 | STRIPE          TRANSFER | 320.18- |
|      | ANDREW CHAPIN |  |
|      | ST-R5G1I8I8A7G3 |  |
| 8/05 | AMEX EPAYMENT    ACH PMT | 5,800.00- |
|      | Andrew Chapin |  |
|      | M4460 |  |
| 8/05 | Overdraft Item Charge | 70.00- |
| 8/06 | Guideline Retire GUIDELINE. | 39.00- |
|      | BENJA INCORPORATED |  |
|      | ST-W1Z6D6R7G1G0 |  |
| 8/06 | STRIPE          TRANSFER | 60.06- |
|      | ANDREW CHAPIN |  |
|      | ST-K1T5Y5N3I4V2 |  |
| 8/07 | Wire Transfer Debit | 2,000.00- |
|      | Sports Byline USA |  |
|      | 122016066 |  |
|      | 0450009504 |  |
|      | CITY NATIONAL BANK |  |
|      | 20200807MMQFMPUN000270 |  |
|      | 20200807L2LFCK1C003392 |  |
|      | 08071344FT03 |  |

Case: 20 30819   Doc# 20   Filed: 10/20/20   Entered: 10/20/20 17:46:10   Page 80 of
159

00080



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766  (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
| 8/07 | Wire Transfer Debit<br>Koosh Media<br>321370765<br>8103786531<br>AMERICAN SAVINGS B<br>INV AUGUST<br>20200807MMQFMPUN000313<br>20200807GMQFMP01020788<br>08071428FT03 | 10,000.00- |
| 8/07 | Wire Transfer Debit<br>Sean C Fleming Rev Trust 5/1/0<br>026007993<br>101-WA-258641-000<br>UBS AG<br>Further Credit U2 32785 SCF Tr<br>20200807MMQFMPUN000312<br>20200807B1Q8051R000649<br>08071428FT03 | 12,500.00- |
| 8/07 | Wire Transfer Debit<br>MHC Financial Services, Inc.<br>101000695<br>9872224221<br>UMB BANK, N.A.<br>20200807MMQFMPUN000348<br>20200807J1B7841C001254<br>08071459FT03 | 100,000.00- |
| 8/10 | Wire Transfer Debit<br>E-Revshare Core LLC<br>121000248<br>026012881<br>WELLS FARGO BANK,<br>20200810MMQFMPUN000097<br>20200810I1B7033R010050<br>08101129FT03 | 37,386.78- |
| 8/10 | STRIPE        TRANSFER<br>ANDREW CHAPIN<br>ST-K1H7F8F2G2G0 | 401.43- |
| 8/12 | Wire Transfer Debit<br>E-Revshare Core LLC<br>121000248<br>1200787933<br>WELLS FARGO BANK,<br>20200812MMQFMPUN000149<br>20200812I1B7031R011373<br>08121206FT03 | 37,386.78- |
| 8/12 | STRIPE        TRANSFER<br>ANDREW CHAPIN<br>ST-I8D8U3A1D6Z5 | 41.89- |



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS               4766  (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
| 8/13 | Wire Transfer Debit | 4,500.00- |
|      | TYZ LAW GROUP PC | |
|      | 321171184 | |
|      | 206670879 | |
|      | CITIBANK, N.A. | |
|      | 20200813MMQFMPUN000021 | |
|      | 20200813B1Q8021R009731 | |
|      | 08130904FT03 | |
| 8/14 | Account Analysis Charge | 230.26- |
| 8/17 | STRIPE          TRANSFER | 135.82- |
|      | ANDREW CHAPIN | |
|      | ST-D3A1U6U2I8C0 | |
| 8/18 | From DDA 500764766 | 10,260.63- |
|      | to L 6706744910865 | |
| 8/20 | Wire Transfer Debit | 1,941,298.12- |
|      | MHC Financial Services, Inc. | |
|      | 101000695 | |
|      | 9872224221 | |
|      | UMB BANK, N.A. | |
|      | 20200820MMQFMPUN000031 | |
|      | 20200820J1B7841C000325 | |
|      | 08200926FT03 | |
| 8/20 | FEE AND INT DUE LOAN 0865 | 20,803.49- |
| 8/21 | Wire Transfer Debit | 30,000.00- |
|      | Andrew Chapin | |
|      | 322271627 | |
|      | 555475257 | |
|      | JPMORGAN CHASE BAN | |
|      | 20200821MMQFMPUN000116 | |
|      | 20200821B1QGC01R031442 | |
|      | 08211128FT03 | |
| 8/24 | WCB Warehouse    WCB Wareho | 571.75- |
|      | BENJA INCORPORATED | |
|      | ST-J1P7E3N5I8K0 | |
| 8/24 | CHASE CREDIT CRD EPAY | 8,000.00- |
|      | ANDREW J CHAPIN | |
|      | 4842308773 | |
| 8/24 | PAYPAL          INST XFER | 8,410.46- |
|      | ANDREW CHAPIN | |
|      | MARTIJNKLEI | |
| 8/25 | Wire Transfer Debit | 9,065.00- |
|      | Martinus Petrus Kleiweg | |
|      | 031176110 | |
|      | 36105355930 | |
|      | CAPITAL ONE, NA | |
|      | 20200825MMQFMPUN000068 | |
|      | 20200825MMQFMPGH001506 | |
|      | 08251031FT03 | |



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766  (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
| 8/27 | Wire Transfer Debit | 702.40- |
|      | Benja Incorporated | |
|      | 322271627 | |
|      | 599330732 | |
|      | JPMORGAN CHASE BAN | |
|      | 20200827MMQFMPUN000017 | |
|      | 20200827B1QGC01R021347 | |
|      | 08270920FT03 | |
| 8/27 | Wire Transfer Debit | 10,000.00- |
|      | MHC Financial Services Inc. | |
|      | 101000695 | |
|      | 9872224221 | |
|      | UMB BANK, N.A. | |
|      | 20200827MMQFMPUN000115 | |
|      | 20200827J1B7841C000678 | |
|      | 08271150FT03 | |
| 8/28 | Wire Transfer Debit | 2,500.00- |
|      | MHC Financial Services, Inc. | |
|      | 101000695 | |
|      | 9872224221 | |
|      | UMB BANK, N.A. | |
|      | 20200828MMQFMPUN000308 | |
|      | 20200828J1B7841C001659 | |
|      | 08281546FT03 | |

## CHECKS IN SERIAL NUMBER ORDER

| DATE | CHECK NO | AMOUNT | DATE | CHECK NO | AMOUNT |
|------|----------|--------|------|----------|--------|
| 8/04 | 5015 | 110.46 | 8/07 | 5016 | .91 |

*Indicates break in check number sequence

## DAILY BALANCE SECTION

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|------|---------|------|---------|------|---------|
| 8/03 | 29,023.02- | 8/04 | 34,950.30- | 8/05 | 15,873.01- |
| 8/06 | 4,168.15 | 8/07 | 13,778.56 | 8/10 | 38,397.34 |
| 8/11 | 42,552.69 | 8/12 | 5,173.69 | 8/13 | 673.69 |
| 8/14 | 659.09 | 8/17 | 635.46 | 8/18 | 1,793.31 |
| 8/19 | 22,778.47 | 8/20 | 40,103.71 | 8/21 | 31,000.33 |
| 8/24 | 14,159.92 | 8/25 | 5,493.02 | 8/26 | 5,525.82 |
| 8/27 | 3,233.88 | 8/28 | 819.44 | 8/31 | 1,974.80 |



Check 5015 Amount $110.46 Date 8/4/2020



Check 5016 Amount $0.91 Date 8/7/2020



100 W University Ave
Champaign IL 61820

14776286
BENJA INC
845 MARKET ST 450A
SAN FRANCISCO CA 94117

Date 7/31/20          Page     1
Primary Account              4766

## CHECKING ACCOUNT SUMMARY & DETAIL

| BUSINESS ANALYSIS | | Number of Enclosures | 0 |
|---|---|---|---|
| Account Number | 4766 | Statement Dates   7/01/20 thru  8/02/20 | |
| Previous Balance | 17,983.54- | Days in the statement period | 33 |
| 42 Deposits/Credits | 124,314.55 | Average Ledger | 5,614.76- |
| 67 Checks/Debits | 133,869.60 | Average Collected | 5,614.76- |
| Service Charge | .00 | | |
| Interest Paid | .00 | | |
| Ending Balance | 27,538.59- | | |

| | Total For This Period | Total Year-to-Date |
|---|---|---|
| Overdraft Item Fees | $105.00 | $910.00 |
| Returned Item Fees | $.00 | $35.00 |

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | AMOUNT |
|---|---|---|
| 7/01 | Reverse OD Item Charge | 35.00 |
| 7/01 | Reverse OD Item Charge | 35.00 |
| 7/01 | CGUSABENJA       TRANSFER ANDREW CHAPIN ST-P2P7L9K0W0G3 | 125.09 |
| 7/02 | Reverse OD Item Charge | 35.00 |
| 7/02 | CGUSABENJA       TRANSFER ANDREW CHAPIN ST-B1T1Y9G8C7W7 | 45.73 |
| 7/03 | Reverse OD Item Charge | 35.00 |
| 7/03 | Reverse OD Item Charge | 35.00 |
| 7/06 | CGUSABENJA       TRANSFER ANDREW CHAPIN ST-Z2Z7A7V2X7L0 | 56.96 |
| 7/07 | Reverse OD Item Charge | 35.00 |
| 7/07 | CGUSABENJA       TRANSFER ANDREW CHAPIN ST-L7D3I7O1M6K4 | 222.24 |
| 7/08 | Reverse OD Item Charge | 35.00 |
| 7/08 | Reverse OD Item Charge | 35.00 |
| 7/08 | Reverse OD Item Charge | 35.00 |
| 7/08 | Reverse OD Item Charge | 35.00 |
| 7/09 | Wire Transfer Credit | 17,850.00 |

## CHANGE OF ADDRESS FORM

Please notify us immediately of any address changes on your accounts..

Customer Name: _____

                                                                    (Account Number)

New Address: _____

(Street Address)                                                    (Unit #)

_____

(City)                              (State)                         (Zip Code)

[Equal Housing Lender logo] Member FDIC

(Telephone Number)                                                  (Social Security Number)

_____

(Customer Signature)

### Please return this form to the address listed below or bring it to our office

### THIS FORM WILL HELP YOU BALANCE YOUR CHECKBOOK

| CHECKS or WITHDRAWALS OUTSTANDING Not Charged To Your Account | | | | |
|---|---|---|---|---|
| Check No. | $ | ENDING BALANCE Shown On This Statement | $ _____ | Current Checkbook Balance | $ _____ |
| | | ADD (+) | | ADD (+) |
| | | Deposits, Loan Advances, Credit Memos, And | $ _____ | Interest Earned From This Statement | $ _____ |
| | | Other Automatic Deposits Not Shown On This | $ _____ | |
| | | Statement | $ _____ | SUBTRACT (-) |
| | | | | Misc. Charges From This Statement | $ _____ |
| | | SUBTRACT (-) | $ _____ | |
| | | Total of Checks Outstanding, Automatic Loan | $ _____ | NEW CHECKBOOK BALANCE |
| | | Payments, Automatic Savings Transfers, Service | $ _____ | Should Agree With BALANCE Line | $ _____ |
| | | Charges, Unpaid Finance Charges, Debit Memos And Other Automatic | $ _____ | |
| | | Deductions Not Shown On This Statement | $ _____ | |
| TOTAL | $ | BALANCE | $ _____ | |

### IMPORTANT INFORMATION

**In Case of General Statement Errors**

You must examine your statement of account with "reasonable promptness." If you discover (or reasonably should have discovered) any errors, unauthorized signatures, or alterations, you must promptly notify us of the relevant facts. You agree that the time you have to examine your statement and report to us will depend on the circumstances,but will not, in any circumstance, exceed a total of 30 days from when the statement is first sent or made available to you.

### IMPORTANT INFORMATION FOR CONSUMER ACCOUNTS

**In Case of Errors or Questions About Your Electronic Transactions**

Telephone or write us at the number or address listed below if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.
(1) Tell us your name and account number.
(2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
(3) Tell us the date and the dollar amount of the suspected error.
We will investigate your complaint and will correct any error promptly.If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation. To qualify for this recredit, we require a written notice of the problem or complaint within 10 business days of your telephone call to us.

**In Case of Errors or Questions About Your Line of Credit or Home Equity Loan**

If you think your bill is wrong, or if you need information about this loan or a transaction on this statement, please write to us at the address listed below. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights. In your letter, please give us the following information:
(1) Your name and account number.
(2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
(3) The date and the dollar amount of the suspected error.
You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your questions, we cannot report you as delinquent or take any action to collect the amount you question.

**Balance Subject to Interest Rate for Line of Credit**

Balance Subject to Interest Rate / Average Daily Balance - We figure the interest charge on your account by applying the periodic rate to the 'AVERAGE DAILY BALANCE' of your account (including current transactions). To get the 'AVERAGE DAILY BALANCE', we take the beginning balance of your account each day, add any new advances and subtract any payments or credits, also subtracting any unpaid finance charges. The automatic minimum payment amount is excluded when calculating the 'AVERAGE DAILY BALANCE' and 'INTEREST CHARGE'. If the account does not have sufficient funds to cover payment and another advance is made to cover minimum payment, this is also excluded from figuring the 'AVERAGE DAILY BALANCE' but is reflected in the beginning balance of the next statement cycle. This gives us the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the 'AVERAGE DAILY BALANCE'. Written notification of any errors must be given to preserve your rights under the Truth in Lending Act. At any time the debtor may pay the aggregate balance or any portion of his/her indebtedness.

*We may report information about your account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.*

**Telephone Number and Address to Be Notified in the Event of Errors**

Call us at 800.672.8739 or write to us at Busey Bank, Attention: Customer Care Center, P.O. Box 4028, Champaign, IL 61824. You should also call us at this phone number or write to us at this address if you believe a transfer has been made using the information from your check without your permission.

00086



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766   (Continued)

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | AMOUNT |
|---|---|---|
| | 26 CRAGMONT AVE<br>SAN FRANCISCO CA 94116-1308 US<br>20200709B1QGC08C007019<br>20200709MMQFMPUN000143<br>07091148FT03 | |
| 7/09 | CGUSABENJA       TRANSFER<br>ANDREW CHAPIN<br>ST-M0L6Y9Q8L4W8 | 92.93 |
| 7/10 | Wire Transfer Credit<br>ANDREW J CHAPIN<br>26 CRAGMONT AVE<br>SAN FRANCISCO CA 94116-1308 US<br>20200710B1QGC07C004764<br>20200710MMQFMPUN000155<br>07101113FT03 | 19,600.00 |
| 7/13 | CGUSABENJA       TRANSFER<br>ANDREW CHAPIN<br>ST-L3P5K1H5O8G2 | 160.34 |
| 7/13 | Benja - Affordab Benja - Af<br>ANDREW CHAPIN<br>ST-C1Z3A0J4V8F5 | 3,800.00 |
| 7/13 | From L  6706744910865<br>To DDA 500764766 | 3,800.00 |
| 7/14 | Wire Transfer Credit<br>ANDREW J CHAPIN<br>26 CRAGMONT AVE<br>SAN FRANCISCO CA 94116-1308 US<br>20200714B1QGC02C006404<br>20200714MMQFMPUN000140<br>07141147FT03 | 32,818.09 |
| 7/14 | CGUSABENJA       TRANSFER<br>ANDREW CHAPIN<br>ST-B8G4G2D3T0C3 | 254.97 |
| 7/15 | Wire Transfer Credit<br>ANDREW J CHAPIN<br>26 CRAGMONT AVE<br>SAN FRANCISCO CA  94116-1308<br>20200715E6B7361C000380<br>20200715MMQFMPUN000040<br>07150818FT03 | 40,000.00 |
| 7/15 | CGUSABENJA       TRANSFER<br>ANDREW CHAPIN<br>ST-G6E1B1Z9U6P3 | 32.17 |
| 7/15 | Benja - Affordab Benja - Af<br>ANDREW CHAPIN<br>ST-O9E2A6J0W0O6 | 550.00 |
| 7/16 | Benja - Affordab Benja - Af<br>ANDREW CHAPIN | 1,350.00 |



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                 4766  (Continued)

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | | AMOUNT |
|------|------------------------|---|--------|
| | ST-N7Z5F8V2F7J2 | | |
| 7/20 | CGUSABENJA | TRANSFER | 115.02 |
| | ANDREW CHAPIN | | |
| | ST-T2C0S9X1K9N4 | | |
| 7/20 | Benja - Affordab Benja - Af | | 658.58 |
| | ANDREW CHAPIN | | |
| | ST-T1G3B4V6C2S4 | | |
| 7/21 | CGUSABENJA | TRANSFER | 462.71 |
| | ANDREW CHAPIN | | |
| | ST-N6Y6R6X8J5C5 | | |
| 7/22 | CGUSABENJA | TRANSFER | 32.80 |
| | ANDREW CHAPIN | | |
| | ST-H1D2M6V8M3E8 | | |
| 7/22 | Benja - Affordab Benja - Af | | 390.00 |
| | ANDREW CHAPIN | | |
| | ST-P0Z2N5H4O5T4 | | |
| 7/23 | CGUSABENJA | TRANSFER | 65.83 |
| | ANDREW CHAPIN | | |
| | ST-J1T0X5E6G1U3 | | |
| 7/24 | CGUSABENJA | TRANSFER | 257.08 |
| | ANDREW CHAPIN | | |
| | ST-F1W0O9T7Y7W7 | | |
| 7/27 | CGUSABENJA | TRANSFER | 58.18 |
| | ANDREW CHAPIN | | |
| | ST-S6Z9F0O0S1F4 | | |
| 7/27 | Benja - Affordab Benja - Af | | 640.00 |
| | ANDREW CHAPIN | | |
| | ST-I3O4R0R4R7W3 | | |
| 7/28 | CGUSABENJA | TRANSFER | 137.60 |
| | ANDREW CHAPIN | | |
| | ST-X4H6Y1K8C2G1 | | |
| 7/28 | Benja - Affordab Benja - Af | | 200.00 |
| | ANDREW CHAPIN | | |
| | ST-G3V7I5W5I4N8 | | |
| 7/30 | CGUSABENJA | TRANSFER | 57.06 |
| | ANDREW CHAPIN | | |
| | ST-C9M4N1V7H6I2 | | |
| 7/31 | Reverse OD Item Charge | | 35.00 |
| 7/31 | Reverse OD Item Charge | | 35.00 |
| 7/31 | Reverse OD Item Charge | | 35.00 |
| 7/31 | CGUSABENJA | TRANSFER | 26.17 |
| | ANDREW CHAPIN | | |
| | ST-H2I5E0G6Q2P1 | | |

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|-------------------------|--------|

Case: 20-30819   Doc# 20   Filed: 10/20/20   Entered: 10/20/20 17:46:10   Page 88 of
159



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                4766  (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
| 7/01 | SHOPIFY CAPITAL  RLCTKHK5S<br>Andrew Chapin<br>R7581875 | 26.74- |
| 7/01 | Overdraft Item Charge | 35.00- |
| 7/02 | SHOPIFY CAPITAL  RAFYIHIGX<br>Andrew Chapin<br>R7592370 | 54.52- |
| 7/02 | GUSTO          FEE 955354<br>Benja Incorporated<br>6semjol7uee | 117.00- |
| 7/02 | Overdraft Item Charge | 70.00- |
| 7/06 | SHOPIFY CAPITAL  RIQGVENQI<br>Andrew Chapin<br>R7603172 | 55.43- |
| 7/06 | Overdraft Item Charge | 35.00- |
| 7/07 | SHOPIFY CAPITAL  RUK26RHJG<br>Andrew Chapin<br>R7644096 | 21.80- |
| 7/07 | SHOPIFY CAPITAL  RX5AASE5C<br>Andrew Chapin<br>R7634750 | 35.98- |
| 7/07 | SHOPIFY CAPITAL  RPUOUZGDQ<br>Andrew Chapin<br>R7624759 | 46.25- |
| 7/07 | SHOPIFY CAPITAL  REFDLBBLF<br>Andrew Chapin<br>R7614041 | 57.00- |
| 7/07 | Overdraft Item Charge | 140.00- |
| 7/08 | SHOPIFY CAPITAL  R3YTE3HVO<br>Andrew Chapin<br>R7653886 | 38.60- |
| 7/08 | Overdraft Item Charge | 35.00- |
| 7/09 | SHOPIFY CAPITAL  RA6JN4TG4<br>Andrew Chapin<br>R7664471 | 9.49- |
| 7/09 | WCB Warehouse    WCB Wareho<br>BENJA INCORPORATED<br>ST-S0K3N3Q8V9B7 | 729.38- |
| 7/09 | Overdraft Item Charge | 70.00- |
| 7/10 | Wire Transfer Debit<br>Sports Byline USA<br>122016066<br>0450009504<br>CITY NATIONAL BANK<br>20200710MMQFMPUN000256<br>20200710L2LFCK1C003772<br>07101432FT03 | 2,000.00- |
| 7/10 | Wire Transfer Debit<br>E-Revshare Core LLC | 3,597.44- |

Case: 20-30819   Doc# 20   Filed: 10/20/20   Entered: 10/20/20 17:46:10   Page 89 of
159



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                4766  (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
| | 121000248<br>1200787933<br>WELLS FARGO BANK,<br>Benja June 2020<br>20200710MMQFMPUN000119<br>20200710I1B7031R009610<br>07101131FT03 | |
| 7/10 | SHOPIFY CAPITAL  RGY5P45I5<br>Andrew Chapin<br>R7675495 | 37.72- |
| 7/10 | CGUSABENJA      TRANSFER<br>ANDREW CHAPIN<br>ST-D7A4R1M2X3B5 | 48.17- |
| 7/10 | to loan 6706744910865<br>from dda 500764766 | 11,199.54- |
| 7/13 | SHOPIFY CAPITAL  RHOHWPCKL<br>Andrew Chapin<br>R7686557 | 26.18- |
| 7/14 | Wire Transfer Debit<br>E-Revshare Core LLC<br>121000248<br>1200787933<br>WELLS FARGO BANK,<br>20200714MMQFMPUN000137<br>20200714I1B7031R011008<br>07141203FT03 | 33,917.56- |
| 7/14 | SHOPIFY CAPITAL  RVXEXCCSD<br>Andrew Chapin<br>R7708123 | 35.84- |
| 7/14 | SHOPIFY CAPITAL  RFD7MTUJM<br>Andrew Chapin<br>R7717989 | 38.65- |
| 7/14 | PAYPAL          INST XFER<br>ANDREW CHAPIN<br>REESE8453 EBAY | 47.44- |
| 7/14 | SHOPIFY CAPITAL  RBKII5AXD<br>Andrew Chapin<br>R7697558 | 51.93- |
| 7/14 | GUSTO           CND 027771<br>Benja Incorporated<br>6semjom9jlq | 75.00- |
| 7/15 | Account Analysis Charge | 286.68- |
| 7/15 | Wire Transfer Debit<br>Sean C Fleming Rev Trust 5/1/0<br>026007993<br>101WA258641000<br>UBS AG<br>U2 32785 SCF Tr Alt Inv | 13,125.00- |



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                4766  (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
| | 20200715MMQFMPUN000041 | |
| | 20200715B1Q8052R000407 | |
| | 07150921FT03 | |
| 7/15 | Wire Transfer Debit | 30,000.00- |
| | UMB Bank NA | |
| | 101000695 | |
| | 9872215826 | |
| | UMB BANK, N.A. | |
| | 20200715MMQFMPUN000042 | |
| | 20200715J1B7841C000337 | |
| | 07150921FT03 | |
| 7/15 | SHOPIFY CAPITAL   RR3G3Z7R7 | 115.49- |
| | Andrew Chapin | |
| | R7728106 | |
| 7/15 | WCB Warehouse    WCB Wareho | 250.00- |
| | BENJA INCORPORATED | |
| | ST-D6Q8E9Y3S9O9 | |
| 7/15 | GUSTO            CND 063362 | 500.00- |
| | Benja Incorporated | |
| | 6semjomjc6q | |
| 7/16 | Wire Transfer Debit | 4,250.00- |
| | CFOs2Go | |
| | 121143260 | |
| | 0101150100 | |
| | WESTERN ALLIANCE B | |
| | 20200716MMQFMPUN000249 | |
| | 20200716L1LFB71C001608 | |
| | 07161536FT03 | |
| 7/16 | CGUSABENJA       TRANSFER | 9.73- |
| | ANDREW CHAPIN | |
| | ST-U0F5Z7N1N4Q8 | |
| 7/16 | SHOPIFY CAPITAL   RNS6W7IBL | 70.61- |
| | Andrew Chapin | |
| | R7738730 | |
| 7/17 | CGUSABENJA       TRANSFER | .37- |
| | ANDREW CHAPIN | |
| | ST-S5N2F5B0R8U1 | |
| 7/17 | SHOPIFY CAPITAL   RZ6DPYVYF | 34.97- |
| | Andrew Chapin | |
| | R7749605 | |
| 7/20 | SHOPIFY CAPITAL   RBLUIHBSA | 48.48- |
| | Andrew Chapin | |
| | R7760752 | |
| 7/21 | SHOPIFY CAPITAL   R7MEQNSVL | 5.46- |
| | Andrew Chapin | |
| | R7771889 | |
| 7/21 | SHOPIFY CAPITAL   RQ7Y4LEKA | 13.22- |
| | Andrew Chapin | |



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS              4766  (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
|      | R7792529 | |
| 7/21 | SHOPIFY CAPITAL  RCJSO5DIK<br>Andrew Chapin<br>R7782568 | 19.30- |
| 7/21 | SMOOTHOSTING LTD IAT PAYPAL<br>ANDREW CHAPIN | 110.00- |
| 7/22 | SHOPIFY CAPITAL  RKMAVDNTR<br>Andrew Chapin<br>R7802761 | 20.79- |
| 7/22 | PAYPAL          INST XFER<br>ANDREW CHAPIN<br>AIRBRUSHUNL | 148.30- |
| 7/24 | VENMO          PAYMENT<br>ANDREW CHAPIN<br>3806386704 | 11.99- |
| 7/24 | SHOPIFY CAPITAL  RZD7VLYFH<br>Andrew Chapin<br>R7824477 | 52.27- |
| 7/24 | WCB Warehouse    WCB Wareho<br>BENJA INCORPORATED<br>ST-U7T5A5U5I9H4 | 250.00- |
| 7/27 | PAYPAL          INST XFER<br>ANDREW CHAPIN<br>SPORTSKARDC EBA | 16.26- |
| 7/27 | SHOPIFY CAPITAL  RRRRH62HX<br>Andrew Chapin<br>R7835433 | 47.87- |
| 7/28 | SHOPIFY CAPITAL  RKFDGNVL3<br>Andrew Chapin<br>R7867135 | 6.37- |
| 7/28 | SHOPIFY CAPITAL  R673UTSRW<br>Andrew Chapin<br>R7857229 | 12.83- |
| 7/28 | SHOPIFY CAPITAL  RKSIS5ECF<br>Andrew Chapin<br>R7846553 | 13.55- |
| 7/29 | CGUSABENJA      TRANSFER<br>ANDREW CHAPIN<br>ST-A2B3U3O7U3Z5 | 48.17- |
| 7/30 | GUSTO          CND 142790<br>Benja Incorporated<br>6semjono4dl | 50.00- |
| 7/30 | GUSTO          CND 142790<br>Benja Incorporated<br>6semjono4eo | 150.00- |
| 7/30 | GUSTO          CND 142790<br>Benja Incorporated<br>6semjono4ef | 200.00- |



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766  (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
| 7/30 | GUSTO            CND 142790 | 300.00- |
|      | Benja Incorporated | |
|      | 6semjono4el | |
| 7/30 | GUSTO            CND 142790 | 400.00- |
|      | Benja Incorporated | |
|      | 6semjono4e3 | |
| 7/30 | GUSTO            CND 142790 | 450.00- |
|      | Benja Incorporated | |
|      | 6semjono4dn | |
| 7/30 | GUSTO            CND 142790 | 1,000.00- |
|      | Benja Incorporated | |
|      | 6semjono4en | |
| 7/30 | GUSTO            REM 142476 | 1,900.00- |
|      | Benja Incorporated | |
|      | 6semjonpvv5 | |
| 7/30 | GUSTO            TAX 142477 | 7,717.25- |
|      | Benja Incorporated | |
|      | 6semjonpvpo | |
| 7/30 | GUSTO            NET 142475 | 19,476.98- |
|      | Benja Incorporated | |
|      | 6semjonpvmu | |
| 7/30 | Overdraft Item Charge | 105.00- |

## DAILY BALANCE SECTION

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|------|---------|------|---------|------|---------|
| 7/01 | 17,850.19- | 7/02 | 18,010.98- | 7/03 | 17,940.98- |
| 7/06 | 17,974.45- | 7/07 | 18,018.24- | 7/08 | 17,951.84- |
| 7/09 | 817.78- | 7/10 | 1,899.35 | 7/13 | 9,633.51 |
| 7/14 | 8,540.15 | 7/15 | 4,845.15 | 7/16 | 1,864.81 |
| 7/17 | 1,829.47 | 7/20 | 2,554.59 | 7/21 | 2,869.32 |
| 7/22 | 3,123.03 | 7/23 | 3,188.86 | 7/24 | 3,131.68 |
| 7/27 | 3,765.73 | 7/28 | 4,070.58 | 7/29 | 4,022.41 |
| 7/30 | 27,669.76- | 7/31 | 27,538.59- | | |

**AGREEMENT AND CONSENT TO ELECTRONIC DELIVERY OF BANK STATEMENTS, NOTICES AND OTHER ACCOUNT DOCUMENTS**

1. Welcome to Busey Bank's e-delivery service. Busey Bank's goal is to provide you with an easy and convenient way to receive electronically your periodic bank account statements ("Bank Statements"), notices and other account documents.

2. **Your consent:** For Busey Bank (the "Bank") to begin forwarding your Bank Statements and other account documents to you electronically, the Bank needs your consent. Your consent is given when you accept this Agreement and Consent to Electronic Delivery of Bank Statements and Other Account Documents (this "Agreement"). By agreeing to have these documents sent electronically, you also agree to notify the Bank immediately by telephone at the numbers set forth in this Agreement of any change in your email address or any errors or complications relating to your electronic receipt or access of your Bank Statements and other account documents. To the extent that you previously agreed to electronic delivery of your Bank Statements and other account documents, this Agreement hereby supersedes any prior agreement and your consent to electronic delivery remains in place unless you instruct the Bank otherwise within thirty (30) calendar days after receiving this Agreement by contacting the Bank at the phone number, email address or mailing address included below.

- **Statement delivery -** If you elect to receive your Bank Statements through electronic delivery, the Bank will no longer send you your Bank Statements through the mail.

- **Whether your consent applies only to a particular transaction or to categories of transactions –** Your consent will authorize the Bank to forward to you electronically your periodic Bank Statements, notices and other documents regarding your account(s), including but not limited to, Truth in Savings disclosures and other required disclosures and documents relating to your accounts.

- **The right to withdraw consent to have records provided electronically, including any consequences or fees associated with doing so -** To discontinue this electronic delivery service, you can log into the Busey online banking platform and navigate to the Documents section. Under the Sign Up/ Changes option you can elect to unenroll any accounts you wish to have paper delivery. It will take up to forty-five (45) days for the Bank to implement your request, and after such time you will no longer receive your Bank Statements, notices, disclosures, and other documents regarding your accounts electronically.

- **How the customer may obtain a paper copy of records upon request –** To obtain paper copies of a particular Bank Statement, notice or other account document contact the Bank at 1-800-672-8739. A fee per statement will be charged to your account. Please see Terms and Fees Disclosure for the fee amount.

- **Hardware and software requirements for access and retention of the electronic information -** The hardware and software requirements to enable you to receive and retain your Bank Statements, notices and other account documents electronically are discussed below in **The Bank's Requirements**.

3. **The Bank's Requirements:** First, the same terms apply with respect to electronically delivered Bank Statements, notices and other accounts documents as apply to those in paper form, and, except as set forth in **Your Consent** with respect to this Agreement, the account agreements and disclosures that you have previously entered into with or received from the Bank remain in effect.
Second, for you to be able to receive and view your documents effectively, you must use an Internet browser that supports 128-bit encryption. It is recommended that only certified/supported browsers be used to view Bank Statements. A list of supported browsers is available on the Bank's website at www.busey.com/personal/products-and-services/online---mobile/online-banking. To review your Bank Statements, you will need Adobe Acrobat Flash Player. This product is available for free at http:// www.adobe.com.

**You may print or download your eStatements to retain copies of them.**

4. **Privacy:** The Bank's privacy policy (that has been previously provided to you) will apply to this service and the policy is incorporated into and made a part of this Agreement.

5. **Service Availability:** The Bank may change, suspend or eliminate all or any aspect of this delivery service upon notice to you.

6. **Security:** You will access your Bank Statements, notices and other account documents through the Busey

online banking platform. To protect the security of your banking information, you must not disclose or share your Busey online banking password with any third party. In addition, your Bank Statements and notices will not be forwarded to you through email. Documents such as terms and conditions and similar disclosure agreements may be sent directly to you by email.

7.   **NO WARRANTY FOR CONTINUOUS OR UNINTERRUPTED SERVICE:** BECAUSE OF THE UNPREDICTABILITY OF THE INTERNET, THE BANK DOES NOT GUARANTEE CONTINUOUS OR UNINTERRUPTED ACCESS TO YOUR BANK STATEMENTS THROUGH THE INTERNET.

8.   **LIMIT OF LIABILITY:** YOU AGREE THAT IN NO EVENT WILL THE BANK OR THE BANK'S SUPPLIERS (OR ANY OF THE BANK'S OR ITS SUPPLIER'S SHAREHOLDERS, MEMBERS, OFFICERS, DIRECTORS OR EMPLOYEES) BE LIABLE FOR LOST PROFITS OR ANY SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR IN CONNECTION WITH YOUR USE OF THE BANK'S SERVICE, EVEN IF THE BANK HAS BEEN ADVISED OF THE POSSIBILITY THAT SUCH DAMAGE WILL OCCUR. FURTHER YOU AGREE THAT NEITHER THE BANK NOR THE BANK'S SUPPLIERS (OR ANY OF THE BANK'S OR THE BANK'S SUPPLIER'S SHAREHOLDERS, MEMBERS, OFFICERS, DIRECTORS OR EMPLOYEES) WILL BE LIABLE FOR ANY TECHNICAL, HARDWARE OR SOFTWARE FAILURE OF ANY KIND, ANY INTERRUPTION IN THE AVAILABILITY OF THE BANK'S SERVICE, ANY DELAY IN OPERATION OR TRANSMISSION, ANY INCOMPLETE OR GARBLED TRANSMISSION, COMPUTER VIRUS, LOSS OF DATA, OR OTHER SIMILAR LOSS. TO THE EXTENT THE BANK MAY HAVE BREACHED ANY TERM OF THIS AGREEMENT, YOU AGREE THAT YOUR SOLE REMEDY IS TO DISCONTINUE USE OF THIS SERVICE. YOU FURTHER AGREE THAT THE BANK'S LIABILITY TO YOU IN ANY CASE (WHETHER IN CONTRACT OR TORT) WILL NOT EXCEED AMOUNTS PAID TO THE BANK WITHIN THE LAST NINETY (90) DAYS (IF ANY) FOR THIS SERVICE.

9.   **Notice:** If you want to send the Bank a notice in relation to this Agreement, you must send it by email or regular mail to the addresses listed below. The Bank may notify you by sending notice to your email address or by mailing you notice by U.S. mail to the most current mailing address that the Bank has for you. You agree that any notices sent by email will be deemed delivered and received 48 hours after being sent. You agree that any notices sent by U.S. mail as provided in this paragraph will be deemed delivered and received three days after the date of mailing.

10.  **Arbitration:** To the extent that your account(s) is one not already governed by another arbitration provision with the Bank, you agree that at any claim or controversy relating to this Agreement will be settled by binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. You agree that any claim or controversy you may have will be arbitrated on an individual basis and will not be consolidated in any arbitration with any claim or controversy of any other party. You agree that the arbitration will be conducted in the city in which the Bank's main office is located and that judgment on the arbitration award may be enforced by any court having proper jurisdiction.

11.  **Governing Law:** You agree that this Agreement is governed by the laws of the State of Illinois, excluding any application of conflicts of laws rules or principals. You agree that the sole jurisdiction and venue for any litigation arising from your use of the Bank's service shall be an appropriate federal or state court located in Champaign County, Illinois.

**12. Contact us:**

- Phone:   1-800-672-8739   Option   2
  Email: customersupport@busey.com
- Treasury Management Customers may contact us by phone at 1-800-749-7844 and by Email at treasurymanagement@busey.com
- Address: Attn: eStatements, Busey Bank, P.O. Box 17430, Urbana, IL 61803-9934.

# TERMS AND CONDITIONS
# OF YOUR ACCOUNT

**IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT -** To help the government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account.

What this means for you: When you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

**AGREEMENT -** This document, along with any other documents we give you pertaining to your account(s), is a contract that establishes rules which control your account(s) with us. Please read this carefully and retain it for future reference. If you sign the signature card or open or continue to use the account, you agree to these rules. You will receive a separate schedule of rates, qualifying balances, and fees which are incorporated herein by reference if they are not included in this document. If you have any questions, please call us. **This agreement requires that disputes be resolved in arbitration on an individual basis, rather than through jury trials or class actions. See section Dispute Resolution by Binding Arbitration below for details. If you do not wish to agree to arbitration, you must follow the rejection procedure set forth in the section Dispute Resolution by Binding Arbitration below.**

This agreement is subject to applicable federal laws, the laws of the state of the branch in which your account is located and other applicable rules such as the operating letters of the Federal Reserve Banks and payment processing system rules (except to the extent that this agreement can and does vary such rules or laws). The body of state and federal law that governs our relationship with you, however, is too large and complex to be reproduced here. The purpose of this document is to:

(1) summarize some laws that apply to common transactions;

(2) establish rules to cover transactions or events which the law does not regulate;

(3) establish rules for certain transactions or events which the law regulates but permits variation by agreement; and

(4) give you disclosures of some of our policies to which you may be entitled or in which you may be interested.

If any provision of this document is found to be unenforceable according to its terms, all remaining provisions will continue in full force and effect. We may permit some variations from our standard agreement, but we must agree to any variation in writing either on the signature card for your account or in some other document. Nothing in this document is intended to vary our duty to act in good faith and with ordinary care when required by law.

As used in this document the words "we," "our," and "us" mean the financial institution and the words "you" and "your" mean the account holder(s) and anyone else with the authority to deposit, withdraw, or exercise control over the funds in the account. However, this agreement does not intend, and the terms "you" and "your" should not be interpreted, to expand an individual's responsibility for an organization's liability. If this account is owned by a corporation, partnership or other organization, individual liability is determined by the laws generally applicable to that type of organization. The headings in this document are for convenience or reference only and will not govern the interpretation of the provisions. Unless it would be inconsistent to do so, words and phrases used in this document should be construed so the singular includes the plural and the plural includes the singular. **In Florida,** "Party" means a person who, by the terms of an account, has a present right, subject to request, to payment from the account other than as a beneficiary or agent.

Throughout this document, when a provision is identified as being applicable to a certain state (for example, "in Illinois"), it means that the provision is only applicable if your account is held at a branch located in that particular state. Any provision which is not described as applying to a particular state, applies to your account.

**LIABILITY -** You agree, for yourself (and the person or entity you represent if you sign as a representative of another) to the terms of this account and the schedule of charges. You authorize us to deduct these charges, without notice to you, directly from the account balance as accrued. You will pay any additional reasonable charges for services you request which are not covered by this agreement.

Each of you also agrees to be jointly and severally (individually) liable for any account shortage resulting from charges or overdrafts, whether caused by you or another with access to this account. This liability is due immediately, and we can deduct any amounts deposited into the account and apply those amounts to the shortage. You have no right to defer payment of this liability, and you are liable regardless of whether you signed the item or benefited from the charge or overdraft.

You will be liable for our costs as well as for our reasonable attorneys' fees, to the extent permitted by law, whether incurred as a result of collection or in any other dispute involving your account. This includes, but is not limited to, disputes between you and another joint owner; you and an authorized signer or similar party; or a third party claiming an interest in your account. This also includes any action that you or a third party takes regarding the account that causes us, in good faith, to seek the advice of an attorney, whether or not we become involved in the dispute. All costs and attorneys' fees can be deducted from your account when they are incurred, without notice to you.

**DEPOSITS -** We will give you provisional credit until collection is final for any items, other than cash, we accept for deposit (including items drawn "on us"). Before settlement of any item becomes final, we act only as your agent, regardless of the form of indorsement or lack of indorsement on the item and even though we provide

you provisional credit for the item. We may reverse any provisional credit for items that are lost, stolen, or returned. Unless prohibited by law, we also reserve the right to charge back to your account the amount of any item deposited to your account or cashed for you which was initially paid by the payor bank and which is later returned to us due to an allegedly forged, unauthorized or missing indorsement, claim of alteration, encoding error, counterfeit cashier's check or other problem which in our judgment justifies reversal of credit. You authorize us to attempt to collect previously returned items without giving you notice, and in attempting to collect we may permit the payor bank to hold an item beyond the midnight deadline. Actual credit for deposits of, or payable in, foreign currency will be at the exchange rate in effect on final collection in U.S. dollars. We are not responsible for transactions by mail or outside depository until we actually record them. We will treat and record all transactions received after our "daily cutoff time" on a business day we are open, or received on a day we are not open for business, as if initiated on the next business day that we are open. At our option, we may take an item for collection rather than for deposit. If we accept a third-party check or draft for deposit, we may require any third-party indorsers to verify or guarantee their indorsements, or indorse in our presence.

**WITHDRAWALS -**

**Generally -** Unless clearly indicated otherwise on the account records, any of you, acting alone, who signs to open the account or has authority to make withdrawals may withdraw or transfer all or any part of the account balance at any time. Each of you (until we receive written notice to the contrary) authorizes each other person who signs or has authority to make withdrawals to indorse any item payable to you or your order for deposit to this account or any other transaction with us.

**Postdated checks -** A postdated check is one which bears a date later than the date on which the check is written. We may properly pay and charge your account for a postdated check even though payment was made before the date of the check, unless we have received written notice of the postdating in time to have a reasonable opportunity to act. Because we process checks mechanically, your notice will not be effective and we will not be liable for failing to honor your notice unless it precisely identifies the number, date, amount and payee of the item.

**Checks and withdrawal rules -** If you do not purchase your check blanks from us, you must be certain that we approve the check blanks you purchase. We may refuse any withdrawal or transfer request which you attempt on forms not approved by us or by any method we do not specifically permit. We may refuse any withdrawal or transfer request which is greater in number than the frequency permitted, or which is for an amount greater or less than any withdrawal limitations. We will use the date the transaction is completed by us (as opposed to the date you initiate it) to apply the frequency limitations. In addition, we may place limitations on the account until your identity is verified. Even if we honor a nonconforming request, we are not required to do so later. If you violate the stated transaction limitations (if any), in our discretion we may close your account or reclassify it as a transaction account. If we reclassify your account, your account will be subject to the fees and earnings rules of the new account classification.

If we are presented with an item drawn against your account that would be a "substitute check," as defined by law, but for an error or defect in the item introduced in the substitute check creation process, you agree that we may pay such item.

See the funds availability policy disclosure for information about when you can withdraw funds you deposit. For those accounts to which our funds availability policy disclosure does not apply, you can ask us when you make a deposit when those funds will be available for withdrawal. An item may be returned after the funds from the deposit of that item are made available for withdrawal. In that case, we will reverse the credit of the item. We may determine the amount of available funds in your account for the purpose of deciding whether to return an item for insufficient funds at any time between the time we receive the item and when we return the item or send a notice in lieu of return. We need only make one determination, but if we choose to make a subsequent determination, the account balance at the subsequent time will determine whether there are insufficient available funds.

**Cash withdrawals -** We recommend you take care when making large cash withdrawals because carrying large amounts of cash may pose a danger to your personal safety. As an alternative to making a large cash withdrawal, you may want to consider a cashier's check or similar instrument. You assume full responsibility of any loss in the event the cash you withdraw is lost, stolen, or destroyed. You agree to hold us harmless from any loss you incur as a result of your decision to withdraw funds in the form of cash.

**A temporary debit authorization hold affects your account balance -** On debit card purchases, merchants may request a temporary hold on your account for a specified sum of money when the merchant does not know the exact amount of the purchase at the time the card is authorized. The amount of the temporary hold may be more than the actual amount of your purchase.

Some common transactions where this occurs involve purchases of gasoline, hotel rooms, or meals at restaurants. When this happens, our processing system cannot determine that the amount of the hold exceeds the actual amount of your purchase. This temporary hold, and the amount charged to your account, will eventually be adjusted to the actual amount of your purchase, but it could be three calendar days, or even longer in some cases, before the adjustment is made. Until the adjustment is made, the amount of funds in your account available for other transactions will be reduced by the amount of the temporary hold. If another transaction is presented for payment in an amount greater than the funds left after the deduction of the temporary hold amount, that transaction will be a nonsufficient funds (NSF) transaction if we do not pay it or an overdraft transaction if we do pay it. You will be charged an NSF or overdraft fee according to our NSF or overdraft fee policy. You will be charged the fee

© 2019 Wolters Kluwer Financial Services, Inc. All rights reserved.
TC-BRO 8/1/2019

even if you would have had sufficient funds in your account if the amount of the hold had been equal to the amount of your purchase. An item that has been returned and subsequently resubmitted for payment is considered a new item that may result in an additional NSF fee each time the item is returned for non-sufficient funds.

**Overdrafts -** You understand that we may, at our discretion, honor withdrawal requests that overdraw your account. However, the fact that we may honor withdrawal requests that overdraw the account balance does not obligate us to do so later. So you can NOT rely on us to pay overdrafts on your account regardless of how frequently or under what circumstances we have paid overdrafts on your account in the past. We can change our practice of paying, or not paying, discretionary overdrafts on your account without notice to you. You can ask us if we have other account services that might be available to you where we commit to paying overdrafts under certain circumstances, such as an overdraft protection line-of-credit or a plan to sweep funds from another account you have with us. You agree that we may charge fees for overdrafts.

For consumer accounts, we will not charge fees for overdrafts caused by ATM withdrawals or one-time debit card transactions if you have not opted-in to that service. We may use subsequent deposits, including direct deposits of social security or other government benefits, to cover such overdrafts and overdraft fees.

**Multiple signatures, electronic check conversion, and similar transactions -** An electronic check conversion transaction is a transaction where a check or similar item is converted into an electronic fund transfer as defined in the Electronic Fund Transfers regulation. In these types of transactions the check or similar item is either removed from circulation (truncated) or given back to you. As a result, we have no opportunity to review the check to examine the signatures on the item. You agree that, as to these or any items as to which we have no opportunity to examine the signatures, you waive any requirement of multiple signatures.

**Notice of withdrawal -** We reserve the right to require not less than 7 days' notice in writing before each withdrawal from an interest-bearing account other than a time deposit or demand deposit, or from any other savings account as defined by Regulation D. (The law requires us to reserve this right, but it is not our general policy to use it.) Withdrawals from a time account prior to maturity or prior to any notice period may be restricted and may be subject to penalty. See your notice of penalty for early withdrawal.

**In Illinois, OWNERSHIP OF ACCOUNT AND BENEFICIARY DESIGNATION -** These rules apply to this account depending on the form of ownership and beneficiary designation, if any, specified on the account records. We make no representations as to the appropriateness or effect of the ownership and beneficiary designations, except as they determine to whom we pay the account funds.

**Individual Account -** is an account in the name of one person.

**Joint Account - With Survivorship (And Not As Tenants In Common) -** is an account in the name of two or more persons. Each of you intend that when you die the balance in the account (subject to any previous pledge to which we have agreed) will belong to the survivor(s). If two or more of you survive, you will own the balance in the account as joint tenants with survivorship and not as tenants in common.

**Joint Account - No Survivorship (As Tenants In Common) -** This is owned by two or more persons, but none of you intend (merely by opening this account) to create any right of survivorship in any other person. We encourage you to agree and tell us in writing of the percentage of the deposit contributed by each of you. This information will not, however, affect the number of signatures necessary for withdrawal.

**Revocable Trust or Pay-on-Death Account -** If two or more of you create this type of account, you own the account jointly with survivorship. Beneficiaries of either of these account types cannot withdraw unless: (1) all persons creating the account die, and (2) the beneficiary is then living. If two or more beneficiaries are named and survive the death of the owner(s) of the account, such beneficiaries will own this account in equal shares, without right of survivorship. The person(s) creating either a Pay-On-Death or Revocable Trust account reserves the right to: (1) change beneficiaries, (2) change account types, and (3) withdraw all or part of the account funds at any time.

**In Florida, OWNERSHIP OF ACCOUNT AND BENEFICIARY DESIGNATION -** These rules apply to this account depending on the form of ownership and beneficiary designation, if any, specified on the account records. We make no representations as to the appropriateness or effect of the ownership and beneficiary designations, except as they determine to whom we pay the account funds.

**Single-Party Account -** Such an account is owned by one party.

**Multiple-Party Account -** Such an account is payable on request to one or more of two or more parties, whether or not a right of survivorship is mentioned.

**Multiple-Party Account - Tenancy by the Entireties -** The account is owned by two parties who are married to each other and hold the account as tenants by the entirety.

**Rights At Death- Single-Party Account -** At the death of a party, ownership passes as part of the party's estate.

**Multiple-Party Account With Right of Survivorship -** At death of party, ownership passes to the surviving party or parties.

**Multiple-Party Account Without Right of Survivorship -** At death of party, deceased party's ownership passes as part of deceased party's estate.

**Single-Party Account With Pay-on-Death Designation -** At death of the party, ownership passes to the designated pay-on-death beneficiaries and is not part of the party's estate.

**Multiple-Party Account With Right of Survivorship and Pay-on-Death Designation -** At death of last surviving party, ownership passes to the designated pay-on-death beneficiaries and is not part of the last surviving party's estate.

**In Indiana, OWNERSHIP OF ACCOUNT AND BENEFICIARY DESIGNATION -** These rules apply to this account depending on the form of ownership and beneficiary designation, if any, specified on the account records. We make no representations as to the appropriateness or effect of the ownership and beneficiary designations, except as they determine to whom we pay the account funds.

**Individual Account -** is an account in the name of one person.

**Joint Account - With Survivorship (And Not As Tenants In Common) -** is an account in the name of two or more persons. Each of you intend that when you die the balance in the account (subject to any previous pledge to which we have agreed) will belong to the survivor(s). If two or more of you survive, you will own the balance in the account as joint tenants with survivorship and not as tenants in common.

**Joint Account - No Survivorship (As Tenants In Common) -** This is owned by two or more persons, but none of you intend (merely by opening this account) to create any right of survivorship in any other person. We encourage you to agree and tell us in writing of the percentage of the deposit contributed by each of you. This information will not, however, affect the number of signatures necessary for withdrawal.

**Revocable Trust Account/In Trust For (pursuant to the Multiple Party Account statutes in *Indiana Code* ch. 32-17-11 et. seq.) -** If two or more of you create this type of account, you own the account jointly with survivorship. Beneficiaries cannot withdraw unless: (1) all persons creating the account die, and (2) the beneficiary is then living. If two or more beneficiaries are named and survive the death of all persons creating the account, beneficiaries will own this account in equal shares, without right of survivorship. The person(s) creating this account type may: (1) change beneficiaries, (2) change account types, and (3) withdraw all or part of the account funds at any time.

**Pay-on-Death Account with LDPS (pursuant to the Transfer on Death Property Act statutes in *Indiana Code* ch. 32-17-14 et. seq.) -** If two or more of you create this type of account, you own the account jointly with survivorship. Beneficiaries cannot withdraw unless all persons creating the account die. If a named beneficiary does not survive all persons that created the account, that beneficiary's right to a transfer on death transfer belongs to that beneficiary's lineal descendants per stirpes (LDPS) who survive all persons that created the account. LDPS means that group of people that are the lineal descendants of a beneficiary who will take, in place of the beneficiary they have survived, the beneficiary's share as determined under Indiana law. In order for a lineal descendant to take in place of a beneficiary, the lineal descendant must survive the death of that beneficiary. The person(s) creating this account type may: (1) change beneficiaries, (2) change account types, and (3) withdraw all or part of the account funds at any time.

**Pay-on-Death Account No LDPS (pursuant to the Transfer on Death Property Act statutes in *Indiana Code* ch. 32-17-14 et. seq.) -** If two or more of you create this type of account, you own the account jointly with survivorship. Beneficiaries cannot withdraw unless: (1) all persons creating the account die, and (2) the beneficiary is then living. If two or more beneficiaries are named and survive the death of all persons creating the account, beneficiaries will own this account in equal shares unless otherwise designated in writing, without right of survivorship. The person(s) creating this account type may: (1) change beneficiaries, (2) change account types, and (3) withdraw all or part of the account funds at any time.

**Additional Transfer on Death Property Act Rules -** If there are multiple primary beneficiaries and a primary beneficiary does not survive all persons creating the account and does not have a substitute under the LDPS rules, the share of the nonsurviving primary beneficiary is allocated among the surviving primary beneficiaries in the proportion that their shares bear to each other. If there are no surviving primary beneficiaries and there are no substitutes for the nonsurviving primary beneficiaries under the LDPS rules, the property belongs to the surviving contingent beneficiaries in equal shares or according to the percentages or fractional shares stated in the designation. If there are multiple contingent beneficiaries and a contingent beneficiary does not survive all persons creating the account and does not have a substitute under the LDPS rules, the share of the nonsurviving contingent beneficiary is allocated among the surviving contingent beneficiaries in the proportion that their shares bear to each other. If no beneficiary survives all persons creating the account, the property belongs to the estate of the owner unless directed to a substitute beneficiary under the LDPS rules.

**In Missouri, OWNERSHIP OF ACCOUNT AND BENEFICIARY DESIGNATION -** These rules apply to this account depending on the form of ownership and beneficiary designation, if any, specified on the account records. We make no representations as to the appropriateness or effect of the ownership and beneficiary designations, except as they determine to whom we pay the account funds.

**Individual Account -** is an account in the name of one person.

**Joint Account - With Survivorship (And Not As A Tenancy By The Entirety Or As Tenants In Common) -** is an account in the name of two or more persons. Each of you intend that when you die the balance in the account (subject to any previous pledge to which we have agreed) will belong to the survivor(s). If two or more of you survive, you will own the balance in the account as joint tenants with survivorship and not as tenants in common.

**Joint Account - As Tenants In Common Without Survivorship (And Not As A Tenancy By The Entirety) -** This is owned by two or more persons, but none of you intend (merely by opening this account) to create any right of survivorship in any other person. We encourage you to agree and tell us in writing of the percentage of the deposit contributed by each of you. This information will not, however, affect the number of signatures necessary for withdrawal.

**Husband And Wife As A Tenancy By The Entirety -** is an account in the name of two persons who are husband and wife as tenants by the entirety.

© 2019 Wolters Kluwer Financial Services, Inc. All rights reserved.
TC-BRO 8/1/2018

Page 2 of 6

00097

**Revocable Trust or Pay-On-Death Account (not subject to the Nonprobate Transfers Law of Missouri) -** If two or more of you create such an account, you own the account jointly with survivorship. Beneficiaries cannot withdraw unless: (1) all persons creating the account die, and (2) the beneficiary is then living. If two or more beneficiaries are named and survive the death of all persons creating the account, such beneficiaries will own this account in equal shares, without right of survivorship. The person(s) creating either of these account types reserves the right to: (1) change beneficiaries, (2) change account types, and (3) withdraw all or part of the account funds at any time.

**Registration in Beneficiary Form -** LDPS means a class of unnamed persons who are the lineal descendants per stirpes of a beneficiary and who are to take upon surviving, in place of and with the same priority as the named individual for whom they are indicated as substitutes.

**BUSINESS, ORGANIZATION AND ASSOCIATION ACCOUNTS -** Earnings in the form of interest, dividends, or credits will be paid only on collected funds, unless otherwise provided by law or our policy. You represent that you have the authority to open and conduct business on this account on behalf of the entity. We may require the governing body of the entity opening the account to give us a separate authorization telling us who is authorized to act on its behalf. We will honor the authorization until we actually receive written notice of a change from the governing body of the entity.

**In Illinois and Missouri, STOP PAYMENTS -** Unless otherwise provided, the rules in this section cover stopping payment of items such as checks and drafts. Rules for stopping payment of other types of transfers of funds, such as consumer electronic fund transfers, may be established by law or our policy. If we have not disclosed these rules to you elsewhere, you may ask us about those rules.

We may accept an order to stop payment on any item from any one of you. You must make any stop-payment order in the manner required by law and we must receive it in time to give us a reasonable opportunity to act on it before our stop-payment cutoff time. Because stop-payment orders are handled by computers, to be effective, your stop-payment order must precisely identify the number, date, and amount of the item, and the payee. You may stop payment on any item drawn on your account whether you sign the item or not. Generally, if your stop-payment order is given to us in writing it is effective for six months. Your order will lapse after that time if you do not renew the order in writing before the end of the six-month period. If the original stop-payment order was oral your stop-payment order will lapse after 14 calendar days if you do not confirm your order in writing within that time period. We are not obligated to notify you when a stop-payment order expires.

If you stop payment on an item and we incur any damages or expenses because of the stop payment, you agree to indemnify us for those damages or expenses, including attorneys' fees. You assign to us all rights against the payee or any other holder of the item. You agree to cooperate with us in any legal actions that we may take against such persons. You should be aware that anyone holding the item may be entitled to enforce payment against you despite the stop-payment order.

Our stop-payment cutoff time is one hour after the opening of the next banking day after the banking day on which we receive the item. Additional limitations on our obligation to stop payment are provided by law (e.g., we paid the item in cash or we certified the item).

**In Florida, STOP PAYMENTS -** Unless otherwise provided, the rules in this section cover stopping payment of items such as checks and drafts. Rules for stopping payment of other types of transfers of funds, such as consumer electronic fund transfers, may be established by law or our policy. If we have not disclosed these rules to you elsewhere, you may ask us about those rules. We may accept an order to stop payment on any item from any one of you. You must make any stop-payment order in the manner required by law, it must be made in a signed and dated writing, and we must receive it in time to give us a reasonable opportunity to act on it before our stop-payment cutoff time. Because stop-payment orders are handled by computers, to be effective, your stop-payment order must precisely identify the number, date, and amount of the item, and the payee.

You may stop payment on any item drawn on your account whether you sign the item or not. Your stop-payment order is effective for six months. Your order will lapse after that time if you do not renew the order in writing before the end of the six-month period. We are not obligated to notify you when a stop-payment order expires.

If you stop payment on an item and we incur any damages or expenses because of the stop payment, you agree to indemnify us for those damages or expenses, including attorneys' fees. You assign to us all rights against the payee or any other holder of the item. You agree to cooperate with us in any legal actions that we may take against such persons. You should be aware that anyone holding the item may be entitled to enforce payment against you despite the stop-payment order.

Our stop-payment cutoff time is one hour after the opening of the next banking day after the banking day on which we receive the item. Additional limitations on our obligation to stop payment are provided by law (e.g., we paid the item in cash or we certified the item).

**In Indiana, STOP PAYMENTS -** Unless otherwise provided, the rules in this section cover stopping payment of items such as checks and drafts. Rules for stopping payment of other types of transfers of funds, such as consumer electronic fund transfers, may be established by law or our policy. If we have not disclosed these rules to you elsewhere, you may ask us about those rules.

We may accept an order to stop payment on any item from any one of you. You must make any stop-payment order in the manner required by law and we must receive it in time to give us a reasonable opportunity to act on it before our stop-payment cutoff time. Because stop-payment orders are handled by computers, to be effective, your stop-payment order must precisely identify the number, date, and amount of the item,

and the payee. You may stop payment on any item drawn on your account whether you sign the item or not. Your stop-payment order is effective for six months if it is given to us in writing or by another type of record (Generally, a "record" is information that is stored in such a way that it can be retrieved and can be heard or read and understood – you can ask us what type of stop-payment records you can give us). Your order will lapse after that time if you do not renew the order in writing before the end of the six-month period. If the original stop-payment order was oral your stop-payment order will lapse after 14 calendar days if it is not confirmed in writing or by another type of record within that time period. We are not obligated to notify you when a stop-payment order expires.

If you stop payment on an item and we incur any damages or expenses because of the stop payment, you agree to indemnify us for those damages or expenses, including attorneys' fees. You assign to us all rights against the payee or any other holder of the item. You agree to cooperate with us in any legal actions that we may take against such persons. You should be aware that anyone holding the item may be entitled to enforce payment against you despite the stop-payment order.

Our stop-payment cutoff time is one hour after the opening of the next banking day after the banking day on which we receive the item. Additional limitations on our obligation to stop payment are provided by law (e.g., we paid the item in cash or we certified the item).

**TELEPHONE TRANSFERS -** A telephone transfer of funds from this account to another account with us, if otherwise arranged for or permitted, may be made by the same persons and under the same conditions generally applicable to withdrawals made in writing. Limitations on the number of telephonic transfers from a savings account are described elsewhere.

**AMENDMENTS AND TERMINATION -** We may change any term of this agreement. Rules governing changes in interest rates are provided separately in the Truth-in-Savings disclosure or in another document. For other changes, we will give you reasonable notice in writing or by any other method permitted by law. We may also close this account at any time upon reasonable notice to you and tender of the account balance personally or by mail. Items presented for payment after the account is closed may be dishonored. When you close your account, you are responsible for leaving enough money in the account to cover any outstanding items to be paid from the account. Reasonable notice depends on the circumstances, and in some cases such as when we cannot verify your identity or we suspect fraud, it might be reasonable for us to give you notice after the change or account closure becomes effective. For instance, if we suspect fraudulent activity with respect to your account, we might immediately freeze or close your account and then give you notice. If we have notified you of a change in any term of your account and you continue to have your account after the effective date of the change, you have agreed to the new term(s).

**NOTICES -** Any written notice you give us is effective when we actually receive it, and it must be given to us according to the specific delivery instructions provided elsewhere, if any. We must receive it in time to have a reasonable opportunity to act on it. If the notice is regarding a check or other item, you must give us sufficient information to be able to identify the check or item, including the precise check or item number, amount, date and payee. Written notice we give you is effective when it is deposited in the United States Mail with proper postage and addressed to your mailing address we have on file. Notice to any of you is notice to all of you.

**STATEMENTS - Your duty to report unauthorized signatures, alterations and forgeries -** You must examine your statement of account with "reasonable promptness." If you discover (or reasonably should have discovered) any unauthorized signatures or alterations, you must promptly notify us of the relevant facts. As between you and us, if you fail to do either of these duties, you will have to either share the loss with us, or bear the loss entirely yourself (depending on whether we used ordinary care and, if not, whether we substantially contributed to the loss). The loss could be not only with respect to items on the statement but other items with unauthorized signatures or alterations by the same wrongdoer.

You agree that the time you have to examine your statement and report to us will depend on the circumstances, but will not, in any circumstance, exceed a total of 30 days from when the statement is first sent or made available to you.

You further agree that if you fail to report any unauthorized signatures, alterations or forgeries in your account within 60 days of when we first send or make the statement available, you cannot assert a claim against us on any items in that statement, and as between you and us the loss will be entirely yours. This 60-day limitation is without regard to whether we used ordinary care. The limitation in this paragraph is in addition to that contained in the first paragraph of this section.

**Your duty to report other errors or problems -** In addition to your duty to review your statements for unauthorized signatures, alterations and forgeries, you agree to examine your statement with reasonable promptness for any other error or problem - such as an encoding error or an unexpected deposit amount. Also, if you receive or we make available either your items or images of your items, you must examine them for any unauthorized or missing indorsements or any other problems. You agree that the time you have to examine your statement and items and report to us will depend on the circumstances. However, this time period shall not exceed 60 days. Failure to examine your statement and items and report any errors to us within 60 days of when we first send or make the statement available precludes you from asserting a claim against us for any errors on items identified in that statement and as between you and us the loss will be entirely yours.

**Errors relating to electronic fund transfers or substitute checks -** For information on errors relating to electronic fund transfers (e.g., on-line, mobile, debit card or ATM transactions) refer to your Electronic Fund Transfers disclosure and the sections on consumer liability and error resolution. For information on errors relating to a

© 2019 Wolters Kluwer Financial Services, Inc. All rights reserved.
TC-BRO 8/1/2019

substitute check you received, refer to your disclosure entitled Substitute Checks and Your Rights.

**Duty to notify if statement not received -** You agree to immediately notify us if you do not receive your statement by the date you normally expect to receive it. Not receiving your statement in a timely manner is a sign that there may be an issue with your account, such as possible fraud or identity theft.

**ACCOUNT TRANSFER -** This account may not be transferred or assigned without our prior written consent.

**DIRECT DEPOSITS -** If we are required for any reason to reimburse the federal government for all or any portion of a benefit payment that was directly deposited into your account, you authorize us to deduct the amount of our liability to the federal government from the account or from any other account you have with us, without prior notice and at any time, except as prohibited by law. We may also use any other legal remedy to recover the amount of our liability.

**TEMPORARY ACCOUNT AGREEMENT -** If the account documentation indicates that this is a temporary account agreement, each person who signs to open the account or has authority to make withdrawals (except as indicated to the contrary) may transact business on this account. However, we may at some time in the future restrict or prohibit further use of this account if you fail to comply with the requirements we have imposed within a reasonable time.

**SETOFF -** We may (without prior notice and when permitted by law) set off the funds in this account against any due and payable debt any of you owe us now or in the future. If this account is owned by one or more of you as individuals, we may set off any funds in the account against a due and payable debt a partnership owes us now or in the future, to the extent of your liability as a partner for the partnership debt. If your debt arises from a promissory note, then the amount of the due and payable debt will be the full amount we have demanded, as entitled under the terms of the note, and this amount may include any portion of the balance for which we have properly accelerated the due date.

This right of setoff does not apply to this account if prohibited by law. For example, the right of setoff does not apply to this account if: (a) it is an Individual Retirement Account or similar tax-deferred account, or (b) the debt is created by a consumer credit transaction under a credit card plan (but this does not affect our rights under any consensual security interest), or (c) the debtor's right of withdrawal only arises in a representative capacity. We will not be liable for the dishonor of any check when the dishonor occurs because we set off a debt against this account. You agree to hold us harmless from any claim arising as a result of our exercise of our right of setoff.

**In Illinois, Indiana and Missouri, AUTHORIZED SIGNER (Individual Accounts only) -** A single individual is the owner. The authorized signer is merely designated to conduct transactions on the owner's behalf. The owner does not give up any rights to act on the account, and the authorized signer may not in any manner affect the rights of the owner or beneficiaries, if any, other than by withdrawing funds from the account. The owner is responsible for any transactions of the authorized signer. We undertake no obligation to monitor transactions to determine that they are on the owner's behalf.

The owner may terminate the authorization at any time, and the authorization is automatically terminated by the death of the owner. However, we may continue to honor the transactions of the authorized signer until: (a) we have received written notice or have actual knowledge of the termination of authority, and (b) we have a reasonable opportunity to act on that notice or knowledge. We may refuse to accept the designation of an authorized signer.

**In Florida, CONVENIENCE ACCOUNT AGENT (Single-Party Accounts only) -** A convenience account, as defined by Florida law, means a deposit account other than a certificate of deposit, in the name of one individual, in which one or more individuals have been designated as agent with the right to make deposits to and withdraw funds from or draw checks on such account on the owner's behalf. A single individual is the owner, and the agent is merely designated to conduct transactions on the owner's behalf. The owner does not give up any rights to act on the account, and the agent may not in any manner affect the rights of the owner or beneficiaries, if any, other than by withdrawing funds from the account. The owner is responsible for any transactions of the agent. We undertake no obligation to monitor transactions to determine that they are on the owner's behalf.

The owner may terminate the agency at any time, and the agency is automatically terminated by the death of the owner. However, we may continue to honor the transactions of the agent until: (a) we have received written notice or have actual knowledge of the termination of agency, and (b) we have a reasonable opportunity to act on that notice or knowledge. We may refuse to accept the designation of a convenience account agent.

**RESTRICTIVE LEGENDS OR INDORSEMENTS -** The automated processing of the large volume of checks we receive prevents us from inspecting or looking for restrictive legends, restrictive indorsements or other special instructions on every check. For this reason, we are not required to honor any restrictive legend or indorsement or other special instruction placed on checks you write unless we have agreed in writing to the restriction or instruction. Unless we have agreed in writing, we are not responsible for any losses, claims, damages, or expenses that result from your placement of these restrictions or instructions on your checks. Examples of restrictive legends placed on checks are "must be presented within 90 days" or "not valid for more than $1,000.00." The payee's signature accompanied by the words "for deposit only" is an example of a restrictive indorsement.

**FACSIMILE SIGNATURES -** Unless you make advance arrangements with us, we have no obligation to honor facsimile signatures on your checks or other orders. If we do agree to honor items containing facsimile signatures, you authorize us, at any time, to charge you for all checks, drafts, or other orders, for the payment of money, that are drawn on us. You give us this authority regardless of by whom or by what means the facsimile signature(s) may have been affixed so long as they resemble the facsimile signature specimen filed with us, and contain the required number of signatures for this purpose. You must notify us at once if you suspect that your facsimile signature is being or has been misused.

**CHECK PROCESSING -** We process items mechanically by relying solely on the information encoded in magnetic ink along the bottom of the items. This means that we do not individually examine all of your items to determine if the item is properly completed, signed and indorsed or to determine if it contains any information other than what is encoded in magnetic ink. You agree that we have exercised ordinary care if our automated processing is consistent with general banking practice, even though we do not inspect each item. Because we do not inspect each item, if you write a check to multiple payees, we can properly pay the check regardless of the number of indorsements unless you notify us in writing that the check requires multiple indorsements. We must receive the notice in time for us to have a reasonable opportunity to act on it, and you must tell us the precise date of the check, amount, check number and payee. We are not responsible for any unauthorized signature or alteration that would not be identified by a reasonable inspection of the item. Using an automated process helps us keep costs down for you and all account holders.

**CHECK CASHING -** We may charge a fee for anyone that does not have an account with us who is cashing a check, draft or other instrument written on your account. We may also require reasonable identification to cash such a check, draft or other instrument. We can decide what identification is reasonable under the circumstances and such identification may be documentary or physical and may include collecting a thumbprint or fingerprint.

**INDORSEMENTS -** We may accept for deposit any item payable to you or your order, even if they are not indorsed by you. We may give cash back to any one of you. We may supply any missing indorsement(s) for any item we accept for deposit or collection, and you warrant that all indorsements are genuine.

To ensure that your check or share draft is processed without delay, you must indorse it (sign it on the back) in a specific area. Your entire indorsement (whether a signature or a stamp) along with any other indorsement information (e.g. additional indorsements, ID information, driver's license number, etc.) must fall within 1½" of the "trailing edge" of a check. Indorsements must be made in blue or black ink, so that they are readable by automated check processing equipment.

As you look at the front of a check, the "trailing edge" is the left edge. When you flip the check over, be sure to keep all indorsement information within 1½" of that edge.



It is important that you confine the indorsement information to this area since the remaining blank space will be used by others in the processing of the check to place additional needed indorsements and information. You agree that you will indemnify, defend, and hold us harmless for any loss, liability, damage or expense that occurs because your indorsement, another indorsement or information you have printed on the back of the check obscures our indorsement.

These indorsement guidelines apply to both personal and business checks.

**DEATH OR INCOMPETENCE -** You agree to notify us promptly if any person with a right to withdraw funds from your account(s) dies or is adjudicated (determined by the appropriate official) incompetent. We may continue to honor your checks, items, and instructions until: (a) we know of your death or adjudication of incompetence, and (b) we have had a reasonable opportunity to act on that knowledge. You agree that we may pay or certify checks drawn on or before the date of death or adjudication of incompetence for up to ten (10) days after your death or adjudication of incompetence unless ordered to stop payment by someone claiming an interest in the account.

**FIDUCIARY ACCOUNTS -** Accounts may be opened by a person acting in a fiduciary capacity. A fiduciary is someone who is appointed to act on behalf of and for the benefit of another. We are not responsible for the actions of a fiduciary, including the misuse of funds. This account may be opened and maintained by a person or persons named as a trustee under a written trust agreement, or as executors, administrators, or conservators under court orders. You understand that by merely opening such an

© 2019 Wolters Kluwer Financial Services, Inc. All rights reserved.
TC-BRO 8/1/2019

account, we are not acting in the capacity of a trustee in connection with the trust nor do we undertake any obligation to monitor or enforce the terms of the trust or letters.

**CREDIT VERIFICATION -** You agree that we may verify credit and employment history by any necessary means, including preparation of a credit report by a credit reporting agency.

**LEGAL ACTIONS AFFECTING YOUR ACCOUNT -** If we are served with a subpoena, restraining order, writ of attachment or execution, levy, garnishment, search warrant, or similar order relating to your account (termed "legal action" in this section), we will comply with that legal action. Or, in our discretion, we may freeze the assets in the account and not allow any payments out of the account until a final court determination regarding the legal action. We may do these things even if the legal action involves less than all of you. In these cases, we will not have any liability to you if there are insufficient funds to pay your items because we have withdrawn funds from your account or in any way restricted access to your funds in accordance with the legal action. Any fees or expenses we incur in responding to any legal action (including, without limitation, attorneys' fees and our internal expenses) may be charged against your account. The list of fees applicable to your account(s) provided elsewhere may specify additional fees that we may charge for certain legal actions.

**ACCOUNT SECURITY -**

**Duty to protect account information and methods of access -** It is your responsibility to protect the account numbers and electronic access devices (e.g., an ATM card) we provide you for your account(s). Do not discuss, compare, or share information about your account number(s) with anyone unless you are willing to give them full use of your money. An account number can be used by thieves to issue an electronic debit or to encode your number on a false demand draft which looks like and functions like an authorized check. If you furnish your access device and grant actual authority to make transfers to another person (a family member or coworker, for example) who then exceeds that authority, you are liable for the transfers unless we have been notified that transfers by that person are no longer authorized.

Your account number can also be used to electronically remove money from your account, and payment can be made from your account even though you did not contact us directly and order the payment.

You must also take precaution in safeguarding your blank checks. Notify us at once if you believe your checks have been lost or stolen. As between you and us, if you are negligent in safeguarding your checks, you must bear the loss entirely yourself or share the loss with us (we may have to share some of the loss if we failed to use ordinary care and if we substantially contributed to the loss).

**Positive pay and other fraud prevention services -** Except for consumer electronic fund transfers subject to Regulation E, you agree that if we offer you services appropriate for your account to help identify and limit fraud or other unauthorized transactions against your account, and you reject those services, you will be responsible for any fraudulent or unauthorized transactions which could have been prevented by the services we offered. You will not be responsible for such transactions if we acted in bad faith or to the extent our negligence contributed to the loss. Such services include positive pay or commercially reasonable security procedures. If we offered you a commercially reasonable security procedure which you reject, you agree that you are responsible for any payment order, whether authorized or not, that we accept in compliance with an alternative security procedure that you have selected. The positive pay service can help detect and prevent check fraud and is appropriate for account holders that issue: a high volume of checks, a lot of checks to the general public, or checks for large dollar amounts.

**TELEPHONIC INSTRUCTIONS -** Unless required by law or we have agreed otherwise in writing, we are not required to act upon instructions you give us via facsimile transmission or leave by voice mail or on a telephone answering machine.

**MONITORING AND RECORDING TELEPHONE CALLS AND CONSENT TO RECEIVE COMMUNICATIONS -** Subject to federal and state law, we may monitor or record phone calls for security reasons, to maintain a record and to ensure that you receive courteous and efficient service. You consent in advance to any such recording.

To provide you with the best possible service in our ongoing business relationship for your account we may need to contact you about your account from time to time by telephone, text messaging or email. However, we first obtain your consent to contact you about your account in compliance with applicable consumer protection provisions in the federal Telephone Consumer Protection Act of 1991 (TCPA), CAN-SPAM Act and their related federal regulations and orders issued by the Federal Communications Commission (FCC).

- Your consent is limited to your account, and as authorized by applicable law and regulations.
- Your consent is voluntary and not conditioned on the purchase of any product or service from us.

With the above understandings, you authorize us to contact you regarding your account throughout its existence using any telephone numbers or email addresses that you have previously provided to us by virtue of an existing business relationship or that you may subsequently provide to us.

This consent is regardless of whether the number we use to contact you is assigned to a landline, a paging service, a cellular wireless service, a specialized mobile radio service, other radio common carrier service or any other service for which you may be charged for the call. You further authorize us to contact you through the use of voice, voice mail and text messaging, including the use of pre-recorded or artificial voice messages and an automated dialing device.

If necessary, you may change or remove any of the telephone numbers or email addresses at any time using any reasonable means to notify us.

**CLAIM OF LOSS -** If you claim a credit or refund because of a forgery, alteration, or any other unauthorized withdrawal, you agree to cooperate with us in the investigation of the loss, including giving us an affidavit containing whatever reasonable information we require concerning your account, the transaction, and the circumstances surrounding the loss. You will notify law enforcement authorities of any criminal act related to the claim of lost, missing, or stolen checks or unauthorized withdrawals. We will have a reasonable period of time to investigate the facts and circumstances surrounding any claim of loss. Unless we have acted in bad faith, we will not be liable for special or consequential damages, including loss of profits or opportunity, or for attorneys' fees incurred by you.

You agree that you will not waive any rights you have to recover your loss against anyone who is obligated to repay, insure, or otherwise reimburse you for your loss. You will pursue your rights or, at our option, assign them to us so that we may pursue them. Our liability will be reduced by the amount you recover or are entitled to recover from these other sources.

**EARLY WITHDRAWAL PENALTIES (and involuntary withdrawals) -** We may impose early withdrawal penalties on a withdrawal from a time account even if you don't initiate the withdrawal. For instance, the early withdrawal penalty may be imposed if the withdrawal is caused by our setoff against funds in the account or as a result of an attachment or other legal process. We may close your account and impose the early withdrawal penalty on the entire account balance in the event of a partial early withdrawal. See your notice of penalty for early withdrawals for additional information.

**ADDRESS OR NAME CHANGES -** You are responsible for notifying us of any change in your address or your name. Unless we agree otherwise, change of address or name must be made in writing by at least one of the account holders. Informing us of your address or name change on a check reorder form is not sufficient. We will attempt to communicate with you only by use of the most recent address you have provided to us. If provided elsewhere, we may impose a service fee if we attempt to locate you.

**RESOLVING ACCOUNT DISPUTES -** We may place an administrative hold on the funds in your account (refuse payment or withdrawal of the funds) if it becomes subject to a claim adverse to (1) your own interest; (2) others claiming an interest as survivors or beneficiaries of your account; or (3) a claim arising by operation of law. The hold may be placed for such period of time as we believe reasonably necessary to allow a legal proceeding to determine the merits of the claim or until we receive evidence satisfactory to us that the dispute has been resolved. We will not be liable for any items that are dishonored as a consequence of placing a hold on funds in your account for these reasons.

**WAIVER OF NOTICES -** To the extent permitted by law, you waive any notice of non-payment, dishonor or protest regarding any items credited to or charged against your account. For example, if you deposit an item and it is returned unpaid or we receive a notice of nonpayment, we do not have to notify you unless required by federal Regulation CC or other law.

**ACH AND WIRE TRANSFERS -** This agreement is subject to Article 4A of the Uniform Commercial Code - Fund Transfers as adopted in the state in which you have your account with us. If you originate a fund transfer and you identify by name and number a beneficiary financial institution, an intermediary financial institution or a beneficiary, we and every receiving or beneficiary financial institution may rely on the identifying number to make payment. We may rely on the number even if it identifies a financial institution, person or account other than the one named. You agree to be bound by automated clearing house association rules. These rules provide, among other things, that payments made to you, or originated by you, are provisional until final settlement is made through a Federal Reserve Bank or payment is otherwise made as provided in Article 4A-403(a) of the Uniform Commercial Code. If we do not receive such payment, we are entitled to a refund from you in the amount credited to your account and the party originating such payment will not be considered to have paid the amount so credited. Credit entries may be made by ACH. If we receive a payment order to credit an account you have with us by wire or ACH, we are not required to give you any notice of the payment order or credit.

**TRUNCATION, SUBSTITUTE CHECKS, AND OTHER CHECK IMAGES -** If you truncate an original check and create a substitute check, or other paper or electronic image of the original check, you warrant that no one will be asked to make payment on the original check, a substitute check or any other electronic or paper image, if the payment obligation relating to the original check has already been paid. You also warrant that any substitute check you create conforms to the legal requirements and generally accepted specifications for substitute checks. You agree to retain the original check in conformance with our internal policy for retaining original checks. You agree to indemnify us for any loss we may incur as a result of any truncated check transaction you initiate. We can refuse to accept substitute checks that have not previously been warranted by a bank or other financial institution in conformance with the Check 21 Act. Unless specifically stated in a separate agreement between you and us, we do not have to accept any other electronic or paper image of an original check.

**REMOTELY CREATED CHECKS -** Like any standard check or draft, a remotely created check (sometimes called a telecheck, preauthorized draft or demand draft) is a check or draft that can be used to withdraw money from an account. Unlike a typical check or draft, however, a remotely created check is not issued by the paying bank and does not contain the signature of the account owner (or a signature purported to be the signature of the account owner). In place of a signature, the check usually has a statement that the owner authorized the check or has the owner's name typed or printed on the signature line.

You warrant and agree to the following for every remotely created check we receive from you for deposit or collection: (1) you have received express and verifiable

© 2019 Wolters Kluwer Financial Services, Inc. All rights reserved.
TC-BRO 8/1/2019

authorization to create the check in the amount and to the payee that appears on the check; (2) you will maintain proof of the authorization for at least 2 years from the date of the authorization, and supply us the proof if we ask; and (3) if a check is returned to you owe us the amount of the check, regardless of when the check is returned. We may take funds from your account to pay the amount you owe us, and if there are insufficient funds in your account, you still owe us the remaining balance.

**UNLAWFUL INTERNET GAMBLING NOTICE -** Restricted transactions as defined in Federal Reserve Regulation GG are prohibited from being processed through this account or relationship. Restricted transactions generally include, but are not limited to, those in which credit, electronic fund transfers, checks, or drafts are knowingly accepted by gambling businesses in connection with the participation by others in unlawful Internet gambling.

**DISPUTE RESOLUTION BY BINDING ARBITRATION -**

**Claims Subject to Arbitration:** Unless you opt out of this arbitration provision in accordance with the procedure set forth below, you and we agree that any dispute or claim between us, except for claims arising from bodily injury or death, must be arbitrated if either party elects arbitration of that dispute or claim. This agreement to arbitrate is intended to be broadly interpreted. It includes, but is not limited to:

- claims arising out of or relating to any aspect of the relationship between us, whether based in contract, tort, fraud, misrepresentation or any other statutory or common-law legal theory;
- claims that arose before this or any prior agreement (including, but not limited to, claims relating to advertising or disclosures);
- claims for mental or emotional distress or injury not arising out of bodily injury;
- claims asserted in a court of general jurisdiction against you or us, including counterclaims, cross-claims, or third-party claim, that you or we elect to arbitrate;
- claims that are currently the subject of purported class action litigation in which you are not a member of a certified class; and
- claims that may arise after the termination of this agreement.

References to "you," and "us" in this arbitration provision include our respective parents, subsidiaries, affiliates, predecessors, successors, and assigns; our and those entities' agents and employees; and all authorized or unauthorized users or beneficiaries of your account, as well as your heirs, trustees, or other representatives. However, either party may elect arbitration of an action in small claims court seeking only individualized relief, so long as the action remains in that court and is not removed to a court of general jurisdiction. This arbitration agreement does not preclude you from bringing issues to the attention of federal, state, or local agencies. Such agencies can, if the law allows, seek relief against us on your behalf. Nor does this arbitration agreement preclude either you or we from exercising self-help remedies (including setoff), and exercising such a remedy is not a waiver of the right to invoke arbitration of any dispute. **You and we each waive the right to a trial by jury or to participate in a class action whenever either you or we elect arbitration.** This agreement evidences a transaction in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this provision. This arbitration provision shall survive termination of this agreement.

**Pre-Arbitration Notice of Disputes:** Before either you or we commence arbitration, the claimant must first send to the other a written Notice of Dispute ("Notice"). The Notice to us must be sent by certified mail to: General Counsel, Busey Bank, 100 West University Avenue, Champaign, Illinois 61820 ("Notice Address"). The Notice to you will be sent to your address on file with your account. The Notice must (i) include your name and account number; (ii) describe the nature and basis of the claim or dispute; and (iii) set forth the specific relief sought.

If you and we do not reach an agreement to resolve the claim within 30 calendar days after the Notice is received, you or we may commence an arbitration proceeding. During the arbitration, the amount of any settlement offer shall not be disclosed to the arbitrator until after the arbitrator determines the amount, if any, to which you are entitled. If you have complied with the requirements of this paragraph and the arbitrator awards you an amount of money that exceeds the value of our last written settlement to you before the appointment of the arbitrator, then we will pay you $500 in lieu of any smaller award.

In determining whether you are entitled to the minimum $500 recovery, the arbitrator shall not consider amounts offered or awarded for attorneys' fees or costs. Any disputes as to recovery of the $500 minimum recovery shall be resolved by the arbitrator, and must be raised within 14 calendar days of the arbitrator's ruling on the merits.

**Arbitration Procedure:** The arbitration will be governed by the Consumer Arbitration Rules ("AAA Rules") of the American Arbitration Association ("AAA"), as modified by this arbitration provision, and will be administered by the AAA. (If the AAA is unavailable, another arbitration provider shall be selected by the parties or by the court.) The AAA Rules are available online at www.adr.org or by writing to the Notice Address. All issues are for the arbitrator to decide, except that issues relating to the scope and enforceability of the arbitration provision or whether a dispute can or must be brought in arbitration are for the court to decide. The arbitrator may consider but shall not be bound by rulings in other arbitrations involving different customers. Unless you and we agree otherwise, any arbitration hearings will take place in the county of

your address on file with your account. If your claim is for $10,000 or less, we agree that you may choose whether the arbitration will be conducted solely on the basis of documents submitted to the arbitrator, through a telephonic hearing, or by an in-person hearing as established by the AAA Rules. If your claim exceeds $10,000, the right to a hearing will be determined by the AAA Rules. Regardless of the manner in which the arbitration is conducted, the arbitrator shall issue a reasoned written decision sufficient to explain the essential findings and conclusions on which the award is based. Except as provided below, the arbitrator can award the same damages and relief that a court can award under applicable law.

**Arbitration Fees:** If you complied with the notice requirements above, after we receive notice at the Notice Address that you have commenced arbitration, we will promptly reimburse you for your payment of the filing fee, unless your claim is for greater than $10,000 in value. (The filing fee currently is $200 but is subject to change by the arbitration provider. If you are unable to pay this fee, we will pay it directly upon receiving a written request at the Notice Address.) We also will pay all other AAA filing, administration, and arbitrator fees for that arbitration. If, however, the arbitrator finds that either the substance of your claim or the relief you seek is frivolous or brought for an improper purpose (as measured by the standards set forth in Federal Rule of Civil Procedure 11(b)), then the payment of all such fees will be governed by the AAA Rules. In such case, you agree to reimburse us for all monies previously disbursed that are otherwise your obligation to pay under the AAA Rules. In addition, if you initiate an arbitration in which you seek relief valued at greater than $10,000 (either to you or to us), the payment of these fees will be governed by the AAA rules. We will pay all AAA filing, administration, and arbitrator fees for any arbitration we commence against you.

**Requirement of Individual Arbitration:** The arbitrator may award declaratory or injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim. **YOU AND WE AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR OUR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS, REPRESENTATIVE, OR PRIVATE ATTORNEY GENERAL PROCEEDING.** Further, unless both you and we agree otherwise, the arbitrator may not consolidate the claims of more than one person (except for the claims of co- or joint account owners pertaining to that account), and may not otherwise preside over any form of a representative, class, or private attorney general proceeding. If, after exhaustion of all appeals, any of these prohibitions on non-individualized declaratory or injunctive relief; class, representative, and private attorney general claims; and consolidation is found to be unenforceable with respect to a particular claim or with respect to a particular request for relief (such as a request for injunctive relief), then that claim or request for relief shall be severed and decided by a court, and all other claims and requests for relief shall be arbitrated.

**Future Changes to Arbitration Provision:** Notwithstanding any provision in this agreement to the contrary, we agree that if we make any future change to this arbitration provision (other than a change to the Notice Address), you may reject that change by sending us written notice within 30 calendar days of the change to the Notice Address provided above. By rejecting that future change, you are agreeing that you will arbitrate any dispute between us in accordance with the language of this arbitration provision, as amended by any prior changes that you did not timely reject.

**Right to Reject Arbitration Provision:** If you do not wish to arbitrate, you have 30 calendar days to reject this arbitration provision by sending a rejection notice to the Notice Address above by certified mail ("Rejection Notice"). To be valid, a Rejection Notice must: (i) include your name, account number, and a statement that you are rejecting the arbitration provision in this agreement; and (ii) be received by us within 30 calendar days after the opening of your account or, if an arbitration provision has been added for the first time to this agreement for an existing account, within 30 calendar days after you received notice of the change in terms. If your Rejection Notice complies with these requirements, this arbitration provision will not apply to you with respect to any claims that you or we commence in litigation or arbitration after we receive your Rejection Notice. Rejecting this arbitration provision will not affect your other rights or responsibilities under this agreement. Nor will it affect any other arbitration agreements between us.

**Military Lending Act:** If you are a covered member of the armed forces or the dependent of a covered member within the meaning of the Military Lending Act and your contract with us involves an extension of consumer credit under that Act, then you are not required to arbitrate disputes.

© 2019 Wolters Kluwer Financial Services, Inc. All rights reserved.
TC-BRO 8/1/2019

Page 6 of 6

00101



100 W University Ave
Champaign IL 61820

13548701                          Date 6/30/20          Page      1
BENJA INC                         Primary Account             4766
845 MARKET ST 450A
SAN FRANCISCO CA 94117

## CHECKING ACCOUNT SUMMARY & DETAIL

| | | | |
|---|---|---|---|
| BUSINESS ANALYSIS | | Number of Enclosures | 3 |
| Account Number | 4766 | Statement Dates 6/01/20 thru 6/30/20 | |
| Previous Balance | 3,016.22 | Days in the statement period | 30 |
| 29 Deposits/Credits | 1,845,252.06 | Average Ledger | 13,684.01 |
| 87 Checks/Debits | 1,866,251.82 | Average Collected | 13,684.01 |
| Service Charge | .00 | | |
| Interest Paid | .00 | | |
| Ending Balance | 17,983.54- | | |

| | Total For This Period | Total Year-to-Date |
|---|---|---|
| Overdraft Item Fees | $70.00 | $875.00 |
| Returned Item Fees | $.00 | $35.00 |

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | AMOUNT |
|---|---|---|
| 6/01 | Wire Transfer Credit | 25,000.00 |
| | BODIL ARLANDER REVOCABLE TRUST | |
| | 1/2008 CHECKING | |
| | 32 LAGOON ROAD | |
| | BELVEDERE CA  94920-2319 | |
| | RBC CAPITAL MARKETS CORPORATIO | |
| | 60 SOUTH SIXTH STREET | |
| | MINNEAPOLIS,MN,55402 | |
| | REF: BODIL ARLANDER | |
| | 20200601MMQFMP31005470 | |
| | 20200601MMQFMPUN000383 | |
| | 06011648FT03 | |
| 6/01 | guideline 401(k) AMTS:55,2 | .02 |
| | BENJA INCORPORATED | |
| | ST-M4K1G9Z7F8O6 | |
| 6/01 | guideline 401(k) AMTS:55,2 | .55 |
| | BENJA INCORPORATED | |
| | ST-S8L8M8O8Z2U2 | |
| 6/01 | CGUSABENJA      TRANSFER | 108.78 |
| | ANDREW CHAPIN | |
| | ST-K2H1D2D3Z4C3 | |
| 6/02 | CGUSABENJA      TRANSFER | 664.26 |
| | ANDREW CHAPIN | |
| 6/03 | CGUSABENJA      TRANSFER | 76.97 |
| | ANDREW CHAPIN | |

## CHANGE OF ADDRESS FORM

Please notify us immediately of any address changes on your accounts..

Customer Name: _____

(Account Number)

New Address: _____

(Street Address)                                      (Unit #)

_____

(City)                          (State)                (Zip Code)

🏠 Member FDIC        _____

(Telephone Number)                               (Social Security Number)

_____

(Customer Signature)

**Please return this form to the address listed below or bring it to our office**

### THIS FORM WILL HELP YOU BALANCE YOUR CHECKBOOK

| CHECKS or WITHDRAWALS OUTSTANDING Not Charged To Your Account | | ENDING BALANCE Shown On This Statement | $ _____ | Current Checkbook Balance | $ _____ |
|---|---|---|---|---|---|
| Check No. | $ | | | | |
| | | ADD (+) | | ADD (+) | |
| | | Deposits, Loan Advances, Credit Memos, And | $ _____ | Interest Earned From This Statement | $ _____ |
| | | Other Automatic Deposits Not Shown On This | $ _____ | | |
| | | Statement | $ _____ | SUBTRACT (-) | |
| | | | | Misc. Charges From This Statement | $ _____ |
| | | SUBTRACT (-) | $ _____ | | |
| | | Total of Checks Outstanding, Automatic Loan | $ _____ | NEW CHECKBOOK BALANCE | |
| | | Payments, Automatic Savings Transfers, Service | $ _____ | Should Agree With BALANCE Line | $ _____ |
| | | Charges, Debit Memos And Other Automatic | $ _____ | | |
| | | Deductions Not Shown On This Statement | $ _____ | | |
| TOTAL | $ | BALANCE | $ _____ | | |

### IMPORTANT INFORMATION

#### In Case of General Statement Errors

You must examine your statement of account with "reasonable promptness." If you discover (or reasonably should have discovered) any errors, unauthorized signatures, or alterations, you must promptly notify us of the relevant facts. You agree that the time you have to examine your statement and report to us will depend on the circumstances,but will not, in any circumstance, exceed a total of 30 days from when the statement is first sent or made available to you.

### IMPORTANT INFORMATION FOR CONSUMER ACCOUNTS

#### In Case of Errors or Questions About Your Electronic Transactions

Telephone or write us at the number or address listed below if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.
(1) Tell us your name and account number.
(2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
(3) Tell us the date and the dollar amount of the suspected error.
We will investigate your complaint and will correct any error promptly.If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation. To qualify for this recredit, we require a written notice of the problem or complaint within 10 business days of your telephone call to us.

#### In Case of Errors or Questions About Your Line of Credit or Home Equity Loan

If you think your bill is wrong, or if you need information about this loan or a transaction on this statement, please write to us at the address listed below. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights. In your letter, please give us the following information:
(1) Your name and account number.
(2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
(3) The date and the dollar amount of the suspected error.
You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your questions, we cannot report you as delinquent or take any action to collect the amount you question.

#### Balance Subject to Interest Rate for Line of Credit

Balance Subject to Interest Rate / Average Daily Balance - We figure the interest charge on your account by applying the periodic rate to the 'AVERAGE DAILY BALANCE' of your account (including current transactions). To get the 'AVERAGE DAILY BALANCE', we take the beginning balance of your account each day, add any new advances and subtract any payments or credits, also subtracting any unpaid finance charges. The automatic minimum payment amount is excluded when calculating the 'AVERAGE DAILY BALANCE' and 'INTEREST CHARGE'. If the account does not have sufficient funds to cover payment and another advance is made to cover minimum payment, this is also excluded for figuring the 'AVERAGE DAILY BALANCE' but is reflected in the beginning balance of the next statement cycle. This gives us the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the 'AVERAGE DAILY BALANCE'. Written notification of any errors must be given to preserve your rights under the Truth in Lending Act. At any time the debtor may pay the aggregate balance or any portion of his/her indebtedness.

*We may report information about your account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.*

#### Telephone Number and Address to Be Notified in the Event of Errors

Call us at 800.672.8739 or write to us at Busey Bank, Attention: Customer Care Center, P.O. Box 4028, Champaign, IL 61824. You should also call us at this phone number or write to us at this address if you believe a transfer has been made using the information from your check without your permission.



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766  (Continued)

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | AMOUNT |
|------|----------------------|--------|
|      | ST-Q8S5P6Q4C6F6 |  |
| 6/03 | Advance to ***4766 | 500,000.00 |
|      | Advance from ***0865 |  |
| 6/04 | CGUSABENJA      TRANSFER | 282.74 |
|      | ANDREW CHAPIN |  |
|      | ST-G2Y2T0C4B9E4 |  |
| 6/05 | Wire Transfer Credit | 1,000,000.00 |
|      | E-REVSHARE CORE, LLC |  |
|      | C O THE SCION GROUP |  |
|      | 223 WALL ST |  |
|      | HUNTINGTON, NY 11743-2060 |  |
|      | INVESTMENT |  |
|      | 20200605I1B7032R016138 |  |
|      | 20200605MMQFMPUN000325 |  |
|      | 06051637FT03 |  |
| 6/05 | CGUSABENJA      TRANSFER | 97.10 |
|      | ANDREW CHAPIN |  |
|      | ST-T1K4A7I0R6G6 |  |
| 6/08 | CGUSABENJA      TRANSFER | 332.83 |
|      | ANDREW CHAPIN |  |
|      | ST-L2V7O9W2I8V6 |  |
| 6/09 | CGUSABENJA      TRANSFER | 829.82 |
|      | ANDREW CHAPIN |  |
|      | ST-C3R6E7K9C3Y3 |  |
| 6/09 | to dda 500764766 | 55,000.00 |
|      | from loan 6706744910865 |  |
| 6/09 | to dda 500764766 | 250,000.00 |
|      | from loan 6706744910865 |  |
| 6/10 | CGUSABENJA      TRANSFER | 426.32 |
|      | ANDREW CHAPIN |  |
|      | ST-H9Z3G9S9M4S9 |  |
| 6/10 | Benja - Affordab Benja - Af | 5,000.00 |
|      | ANDREW CHAPIN |  |
|      | ST-N6W5P7N1Y3E9 |  |
| 6/11 | CGUSABENJA      TRANSFER | 411.46 |
|      | ANDREW CHAPIN |  |
|      | ST-Z5X2Z6W2U1Y6 |  |
| 6/12 | CGUSABENJA      TRANSFER | 228.30 |
|      | ANDREW CHAPIN |  |
|      | ST-Z7K6E3A3P7S4 |  |
| 6/15 | CGUSABENJA      TRANSFER | 197.32 |
|      | ANDREW CHAPIN |  |
|      | ST-Y1X2H3Z3Y9H2 |  |
| 6/16 | CGUSABENJA      TRANSFER | 757.74 |
|      | ANDREW CHAPIN |  |
|      | ST-W9T6M3R7O2A4 |  |
| 6/17 | CGUSABENJA      TRANSFER | 145.40 |
|      | ANDREW CHAPIN |  |



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766  (Continued)

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | AMOUNT |
|------|------------------------|--------|
|      | ST-H4H5J5Y4K9J5 | |
| 6/18 | CGUSABENJA        TRANSFER | 129.36 |
|      | ANDREW CHAPIN | |
|      | ST-G1V5N7S2J2F6 | |
| 6/19 | CGUSABENJA        TRANSFER | 194.56 |
|      | ANDREW CHAPIN | |
|      | ST-W9N7W8M5B4P5 | |
| 6/19 | Benja - Affordab Benja | 1,750.00 |
|      | ANDREW CHAPIN | |
|      | ST-V5I2L8J2G1H5 | |
| 6/22 | CGUSABENJA        TRANSFER | 43.12 |
|      | ANDREW CHAPIN | |
|      | ST-H6I1G9M0O4Q4 | |
| 6/23 | CGUSABENJA        TRANSFER | 306.70 |
|      | ANDREW CHAPIN | |
|      | ST-L2C8I8C0I5V0 | |
| 6/25 | CGUSABENJA        TRANSFER | 71.10 |
|      | ANDREW CHAPIN | |
|      | ST-C0L7X0P2U1R4 | |
| 6/30 | CGUSABENJA        TRANSFER | 97.61 |
|      | ANDREW CHAPIN | |
|      | ST-E6W6L6R4Q0W3 | |
| 6/30 | Benja - Affordab Benja - Af | 3,100.00 |
|      | ANDREW CHAPIN | |
|      | ST-O4X7O4I3O2E3 | |

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
| 6/01 | PAYPAL            INST XFER | 12.17- |
|      | ANDREW CHAPIN | |
|      | KENLESKO EBAY K | |
| 6/01 | SHOPIFY CAPITAL  R6ZIQCV35 | 19.31- |
|      | Andrew Chapin | |
|      | R7255254 | |
| 6/01 | SHOPIFY CAPITAL  R4NB32JCY | 28.08- |
|      | Andrew Chapin | |
|      | R7253817 | |
| 6/02 | Wire Transfer Debit | 10,500.00- |
|      | Andrew Chapin Benja | |
|      | 322271627 | |
|      | 555475257 | |
|      | JPMORGAN CHASE BAN | |
|      | 20200602MMQFMPUN000317 | |
|      | 20200602B1QGC01R056571 | |
|      | 06021535FT03 | |
| 6/02 | SHOPIFY CAPITAL  RB6OVINIV | 1.57- |
|      | Andrew Chapin | |

Case: 20-30819   Doc# 20   Filed: 10/20/20   Entered: 10/20/20 17:46:10   Page 105 of 159
00105



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766  (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
| | R7285160 | |
| 6/02 | SHOPIFY CAPITAL  RPE6WKHNB | 9.10- |
| | Andrew Chapin | |
| | R7274537 | |
| 6/02 | SHOPIFY CAPITAL  RSS2FHH44 | 9.49- |
| | Andrew Chapin | |
| | R7283929 | |
| 6/02 | SHOPIFY CAPITAL  RL4ULHEHY | 18.90- |
| | Andrew Chapin | |
| | R7264462 | |
| 6/02 | SHOPIFY CAPITAL  R4KWI3ACS | 49.09- |
| | Andrew Chapin | |
| | R7265957 | |
| 6/02 | SHOPIFY CAPITAL  R2ICUNGUO | 66.57- |
| | Andrew Chapin | |
| | R7275952 | |
| 6/02 | GUSTO          FEE 787806 | 117.00- |
| | Benja Incorporated | |
| | 6semjoigajn | |
| 6/03 | Wire Transfer Debit | 10,000.00- |
| | Koosh Media | |
| | 321370765 | |
| | 8103786531 | |
| | AMERICAN SAVINGS B | |
| | 20200603MMQFMPUN000255 | |
| | 20200603GMQFMP01016423 | |
| | 06031424FT03 | |
| 6/03 | Wire Transfer Debit | 12,500.00- |
| | Sean C Fleming Rev Trust 5/1/0 | |
| | 026007993 | |
| | 101-WA-258641-000 | |
| | UBS AG | |
| | 20200603MMQFMPUN000259 | |
| | 20200603B1Q8052R000571 | |
| | 06031425FT03 | |
| 6/03 | Wire Transfer Debit | 102,018.25- |
| | Murphy Hoffman Company | |
| | 101000695 | |
| | 9872224221 | |
| | UMB BANK, N.A. | |
| | 20200603MMQFMPUN000256 | |
| | 20200603J1B7841C001027 | |
| | 06031425FT03 | |
| 6/03 | Wire Transfer Debit | 380,281.86- |
| | Murphy Hoffman Company | |
| | 101000695 | |
| | 9872224221 | |



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                4766  (Continued)

| CHECKS AND OTHER DEBITS | | |
|---|---|---|
| **DATE** | **TRANSACTION DESCRIPTION** | **AMOUNT** |
| | UMB BANK, N.A. | |
| | 20200603MMQFMPUN000257 | |
| | 20200603J1B7841C001028 | |
| | 06031425FT03 | |
| 6/03 | SHOPIFY CAPITAL  RXME4RTD4 | 13.66- |
| | Andrew Chapin | |
| | R7294951 | |
| 6/03 | SHOPIFY CAPITAL  RKZA6PX3L | 27.87- |
| | Andrew Chapin | |
| | R7293612 | |
| 6/04 | Wire Transfer Debit | 11,930.05- |
| | Internet Escrow Services Inc | |
| | 021000089 | |
| | 31044399 | |
| | CITIBANK, N.A. | |
| | Reference Escrow Transaction # | |
| | 20200604MMQFMPUN000089 | |
| | 20200604B1Q8021R020404 | |
| | 06041525FT03 | |
| 6/04 | SHOPIFY CAPITAL  RDSPHCV7P | 46.97- |
| | Andrew Chapin | |
| | R7303701 | |
| 6/04 | SHOPIFY CAPITAL  RJV5CT52P | 49.93- |
| | Andrew Chapin | |
| | R7305135 | |
| 6/04 | WCB Warehouse    WCB Wareho | 250.00- |
| | BENJA INCORPORATED | |
| | ST-E5M7M7L3F9M3 | |
| 6/05 | Wire Transfer Debit | 212,473.85- |
| | Murphy Hoffman Company | |
| | 101000695 | |
| | 9872224221 | |
| | UMB BANK, N.A. | |
| | Benja - INV-0517 | |
| | 20200605MMQFMPUN000516 | |
| | 20200605J1B7841C001639 | |
| | 06051701FT03 | |
| 6/05 | Wire Transfer Debit | 324,805.50- |
| | Murphy Hoffman Company | |
| | 101000695 | |
| | 9872224221 | |
| | UMB BANK, N.A. | |
| | 20200605MMQFMPUN000514 | |
| | 20200605J1B7841C001637 | |
| | 06051701FT03 | |
| 6/05 | Wire Transfer Debit | 462,183.93- |
| | Murphy Hoffman Company | |



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                4766  (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|-------------------------|--------|
|      | 101000695 | |
|      | 9872224221 | |
|      | UMB BANK, N.A. | |
|      | Benja - INV-0482 | |
|      | 20200605MMQFMPUN000515 | |
|      | 20200605J1B7841C001638 | |
|      | 06051701FT03 | |
| 6/05 | guideline 401(k) AMTS:55,2 | .57- |
|      | BENJA INCORPORATED | |
|      | ST-O4T6P6U4R8T9 | |
| 6/05 | SHOPIFY CAPITAL  R4V2USQ7I | 17.16- |
|      | Andrew Chapin | |
|      | R7315494 | |
| 6/05 | SHOPIFY CAPITAL  R3D6VY2FQ | 84.45- |
|      | Andrew Chapin | |
|      | R7313981 | |
| 6/08 | SHOPIFY CAPITAL  RHP7JZL55 | 8.19- |
|      | Andrew Chapin | |
|      | R7324605 | |
| 6/08 | SHOPIFY CAPITAL  RDBJQBSYN | 58.47- |
|      | Andrew Chapin | |
|      | R7326147 | |
| 6/08 | PAYPAL           INST XFER | 800.00- |
|      | ANDREW CHAPIN | |
|      | BILLCORMALI | |
| 6/09 | Wire Transfer Debit | 255,000.00- |
|      | Murphy Hoffman Company | |
|      | 101000695 | |
|      | 9872224221 | |
|      | UMB BANK, N.A. | |
|      | 20200609MMQFMPUN000235 | |
|      | 20200609J1B7841C001024 | |
|      | 06091422FT03 | |
| 6/09 | SHOPIFY CAPITAL  RG5EHLNQD | 16.97- |
|      | Andrew Chapin | |
|      | R7345473 | |
| 6/09 | SHOPIFY CAPITAL  RJSRMF5PG | 18.30- |
|      | Andrew Chapin | |
|      | R7354960 | |
| 6/09 | SHOPIFY CAPITAL  RSNI7UTCG | 19.87- |
|      | Andrew Chapin | |
|      | R7336816 | |
| 6/09 | SHOPIFY CAPITAL  RFJGP4WVH | 34.45- |
|      | Andrew Chapin | |
|      | R7335272 | |
| 6/09 | SHOPIFY CAPITAL  RBVTDSQSZ | 49.67- |
|      | Andrew Chapin | |
|      | R7346921 | |



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766   (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|------|------------------------|---|--------|
| 6/09 | SHOPIFY CAPITAL   RVVZIO26E<br>Andrew Chapin<br>R7356268 | | 76.87- |
| 6/10 | SHOPIFY CAPITAL   R6WGLTEEX<br>Andrew Chapin<br>R7366323 | | 75.21- |
| 6/10 | PAYPAL | INST XFER<br>ANDREW CHAPIN<br>MARTIJNKLEI EBA | 89.38- |
| 6/10 | SHOPIFY CAPITAL   R7RUIEYUD<br>Andrew Chapin<br>R7368361 | | 423.13- |
| 6/10 | APPLECARD GSBANK PAYMENT<br>Andrew Chapin<br>1749626 | | 3,158.95- |
| 6/10 | AMEX EPAYMENT     ACH PMT<br>Andrew Chapin<br>W4750 | | 6,500.00- |
| 6/10 | CHASE CREDIT CRD EPAY<br>ANDREW J CHAPIN<br>4726092077 | | 8,900.00- |
| 6/11 | SHOPIFY CAPITAL   RHQMK6SKP<br>Andrew Chapin<br>R7375301 | | 20.33- |
| 6/12 | SHOPIFY CAPITAL   RVXTYS45D<br>Andrew Chapin<br>R7385992 | | 35.11- |
| 6/15 | SHOPIFY CAPITAL   RRPIKU2MQ<br>Andrew Chapin<br>R7396746 | | 26.78- |
| 6/15 | VZ WIRELESS VE    VZW WEBPAY<br>ANDREW *CHAPIN<br>9840064 | | 534.64- |
| 6/15 | LIN XIAO LI       IAT PAYPAL<br>ANDREW CHAPIN | | 2,068.99- |
| 6/15 | TO LN 6706744910865<br>FROM DDA 500764766 | | 11,086.50- |
| 6/16 | Account Analysis Charge | | 194.05- |
| 6/16 | SHOPIFY CAPITAL   RUMPYX7IM<br>Andrew Chapin<br>R7427659 | | 18.04- |
| 6/16 | SHOPIFY CAPITAL   RVVJOZWJY<br>Andrew Chapin<br>R7417958 | | 29.82- |
| 6/16 | SHOPIFY CAPITAL   RTZ3YKSKS<br>Andrew Chapin<br>R7407639 | | 47.88- |
| 6/17 | Wire Transfer Debit<br>UMB Capital Finance | | 20,000.00- |



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766  (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
|      | 101000695 | |
|      | 9872215826 | |
|      | UMB BANK, N.A. | |
|      | 20200617MMQFMPUN000112 | |
| 6/17 | SHOPIFY CAPITAL  RTWRPSWHM<br>Andrew Chapin<br>R7437780 | 16.15- |
| 6/17 | WCB Warehouse    WCB Wareho<br>BENJA INCORPORATED<br>ST-V8Z6L0G5P3B7 | 250.00- |
| 6/18 | SHOPIFY CAPITAL  RWZ4OTAAP<br>Andrew Chapin<br>R7448357 | 26.18- |
| 6/18 | PAYPAL           INST XFER<br>ANDREW CHAPIN<br>BILLCORMALI | 125.00- |
| 6/19 | SHOPIFY CAPITAL  RA7RUYS64<br>Andrew Chapin<br>R7459079 | 83.99- |
| 6/19 | WCB Warehouse    WCB Wareho<br>BENJA INCORPORATED<br>ST-G4M5Y6R6V0W3 | 582.90- |
| 6/19 | WCB Warehouse    WCB Wareho<br>BENJA INCORPORATED<br>ST-O9V6E4G8M5K6 | 619.54- |
| 6/22 | GUSTO           CND 884331<br>Benja Incorporated<br>6semjok9c2t | 50.00- |
| 6/22 | SHOPIFY CAPITAL  RQGWLUSYN<br>Andrew Chapin<br>R7469780 | 78.74- |
| 6/23 | SHOPIFY CAPITAL  R6O3DPXFV<br>Andrew Chapin<br>R7500512 | 18.20- |
| 6/23 | SHOPIFY CAPITAL  R6RSELDZV<br>Andrew Chapin<br>R7480652 | 35.48- |
| 6/23 | SHOPIFY CAPITAL  REYVUKJYU<br>Andrew Chapin<br>R7491037 | 65.86- |
| 6/23 | WCB Warehouse    WCB Wareho<br>BENJA INCORPORATED<br>ST-F5M6Z2V6B2T2 | 250.00- |
| 6/24 | SHOPIFY CAPITAL  RK3VP5ASX<br>Andrew Chapin<br>R7510126 | 40.95- |
| 6/25 | SHOPIFY CAPITAL  RL36ANLSC<br>Andrew Chapin | 9.10- |

Case: 20-30819   Doc# 20   Filed: 10/20/20   Entered: 10/20/20 17:46:10   Page 110 of
159



BUSINESS ANALYSIS                4766  (Continued)

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|------|------------------------|--|--------|
| | R7520344 | | |
| 6/25 | VENMO          PAYMENT | | 1,490.00- |
| | ANDREW CHAPIN | | |
| | 3666252200 | | |
| 6/26 | CGUSABENJA     TRANSFER | | 15.42- |
| | ANDREW CHAPIN | | |
| | ST-S4T4K5G1T7E7 | | |
| 6/26 | SHOPIFY CAPITAL  RFZJYVCBI | | 26.09- |
| | Andrew Chapin | | |
| | R7530750 | | |
| 6/29 | SHOPIFY CAPITAL  RS34R7QXL | | 59.83- |
| | Andrew Chapin | | |
| | R7541406 | | |
| 6/30 | SHOPIFY CAPITAL  RH3AOPWHV | | 31.64- |
| | Andrew Chapin | | |
| | R7562436 | | |
| 6/30 | GUSTO          CND 944380 | | 50.00- |
| | Benja Incorporated | | |
| | 6semjol1dok | | |
| 6/30 | SHOPIFY CAPITAL  RPUVPV445 | | 53.31- |
| | Andrew Chapin | | |
| | R7552116 | | |
| 6/30 | SHOPIFY CAPITAL  RTP7D627W | | 55.76- |
| | Andrew Chapin | | |
| | R7571971 | | |
| 6/30 | GUSTO          CND 944380 | | 100.00- |
| | Benja Incorporated | | |
| | 6semjol1do6 | | |
| 6/30 | GUSTO          CND 944380 | | 750.00- |
| | Benja Incorporated | | |
| | 6semjol1dpi | | |
| 6/30 | GUSTO          CND 944380 | | 800.00- |
| | Benja Incorporated | | |
| | 6semjol1dp3 | | |
| 6/30 | GUSTO          REM 944386 | | 1,490.00- |
| | Benja Incorporated | | |
| | 6semjol1dms | | |
| 6/30 | GUSTO          TAX 944394 | | 5,814.16- |
| | Benja Incorporated | | |
| | 6semjol1dlg | | |
| 6/30 | GUSTO          NET 944385 | | 16,201.78- |
| | Benja Incorporated | | |
| | 6semjol1dk7 | | |
| 6/30 | Overdraft Item Charge | | 70.00- |



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766  (Continued)

| CHECKS  IN  SERIAL  NUMBER  ORDER ||||||
| DATE | CHECK NO | AMOUNT | DATE | CHECK NO | AMOUNT |
|------|----------|--------|------|----------|--------|
| 6/16 | 5006 | 67.57 | 6/10 | 5007 | 107.24 |
| 6/12 | 5013* | 10.00 | | | |

*Indicates break in check number sequence

| DAILY  BALANCE  SECTION ||||||
| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|------|---------|------|---------|------|---------|
| 6/01 | 28,066.01 | 6/02 | 17,958.55 | 6/03 | 13,193.88 |
| 6/04 | 1,199.67 | 6/05 | 1,731.31 | 6/08 | 1,197.48 |
| 6/09 | 51,811.17 | 6/10 | 37,983.58 | 6/11 | 38,374.71 |
| 6/12 | 38,557.90 | 6/15 | 25,038.31 | 6/16 | 25,438.69 |
| 6/17 | 5,317.94 | 6/18 | 5,296.12 | 6/19 | 5,954.25 |
| 6/22 | 5,868.63 | 6/23 | 5,805.79 | 6/24 | 5,764.84 |
| 6/25 | 4,336.84 | 6/26 | 4,295.33 | 6/29 | 4,235.50 |
| 6/30 | 17,983.54- | | | | |



Check 5006 Amount $67.57 Date 6/16/2020



Check 5007 Amount $107.24 Date 6/10/2020



Check 5013 Amount $10.00 Date 6/12/2020



100 W University Ave
Champaign IL 61820

12344742                                    Date  5/29/20          Page      1
BENJA INC                                   Primary Account              4766
845 MARKET ST 450A
SAN FRANCISCO CA 94117

## CHECKING ACCOUNT SUMMARY & DETAIL

| BUSINESS ANALYSIS | | Number of Enclosures | 6 |
|---|---|---|---|
| Account Number | 4766 | Statement Dates  5/01/20 thru  5/31/20 | |
| Previous Balance | 195,406.71 | Days in the statement period | 31 |
| 24 Deposits/Credits | 965,024.70 | Average Ledger | 68,384.33 |
| 91 Checks/Debits | 1,157,415.19 | Average Collected | 68,384.33 |
| Service Charge | .00 | | |
| Interest Paid | .00 | | |
| Ending Balance | 3,016.22 | | |

| | Total For This Period | Total Year-to-Date |
|---|---|---|
| Overdraft Item Fees | $.00 | $805.00 |
| Returned Item Fees | $.00 | $35.00 |

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | AMOUNT |
|---|---|---|
| 5/01 | CGUSABENJA        TRANSFER<br>ANDREW CHAPIN<br>ST-U9D7A0P0R4R1 | 31.91 |
| 5/05 | CGUSABENJA        TRANSFER<br>ANDREW CHAPIN<br>ST-V7H3O5J9P0Q5 | 77.42 |
| 5/06 | RAINY DAY PRINTI ACH<br>Benja Incorporated | .06 |
| 5/06 | RAINY DAY PRINTI ACH<br>Benja Incorporated | .08 |
| 5/06 | CGUSABENJA        TRANSFER<br>ANDREW CHAPIN<br>ST-Y9X1D0C8J7Y3 | 6.73 |
| 5/08 | CGUSABENJA        TRANSFER<br>ANDREW CHAPIN<br>ST-E5W6V4A3F1J1 | 32.74 |
| 5/11 | CGUSABENJA        TRANSFER<br>ANDREW CHAPIN<br>ST-Y0X3C6L2W7T7 | 82.34 |
| 5/12 | CGUSABENJA        TRANSFER<br>ANDREW CHAPIN<br>ST-R1L7U8Z0N5I6 | 209.70 |
| 5/13 | CGUSABENJA        TRANSFER<br>ANDREW CHAPIN<br>ST-W0F3M5J4E4O2 | |

Case: 20-30819   Doc# 20   Filed: 10/20/20   Entered: 10/20/20 17:46:10   Page 114 of 159

## CHANGE OF ADDRESS FORM

Please notify us immediately of any address changes on your accounts..

Customer Name: _____

(Account Number)

New Address: _____

(Street Address)                                    (Unit #)

_____

(City)                          (State)                    (Zip Code)

_____

Member FDIC     (Telephone Number)                      (Social Security Number)

_____

(Customer Signature)

**Please return this form to the address listed below or bring it to our office**

### THIS FORM WILL HELP YOU BALANCE YOUR CHECKBOOK

| CHECKS or WITHDRAWALS OUTSTANDING Not Charged To Your Account | | | | |
|---|---|---|---|---|
| Check No. | $ | ENDING BALANCE Shown On This Statement | $ _____ | Current Checkbook Balance $ _____ |

ENDING BALANCE
Shown On This Statement                          $ _____

Current Checkbook Balance                        $ _____

ADD (+)
Deposits, Loan Advances, Credit Memos, And      $ _____
Other Automatic Deposits Not Shown On This
Statement                                        $ _____

ADD (+)
Interest Earned From This Statement  $ _____

SUBTRACT (-)
Misc. Charges From This Statement    $ _____

SUBTRACT (-)
Total of Checks Outstanding, Automatic Loan     $ _____
Payments, Automatic Savings Transfers, Service  $ _____
Charges, Debit Memos And Other Automatic
Deductions Not Shown On This Statement          $ _____

NEW CHECKBOOK BALANCE
Should Agree With BALANCE Line       $ _____

| TOTAL | $ | BALANCE | $ _____ | |

### IMPORTANT INFORMATION

**In Case of General Statement Errors**

You must examine your statement of account with "reasonable promptness." If you discover (or reasonably should have discovered) any errors, unauthorized signatures, or alterations, you must promptly notify us of the relevant facts. You agree that the time you have to examine your statement and report to us will depend on the circumstances,but will not, in any circumstance, exceed a total of 30 days from when the statement is first sent or made available to you.

### IMPORTANT INFORMATION FOR CONSUMER ACCOUNTS

**In Case of Errors or Questions About Your Electronic Transactions**

Telephone or write us at the number or address listed below if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.
(1)   Tell us your name and account number.
(2)   Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
(3)   Tell us the date and the dollar amount of the suspected error.
We will investigate your complaint and will correct any error promptly.If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation. To qualify for this recredit, we require a written notice of the problem or complaint within 10 business days of your telephone call to us.

**In Case of Errors or Questions About Your Line of Credit or Home Equity Loan**

If you think your bill is wrong, or if you need information about this loan or a transaction on this statement, please write to us at the address listed below. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights. In your letter, please give us the following information:
(1)   Your name and account number.
(2)   Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
(3)   The date and the dollar amount of the suspected error.
You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your questions, we cannot report you as delinquent or take any action to collect the amount you question.

**Balance Subject to Interest Rate for Line of Credit**

Balance Subject to Interest Rate / Average Daily Balance - We figure the interest charge on your account by applying the periodic rate to the 'AVERAGE DAILY BALANCE' of your account (including current transactions). To get the 'AVERAGE DAILY BALANCE', we take the beginning balance of your account each day, add any new advances and subtract any payments or credits, also subtracting any unpaid finance charges. The automatic minimum payment amount is excluded when calculating the 'AVERAGE DAILY BALANCE' and 'INTEREST CHARGE'. If the account does not have sufficient funds to cover payment and another advance is made to cover minimum payment, this is also excluded for figuring the 'AVERAGE DAILY BALANCE' but is reflected in the beginning balance of the next statement cycle. This gives us the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the 'AVERAGE DAILY BALANCE'. Written notification of any errors must be given to preserve your rights under the Truth in Lending Act. At any time the debtor may pay the aggregate balance or any portion of his/her indebtedness.

*We may report information about your account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.*

**Telephone Number and Address to Be Notified in the Event of Errors**

Call us at 800.672.8739 or write to us at Busey Bank, Attention: Customer Care Center, P.O. Box 4028, Champaign, IL 61824. You should also call us at this phone number or write to us at this address if you believe a transfer has been made using the information from your check without your permission.

BSB-00f46-STMT
00115



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766  (Continued)

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | AMOUNT |
|------|------------------------|--------|
| 5/14 | CGUSABENJA       TRANSFER<br>ANDREW CHAPIN<br>ST-V1Z6M5L6X1Z0 | 144.29 |
| 5/15 | CGUSABENJA       TRANSFER<br>ANDREW CHAPIN<br>ST-Y1Q2P7N4D9H1 | 31.78 |
| 5/18 | CGUSABENJA       TRANSFER<br>ANDREW CHAPIN<br>ST-Q1T2X1F3J2Y8 | 99.72 |
| 5/19 | CGUSABENJA       TRANSFER<br>ANDREW CHAPIN<br>ST-E2D7C1S8I4K8 | 426.26 |
| 5/20 | CGUSABENJA       TRANSFER<br>ANDREW CHAPIN<br>ST-B4N2Q2A7E8A6 | 84.03 |
| 5/21 | Benja - Affordab Benja - Af<br>ANDREW CHAPIN<br>ST-W9C2J8N3K8T5 | 3,000.00 |
| 5/22 | CGUSABENJA       TRANSFER<br>ANDREW CHAPIN<br>ST-V4V8F2Q9U4U4 | 208.25 |
| 5/26 | CGUSABENJA       TRANSFER<br>ANDREW CHAPIN<br>ST-O9B9J8R0G3I1 | 97.88 |
| 5/26 | SBAD TREAS 310    MISC PAY<br>Benja Incorporated<br>166317780073000<br>RMT*CT*1663177800 200 12668 F8<br>041********\ | 149,900.00 |
| 5/27 | Wire Transfer Credit<br>MHC FINANCIAL SERVICES INC DBA<br>11120 TOMAHAWK CREEK PKWY SUIT<br>LEAWOOD, KS 662112695<br>FACTORING PURCHASE<br>MHC FINANCIAL SERVICES<br>20200527J1B7841C001627<br>20200527MMQFMPUN000319<br>05271651FT03 | 268,872.52 |
| 5/27 | CGUSABENJA       TRANSFER<br>ANDREW CHAPIN<br>ST-M1C3I9M8R6O5 | 303.27 |
| 5/27 | MHC FIN SERVICES CHKNAM<br>Benja Incorporated<br>56762 | 540,572.25 |
| 5/28 | CGUSABENJA       TRANSFER<br>ANDREW CHAPIN<br>ST-C3D0Q4V5J9X7 | 175.75 |
| 5/28 | AMZN4F5DE52Z      Marketplac<br>Benja Incorporated | 340.64 |



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766   (Continued)

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | AMOUNT |
|------|----------------------|--------|
|      | 55Y0Z0MOS2NZMJY |  |
| 5/29 | CGUSABENJA       TRANSFER | 263.26 |
|      | ANDREW CHAPIN |  |
|      | ST-Z9W7T5R8O4D6 |  |

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|----------------------|--------|
| 5/01 | Wire Transfer Debit | 144,000.00- |
|      | Andrew Chapin |  |
|      | 322271627 |  |
|      | 555475257 |  |
|      | JPMORGAN CHASE BAN |  |
|      | 20200501MMQFMPUN000254 |  |
|      | 20200501B1QGC01R056608 |  |
|      | 05011340FT03 |  |
| 5/01 | SHOPIFY CAPITAL  RRM6N5WYM | 5.64- |
|      | Andrew Chapin |  |
|      | R6962604 |  |
| 5/01 | SHOPIFY CAPITAL  RIVLYGTYZ | 21.55- |
|      | Andrew Chapin |  |
|      | R6961211 |  |
| 5/04 | Wire Transfer Debit | 200.00- |
|      | Rainy Day Printing |  |
|      | 102000021 |  |
|      | 103683925111 |  |
|      | US BANK, NA |  |
|      | 20200504MMQFMPUN000429 |  |
|      | 20200504J1Q5040C001340 |  |
|      | 05041706FT03 |  |
| 5/04 | SHOPIFY CAPITAL  RR6UA2ZSL | 16.82- |
|      | Andrew Chapin |  |
|      | R6971590 |  |
| 5/04 | PAYPAL           INST XFER | 113.42- |
|      | ANDREW CHAPIN |  |
|      | BESTAUTHENT EBA |  |
| 5/04 | GUSTO            FEE 629057 | 141.00- |
|      | Benja Incorporated |  |
|      | 6semjog3emg |  |
| 5/04 | GUSTO            REM 630913 | 237.50- |
|      | Benja Incorporated |  |
|      | 6semjog5pbv |  |
| 5/05 | Wire Transfer Debit | 2,500.00- |
|      | CFOS 2GO STAFFING |  |
|      | 121143260 |  |
|      | 0101150100 |  |



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766   (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
|      | WESTERN ALLIANCE B 20200505MMQFMPUN000395 20200505L1LFB71C001847 05051725FT03 | |
| 5/05 | SHOPIFY CAPITAL   RWRDKDZYD Andrew Chapin R6993344 | 2.50- |
| 5/05 | SHOPIFY CAPITAL   RVWB5SBNW Andrew Chapin R6983473 | 11.21- |
| 5/05 | SHOPIFY CAPITAL   RKRDUT63D Andrew Chapin R6991951 | 18.20- |
| 5/05 | SHOPIFY CAPITAL   ROSGNXSN4 Andrew Chapin R7001455 | 33.97- |
| 5/05 | SHOPIFY CAPITAL   R6FPVKKMY Andrew Chapin R6981979 | 44.52- |
| 5/05 | PAYMENTECH      FEE AffordableJerseys 6470807 | 56.27- |
| 5/06 | SHOPIFY CAPITAL   RYSAUIT5O Andrew Chapin R7012844 | 1.23- |
| 5/06 | GUSTO          CND 636917 Benja Incorporated 6semjogc0kp | 250.00- |
| 5/07 | PAYPAL         INST XFER ANDREW CHAPIN SAYIT86 EBAY SA | 2.16- |
| 5/07 | SHOPIFY CAPITAL   RC5Q5D742 Andrew Chapin R7021722 | 7.28- |
| 5/08 | SHOPIFY CAPITAL   ROUB53ATT Andrew Chapin R7033526 | 5.84- |
| 5/08 | SHOPIFY CAPITAL   REMTFR5ZK Andrew Chapin R7032077 | 42.22- |
| 5/11 | SHOPIFY CAPITAL   RC6AKSNGA Andrew Chapin R7042453 | 8.54- |
| 5/11 | SHOPIFY CAPITAL   RWCX25WNO Andrew Chapin R7043877 | 14.57- |
| 5/11 | APPLECARD GSBANK PAYMENT Andrew Chapin | 1,134.01- |

Case: 20-30819   Doc# 20   Filed: 10/20/20   Entered: 10/20/20 17:46:10   Page 118 of 159



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766  (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
|  | 1749626 |  |
| 5/12 | SHOPIFY CAPITAL  RTZT5QBJG<br>Andrew Chapin<br>R7073189 | 8.80- |
| 5/12 | SHOPIFY CAPITAL  RT6JGRWDR<br>Andrew Chapin<br>R7071994 | 10.18- |
| 5/12 | SHOPIFY CAPITAL  RV2BIHFYR<br>Andrew Chapin<br>R7064179 | 28.23- |
| 5/12 | SHOPIFY CAPITAL  RMJN567IH<br>Andrew Chapin<br>R7062811 | 36.85- |
| 5/13 | SHOPIFY CAPITAL  RSDJZGG6S<br>Andrew Chapin<br>R7082765 | 11.28- |
| 5/13 | SHOPIFY CAPITAL  R2UPXEWI5<br>Andrew Chapin<br>R7081465 | 18.95- |
| 5/14 | SHOPIFY CAPITAL  R5YLV7CLO<br>Andrew Chapin<br>R7091509 | 9.16- |
| 5/14 | SHOPIFY CAPITAL  RAOIR3ENS<br>Andrew Chapin<br>R7092892 | 25.59- |
| 5/15 | Account Analysis Charge | 346.34- |
| 5/15 | SHOPIFY CAPITAL  REOHWOJUZ<br>Andrew Chapin<br>R7103053 | 5.62- |
| 5/15 | SHOPIFY CAPITAL  REPTKSAFM<br>Andrew Chapin<br>R7101663 | 26.18- |
| 5/18 | SHOPIFY CAPITAL  RS2US7XZ7<br>Andrew Chapin<br>R7111979 | 8.19- |
| 5/18 | SHOPIFY CAPITAL  R7ITCP4RJ<br>Andrew Chapin<br>R7113386 | 17.68- |
| 5/18 | PAYPAL          INST XFER<br>ANDREW CHAPIN<br>THETRAVYTRA | 56.00- |
| 5/18 | PAYMENTECH      CHARGEBACK<br>AffordableJerseys<br>6470807 | 72.99- |
| 5/18 | PAYPAL          INST XFER<br>ANDREW CHAPIN<br>TYLERPEDEN1 | 89.99- |
| 5/19 | SHOPIFY CAPITAL  R2CLCVRXH<br>Andrew Chapin | 10.27- |

Case: 20-30819   Doc# 20   Filed: 10/20/20   Entered: 10/20/20 17:46:10   Page 119 of 159



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                4766  (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
| | R7141938 | |
| 5/19 | SHOPIFY CAPITAL   RTNX2T6NC | 11.24- |
| | Andrew Chapin | |
| | R7143224 | |
| 5/19 | SHOPIFY CAPITAL   ROFKYFNXD | 22.52- |
| | Andrew Chapin | |
| | R7123927 | |
| 5/19 | SHOPIFY CAPITAL   R3A22DAJ6 | 33.01- |
| | Andrew Chapin | |
| | R7133895 | |
| 5/19 | SHOPIFY CAPITAL   RJ46LB7HR | 58.57- |
| | Andrew Chapin | |
| | R7132499 | |
| 5/20 | SHOPIFY CAPITAL   RS4UXLJEP | 14.92- |
| | Andrew Chapin | |
| | R7153201 | |
| 5/20 | SHOPIFY CAPITAL   R7C3JR2MV | 20.12- |
| | Andrew Chapin | |
| | R7151847 | |
| 5/20 | AMEX EPAYMENT    ACH PMT | 8,999.27- |
| | Andrew Chapin | |
| | W1786 | |
| 5/21 | SHOPIFY CAPITAL   RDEGYZKZU | 8.19- |
| | Andrew Chapin | |
| | R7162064 | |
| 5/21 | PAYMENTECH       CHARGEBACK | 63.00- |
| | AffordableJerseys | |
| | 6470807 | |
| 5/21 | WCB Warehouse    WCB Wareho | 250.00- |
| | BENJA INCORPORATED | |
| | ST-P8N0P3W1R4I3 | |
| 5/22 | SHOPIFY CAPITAL   RIIBBV3AR | 16.73- |
| | Andrew Chapin | |
| | R7172513 | |
| 5/22 | SHOPIFY CAPITAL   RIZFI24QF | 36.75- |
| | Andrew Chapin | |
| | R7173938 | |
| 5/26 | Wire Transfer Debit | 600.00- |
| | Morning Blitz LLC | |
| | 026009593 | |
| | 898115416717 | |
| | 921 Heron Court | |
| | Marco Island, FL | |
| | BANK OF AMERICA, N | |
| | 20200526MMQFMPUN000385 | |
| | 20200526B6B7HU4R011332 | |
| | 05261424FT03 | |
| 5/26 | Wire Transfer Debit | 1,100.00- |
| | Koosh Media LLC | |

Case: 20-30819   Doc# 20   Filed: 10/20/20   Entered: 10/20/20 17:46:10   Page 120 of
159



BUSINESS ANALYSIS                4766  (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|-----------------------|--------|
|  | 321370765 | |
|  | 8103786531 | |
|  | AMERICAN SAVINGS B | |
|  | 20200526MMQFMPUN000386 | |
|  | 20200526GMQFMP01021050 | |
|  | 05261424FT03 | |
| 5/26 | SHOPIFY CAPITAL  R4YNZFLFY | 17.30- |
|  | Andrew Chapin | |
|  | R7184415 | |
| 5/26 | SHOPIFY CAPITAL  R4TE4DPAB | 61.12- |
|  | Andrew Chapin | |
|  | R7182983 | |
| 5/27 | Wire Transfer Debit | 250,500.00- |
|  | Andrew Chapin | |
|  | 322271627 | |
|  | 555475257 | |
|  | JPMORGAN CHASE BAN | |
|  | 20200527MMQFMPUN000123 | |
|  | 20200527B1QGC01R031842 | |
|  | 05271126FT03 | |
| 5/27 | SHOPIFY CAPITAL  RUJCBVNOE | 5.64- |
|  | Andrew Chapin | |
|  | R7214810 | |
| 5/27 | SHOPIFY CAPITAL  RRAX7ZZ3H | 9.10- |
|  | Andrew Chapin | |
|  | R7213542 | |
| 5/27 | SHOPIFY CAPITAL  RTW6AKAZU | 9.76- |
|  | Andrew Chapin | |
|  | R7204053 | |
| 5/27 | SHOPIFY CAPITAL  RPEBS4R3F | 12.17- |
|  | Andrew Chapin | |
|  | R7205454 | |
| 5/27 | SHOPIFY CAPITAL  RWH64DJXE | 12.57- |
|  | Andrew Chapin | |
|  | R7224204 | |
| 5/27 | SHOPIFY CAPITAL  RAQ67TISH | 21.35- |
|  | Andrew Chapin | |
|  | R7222908 | |
| 5/27 | SHOPIFY CAPITAL  RO7Q73UE7 | 23.27- |
|  | Andrew Chapin | |
|  | R7195257 | |
| 5/27 | SHOPIFY CAPITAL  RY6VJLH6N | 67.79- |
|  | Andrew Chapin | |
|  | R7193707 | |
| 5/27 | AMEX EPAYMENT    ACH PMT | 1,338.79- |
|  | Andrew Chapin | |
|  | W9564 | |
| 5/27 | LIN XIAO LI     IAT PAYPAL | 3,593.68- |
|  | ANDREW CHAPIN | |



BUSINESS ANALYSIS                4766  (Continued)

| CHECKS AND OTHER DEBITS | | |
|---|---|---|
| **DATE** | **TRANSACTION DESCRIPTION** | **AMOUNT** |
| 5/27 | JOMBOY CORP     SALE<br>BENJA INCORPORATED | 4,000.00- |
| 5/27 | CHASE CREDIT CRD EPAY<br>ANDREW J CHAPIN<br>4703131471 | 4,412.84- |
| 5/28 | SHOPIFY CAPITAL  REAU276XE<br>Andrew Chapin<br>R7234445 | 31.09- |
| 5/28 | from dda 500764766<br>to loan 6706744910865 | 700,000.00- |
| 5/29 | Wire Transfer Debit<br>Sports Byline USA<br>122016066<br>0450009504<br>CITY NATIONAL BANK<br>20200529MMQFMPUN000295<br>20200529L2LFCK1C003994<br>05291331FT03 | 2,500.00- |
| 5/29 | GUSTO           CND 783183<br>Benja Incorporated<br>6semjoibrth | 50.00- |
| 5/29 | SHOPIFY CAPITAL  RXHOAV62S<br>Andrew Chapin<br>R7244802 | 50.19- |
| 5/29 | SHOPIFY CAPITAL  RYL5OQIML<br>Andrew Chapin<br>R7243381 | 63.52- |
| 5/29 | GUSTO           CND 783183<br>Benja Incorporated<br>6semjoibrt8 | 150.00- |
| 5/29 | GUSTO           CND 783183<br>Benja Incorporated<br>6semjoibrt9 | 150.00- |
| 5/29 | GUSTO           CND 783183<br>Benja Incorporated<br>6semjoibrta | 350.00- |
| 5/29 | GUSTO           CND 783183<br>Benja Incorporated<br>6semjoibrt7 | 400.00- |
| 5/29 | GUSTO           CND 783183<br>Benja Incorporated<br>6semjoibrtk | 800.00- |
| 5/29 | GUSTO           CND 783183<br>Benja Incorporated<br>6semjoibrtd | 850.00- |
| 5/29 | GUSTO           REM 783186<br>Benja Incorporated<br>6semjoibrt4 | 2,187.50- |



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766  (Continued)

| CHECKS AND OTHER DEBITS | | |
|---|---|---|
| **DATE** | **TRANSACTION DESCRIPTION** | **AMOUNT** |
| 5/29 | GUSTO          TAX 783187 | 6,491.07- |
|  | Benja Incorporated | |
|  | 6semjoibrss | |
| 5/29 | GUSTO          NET 783185 | 17,892.04- |
|  | Benja Incorporated | |
|  | 6semjoibrse | |

| CHECKS IN SERIAL NUMBER ORDER | | | | | |
|---|---|---|---|---|---|
| **DATE** | **CHECK NO** | **AMOUNT** | **DATE** | **CHECK NO** | **AMOUNT** |
| 5/28 | 5005 | 44.99 | 5/22 | 5008* | 107.24 |
| 5/29 | 5009 | 128.37 | 5/20 | 5011* | 134.99 |
| 5/18 | 5012 | 51.50 | 5/22 | 5014* | 12.24 |

*Indicates break in check number sequence

| DAILY BALANCE SECTION | | | | | |
|---|---|---|---|---|---|
| **DATE** | **BALANCE** | **DATE** | **BALANCE** | **DATE** | **BALANCE** |
| 5/01 | 51,411.43 | 5/04 | 50,702.69 | 5/05 | 48,113.44 |
| 5/06 | 47,869.08 | 5/07 | 47,859.64 | 5/08 | 47,844.32 |
| 5/11 | 46,769.54 | 5/12 | 46,895.18 | 5/13 | 46,928.77 |
| 5/14 | 47,038.31 | 5/15 | 46,691.95 | 5/18 | 46,495.32 |
| 5/19 | 46,785.97 | 5/20 | 37,700.70 | 5/21 | 40,379.51 |
| 5/22 | 40,414.80 | 5/26 | 188,634.26 | 5/27 | 734,375.34 |
| 5/28 | 34,815.65 | 5/29 | 3,016.22 | | |



Check 5005 Amount $44.99 Date 5/28/2020



Check 5008 Amount $107.24 Date 5/22/2020



Check 5009 Amount $128.37 Date 5/29/2020



Check 5011 Amount $134.99 Date 5/20/2020



Check 5012 Amount $51.50 Date 5/18/2020



Check 5014 Amount $12.24 Date 5/22/2020



100 W University Ave
Champaign IL 61820

11386266

BENJA INC
845 MARKET ST 450A
SAN FRANCISCO CA 94117

Date  4/30/20          Page      1
Primary Account            4766

## CHECKING ACCOUNT SUMMARY & DETAIL

| BUSINESS ANALYSIS | | Number of Enclosures | 0 |
|---|---|---|---|
| Account Number | 4766 | Statement Dates  4/01/20 thru  4/30/20 | |
| Previous Balance | 11,599.47 | Days in the statement period | 30 |
| 28 Deposits/Credits | 4,290,724.02 | Average Ledger | 143,808.36 |
| 101 Checks/Debits | 4,106,916.78 | Average Collected | 143,808.36 |
| Service Charge | .00 | | |
| Interest Paid | .00 | | |
| Ending Balance | 195,406.71 | | |

| | Total For This Period | Total Year-to-Date |
|---|---|---|
| Overdraft Item Fees | $.00 | $805.00 |
| Returned Item Fees | $.00 | $35.00 |

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | AMOUNT |
|---|---|---|
| 4/02 | Wire Transfer Credit<br>MHC FINANCIAL SERVICES INC DBA<br>11120 TOMAHAWK CREEK PKWY SUIT<br>LEAWOOD, KS 662112695<br>FACTORING PURCHASE<br>MHC FINANCIAL SERVICES<br>20200401J1B7841C002985<br>20200401MMQFMPUN000330<br>04011745FT01 | 414,950.54 |
| 4/03 | CGUSABENJA        TRANSFER<br>ANDREW CHAPIN<br>ST-E5B4L1W0V5J3 | 47.94 |
| 4/06 | Wire Transfer Credit<br>MHC FINANCIAL SERVICES INC DBA<br>11120 TOMAHAWK CREEK PKWY SUIT<br>LEAWOOD, KS 662112695<br>FACTORING PURCHASE<br>MHC FINANCIAL SERVICES<br>20200403J1B7841C001682<br>20200403MMQFMPUN000275<br>04031800FT01 | 1,243,604.49 |
| 4/06 | CGUSABENJA        TRANSFER<br>ANDREW CHAPIN<br>ST-Y7O8Y1D4W4H2 | 27.05 |
| 4/08 | CGUSABENJA        TRANSFER<br>ANDREW CHAPIN | |

Case: 20-30819   Doc# 20   Filed: 10/20/20   Entered: 10/20/20 17:46:10   Page 125 of 159

## CHANGE OF ADDRESS FORM

Please notify us immediately of any address changes on your accounts..

Customer Name: _____

(Account Number)

New Address: _____

(Street Address)      (Unit #)

_____

(City)      (State)      (Zip Code)

**Member FDIC**    _____

(Telephone Number)      (Social Security Number)

_____

(Customer Signature)

**Please return this form to the address listed below or bring it to our office**

### THIS FORM WILL HELP YOU BALANCE YOUR CHECKBOOK

| CHECKS or WITHDRAWALS OUTSTANDING Not Charged To Your Account | | ENDING BALANCE Shown On This Statement | $ _____ | Current Checkbook Balance | $ _____ |
|---|---|---|---|---|---|
| Check No. | $ | | | | |
| | | ADD (+) | | ADD (+) | |
| | | Deposits, Loan Advances, Credit Memos, And | $ _____ | Interest Earned From This Statement | $ _____ |
| | | Other Automatic Deposits Not Shown On This | $ _____ | | |
| | | Statement | $ _____ | SUBTRACT (-) | |
| | | | | Misc. Charges From This Statement | $ _____ |
| | | SUBTRACT (-) | $ _____ | | |
| | | Total of Checks Outstanding, Automatic Loan | $ _____ | NEW CHECKBOOK BALANCE | |
| | | Payments, Automatic Savings Transfers, Service | $ _____ | Should Agree With BALANCE Line | $ _____ |
| | | Charges, Debit Memos And Other Automatic | $ _____ | | |
| | | Deductions Not Shown On This Statement | $ _____ | | |
| TOTAL | $ | BALANCE | $ _____ | | |

### IMPORTANT INFORMATION

**In Case of General Statement Errors**

You must examine your statement of account with "reasonable promptness." If you discover (or reasonably should have discovered) any errors, unauthorized signatures, or alterations, you must promptly notify us of the relevant facts. You agree that the time you have to examine your statement and report to us will depend on the circumstances,but will not, in any circumstance, exceed a total of 30 days from when the statement is first sent or made available to you.

### IMPORTANT INFORMATION FOR CONSUMER ACCOUNTS

**In Case of Errors or Questions About Your Electronic Transactions**

Telephone or write us at the number or address listed below if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.
(1) Tell us your name and account number.
(2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
(3) Tell us the date and the dollar amount of the suspected error.
We will investigate your complaint and will correct any error promptly.If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation. To qualify for this recredit, we require a written notice of the problem or complaint within 10 business days of your telephone call to us.

**In Case of Errors or Questions About Your Line of Credit or Home Equity Loan**

If you think your bill is wrong, or if you need information about this loan or a transaction on this statement, please write to us at the address listed below. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights. In your letter, please give us the following information:
(1) Your name and account number.
(2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
(3) The date and the dollar amount of the suspected error.
You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your questions, we cannot report you as delinquent or take any action to collect the amount you question.

**Balance Subject to Interest Rate for Line of Credit**

Balance Subject to Interest Rate / Average Daily Balance - We figure the interest charge on your account by applying the periodic rate to the 'AVERAGE DAILY BALANCE' of your account (including current transactions). To get the 'AVERAGE DAILY BALANCE', we take the beginning balance of your account each day, add any new advances and subtract any payments or credits, also subtracting any unpaid finance charges. The automatic minimum payment amount is excluded when calculating the 'AVERAGE DAILY BALANCE' and 'INTEREST CHARGE'. If the account does not have sufficient funds to cover payment and another advance is made to cover minimum payment, this is also excluded for figuring the 'AVERAGE DAILY BALANCE' but is reflected in the beginning balance of the next statement cycle. This gives us the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the 'AVERAGE DAILY BALANCE'. Written notification of any errors must be given to preserve your rights under the Truth in Lending Act. At any time the debtor may pay the aggregate balance or any portion of his/her indebtedness.

*We may report information about your account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.*

**Telephone Number and Address to Be Notified in the Event of Errors**

Call us at 800.672.8739 or write to us at Busey Bank, Attention: Customer Care Center, P.O. Box 4028, Champaign, IL 61824. You should also call us at this phone number or write to us at this address if you believe a transfer has been made using the information from your check without your permission.

46-STMT

00126



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766   (Continued)

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | AMOUNT |
|------|------------------------|--------|
|      | ST-M7W9W8G2D4P9 | |
| 4/09 | CGUSABENJA       TRANSFER | 55.09 |
|      | ANDREW CHAPIN | |
|      | ST-O8X9K3N4W2R8 | |
| 4/10 | Wire Transfer Credit | 322,963.00 |
|      | MHC FINANCIAL SERVICES, INC. | |
|      | MHC FINANCIAL SERVICES INC DBA | |
|      | 11120 TOMAHAWK CREEK PKWY SUIT | |
|      | LEAWOOD, KS 662112695 | |
|      | ACCOUNT NAME: BENJA INCORPORAT | |
|      | 20200410J1B7841C000516 | |
|      | 20200410MMQFMPUN000166 | |
|      | 04101427FT03 | |
| 4/10 | CGUSABENJA       TRANSFER | 103.12 |
|      | ANDREW CHAPIN | |
|      | ST-X2P9A0K6K2J7 | |
| 4/13 | CGUSABENJA       TRANSFER | 68.97 |
|      | ANDREW CHAPIN | |
|      | ST-W0I1B0P6N1A8 | |
| 4/14 | CGUSABENJA       TRANSFER | 111.86 |
|      | ANDREW CHAPIN | |
|      | ST-C2E2S0K5G0W4 | |
| 4/16 | CGUSABENJA       TRANSFER | 31.91 |
|      | ANDREW CHAPIN | |
|      | ST-J9Z0N0B0N0H3 | |
| 4/17 | CGUSABENJA       TRANSFER | 6.66 |
|      | ANDREW CHAPIN | |
|      | ST-Y0E8Y8F5Q7T1 | |
| 4/17 | PAYPAL           TRANSFER | 100.00 |
|      | ANDREW CHAPIN | |
|      | 1008631391114 | |
| 4/17 | ANDREW GLUCK     SENDER | 10,000.00 |
|      | 463303580 | |
| 4/20 | CGUSABENJA       TRANSFER | 61.50 |
|      | ANDREW CHAPIN | |
|      | ST-P0J3W1N5D1P0 | |
| 4/20 | to dda 500764766 | 400,000.00 |
|      | from ln 6706744910865 | |
| 4/21 | Wire Transfer Credit | 200,000.00 |
|      | DISTRIBUTION MANAGEMENT, INC. | |
|      | 5 RESEARCH PARK DR | |
|      | SAINT CHARLES,MO,63304 | |
|      | 20200421L3LF151C003794 | |
|      | 20200421MMQFMPUN000254 | |
|      | 04211701FT03 | |
| 4/21 | CGUSABENJA       TRANSFER | 262.32 |
|      | ANDREW CHAPIN | |
|      | ST-O7S1K5F7J9F8 | |



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766  (Continued)

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | AMOUNT |
|------|------------------------|--------|
| 4/21 | SBAD TREAS 310      MISC PAY<br>Benja Incorporated<br>EIDG:3600140295<br>NTE*PMT*EIDG:3600140295\ | 6,000.00 |
| 4/23 | CGUSABENJA      TRANSFER<br>ANDREW CHAPIN<br>ST-B1F0S3Z0C9P1 | 138.84 |
| 4/24 | CGUSABENJA      TRANSFER<br>ANDREW CHAPIN<br>ST-S7B5Z4A0M0H6 | 187.05 |
| 4/27 | CGUSABENJA      TRANSFER<br>ANDREW CHAPIN<br>ST-U8L8T5D4T2R2 | 67.76 |
| 4/28 | CGUSABENJA      TRANSFER<br>ANDREW CHAPIN<br>ST-O0A7I7F4P0P2 | 55.62 |
| 4/29 | Wire Transfer Credit<br>MHC FINANCIAL SERVICES, INC.<br>MHC FINANCIAL SERVICES INC DBA<br>11120 TOMAHAWK CREEK PKWY SUIT<br>LEAWOOD, KS 662112695<br>ACCOUNT NAME: BENJA INCORPORAT<br>20200429J1B7841C001317<br>20200429MMQFMPUN000356<br>04291639FT03 | 994,774.76 |
| 4/29 | CGUSABENJA      TRANSFER<br>ANDREW CHAPIN<br>ST-V6G0S5H2S4Q3 | 33.59 |
| 4/30 | Wire Transfer Credit<br>MHC FINANCIAL SERVICES, INC.<br>MHC FINANCIAL SERVICES INC DBA<br>11120 TOMAHAWK CREEK PKWY SUIT<br>LEAWOOD, KS 662112695<br>ACCOUNT NAME: BENJA INCORPORAT<br>20200430J1B7841C000733<br>20200430MMQFMPUN000198<br>04301138FT03 | 696,970.23 |
| 4/30 | CGUSABENJA      TRANSFER<br>ANDREW CHAPIN<br>ST-O2E7B5D4U6O4 | 5.19 |
| 4/30 | PAYMENTECH      CHARGEBACK<br>AffordableJerseys<br>6470807 | 75.06 |

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766  (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
| 4/01 | SHOPIFY CAPITAL  R64TJL6EE<br>Andrew Chapin<br>R6669278 | 59.11- |
| 4/01 | PAYPAL          INST XFER<br>ANDREW CHAPIN<br>JERSEYSTORE | 420.00- |
| 4/02 | Wire Transfer Debit<br>Taco Corp<br>265270413<br>20001214039<br>IBERIABANK<br>20200402MMQFMPUN000061<br>20200402MMQFMP9H000273<br>04021018FT01 | 350,000.00- |
| 4/02 | SHOPIFY CAPITAL  ROP72W4VP<br>Andrew Chapin<br>R6678837 | 17.21- |
| 4/02 | GUSTO          REM 521595<br>Benja Incorporated<br>6semjodiq7s | 50.00- |
| 4/02 | GUSTO          CND 521587<br>Benja Incorporated<br>6semjodiq8i | 100.00- |
| 4/02 | GUSTO          TAX 521606<br>Benja Incorporated<br>6semjodiq75 | 101.89- |
| 4/02 | GUSTO          FEE 520375<br>Benja Incorporated<br>6semjodfebr | 105.00- |
| 4/02 | GUSTO          CND 521587<br>Benja Incorporated<br>6semjodiq8s | 300.00- |
| 4/02 | GUSTO          NET 521594<br>Benja Incorporated<br>6semjodiq6d | 570.93- |
| 4/03 | Wire Transfer Debit<br>KEMA Partners LLC<br>021000021<br>606768692<br>JPMORGAN CHASE BAN<br>20200403MMQFMPUN000052<br>20200403B1QGC01R017533<br>04030914FT01 | 50,000.00- |
| 4/03 | SHOPIFY CAPITAL  RX4EW4OTJ<br>Andrew Chapin<br>R6689748 | 8.54- |
| 4/03 | SHOPIFY CAPITAL  RMYANBU3L<br>Andrew Chapin | 40.56- |



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS           4766   (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
|  | R6688428 |  |
| 4/03 | PAYMENTECH      FEE | 138.95- |
|  | AffordableJerseys |  |
|  | 6470807 |  |
| 4/03 | AMEX EPAYMENT    ACH PMT | 3,201.25- |
|  | Andrew Chapin |  |
|  | W4154 |  |
| 4/06 | Wire Transfer Debit | 100,000.00- |
|  | Andrew Chapin |  |
|  | 322271627 |  |
|  | 555475257 |  |
|  | JPMORGAN CHASE BAN |  |
|  | 20200406MMQFMPUN000032 |  |
|  | 20200406B1QGC01R018097 |  |
|  | 04060928FT03 |  |
| 4/06 | Wire Transfer Debit | 600,000.00- |
|  | Taco Corp of America |  |
|  | 265270413 |  |
|  | 20001214039 |  |
|  | IBERIABANK |  |
|  | 20200406MMQFMPUN000033 |  |
|  | 20200406MMQFMP9H000284 |  |
|  | 04060929FT03 |  |
| 4/06 | SHOPIFY CAPITAL   R7ZTBQ6R5 | 4.79- |
|  | Andrew Chapin |  |
|  | R6699452 |  |
| 4/06 | VZ WIRELESS VE    VZW WEBPAY | 672.59- |
|  | ANDREW *CHAPIN |  |
|  | 5165198 |  |
| 4/06 | CHASE CREDIT CRD EPAY | 1,234.80- |
|  | ANDREW J CHAPIN |  |
|  | 4621558942 |  |
| 4/07 | SHOPIFY CAPITAL   RNJWCDUZG | 18.03- |
|  | Andrew Chapin |  |
|  | R6717418 |  |
| 4/07 | SHOPIFY CAPITAL   RANYWFALH | 18.59- |
|  | Andrew Chapin |  |
|  | R6707965 |  |
| 4/07 | WCB Warehouse    WCB Wareho | 480.64- |
|  | BENJA INCORPORATED |  |
|  | ST-C6Y7K9M6H8V6 |  |
| 4/07 | PAYPAL         INST XFER | 1,111.27- |
|  | ANDREW CHAPIN |  |
|  | ALEXFREEDMA EBA |  |
| 4/08 | SHOPIFY CAPITAL   RR4MQL5JH | 3.86- |
|  | Andrew Chapin |  |
|  | R6737042 |  |
| 4/08 | SHOPIFY CAPITAL   RTJLEJUJ6 | 43.68- |
|  | Andrew Chapin |  |



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766  (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|---|---|---|
| | R6735755 | |
| 4/08 | to loan 6706744910865<br>from dda 500764766 | 450,000.00- |
| 4/09 | SHOPIFY CAPITAL   R7NVYAWIU<br>Andrew Chapin<br>R6746547 | 9.75- |
| 4/09 | SHOPIFY CAPITAL   RMFPDTCYT<br>Andrew Chapin<br>R6745236 | 23.72- |
| 4/10 | Wire Transfer Debit<br>Andrew Chapin<br>322271627<br>555475257<br>JPMORGAN CHASE BAN<br>20200410MMQFMPUN000180<br>20200410B1QGC01R032183<br>04101405FT03 | 100,000.00- |
| 4/10 | SHOPIFY CAPITAL   RBNF33WE4<br>Andrew Chapin<br>R6754933 | 8.19- |
| 4/10 | SHOPIFY CAPITAL   R5CK4YRHB<br>Andrew Chapin<br>R6756274 | 18.22- |
| 4/13 | Wire Transfer Debit<br>Fenwick & West<br>026009593<br>1484401104<br>BANK OF AMERICA, N<br>20200413MMQFMPUN000036<br>20200413B6B7HU3R002651<br>04130912FT03 | 7,100.00- |
| 4/13 | Wire Transfer Debit<br>Taco Corp of America<br>265270413<br>20001214039<br>IBERIABANK<br>20200413MMQFMPUN000037<br>20200413MMQFMP9H000197<br>04130912FT03 | 250,000.00- |
| 4/13 | SHOPIFY CAPITAL   RYZGDWHL2<br>Andrew Chapin<br>R6764705 | 7.81- |
| 4/13 | SHOPIFY CAPITAL   R2QPXBOOI<br>Andrew Chapin<br>R6766051 | 12.23- |
| 4/14 | SHOPIFY CAPITAL   R5L2AQJ4X<br>Andrew Chapin<br>R6775914 | 1.36- |

Case: 20-30819   Doc# 20   Filed: 10/20/20   Entered: 10/20/20 17:46:10   Page 131 of 159

00131



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766  (Continued)

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
| 4/14 | SHOPIFY CAPITAL  RPRGLTPBH<br>Andrew Chapin<br>R6785151 | 6.15- |
| 4/14 | SHOPIFY CAPITAL  RGSRI3P3A<br>Andrew Chapin<br>R6793699 | 12.30- |
| 4/14 | SHOPIFY CAPITAL  RTXYUMJZX<br>Andrew Chapin<br>R6792494 | 23.49- |
| 4/14 | GUSTO          CND 555619<br>Benja Incorporated<br>6semjoeds55 | 50.00- |
| 4/14 | PAYMENTECH      CHARGEBACK<br>AffordableJerseys<br>6470807 | 75.06- |
| 4/14 | PAYPAL          INST XFER<br>ANDREW CHAPIN<br>STEINERSPOR EBA | 147.00- |
| 4/14 | WCB Warehouse   WCB Wareho<br>BENJA INCORPORATED<br>ST-I4Z5V4O3Y3O4 | 250.00- |
| 4/14 | GUSTO          CND 555619<br>Benja Incorporated<br>6semjoeds3i | 400.00- |
| 4/14 | GUSTO          CND 555619<br>Benja Incorporated<br>6semjoeds49 | 650.00- |
| 4/14 | AMEX EPAYMENT   ACH PMT<br>Andrew Chapin<br>W6968 | 9,000.00- |
| 4/15 | Account Analysis Charge | 332.52- |
| 4/15 | PAYPAL          INST XFER<br>ANDREW CHAPIN<br>PJ721 | 41.99- |
| 4/16 | SHOPIFY CAPITAL  RGFQWO3IV<br>Andrew Chapin<br>R6812720 | 5.64- |
| 4/16 | SHOPIFY CAPITAL  R4XAOLOSG<br>Andrew Chapin<br>R6811377 | 24.92- |
| 4/16 | APPLECARD GSBANK PAYMENT<br>Andrew Chapin<br>1749626 | 1,336.71- |
| 4/17 | SHOPIFY CAPITAL  RZAYTZTYP<br>Andrew Chapin<br>R6823115 | 1.22- |
| 4/17 | SHOPIFY CAPITAL  RHDTNVIW3<br>Andrew Chapin | 35.38- |



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                4766  (Continued)

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
| | R6821632 | |
| 4/17 | PAYPAL          INST XFER | 55.00- |
| | ANDREW CHAPIN | |
| | THOMASBARBI | |
| 4/20 | Wire Transfer Debit | 100,000.00- |
| | Andrew Chapin | |
| | 322271627 | |
| | 555475257 | |
| | JPMORGAN CHASE BAN | |
| | 20200420MMQFMPUN000285 | |
| | 20200420B1QGC01R063780 | |
| | 04201554FT03 | |
| 4/20 | SHOPIFY CAPITAL  RQNSADQG7 | 10.82- |
| | Andrew Chapin | |
| | R6833834 | |
| 4/20 | SHOPIFY CAPITAL  R6ENGTIPG | 58.81- |
| | Andrew Chapin | |
| | R6832349 | |
| 4/21 | Wire Transfer Debit | 350,000.00- |
| | Taco Corp of America | |
| | 265270413 | |
| | 20001214039 | |
| | IBERIABANK | |
| | 20200421MMQFMPUN000261 | |
| | 20200421MMQFMP9H000845 | |
| | 04211516FT03 | |
| 4/21 | SHOPIFY CAPITAL  RH4OCW5ER | 11.28- |
| | Andrew Chapin | |
| | R6854362 | |
| 4/21 | SHOPIFY CAPITAL  RGS465RSV | 17.19- |
| | Andrew Chapin | |
| | R6863817 | |
| 4/21 | SHOPIFY CAPITAL  RUIV6OLLW | 17.88- |
| | Andrew Chapin | |
| | R6844403 | |
| 4/21 | SHOPIFY CAPITAL  R3APRBEFB | 25.10- |
| | Andrew Chapin | |
| | R6852901 | |
| 4/22 | Wire Transfer Debit | 4,000.00- |
| | Koosh Media LLC | |
| | 321370765 | |
| | 8103786531 | |
| | AMERICAN SAVINGS B | |
| | 20200422MMQFMPUN000017 | |
| | 20200422GMQFMP01004587 | |
| | 04220915FT03 | |
| 4/22 | Wire Transfer Debit | 150,000.00- |
| | Taco Corp of America | |



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766  (Continued)

| | CHECKS AND OTHER DEBITS | |
|---|---|---|
| **DATE** | **TRANSACTION DESCRIPTION** | **AMOUNT** |
| | 265270413 | |
| | 20001214039 | |
| | IBERIABANK | |
| | 20200422MMQFMPUN000016 | |
| | 20200422MMQFMP9H000209 | |
| | 04220915FT03 | |
| 4/22 | VENMO         PAYMENT | 706.00- |
| | ANDREW CHAPIN | |
| | 3379376019 | |
| 4/23 | SHOPIFY CAPITAL  RNHWSW655 | 9.10- |
| | Andrew Chapin | |
| | R6882378 | |
| 4/23 | SHOPIFY CAPITAL  RJHC6HFHG | 24.60- |
| | Andrew Chapin | |
| | R6883777 | |
| 4/23 | GUSTO         CND 589409 | 50.00- |
| | Benja Incorporated | |
| | 6semjof7efh | |
| 4/23 | PAYPAL        INST XFER | 170.25- |
| | ANDREW CHAPIN | |
| | FURRYPAL EBAY F | |
| 4/23 | APPLECARD GSBANK PAYMENT | 384.43- |
| | Andrew Chapin | |
| | 1749626 | |
| 4/23 | AMEX EPAYMENT    ACH PMT | 6,250.00- |
| | Andrew Chapin | |
| | W8840 | |
| 4/24 | SHOPIFY CAPITAL  RHROD3XNG | 26.84- |
| | Andrew Chapin | |
| | R6892419 | |
| 4/24 | SHOPIFY CAPITAL  RQSBYQQOI | 33.02- |
| | Andrew Chapin | |
| | R6893816 | |
| 4/27 | SHOPIFY CAPITAL  RNLUNOKHW | 8.78- |
| | Andrew Chapin | |
| | R6902528 | |
| 4/27 | SHOPIFY CAPITAL  RO4ZPIVYH | 11.97- |
| | Andrew Chapin | |
| | R6903941 | |
| 4/27 | VENMO         PAYMENT | 2,000.00- |
| | ANDREW CHAPIN | |
| | 3390259925 | |
| 4/27 | CHASE CREDIT CRD EPAY | 3,048.26- |
| | ANDREW J CHAPIN | |
| | 4651188106 | |
| 4/28 | SHOPIFY CAPITAL  RAKS3DJJG | 9.49- |
| | Andrew Chapin | |
| | R6931462 | |



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766  (Continued)

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|---|---|---|
| 4/28 | SHOPIFY CAPITAL  RN4RUUU7B<br>Andrew Chapin<br>R6914127 | 9.84- |
| 4/28 | SHOPIFY CAPITAL  R34HUTHPL<br>Andrew Chapin<br>R6922251 | 18.38- |
| 4/28 | GUSTO          CND 599561<br>Benja Incorporated<br>6semjoffner | 50.00- |
| 4/28 | GUSTO          CND 599561<br>Benja Incorporated<br>6semjoffndr | 100.00- |
| 4/28 | GUSTO          CND 599561<br>Benja Incorporated<br>6semjoffnee | 150.00- |
| 4/28 | GUSTO          CND 599561<br>Benja Incorporated<br>6semjoffncl | 200.00- |
| 4/28 | GUSTO          CND 599561<br>Benja Incorporated<br>6semjoffnct | 200.00- |
| 4/28 | WCB Warehouse    WCB Wareho<br>BENJA INCORPORATED<br>ST-J7K6J3A8V8G0 | 250.00- |
| 4/28 | GUSTO          CND 599561<br>Benja Incorporated<br>6semjoffndc | 300.00- |
| 4/28 | GUSTO          CND 599563<br>Benja Incorporated<br>6semjoffnf9 | 500.00- |
| 4/28 | to ln 6706744910865<br>from dda 500764766 | 5,909.74- |
| 4/28 | to ln 6706744910865<br>from dda 500764766 | 12,035.38- |
| 4/29 | Wire Transfer Debit<br>Taco Corp of America<br>265270413<br>20001214039<br>IBERIABANK<br>20200429MMQFMPUN000415<br>20200429MMQFMP9H001432<br>04291642FT03 | 1,000,000.00- |
| 4/29 | SHOPIFY CAPITAL  R7JJDFZ7C<br>Andrew Chapin<br>R6942475 | 5.93- |
| 4/29 | SHOPIFY CAPITAL  RBVZ3BZHK<br>Andrew Chapin<br>R6941126 | 27.36- |



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766  (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
| 4/29 | AMEX EPAYMENT    ACH PMT<br>Andrew Chapin<br>W6272 | 1,547.65- |
| 4/30 | Wire Transfer Debit<br>Taco Corp of America<br>265270413<br>20001214039<br>IBERIABANK<br>Close out<br>20200430MMQFMPUN000131<br>20200430MMQFMP9H000768<br>04301156FT03 | 515,027.24- |
| 4/30 | SHOPIFY CAPITAL  R3J4C37ZY<br>Andrew Chapin<br>R6952301 | .96- |
| 4/30 | SHOPIFY CAPITAL  RFTVIYDOD<br>Andrew Chapin<br>R6950966 | 34.57- |
| 4/30 | GUSTO         REM 619626<br>Benja Incorporated<br>6semjofqu60 | 950.00- |
| 4/30 | GUSTO         TAX 619632<br>Benja Incorporated<br>6semjofqu5h | 6,503.53- |
| 4/30 | GUSTO         NET 619622<br>Benja Incorporated<br>6semjofqu4k | 17,892.03- |

## DAILY BALANCE SECTION

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|------|---------|------|---------|------|---------|
| 4/01 | 11,120.36 | 4/02 | 74,825.87 | 4/03 | 21,484.51 |
| 4/06 | 563,203.87 | 4/07 | 561,575.34 | 4/08 | 111,549.27 |
| 4/09 | 111,570.89 | 4/10 | 334,610.60 | 4/13 | 77,559.53 |
| 4/14 | 67,056.03 | 4/15 | 66,681.52 | 4/16 | 65,346.16 |
| 4/17 | 75,361.22 | 4/20 | 375,353.09 | 4/21 | 231,543.96 |
| 4/22 | 76,837.96 | 4/23 | 70,088.42 | 4/24 | 70,215.61 |
| 4/27 | 65,214.36 | 4/28 | 45,537.15 | 4/29 | 38,764.56 |
| 4/30 | 195,406.71 | | | | |

# EXHIBIT 9

Case: 20-30819    Doc# 20    Filed: 10/20/20    Entered: 10/20/20 17:46:10    Page 137 of
159
00137

## CERTIFICATE OF BORROWING BASE

To fulfill the requirements of the Credit Agreement dated as of July 16, 2019; between Benja Inc. and Busey Bank, the undersigned hereby certifies that, as of the close of business on March 26, 2020 the following computations are true and correct.

**Accounts Receivable**

| | | | | |
|---|---|---|---|---|
| 0-30 days from invoice date | 2,057,430 | | | |
| 31-60 days from invoice date | 2,046,872 | | | |
| 61-90 days from invoice date | 546,710 | | | |
| 90+ days from invoice date | - | | | |
| Total Accounts Receivable | | $ 4,651,012 | | |
| | | | | |
| Less: accounts 90+ days from invoice date | - | | | |
| Less: accounts with >25% 90+ days from invoice date | - | | | |
| Less: portion of any account that exceeds 25% of total AR | 261,910 | | | |
| Less: other ineligible accounts receivable | - | | | |
| Total ineligible accounts receivable | | $ 261,910 | | |
| | | | | |
| Net accounts receivable | | | $ 4,389,102 | |
| Margin rate | | | 80% | |
| **Total borrowing base on accounts receivable** | | | $ 3,511,282 | |
| | | | | |
| **TOTAL BORROWING BASE (not to exceed $3,000,000)** | | | $ 3,000,000 | |
| | | | | |
| Less: outstanding balance on revolving line of credit | | | $ - | |
| Remaining availability | | | $ 3,000,000 | |

NAME: Benja Inc.

By: _____
    Andrew Chapin, CEO

Received and reviewed

By: _____
    Dan Saettele, Vice President

## CERTIFICATE OF BORROWING BASE

To fulfill the requirements of the Credit Agreement dated as of July 16, 2019; between Benja Inc. and Busey Bank, the undersigned hereby certifies that, as of the close of business on April 1, 2020 the following computations are true and correct.

**Accounts Receivable**

| | | | |
|---|---|---|---|
| 0-30 days from invoice date | 2,105,824 | | |
| 31-60 days from invoice date | 2,057,430 | | |
| 61-90 days from invoice date | 583,780 | | |
| 90+ days from invoice date | - | | |
| Total Accounts Receivable | | $ 4,747,034 | |
| | | | |
| Less: accounts 90+ days from invoice date | - | | |
| Less: accounts with >25% 90+ days from invoice date | - | | |
| Less: portion of any account that exceeds 25% of total AR | 222,759 | | |
| Less: other ineligible accounts receivable | - | | |
| Total ineligible accounts receivable | | $ 222,759 | |
| | | | |
| Net accounts receivable | | | $ 4,524,275 |
| Margin rate | | | 80% |
| **Total borrowing base on accounts receivable** | | | $ 3,619,420 |
| | | | |
| **TOTAL BORROWING BASE (not to exceed $3,000,000)** | | | $ 3,000,000 |
| | | | |
| Less: outstanding balance on revolving line of credit | | | $ - |
| Remaining availability | | | $ 3,000,000 |

NAME: Benja Inc.

By: _____
Andrew Chapin, CEO

Received and reviewed

By: _____
Dan Saettele, Vice President

## CERTIFICATE OF BORROWING BASE

To fulfill the requirements of the Credit Agreement dated as of July 16, 2019; between Benja Inc. and Busey Bank, the undersigned hereby certifies that, as of the close of business on May 1, 2020 the following computations are true and correct.

**Accounts Receivable**

| | | | | |
|---|---|---|---|---|
| 0-30 days from invoice date | 2,238,579 | | | |
| 31-60 days from invoice date | 2,105,824 | | | |
| 61-90 days from invoice date | 575,581 | | | |
| 90+ days from invoice date | - | | | |
| Total Accounts Receivable | | $ | 4,919,984 | |
| | | | | |
| Less:  accounts 90+ days from invoice date | - | | | |
| Less:  accounts with >25% 90+ days from invoice date | - | | | |
| Less:  portion of any account that exceeds 25% of total AR | 185,854 | | | |
| Less:  other ineligible accounts receivable | - | | | |
| Total ineligible accounts receivable | | $ | 185,854 | |
| | | | | |
| Net accounts receivable | | | $ | 4,734,130 |
| Margin rate | | | | 80% |
| **Total borrowing base on accounts receivable** | | | $ | 3,787,304 |
| | | | | |
| **TOTAL BORROWING BASE (not to exceed $3,000,000)** | | | $ | 3,000,000 |
| | | | | |
| Less:  outstanding balance on revolving line of credit | | | $ | - |
| Remaining availability | | | $ | 3,000,000 |

NAME:  Benja Inc.

By: _____

    Andrew Chapin, CEO

Received and reviewed

By: _____

    Dan Saettele, Vice President

# CERTIFICATE OF BORROWING BASE

To fulfill the requirements of the Credit Agreement dated as of July 16, 2019; between Benja Inc. and Busey Bank, the undersigned hereby certifies that, as of the close of business on June 1, 2020 the following computations are true and correct.

**Accounts Receivable**

| | | | |
|---|---|---|---|
| 0-30 days from invoice date | 2,501,037 | | |
| 31-60 days from invoice date | 2,333,265 | | |
| 61-90 days from invoice date | 606,555 | | |
| 90+ days from invoice date | - | | |
| Total Accounts Receivable | | $ 5,440,857 | |
| | | | |
| Less: accounts 90+ days from invoice date | - | | |
| Less: accounts with >25% 90+ days from invoice date | - | | |
| Less: portion of any account that exceeds 25% of total AR | 204,169 | | |
| Less: other ineligible accounts receivable | - | | |
| Total ineligible accounts receivable | | $ 204,169 | |
| | | | |
| Net accounts receivable | | | $ 5,236,688 |
| Margin rate | | | 80% |
| **Total borrowing base on accounts receivable** | | | $ 4,189,350 |
| | | | |
| **TOTAL BORROWING BASE (not to exceed $3,000,000)** | | | $ 3,000,000 |
| | | | |
| Less: outstanding balance on revolving line of credit | | | $ - |
| Remaining availability | | | $ 3,000,000 |

NAME: Benja Inc.

By: _____
        Andrew Chapin, CEO

Received and reviewed

By: _____

**CERTIFICATE OF BORROWING BASE**

To fulfill the requirements of the Credit Agreement dated as of July 16, 2019; between Benja Inc. and Busey Bank, the undersigned hereby certifies that, as of the close of business on June 1, 2020 the following computations are true and correct.

**Accounts Receivable**

| | | | | |
|---|---|---|---|---|
| 0-30 days from invoice date | 2,333,265 | | | |
| 31-60 days from invoice date | 2,238,579 | | | |
| 61-90 days from invoice date | 579,952 | | | |
| 90+ days from invoice date | 88,794 | | | |
| Total Accounts Receivable | | $ | 5,240,590 | |
| | | | | |
| Less: accounts 90+ days from invoice date | - | | | |
| Less: accounts with >25% 90+ days from invoice date | - | | | |
| Less: portion of any account that exceeds 25% of total AR | 217,430 | | | |
| Less: other ineligible accounts receivable | - | | | |
| Total ineligible accounts receivable | | $ | 217,430 | |
| | | | | |
| Net accounts receivable | | | $ | 5,023,161 |
| Margin rate | | | | 80% |
| **Total borrowing base on accounts receivable** | | | $ | 4,018,528 |
| | | | | |
| **TOTAL BORROWING BASE (not to exceed $3,000,000)** | | | $ | 3,000,000 |
| | | | | |
| Less: outstanding balance on revolving line of credit | | | $ | - |
| Remaining availability | | | $ | 3,000,000 |

NAME: Benja Inc.

By: _____

   Andrew Chapin, CEO

Received and reviewed

By: _____

   Dan Saettele, Vice President

## CERTIFICATE OF BORROWING BASE

To fulfill the requirements of the Credit Agreement dated as of July 16, 2019; between Benja Inc. and Busey Bank, the undersigned hereby certifies that, as of the close of business on June 1, 2020 the following computations are true and correct.

**Accounts Receivable**

| | | | |
|---|---|---|---|
| 0-30 days from invoice date | 3,038,081 | | |
| 31-60 days from invoice date | 2,501,037 | | |
| 61-90 days from invoice date | 702,432 | | |
| 90+ days from invoice date | 88,794 | | |
| Total Accounts Receivable | | $ | 6,330,343 |
| | | | |
| Less: accounts 90+ days from invoice date | - | | |
| Less: accounts with >25% 90+ days from invoice date | - | | |
| Less: portion of any account that exceeds 25% of total AR | 63,641 | | |
| Less: other ineligible accounts receivable | - | | |
| Total ineligible accounts receivable | | $ | 63,641 |
| | | | |
| Net accounts receivable | | $ | 6,266,702 |
| Margin rate | | | 80% |
| **Total borrowing base on accounts receivable** | | $ | 5,013,362 |
| | | | |
| **TOTAL BORROWING BASE (not to exceed $5,000,000)** | | $ | 5,000,000 |
| | | | |
| Less: outstanding balance on revolving line of credit | | | |
| Remaining availability | | $ | 5,000,000 |

NAME: Benja Inc.

By: _____

    Andrew Chapin, CEO

Received and reviewed

By: _____

## CERTIFICATE OF BORROWING BASE

To fulfill the requirements of the Credit Agreement dated as of July 16, 2019; between Benja Inc. and Busey Bank, the undersigned hereby certifies that, as of the close of business on July 31, 2020 the following computations are true and correct.

**Accounts Receivable**

| | | | |
|---|---:|---|---:|
| 0-30 days from invoice date | 2,862,812 | | |
| 31-60 days from invoice date | 2,501,037 | | |
| 61-90 days from invoice date | 702,432 | | |
| 90+ days from invoice date | - | | |
| Total Accounts Receivable | | $ | 6,066,280 |
| | | | |
| Less: accounts 90+ days from invoice date | - | | |
| Less: accounts with >25% 90+ days from invoice date | - | | |
| Less: portion of any account that exceeds 25% of total AR | 67,197 | | |
| Less: other ineligible accounts receivable | - | | |
| Total ineligible accounts receivable | | $ | 67,197 |
| | | | |
| Net accounts receivable | | $ | 5,999,083 |
| Margin rate | | | 80% |
| **Total borrowing base on accounts receivable** | | $ | 4,799,266 |
| | | | |
| **TOTAL BORROWING BASE (not to exceed $3,000,000)** | | $ | 3,000,000 |
| | | | |
| Less: outstanding balance on revolving line of credit | | $ | - |
| Remaining availability | | $ | 3,000,000 |

NAME: Benja Inc.

By: _____
    Andrew Chapin, CEO

Received and reviewed

By: _____
    Patrick Ricke

# Aged Receivables

## Benja Incorporated
## April 2020

| | Current | March | February | January | Older | Total |
|---|---|---|---|---|---|---|
| **Receivables** | | | | | | |
| Apple | - | 3,484 | 3,426 | - | - | 6,910 |
| Arc'teryx | - | 2,020 | 1,990 | - | - | 4,010 |
| Backcountry | - | 358,864 | 357,310 | - | - | 716,174 |
| Black Diamond | - | 21,541 | 20,583 | 20,246 | - | 62,370 |
| Columbia | - | 212,474 | 180,338 | - | - | 392,812 |
| Coverage Gear | - | 89,118 | 88,794 | 76,455 | - | 254,367 |
| Fanatics | - | 464,238 | 462,184 | 483,095 | - | 1,409,517 |
| Helly Hansen | - | 17,083 | 16,780 | - | - | 33,863 |
| Hunter Boots | - | 2,012 | 1,999 | - | - | 4,011 |
| Ibex | - | 2,464 | 2,318 | - | - | 4,781 |
| Lululemon | - | 1,250 | 1,250 | - | - | 2,500 |
| Michael Kors | - | 5,055 | 4,020 | 3,984 | - | 13,059 |
| New Balance | - | 324,806 | 324,408 | - | - | 649,214 |
| Nike | - | 380,282 | 374,653 | - | - | 754,934 |
| Patagonia | - | 96,219 | 101,177 | - | - | 197,395 |
| Sperry | - | 17,400 | 16,248 | - | - | 33,648 |
| Under Armour | - | 53,676 | 46,863 | - | - | 100,539 |
| Zappos | - | 53,838 | 53,092 | - | - | 106,929 |
| **Total Receivables** | **-** | **2,105,824** | **2,057,430** | **583,780** | **-** | **4,747,034** |
| | 0.0% | 44.4% | 43.3% | 12.3% | 0.0% | |

Case: 20-30819    Doc# 20    Filed: 10/20/20    Entered: 10/20/20 17:46:10    Page 145 of 159    00145

# Aged Receivables

## Benja Incorporated
## May 2020

| Receivables | Current | April | March | February | Older | Total |
|---|---|---|---|---|---|---|
| Apple | - | 4,199 | 3,484 | - | - | 7,683 |
| Arc'teryx | - | 2,194 | 2,020 | - | - | 4,214 |
| Backcountry | - | 396,703 | 358,864 | - | - | 755,567 |
| Black Diamond | - | 22,145 | 21,541 | 20,583 | - | 64,268 |
| Columbia | - | 222,421 | 212,474 | - | - | 434,895 |
| Coverage Gear | - | 89,946 | 89,118 | 88,794 | - | 267,858 |
| Fanatics | - | 489,427 | 464,238 | 462,184 | - | 1,415,850 |
| Helly Hansen | - | 17,256 | 17,083 | - | - | 34,339 |
| Hunter Boots | - | 2,140 | 2,012 | - | - | 4,152 |
| Ibex | - | 2,515 | 2,464 | - | - | 4,979 |
| Lululemon | - | 1,250 | 1,250 | - | - | 2,500 |
| Michael Kors | - | 5,137 | 5,055 | 4,020 | - | 14,212 |
| New Balance | - | 338,033 | 324,806 | - | - | 662,838 |
| Nike | - | 392,902 | 380,282 | - | - | 773,184 |
| Patagonia | - | 120,787 | 96,219 | - | - | 217,005 |
| Sperry | - | 17,927 | 17,400 | - | - | 35,327 |
| Under Armour | - | 55,206 | 53,676 | - | - | 108,883 |
| Zappos | - | 58,390 | 53,838 | - | - | 112,228 |
| **Total Receivables** | **-** | **2,238,579** | **2,105,824** | **575,581** | **-** | **4,919,983** |
| | 0.0% | 45.5% | 42.8% | 11.7% | 0.0% | |

Case: 20-30819    Doc# 20    Filed: 10/20/20    Entered: 10/20/20 17:46:10    Page 146 of
159
00146

# Aged Receivables

## Benja Incorporated
## June 2020

| Receivables | Current | May | April | March | Older | Total |
|---|---|---|---|---|---|---|
| Apple | - | 4,080 | 4,199 | - | - | 8,279 |
| Arc'teryx | - | 2,080 | 2,194 | - | - | 4,274 |
| Backcountry | - | 466,490 | 396,703 | - | - | 863,193 |
| Black Diamond | - | 20,517 | 22,145 | 21,541 | - | 64,203 |
| Columbia | - | 265,474 | 222,421 | - | - | 487,895 |
| Coverage Gear | - | 103,005 | 89,946 | 89,118 | 88,794 | 370,863 |
| Fanatics | - | 573,912 | 489,427 | 464,238 | - | 1,527,577 |
| Helly Hansen | - | 16,090 | 17,256 | - | - | 33,346 |
| Hunter Boots | - | 1,950 | 2,140 | - | - | 4,090 |
| Ibex | - | 2,250 | 2,515 | - | - | 4,765 |
| Lululemon | - | 1,500 | 1,250 | - | - | 2,750 |
| Michael Kors | - | 4,998 | 5,137 | 5,055 | - | 15,190 |
| New Balance | - | 395,994 | 338,033 | - | - | 734,027 |
| Nike | - | 453,446 | 392,902 | - | - | 846,348 |
| Patagonia | - | 4,625 | 120,787 | - | - | 125,412 |
| Sperry | - | 16,854 | 17,927 | - | - | 34,781 |
| Under Armour | - | - | 55,206 | - | - | 55,206 |
| Zappos | - | - | 58,390 | - | - | 58,390 |
| **Total Receivables** | **-** | **2,333,265** | **2,238,579** | **579,952** | **88,794** | **5,240,590** |
| | 0.0% | 44.5% | 42.7% | 11.1% | 1.7% | |

Case: 20-30819     Doc# 20     Filed: 10/20/20     Entered: 10/20/20 17:46:10     Page 147 of
159
00147

# Aged Receivables

## Benja Incorporated
## July 2020

|  | Current | June | May | April | Older | Total |
|---|---|---|---|---|---|---|
| **Receivables** | | | | | | |
| Apple | - | 4,165 | 4,080 | - | - | 8,245 |
| Arc'teryx | - | 2,000 | 2,080 | - | - | 4,080 |
| Backcountry | - | 487,409 | 466,490 | - | - | 953,899 |
| Black Diamond | - | 22,211 | 20,517 | 22,145 | - | 64,873 |
| Columbia | - | 211,628 | 265,474 | - | - | 477,101 |
| Coverage Gear | - | 133,546 | 103,005 | 89,946 | - | 326,497 |
| Fanatics | - | 501,044 | 573,912 | 489,427 | - | 1,564,383 |
| Helly Hansen | - | 17,540 | 16,090 | - | - | 33,630 |
| Hunter Boots | - | 1,950 | 1,950 | - | - | 3,900 |
| Ibex | - | 2,250 | 2,250 | - | - | 4,500 |
| Lululemon | - | 1,500 | 1,500 | - | - | 3,000 |
| Michael Kors | - | 4,998 | 4,998 | 5,137 | - | 15,133 |
| New Balance | - | 399,847 | 395,994 | - | - | 795,841 |
| Nike | - | 470,121 | 453,446 | - | - | 923,567 |
| Patagonia | - | 120,694 | 4,625 | - | - | 125,319 |
| Sperry | - | 18,555 | 16,854 | - | - | 35,409 |
| Stinky Lockers | 400 | - | - | - | - | 400 |
| Under Armour | - | 61,668 | - | - | - | 61,668 |
| Zappos | - | 39,911 | - | - | - | 39,911 |
| **Total Receivables** | **400** | **2,501,037** | **2,333,265** | **606,655** | **-** | **5,441,357** |
|  | 0.0% | 46.0% | 42.9% | 11.1% | 0.0% | |

Case: 20-30819     Doc# 20     Filed: 10/20/20     Entered: 10/20/20 17:46:10     Page 148 of
159
00148

## Aged Receivables
### Benja Incorporated
### July 2020

| Receivables | Current | June | May | April |
|---|---|---|---|---|
| Apple | $4,292.50 | $4,165.00 | $4,080.00 | $0.00 |
| Arc'teryx | $2,000.00 | $2,000.00 | $2,080.00 | $0.00 |
| Backcountry | $493,350.00 | $487,409.10 | $466,490.30 | $0.00 |
| Black Diamond | $24,660.00 | $22,211.26 | $20,517.12 | $22,144.68 |
| Columbia | $220,800.00 | $211,627.60 | $265,473.82 | $0.00 |
| Coverage Gear | $135,000.00 | $133,545.51 | $103,005.00 | $89,946.00 |
| Fanatics | $508,812.21 | $501,044.03 | $573,911.57 | $489,427.37 |
| Helly Hansen | $20,000.00 | $17,540.00 | $16,090.00 | $0.00 |
| Hunter Boots | $1,950.00 | $1,950.00 | $1,950.00 | $0.00 |
| Ibex | $2,250.00 | $2,250.00 | $2,250.00 | $0.00 |
| Kohl's | $278,887.07 | $0.00 | $0.00 | $0.00 |
| Lululemon | $1,500.00 | $1,500.00 | $1,500.00 | $0.00 |
| Michael Kors | $4,998.00 | $4,998.00 | $4,998.00 | $5,137.37 |
| New Balance | $409,555.00 | $399,847.33 | $395,993.78 | $0.00 |
| Nike | $493,885.00 | $470,120.98 | $453,446.18 | $0.00 |
| Patagonia | $138,750.00 | $120,694.00 | $4,625.00 | $0.00 |
| Sperry | $18,000.00 | $18,555.00 | $16,854.00 | $0.00 |
| Stinky Lockers | $400.00 | $0.00 | $0.00 | $0.00 |
| Under Armour | $63,707.04 | $61,667.65 | $0.00 | $0.00 |
| Zappos | $40,014.92 | $39,911.10 | $0.00 | $0.00 |
| **Total Receivables** | **$2,862,811.74** | **$2,501,036.56** | **$2,333,264.77** | **$606,655.42** |
|  | 34.4761% | 30.1193% | 28.0989% | 7.3058% |

| Older | Total |
|---|---|
| $0.00 | $12,537.50 |
| $0.00 | $6,080.00 |
| $0.00 | $1,447,249.40 |
| $0.00 | $89,533.06 |
| $0.00 | $697,901.42 |
| $0.00 | $461,496.51 |
| $0.00 | $2,073,195.18 |
| $0.00 | $53,630.00 |
| $0.00 | $5,850.00 |
| $0.00 | $6,750.00 |
| $0.00 | $278,887.07 |
| $0.00 | $4,500.00 |
| $0.00 | $20,131.37 |
| $0.00 | $1,205,396.11 |
| $0.00 | $1,417,452.16 |
| $0.00 | $264,069.00 |
| $0.00 | $53,409.00 |
| $0.00 | $400.00 |
| $0.00 | $125,374.69 |
| $0.00 | $79,926.02 |
| **$0.00** | **$8,303,768.49** |
| 0.0% | |

# Aged Receivables

Benja Incorporated
August 2020

| Receivables | Current | July | June | May | Older | Total |
|---|---|---|---|---|---|---|
| Apple | - | 4,293 | 4,165 | - | - | 8,458 |
| Arc'teryx | - | 2,000 | 2,000 | - | - | 4,000 |
| Backcountry | - | 493,350 | 487,409 | - | - | 980,759 |
| Black Diamond | - | 24,660 | 22,211 | 20,517 | - | 67,388 |
| Columbia | - | 220,800 | 211,628 | - | - | 432,428 |
| Coverage Gear | - | 135,000 | 133,546 | 103,005 | - | 371,551 |
| Fanatics | - | 479,403 | 501,044 | 573,912 | - | 1,554,359 |
| Helly Hansen | - | 20,000 | 17,540 | - | - | 37,540 |
| Hunter Boots | - | 1,950 | 1,950 | - | - | 3,900 |
| Ibex | - | 2,250 | 2,250 | - | - | 4,500 |
| Kohl's | 278,678 | 278,887 | - | - | - | 557,566 |
| Lululemon | - | 1,500 | 1,500 | - | - | 3,000 |
| Michael Kors | - | 4,998 | 4,998 | 4,998 | - | 14,994 |
| New Balance | - | 409,555 | 399,847 | - | - | 809,402 |
| Nike | - | 493,885 | 470,121 | - | - | 964,006 |
| Patagonia | - | 64,750 | 120,694 | - | - | 185,444 |
| Sperry | - | 18,000 | 18,555 | - | - | 36,555 |
| Stinky Lockers | - | 400 | - | - | - | 400 |
| Under Armour | - | 63,707 | 61,668 | - | - | 125,375 |
| Zappos | - | 40,015 | 39,911 | - | - | 79,926 |
| **Total Receivables** | **278,678** | **2,759,403** | **2,501,037** | **702,432** | **-** | **6,241,549** |
| | 4.5% | 44.2% | 40.1% | 11.3% | 0.0% | |

Case: 20-30819    Doc# 20    Filed: 10/20/20    Entered: 10/20/20 17:46:10    Page 151 of 159

00151

# EXHIBIT 10

00152

# U.S. Corporation Income Tax Return

Form **1120**
Department of the Treasury
Internal Revenue Service

For calendar year 2018 or tax year beginning **57** , 2018, ending **Dec 31** , 20 **18**

► Go to *www.irs.gov/Form1120* for instructions and the latest information.

OMB No. 1545-0123

**2018**

**A Check if:**

1a Consolidated return (attach Form 851) ☐
b Life/nonlife consolidated return . ☐
2 Personal holding co. (attach Sch. PH) ☐
3 Personal service corp. (see instructions) ☐
4 Schedule M-3 attached ☐

TYPE OR PRINT

**Name**
Benja Incorporated

Number, street, and room or suite no. If a P.O. box, see instructions.
845 Market Street, 450A

City or town, state or province, country, and ZIP or foreign postal code
San Francisco, CA 94117

**B Employer identification number**
2890

**C Date incorporated**
3/25/2014

**D Total assets** (see instructions)
$ 2,978,541  53

E Check if: **(1)** ☐ Initial return  **(2)** ☐ Final return  **(3)** ☐ Name change  **(4)** ☐ Address change

## Income

| | | | | |
|---|---|---|---|---|
| 1a | Gross receipts or sales | 1a | 6,284,518 | 04 |
| b | Returns and allowances | 1b | 0 | 00 |
| c | Balance. Subtract line 1b from line 1a | 1c | 6,284,518 | 04 |
| 2 | Cost of goods sold (attach Form 1125-A) | 2 | 4,408,790 | 96 |
| 3 | Gross profit. Subtract line 2 from line 1c | 3 | 1,875,727 | 08 |
| 4 | Dividends and inclusions (Schedule C, line 23, column (a)) | 4 | | |
| 5 | Interest | 5 | | |
| 6 | Gross rents | 6 | | |
| 7 | Gross royalties | 7 | | |
| 8 | Capital gain net income (attach Schedule D (Form 1120)) | 8 | | |
| 9 | Net gain or (loss) from Form 4797, Part II, line 17 (attach Form 4797) | 9 | | |
| 10 | Other income (see instructions—attach statement) | 10 | | |
| 11 | **Total income.** Add lines 3 through 10 ► | 11 | 1,875,727 | 08 |

## Deductions (See instructions for limitations on deductions.)

| | | | | |
|---|---|---|---|---|
| 12 | Compensation of officers (see instructions—attach Form 1125-E) ► | 12 | | |
| 13 | Salaries and wages (less employment credits) | 13 | 348,191 | 03 |
| 14 | Repairs and maintenance | 14 | | |
| 15 | Bad debts | 15 | | |
| 16 | Rents | 16 | 35,000 | 00 |
| 17 | Taxes and licenses | 17 | | |
| 18 | Interest (see instructions) | 18 | | |
| 19 | Charitable contributions | 19 | | |
| 20 | Depreciation from Form 4562 not claimed on Form 1125-A or elsewhere on return (attach Form 4562) | 20 | | |
| 21 | Depletion | 21 | | |
| 22 | Advertising | 22 | | |
| 23 | Pension, profit-sharing, etc., plans | 23 | | |
| 24 | Employee benefit programs | 24 | | |
| 25 | Reserved for future use | 25 | | |
| 26 | Other deductions (attach statement) | 26 | | |
| 27 | **Total deductions.** Add lines 12 through 26 ► | 27 | 383,191 | 03 |
| 28 | Taxable income before net operating loss deduction and special deductions. Subtract line 27 from line 11. | 28 | 1,492,536 | 05 |
| 29a | Net operating loss deduction (see instructions) | 29a | | |
| b | Special deductions (Schedule C, line 24, column (c)) | 29b | | |
| c | Add lines 29a and 29b | 29c | 0 | 00 |

## Tax, Refundable Credits, and Payments

| | | | | |
|---|---|---|---|---|
| 30 | **Taxable income.** Subtract line 29c from line 28. See instructions | 30 | 1,492,536 | 05 |
| 31 | Total tax (Schedule J, Part I, line 11) | 31 | 313,432 | 57 |
| 32 | 2018 net 965 tax liability paid (Schedule J, Part II, line 12) | 32 | | |
| 33 | Total payments, credits, and section 965 net tax liability (Schedule J, Part III, line 23) | 33 | 300,000 | 00 |
| 34 | Estimated tax penalty. See instructions. Check if Form 2220 is attached ► ☐ | 34 | | |
| 35 | **Amount owed.** If line 33 is smaller than the total of lines 31, 32, and 34, enter amount owed | 35 | 13,432 | 57 |
| 36 | **Overpayment.** If line 33 is larger than the total of lines 31, 32, and 34, enter amount overpaid | 36 | | |
| 37 | Enter amount from line 36 you want: **Credited to 2019 estimated tax** ► Refunded ► | 37 | | |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Signature of officer   1/10/2019   President & CEO
Date   Title

May the IRS discuss this return with the preparer shown below? See instructions. ☑ Yes ☐ No

**Paid Preparer Use Only**

| | | |
|---|---|---|
| Print/Type preparer's name | Preparer's signature | Date |
| Tom Dunn, CPA | | 1/9/2019 |

Check ☐ if self-employed    PTIN

Firm's name ► Numbrstudio Financial Group LLC

Firm's EIN ►

Firm's address ► 845 Market Street, 450A, San Francisco, CA 94103

Phone no. (415) 367-1513

For Paperwork Reduction Act Notice, see separate instructions.

Cat. No. 11450Q

Form **1120** (2018)

| **Schedule J** | **Tax Computation and Payment** (see instructions) | | | |
|---|---|---|---|---|
| **Part I–Tax Computation** | | | | |
| 1 | Check if the corporation is a member of a controlled group (attach Schedule O (Form 1120)). See instructions ▶ ☐ | | | |
| 2 | Income tax. See instructions | 2 | 313,432 | 57 |
| 3 | Base erosion minimum tax (attach Form 8991) | 3 | | |
| 4 | Add lines 2 and 3 | 4 | 313,432 | 57 |
| 5a | Foreign tax credit (attach Form 1118) | 5a | | |
| b | Credit from Form 8834 (see instructions) | 5b | | |
| c | General business credit (attach Form 3800) | 5c | | |
| d | Credit for prior year minimum tax (attach Form 8827) | 5d | | |
| e | Bond credits from Form 8912 | 5e | | |
| 6 | **Total credits.** Add lines 5a through 5e | 6 | 0 | 00 |
| 7 | Subtract line 6 from line 4 | 7 | 313,432 | 57 |
| 8 | Personal holding company tax (attach Schedule PH (Form 1120)) | 8 | | |
| 9a | Recapture of investment credit (attach Form 4255) | 9a | | |
| b | Recapture of low-income housing credit (attach Form 8611) | 9b | | |
| c | Interest due under the look-back method—completed long-term contracts (attach Form 8697) | 9c | | |
| d | Interest due under the look-back method—income forecast method (attach Form 8866) | 9d | | |
| e | Alternative tax on qualifying shipping activities (attach Form 8902) | 9e | | |
| f | Other (see instructions—attach statement) | 9f | | |
| 10 | **Total.** Add lines 9a through 9f | 10 | 0 | 00 |
| 11 | **Total tax.** Add lines 7, 8, and 10. Enter here and on page 1, line 31 | 11 | 313,432 | 57 |
| **Part II–Section 965 Payments** (see instructions) | | | | |
| 12 | 2018 net 965 tax liability paid from Form 965-B, Part II, column (k), line 2. Enter here and on page 1, line 32 | 12 | | |
| **Part III–Payments, Refundable Credits, and Section 965 Net Tax Liability** | | | | |
| 13 | 2017 overpayment credited to 2018 | 13 | 0 | 00 |
| 14 | 2018 estimated tax payments | 14 | 300,000 | 00 |
| 15 | 2018 refund applied for on Form 4466 | 15 | ( | ) |
| 16 | Combine lines 13, 14, and 15 | 16 | 300,000 | 00 |
| 17 | Tax deposited with Form 7004 | 17 | | |
| 18 | Withholding (see instructions) | 18 | | |
| 19 | **Total payments.** Add lines 16, 17, and 18 | 19 | 300,000 | 00 |
| 20 | Refundable credits from: | | | |
| a | Form 2439 | 20a | | |
| b | Form 4136 | 20b | | |
| c | Form 8827, line 8c | 20c | | |
| d | Other (attach statement—see instructions) | 20d | | |
| 21 | **Total credits.** Add lines 20a through 20d | 21 | 0 | 00 |
| 22 | 2018 net 965 tax liability from Form 965-B, Part I, column (d), line 2. See instructions | 22 | | |
| 23 | **Total payments, credits, and section 965 net tax liability.** Add lines 19, 21, and 22. Enter here and on page 1, line 33 | 23 | 300,000 | 00 |

Form **1120** (2018)

| **Schedule K** | **Other Information** (see instructions) | | Yes | No |
|---|---|---|---|---|

**1** Check accounting method: **a** ☐ Cash **b** ☑ Accrual **c** ☐ Other (specify) ▶ _____

**2** See the instructions and enter the:

**a** Business activity code no. ▶ **541519**

**b** Business activity ▶ **Software Development**

**c** Product or service ▶ **Software**

**3** Is the corporation a subsidiary in an affiliated group or a parent-subsidiary controlled group? . . . . . . . | | ✔

If "Yes," enter name and EIN of the parent corporation ▶ _____

**4** At the end of the tax year:

**a** Did any foreign or domestic corporation, partnership (including any entity treated as a partnership), trust, or tax-exempt organization own directly 20% or more, or own, directly or indirectly, 50% or more of the total voting power of all classes of the corporation's stock entitled to vote? If "Yes," complete Part I of Schedule G (Form 1120) (attach Schedule G) . . . . . . | | ✔

**b** Did any individual or estate own directly 20% or more, or own, directly or indirectly, 50% or more of the total voting power of all classes of the corporation's stock entitled to vote? If "Yes," complete Part II of Schedule G (Form 1120) (attach Schedule G) . | | ✔

**5** At the end of the tax year, did the corporation:

**a** Own directly 20% or more, or own, directly or indirectly, 50% or more of the total voting power of all classes of stock entitled to vote of any foreign or domestic corporation not included on **Form 851,** Affiliations Schedule? For rules of constructive ownership, see instructions. If "Yes," complete (i) through (iv) below. | | ✔

| **(i)** Name of Corporation | **(ii)** Employer Identification Number (if any) | **(iii)** Country of Incorporation | **(iv)** Percentage Owned in Voting Stock |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

**b** Own directly an interest of 20% or more, or own, directly or indirectly, an interest of 50% or more in any foreign or domestic partnership (including an entity treated as a partnership) or in the beneficial interest of a trust? For rules of constructive ownership, see instructions. If "Yes," complete (i) through (iv) below. | | ✔

| **(i)** Name of Entity | **(ii)** Employer Identification Number (if any) | **(iii)** Country of Organization | **(iv)** Maximum Percentage Owned in Profit, Loss, or Capital |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

**6** During this tax year, did the corporation pay dividends (other than stock dividends and distributions in exchange for stock) in excess of the corporation's current and accumulated earnings and profits? See sections 301 and 316 . . . . . . . . | | ✔

If "Yes," file **Form 5452,** Corporate Report of Nondividend Distributions. See the instructions for Form 5452.

If this is a consolidated return, answer here for the parent corporation and on Form 851 for each subsidiary.

**7** At any time during the tax year, did one foreign person own, directly or indirectly, at least 25% of the total voting power of all classes of the corporation's stock entitled to vote or at least 25% of the total value of all classes of the corporation's stock? . | | ✔

For rules of attribution, see section 318. If "Yes," enter:

**(a)** Percentage owned ▶ _____ and **(b)** Owner's country ▶ _____

**(c)** The corporation may have to file **Form 5472,** Information Return of a 25% Foreign-Owned U.S. Corporation or a Foreign Corporation Engaged in a U.S. Trade or Business. Enter the number of Forms 5472 attached ▶ _____

**8** Check this box if the corporation issued publicly offered debt instruments with original issue discount . . . . . ▶ ☐

If checked, the corporation may have to file **Form 8281,** Information Return for Publicly Offered Original Issue Discount Instruments.

**9** Enter the amount of tax-exempt interest received or accrued during the tax year ▶ $ _____

**10** Enter the number of shareholders at the end of the tax year (if 100 or fewer) ▶ _____

**11** If the corporation has an NOL for the tax year and is electing to forego the carryback period, check here (see instructions) ▶ ☐

If the corporation is filing a consolidated return, the statement required by Regulations section 1.1502-21(b)(3) must be attached or the election will not be valid.

**12** Enter the available NOL carryover from prior tax years (do not reduce it by any deduction reported on page 1, line 29a.) . . . . . . . . . . . . . . . . . . . . ▶ $ _____

Form **1120** (2018)

Case: 20-30819   Doc# 20   Filed: 10/20/20   Entered: 10/20/20 17:46:10   Page 155 of 159

| Schedule K | Other Information *(continued from page 4)* | Yes | No |
|---|---|---|---|

| | | Yes | No |
|---|---|:---:|:---:|
| 13 | Are the corporation's total receipts (page 1, line 1a, plus lines 4 through 10) for the tax year **and** its total assets at the end of the tax year less than $250,000? . . . . . . . . . . . . . . . . . . . . . . . | | ✔ |
| | If "Yes," the corporation is not required to complete Schedules L, M-1, and M-2. Instead, enter the total amount of cash distributions and the book value of property distributions (other than cash) made during the tax year ▶ $ _____ | | |
| 14 | Is the corporation required to file Schedule UTP (Form 1120), Uncertain Tax Position Statement? See instructions . . . . | | ✔ |
| | If "Yes," complete and attach Schedule UTP. | | |
| 15a | Did the corporation make any payments in 2018 that would require it to file Form(s) 1099? . . . . . . . . . . . | | ✔ |
| b | If "Yes," did or will the corporation file required Forms 1099? . . . . . . . . . . . . . . . . . . . | | ✔ |
| 16 | During this tax year, did the corporation have an 80% or more change in ownership, including a change due to redemption of its own stock? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | ✔ |
| 17 | During or subsequent to this tax year, but before the filing of this return, did the corporation dispose of more than 65% (by value) of its assets in a taxable, non-taxable, or tax deferred transaction? . . . . . . . . . . . . . . . . . | | ✔ |
| 18 | Did the corporation receive assets in a section 351 transfer in which any of the transferred assets had a fair market basis or fair market value of more than $1 million? . . . . . . . . . . . . . . . . . . . . . . . . . | | ✔ |
| 19 | During the corporation's tax year, did the corporation make any payments that would require it to file Forms 1042 and 1042-S under chapter 3 (sections 1441 through 1464) or chapter 4 (sections 1471 through 1474) of the Code? . . . . . . . | | ✔ |
| 20 | Is the corporation operating on a cooperative basis?. . . . . . . . . . . . . . . . . . . . . . . | | ✔ |
| 21 | During the tax year, did the corporation pay or accrue any interest or royalty for which the deduction is not allowed under section 267A? See instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | ✔ |
| | If "Yes," enter the total amount of the disallowed deductions ▶ $ _____ | | |
| 22 | Does the corporation have gross receipts of at least $500 million in any of the 3 preceding tax years? (See sections 59A(e)(2) and (3)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | ✔ |
| | If "Yes," complete and attach Form 8991. | | |
| 23 | Did the corporation have an election under section 163(j) for any real property trade or business or any farming business in effect during the tax year? See instructions . . . . . . . . . . . . . . . . . . . . . . . . . | | ✔ |
| 24 | Does the corporation satisfy **one** of the following conditions and the corporation does not own a pass-through entity with current year, or prior year carryover, excess business interest expense? See instructions . . . . . . . . . . . | | ✔ |
| a | The corporation's aggregate average annual gross receipts (determined under section 448(c)) for the 3 tax years preceding the current tax year do not exceed $25 million, and the corporation is not a tax shelter, or | | |
| b | The corporation only has business interest expense from (1) an electing real property trade or business, (2) an electing farming business, or (3) certain utility businesses under section 163(j)(7). | | |
| | If "No," complete and attach Form 8990. | | |
| 25 | Is the corporation attaching Form 8996 to certify as a Qualified Opportunity Fund? . . . . . . . . . . . . | | ✔ |
| | If "Yes," enter amount from Form 8996, line 13 . . . . . ▶ $ | | |

Form **1120** (2018)

| Schedule L | Balance Sheets per Books | Beginning of tax year | | End of tax year | |
|---|---|---|---|---|---|
| | Assets | (a) | (b) | (c) | (d) |
| 1 | Cash | | 104,870.00 | | 1,047,195.13 |
| 2a | Trade notes and accounts receivable | 682,185.48 | | 1,931,346.40 | |
| b | Less allowance for bad debts | ( ) | 682,185.48 | ( ) | 2,978,541.53 |
| 3 | Inventories | | | | |
| 4 | U.S. government obligations | | | | |
| 5 | Tax-exempt securities (see instructions) | | | | |
| 6 | Other current assets (attach statement) | | | | |
| 7 | Loans to shareholders | | | | |
| 8 | Mortgage and real estate loans | | | | |
| 9 | Other investments (attach statement) | | | | |
| 10a | Buildings and other depreciable assets | | | | |
| b | Less accumulated depreciation | ( ) | | ( ) | |
| 11a | Depletable assets | | | | |
| b | Less accumulated depletion | ( ) | | ( ) | |
| 12 | Land (net of any amortization) | | | | |
| 13a | Intangible assets (amortizable only) | | | | |
| b | Less accumulated amortization | ( ) | | ( ) | |
| 14 | Other assets (attach statement) | | | | |
| 15 | Total assets | | 787,055.48 | | 2,978,541.53 |
| | **Liabilities and Shareholders' Equity** | | | | |
| 16 | Accounts payable | | 0.00 | | 323,950.00 |
| 17 | Mortgages, notes, bonds payable in less than 1 year | | | | |
| 18 | Other current liabilities (attach statement) | | | | |
| 19 | Loans from shareholders | | | | |
| 20 | Mortgages, notes, bonds payable in 1 year or more | | | | |
| 21 | Other liabilities (attach statement) | | | | |
| 22 | Capital stock: **a** Preferred stock | | | | |
| | **b** Common stock | 1,125,000.00 | 1,125,000.00 | 1,500,000.00 | 1,500,000.00 |
| 23 | Additional paid-in capital | | | | |
| 24 | Retained earnings—Appropriated (attach statement) | | | | |
| 25 | Retained earnings—Unappropriated | | (337,944.52) | | 1,478,541.53 |
| 26 | Adjustments to shareholders' equity (attach statement) | | | | |
| 27 | Less cost of treasury stock | | ( ) | | ( ) |
| 28 | Total liabilities and shareholders' equity | | 787,055.48 | | 2,978,541.53 |

| Schedule M-1 | Reconciliation of Income (Loss) per Books With Income per Return |
|---|---|
| | **Note:** The corporation may be required to file Schedule M-3. See instructions. |

| 1 | Net income (loss) per books | 1,179,103.48 | 7 | Income recorded on books this year not included on this return (itemize): | |
| 2 | Federal income tax per books | 313,432.57 | | Tax-exempt interest   $ _____ | |
| 3 | Excess of capital losses over capital gains | | | -------------------- | |
| 4 | Income subject to tax not recorded on books this year (itemize): _____ | | 8 | Deductions on this return not charged against book income this year (itemize): | |
| | ---------------------------- | | a | Depreciation   $ _____ | |
| 5 | Expenses recorded on books this year not deducted on this return (itemize): | | b | Charitable contributions $ _____ | |
| a | Depreciation   . . . $ _____ | | 9 | Add lines 7 and 8 | |
| b | Charitable contributions . $ _____ | | 10 | Income (page 1, line 28)—line 6 less line 9 | 1,492,536.05 |
| c | Travel and entertainment . $ _____ | | | | |
| 6 | Add lines 1 through 5 | 1,492,536.05 | | | |

| Schedule M-2 | Analysis of Unappropriated Retained Earnings per Books (Line 25, Schedule L) |
|---|---|
| 1 | Balance at beginning of year | | 5 | Distributions: **a** Cash | |
| 2 | Net income (loss) per books | | | **b** Stock | |
| 3 | Other increases (itemize): _____ | | | **c** Property | |
| | ---------------------------- | | 6 | Other decreases (itemize): _____ | |
| | ---------------------------- | | 7 | Add lines 5 and 6 | |
| 4 | Add lines 1, 2, and 3 | | 8 | Balance at end of year (line 4 less line 7) | |

Case: 20-30819   Doc# 20   Filed: 10/20/20   Entered: 10/20/20 17:46:10   Page 157 of 159

00157

# CERTIFICATE OF SERVICE

I, the undersigned, declare that I am employed in the County of Los Angeles. I am over the age of 18 years and not a party to the within entitled action. My business address is 2049 Century Park East, Suite 2900, Los Angeles, California 90067.

A true and correct copy of the foregoing document entitled (specify): **DECLARATION OF MICHAEL MCELHONE IN SUPPORT OF CREDITOR BUSEY BANK'S MOTION FOR THE APPOINTMENT OF A CHAPTER 11 TRUSTEE OR, IN THE ALTERNATIVE, FOR CONVERSION OF CASE TO CHAPTER 7 OF THE BANKRUPTCY CODE** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:
Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On October 20, 2020, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**: On October 20, 2020, I served the document by placing a true copy thereof in a sealed envelope with postage thereon fully prepaid, in the United States Mail at Los Angeles, California, to all parties entitled to receive regularly mailed notices, addressed as follows:

☒ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL**
Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on October 20, 2020, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

VIA OVERNIGHT MAIL
Hon. Dennis Montali
U.S. Bankruptcy Judge
Mail Box 36099
450 Golden Gate Avenue
San Francisco, CA 94102

☒ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| October 20, 2020 | Cindy Cripe | |
|---|---|---|
| Date | Printed Name | Signature |

# ATTACHMENT TO SERVICE LIST

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**

Jared A. Day on behalf of U.S. Trustee Office of the U.S. Trustee / SF jared.a.day@usdoj.gov
ankey.to@usdoj.gov

Mark K. Slater on behalf of Debtor Benja Incorporated mslater@slaterhersey.com
amoses@slaterhersey.com

Office of the U.S. Trustee / SF USTPRegion17.SF.ECF@usdoj.gov

Paul E. Manasian on behalf of Debtor Benja Incorporated manasian@mrlawsf.com
gradl@mrlawsf.com

Randye B. Soref on behalf of Creditor Busey Bank rsoref@polsinelli.com

Tanya Behnam on behalf of Creditor Busey Bank tbehnam@polsinelli.com
tanyabehnam@gmail.com

2. **SERVED BY UNITED STATES MAIL:**

| | | |
|---|---|---|
| Debtor<br>Benja Incorporated<br>26 Cragmont Avenue<br>San Francisco, CA 94116 | Debtor's Attorney<br>Paul E. Manasian, Esq.<br>Law Offices of Paul E. Manasian<br>1310 65th Street<br>Emeryville, CA 94608 | |

3. **SERVED BY EMAIL**

*Jared.A.Day@usdoj.gov*
Jared A. Day
U.S. Department of Justice
Office of the U.S. Trustee, Region 17
300 Booth Street, Suite 3009
Reno, NV 89509