PAUL E. MANASIAN (130855)
1310 65th Street
Emeryville, CA 94608
Phone: 415 730 3419
Email: manasian@mrlawsf.com

Proposed Attorney for Debtor in Possession,
.

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA -- SAN FRANCISCO DIVISION

| | |
|---|---|
| In re: | Case No. 20-30819 |
| BENJA INCORPORATED. a Delaware Corporation, | Chapter 11 |
| Debtor. | Dennis Montali |
| | **DECLARATION OF ANDREW J. CHAPIN** |
| Federal Tax ID: | Date: October 26, 2020<br>Time: 1:30 p.m.<br>Place: Hearing to be conducted by telephone via CourtCall |

I, Andrew J. Chapin, declare as follow:

1.    I am a resident of San Francisco County, California. I am over the age of twenty-one and have never been convicted of a felony or crime of moral turpitude.

2.    Except as otherwise indicated, I have personal knowledge of the matters set forth herein and, if called as a witness, would testify competently thereto.

3.    I make this Declaration in support of the Opposition to the Motion to Appoint Chapter 11 Trustee (the "Opposition") filed by Busey Bank ("Busey").

4.    I am a co-founder and CEO of Defendant Benja Incorporated ("Benja"), a San Francisco e-commerce company operating since 2015. I am also its largest shareholder. The business of Benja

is to facilitate, directly and indirectly, e-commerce sales for direct-to-consumer brands and retailers. I have personally reviewed the accounting records reflecting to Benja's accounts receivable, and believe those records to be complete and accurate. Benja's accounts receivable are $6,361,260.61 as of October 14, 2020, all due within 90 days.

5. I have poured my heart and soul into Benja, taking only a below-market salary of $52,000 in 2019 and 2020, to ensure that every dollar Benja makes goes back into helping Benja grow.

6. The company has been operating for more than five years now, and has achieved millions of dollars in sales for its brand-partners. Benja generated more than $13 million in revenue in 2019 and employs more than 20 individuals and contractors across the country.

7. In the course of its rapid growth, Benja needed more funding, and outgrew its simple bookkeeping resources.

8. Benja sought funding from Busey in 2019.

9. On July 16, 2019, Benja executed a promissory note in favor of Busey in the principal amount of $1,000,000, which is secured by a Business Loan Agreement that was executed on the same day.

10. On February 28, 2020, Benja executed another promissory note in favor of Busey in the principal amount of $3,000,000, secured by a Business Loan Agreement also executed on the same day. This promissory note and Business Loan Agreement replace and supersede the ones dated July 16, 2019.

11. In late 2019, Benja terminated its bookkeeper, Jennifer Li ("Li"), due to the poor quality of her work which led to multiple errors in Benja's financial records.

12. Following the termination of Li, in May 2020, Benja offered Joe Alouf ("Alouf") a contract position as its interim CFO with the assistance of minority investors Scott Sklar ("Sklar") and Pano Anthos ("Anthos"), hoping Alouf would improve the quality and accuracy of the company's financial records.

13. On May 1, 2020, Alouf accepted the position, and started working as Benja's nominal CFO on a project basis.

14. At the time Alouf was hired, Benja was in discussions with E-Revshare Core, LLC d/b/a Empowerment Capital ("Empowerment") about a potential revenue-sharing loan. The Empowerment loan closed in June 2020, while Alouf was involved in unrelated projects as well as evaluating the Empowerment transaction. The Empowerment transaction was approved by Benja's outside counsel, Fenwick & West LLP ("Fenwick"), who informed me that the Empowerment transaction would not conflict with the Busey loan. I was further informed by Empowerment, that the nature of the Empowerment loan made it an off-balance sheet obligation.

15. While the Empowerment loan was not reflected on the balance sheet dated as of June 30, 2020 that Benja provided to Empowerment, I kept Empowerment informed of the Busey loan from the beginning of the negotiations.

16. In July 2020, Alouf transitioned from his contract position to Benja's part-time CFO. After his start as Benja's part-time CFO, he asked me for a copy of Benja's promissory notes in favor of Busey in connection with the Empowerment transaction, which I provided. Alouf did not ask for the associated Business Loan Agreements or any other documents.

17. Alouf also requested Benja's financial information. I told him that I would try to contact our previous bookkeeper, Li. However, she was unavailable, apparently travelling overseas, and I was unable to connect with her.

18. Alouf, on the other hand, contacted a different bookkeeper named Jennifer Lee on his own. Ms. Lee worked briefly for Benja about two or three years ago for a few weeks, and had no substantial knowledge of Benja's financial conditions.

19. Sometime in July and August 2020, I became concerned about Alouf's behavior. I repeatedly noted to two Benja Directors, Sklar and Foppe, that I had communication problems with Alouf, that we would engage in conversations that each would later recap in different ways, that I thought Alouf had repeatedly misquoted me and mischaracterized our conversations, and other similar concerns. Sklar and Foppe repeatedly attempted to mediate, sometimes holding conference calls to discuss specific items or issues. I shared with Sklar and Foppe that Alouf was not a good fit for Benja and questioned whether the company should continue to employ Alouf.

20.     As the company continued to grow, it sought additional investment from a group of existing investors including Pano Anthos, Tom Peters, and Sklar. Benja sought $1.5 million in new investment and in late August of 2020, successfully raised $1 million toward that goal.

21.     I have never made any representations to Alouf that Busey had agreed to amend its security interest to be limited to deposits, or that Benja's net position (deposits less debt) with Busey was positive.

22.     On August 20, 2020, Benja executed a third promissory note in favor of Busey in the original principal amount of $5,000,000, secured by a Business Loan Agreement signed on the same day. The August 20, 2020 promissory note and Business Loan Agreement replace and supersede those dated February 28, 2020. We agreed to the increased note in favor of Busey without including Alouf in that discussion because I wasn't sure he should continue in his role with Benja. The note, and all previous Busey notes, call for monthly interest payments, and Benja has always made those payments.

23.     In an effort to straighten out Benja's debt situation, I engaged with Mike Roznowski, a managing partner at Fractal Capital Advisors, to seek a new loan that would pay off the loans from Empowerment and Busey, and give Benja a fresh start.

24.     In early 2020, Benja also had a loan with MHC Financial Services, Inc. ("MHC"). This was a factoring loan, meaning MHC would loan Benja the amount of accounts receivable upfront, collect from Benja's customers, and then remit a portion of the proceeds to Benja. Benja has since paid off its loan from MHC in full.

25.     I have never denied the existence of the MHC loan to Alouf.

26.     On September 14, 2020, I spoke with Sklar and Foppe after they had a call with Alouf. They both agreed that Alouf was not a good fit for Benja but that it was likely in the best interests of Benja to work with Alouf while it sought a longer-term person for that role.

27.     On September 17, 2020, Alouf texted me that he was "done" and that he "will send my [Alouf's] last email tomorrow to Fenwick, the Board, your partner and Empowerment," which I understood to mean that he was resigning his CFO role. I responded shortly thereafter,

and accepted his resignation. Alouf claimed in response that I took his text out of context but recognized: "it is clear you want me gone, and formally fired me."

28.     The next day, Alouf texted me and said he had informed Empowerment that he, Alouf, had been terminated. True and correct copies of my text message exchange with Alouf between September 17 and September 18, 2020 are attached as Exhibit A.

29.     Due to Alouf s erratic behavior and overt threats, Sklar and Foppe expressed concerns about their potential liability should Alouf act on the threats he was making. To avoid the conflict, they requested to be removed from the Board, and I agreed to do so as a favor to them.

30.     In late September 2020, Alouf started working with a different investor of Benja, Pano Anthos ("Anthos"), to force me to out as Benja's CEO.

31.     On September 21, 2020, Anthos first threatened to report me to the FBI if I did not comply with his demands. On the same day, Fenwick withdrew as counsel for Benja out of concerns of the tension between me and Anthos. Prior to this, Fenwick never threatened to withdraw as counsel for Benja, or conditioned their representation upon Alouf's employment as Benja's part-time CFO.

32.     Following Fenwick's withdrawal, I retained Vedder Price as Benja's outside counsel.

33.     On Saturday, September 26, 2020, Anthos emailed me and copied Benja's investors and Board of Directors, demanding that I step down as Benja's CEO and relinquish any control of the company by 12:00 p.m. the next day.  Otherwise, Anthos claimed, Busey would put Benja into receivership and I "will be looking at financial ruin and other consequences that go along with fraud." But he did not give any details of the "fraud" in his email. A true and correct copy of Anthos' September 26, 2020 email is attached as Exhibit B.

34.     I refused to make any hasty decision before I had a chance to talk to my attorney.

35.     Alouf then dialed up his threats. On September 27, 2020, Alouf texted me: "If this is more important than trying to not end up in a Federal Penitentiary, so be it" and "You need to know you are looking into some serious jail time."

DECLARATION OF ANDREW J. CHAPIN

36.     On September 28, 2020, between 6:05 p.m. and 11:16 p.m., Alouf sent me 51 text messages demanding that I resign before midnight and transfer control of Benja to him. Otherwise, he would report me to the FBI the next day. In the beginning, he wrote: "If you don't sign these documents and transfer control of the bank accounts, I will be calling the FBI first thing tomorrow." In the following hours, he texted me a series of threats: "My 8:30 FBI call. Federal. Racketeering. Look it up." "Resign. Tonight." "We need you to sign the papers and transfer the bank accounts." "(Or, just go to jail)" "You are going to jail Andrew. Federal jail. 10 years at least. Best ofluck to you." And although he was no longer Benja's CFO, he claimed that he would be "advisng the FBI that I am a CFO of a company that o [sic] believe the CEO is [e]ngaged in racketeering." True and correct copies of my text message exchange with Alouf on September 28, 2020 are attached as Exhibit C.

37.     The repeated threats intimidated me. I had no time to consult with my counsel regarding this, and did not know the legitimacy of Aloufs threat. I reluctantly resigned, and offered a plan to begin giving Alouf the information he requested the next morning.

38.     The next morning, however, Alouf refused to meet with me to complete the turn-over of accounts and other related tasks until he received payment of $30,000.00 (which amount was in fact paid to him). His payment was not due under his independent contractor agreement with Benja. In fact, the amount he demanded an amount greater than that was provided for in the agreement, which states Alouf will be paid on a biweekly basis at $250/hr as a contractor. Because Alouf wouldn't cooperate, I hesitated to give him the requested information, and reconsidered my own resignation. A true and correct copy of Alouf s independent contractor agreement with Benja is attached as Exhibit D.

39.     At 4:31 p.m. that day, in an email chain titled "you are making things difficult for everyone and are causing the company to move to bankruptcy," Anthos demanded a list of information by 5:30 p.m., and threatened that he and Alouf would call the FBI and told Busey to put Benja into receivership if the information was not provided in time.

40.     I was on a call and did not see the email until 5:27 p.m. I immediately replied and stated I would be happy to cooperate. But in his response, Anthos instructed Alouf to call the

FBI and to inform Busey to put Benja into receivership. I do not know whether either Anthos or Alouf ever called the FBI. A true and correct copy of my September 29, 2020 email exchange with Anthos is attached as Exhibit E.

41. Benja was without direction after I resigned: no one stepped in to take over my business-related duties, such as booking orders for October and November, working on contract renewals, and keeping in contact with publishers; employees were not properly informed with the change in leadership and were all waiting for instructions while no work was being done; and worse, Alouf instructed Benja not to pay any contract employees, further putting Benja at risk. Benja was effectively not operating, but Alouf refused to let me help in any way.

42. Because of the jeopardy in which he had placed Benja, I removed Alouf as the Interim President of Benja and Anthos as the sole Director of the Board of Directors, and reinstated myself as Benja's CEO. I explained my action and concerns to Benja's investors in an email on September 30, 2020, and attached the corresponding written consents. True and correct copies of my September 30, 2020 email and the written consents by the shareholders and Board of Directors are attached as Exhibit F.

43. While Benja has many investors, the majority of investment has been made through a Simple Agreement for Future Equity, an investment form that does not issue shares at the time of investment. None of these Simple Agreement for Future Equity investors had been converted to shares in the organization. Therefore, I was, and still am, the largest shareholder of Benja, and have sufficient votes to remove Alouf and Anthos and reinstate myself as the CEO Therefore, I was, and still am, the largest shareholder of Benja, and have sufficient votes to remove Alouf and Anthos and reinstate myself as the CEO.

44. Alouf and Anthos' erratic, bullying behavior made Vedder Price very uncomfortable, and it withdrew as counsel for Benja following their attempt to push me out of the company.

45. Due to the uncertainties in Benja's management caused by Alouf and Anthos, Empowerment issued a demand for payment in late September 2020.

46.     In order to repay Empowerment and other Benja lenders, I spoke with one of Benja's earliest investors. That investor agreed to loan Benja $600,000.

47.     When I went to wire the money on the late afternoon of Friday, September 25, 2020 at a Chase branch in San Francisco, I was informed that wiring would require both my and Alouf's signatures. The staff at Chase was unable to get hold of the banker who had the authority to remove the requirement for Alouf s signature. And the banker that I spoke to at Chase told me that I could complete the transaction by withdrawing the money from Benja' s account, depositing it to my personal account, and then transferring it from my personal account to the lender for payment of that lender's legal fees for a loan made by that lender that had been previously paid off. I followed the banker's instruction and transferred the money. I never used the funds for my personal needs. A true and correct copy of the transfer record on September 25, 2020 is attached as Exhibit G.

48.     On October 1, 2020, I contacted Patrick Ricke, Benja's business banker at Busey. In this communication, I shared I had returned to my previous management roles with the company, Anthos and Alouf were no longer authorized to speak on behalf of Benja as it relates to the Busey issues, and that I would like to discuss Benja's state of affairs, and communicated to him that I had a plan for resolution that I would like to share. A true and correct copy of my October 1, 2020 email to Patrick Ricke is attached as Exhibit H.

49.     On or around October 2, 2020, I again terminated Alouf following the instruction of Benja's counsel at Wilson Sonsini Goodrich & Rosati ("WSGR"). Notwithstanding his termination, Alouf has apparently continued to seek access to and investigate Benja's financial records. A true and correct copy of my email exchange with Alouf on October 2, 2020 is attached as Exhibit I.

50.     On the same day, Alouf emailed Eleanor Fenn and Iris Pan at Chase, claiming that he was the CFO of Benja, "there is ongoing fraud," "Andrew has been reported to the FBI," and instructed Chase to put a hold on Benja's account. There has never been any fraudulent activity, where or not connected to the Chase account. I responded to inform Chase of Alouf s termination. WSGR also requested that Chase "restore access for Andrew." Ms. Fenn at Chase responded,

requesting Benja to either provide an agreement between Alouf and me resolving the issue of the authorized user, or a court order determining the same. Alouf refused to cooperate at all, and further refused to transfer access of Benja's payroll account at Gusto to me, unless he is granted "an email releasing me from any claims you may have against me. Known or unknown." This obstruction actively prohibits the company from regular operation, including the compensation of full-time and contractor employees. True and correct copies of the September 30, 2020 and October 2, 2020 emails and are attached as Exhibit J.

51.     The Busey bank statements that Alouf claimed overstated the balance of Benja's account actually included Benja's account balances for all the company's bank accounts, and fairly represented the total sums on hand for Benja.   Benja is working to clean up its financial records and is committed to complying with accounting rules in the future, as evidenced by its engagement with Kruze Consulting and emphasis on providing the accounting firm with everything it requires to provide GAAP-compliant financials and to resolve any reporting issues the company may have.   At the time of the Chapter 11 filing I was in the process of onboarding Kruze Consulting an accounting firm located in San Francisco to organize Benja's books and records and establish appropriate accounting procedures for anticipated future growth..  A true and correct copy of the service agreement between Kruze Consulting and Benja is attached as Exhibit K.

52.     On October 5, 2020, WSGR informed me that they could no longer represent Benja due to Alouf's repeated harassment of their employees.

53.     Benja has never missed a payment with any of its lenders, including Busey and Empowerment. The 2018 tax liens identified in Busey's default letter have been paid off, and the judgment against Benja was a $1,000 small claims judgment, which also has been paid off.

54.     I have engaged in efforts to raise outside capital (through debt, equity, or a mixture of both) to repay all lenders (including Busey) in full, to re-purchase the investment instruments of Anthos, Sklar, and others, and to provide growth capital. I have a high degree of confidence, based on representations of the lenders, that new funding sufficient to satisfy all pre-petition debt will be available to fund a plan of reorganization within the next 90 days.

DECLARATION OF ANDREW J. CHAPIN

55.     I am deeply concerned the actions of the last few weeks by Anthos and Alouf have caused irreparable harm to the relationships Benja holds with partners and employees and am further greatly concerned about harm done to my personal reputation.

56.     I have heard from a number of interested parties, including Mike Roznowski of Fractal Advisors, that Alouf has been contacting them directly during the past weeks and the last several days, notwithstanding that Alouf has no continuing relationship with Benja, neither as a consultant, creditor or investor.

57.     Working with Mr. Roznowski, I have had a number of discussions with potential take-out lenders who are interested in funding a loan secured by Benja's accounts receivable which would be sufficient to pay all of Benja's existing debts and provide working capital going forward.  I believe that such a loan could provide the basis for a plan of reorganization in this case.

58.     There is presently a payroll due to be paid to Benja's employees on November 1, 2020.

58.     I declare under penalty of perjury that the foregoing is true and correct and that this Declaration was executed in San Francisco California on October 26, 2020.

_____
Andrew J. Chapin

Case: 20-30819   Doc# 38   Filed: 10/26/20   Entered: 10/26/20 09:44:06   Page 10 of 95

# EXHIBIT A



# EXHIBIT B

| From: | Pano Anthos |
| --- | --- |
| To: | Andrew Chapin |
| Cc: | Nick Foppe; Tom Peters; Scott Sklar; Esq. Steven Soulios; solson@vedderprice.com; tommy@benja.co |
| Subject: | immediate action needed regarding Benja |
| Date: | Saturday, September 26, 2020 4:20:11 AM |

Andrew,
We want to make clear what a number of investors are expecting from you this weekend for our good and for your good. We have waited over a week for you to do the right thing and step down, but this decision will no longer be yours after this weekend.

Nick has been in direct contact with the market president of Busey, Brian Bjorkman, and informed him of all of the current issues surrounding Benja including defaults and likely wire fraud.

We also understand that you and your counsel have met to discuss stepping down.

Let us be very clear -- Brian has stated unequivocally that Busey will move this company into receivership if you do not step down as CEO and relinquish control of Benja to the previous board this weekend.

It is a really simple binary choice:

- Step down, serve in a capacity that helps save this business (BUT WITH NO LEGAL AUTHORITY) and enable us to attempt to salvage this business

OR

- Busey puts the company into receivership and takes appropriate legal action a against you and Tommy as you are co-signers of the loans

All parties (except for Empowerment) are interested in trying to work out of this situation **BUT NOT WITH YOU AS CEO.**

You have run out of time and with Busey now involved, there is no other option for you,

We are all hoping that this is a real business and that you got in way over your head. But of course you have prevented anyone from getting the true picture of the business so you have left us and now Busey no option.

## So either you step down by tomorrow at 12 pm PST and thereby relinquish any control of the company and any of its accounts or Busey will commence legal action on Monday to put the business into receivership and you and Tommy will be looking at financial ruin and other consequences that go along with fraud.

If you are unclear of what this means, read this link

Brian is calling Nick Sunday night to understand whether you have stepped down.

Can we be any clearer?

The sooner you step down, the less harm you will cause yourself, the company and the investors.

And you are welcome to call Busey or anyone else you or Benja's counsel that you believe is necessary this weekend to confirm this email.

But there is no other option here. Time has run out.

Pano

**Join the conversation on Instagram, Twitter and LinkedIn.**

XRC Labs companies featured at NRF's Fast Track Session 2017 -- in front of 5,000+

Pano Anthos
Managing Partner
XRC Labs
www.xrclabs.com
email: pano@xrclabs.com
cell: 508-641-6570


Thu, Sep 17, 6:08 PM

Hey Andrew. Do you have a minute to chat?

Thu, Sep 17, 10:19 PM

I am done. Will send my last email tomorrow to Fenwick, the Board, your partner and Empowerment.

i understand. we have everything we need on our end, no need for a final e-mail. i'll e-mail you now to close things up.

You have till midnight.

You clearly took my text in a context it wasn't intended. Nevertheless, it is clear you want me gone, and formally fired me. This is regrettable, puzzling, but not surprising. You have repeatedly lied to me, viewed my involvement as a problem as it exposed the fraud that you were masterminding. I was willing and able to get you out of the mess you created, but you decided you knew better. It is so unfortunate, because this is not a recipe for success. It is a show of character. And this sort of conduct is eventually destructive, at best.

Fri, Sep 18, 6:30 AM

Hi Andrew, I did inform Michael last night

iMessage

  

       

# EXHIBIT



JA

Joe >

excuse me, i told you exactly what i'm doing, what a timeline is that works, etc.

this is the best i can do. hang tight, i'm hustling.

You do what you need to do, and how/ when you want to do it. If this is more important than trying to not end up in a Federal Penitentiary, so be it.

Sun, Sep 27, 5:29 PM

extremely disheartening to hear busey was not aware of this plan

and they, in fact, advised against making such moves until our lawyers had a chance to speak

do you still want to plan on meeting at 7a tomorrow?

Sure. However, I would like access to Chase and Busey this afternoon.

okay, i am just settling in. you'll have that here this evening

Go for it. Just dig yourself a deeper and bigger hole. One that i won't be able to save you from. You need to know you are looking into some serious jail time.

iMessage

  

       



JA

Joe >

Mon, Sep 28, 6:05 PM

I suggest you sign the documents Andrew. This way you can at least maintain a c-level position at the company and some good will. The alternative, which is being worked on, will be dramatically worse.

You have one last chance before the personal lawsuits and Federal complaints start hitting. Look how much damage you have created in a matter of three weeks. Like I told you yesterday, you are running out of time. And when you do, there won't be any way back and you will end up in jail for a couple of decades.

i will be signing. you're the only one complicating things at this point. need some peace and quiet for an hour, for once. so much for "i'm not taking any emails or calls."

no cause for concern. all in the works.

I am not at all concerned. I got a call from Pano asking me to reengage. It was at 2pm and I agreed, as a favor to a friend and old business colleague.

Mon, Sep 28, 8:53 PM

If you don't sign these documents and transfer control of the bank accounts, I will be calling the FBI first thing tomorrow.

iMessage





JA

Joe >

> i've been in touch with pano on signing the docs. all happening.
>
> transfer is also happening. why haven't you connected with chase? you're holding that up?

Happening? What does that mean?

Chase: I'm not. The goal with Chase is to REMOVE you from the account. Not to set a dual signature with you on it.

8:30 tomorrow. I will be dialing the FBI hotline.

> you have to be added independently first

> you are added, then i'm removed.
>
> the dual signature pre-dates you and this and will be removed

> the documents are being signed.
>
> pano insisted i speak with tommy first and ensure he stays around. he insisted this is a key piece to everything. i am speaking with tommy and his (independent) counsel tomorrow to make sure our agreements meet his needs.
>
> i have shared this with pano, he is aware.

iMessage














JA

Joe ›

We can see. Otherwise I am not taking it on.  You need to first resign. And if you lied and I am not paid tonight I am not going to engage in Benja matters with the exception of one activity.  My 8:30 FBI call. Federal. Racketeering.  Look it up.

8:30. FBI.

"we can see. otherwise i am not taking it on."

what does that mean?

speak with iris. you need to be added first, then i am removed. it's simple as that. just speak with iris and that will be clear.

it's not that hard. i'm surprised you don't get that.

further, you have been paid in full. you've seen evidence of that. what's the problem there? i don't understand.

you're making these threats if i don't do something, and EVERYTHING has happened or is happening.

I spoke to Pano. He doesn't know what you are talking about.  We spoke to Tommy for a long while earlier.  We have a plan.

okay, tommy has asked to speak with me related to that and the last communication

iMessage

JA

Joe

I spoke to Pano. He doesn't know what you are talking about. We spoke to Tommy for a long while earlier. We have a plan.

okay, tommy has asked to speak with me related to that and the last communication i have from him is that he plans to resign

so per pano's request, i'm making sure that's not the case

Whatever. 8:30am I am advising the FBI that I am a CFO of a company that o believe the CEO is

Engaged in racketeering.

you are saying "do X or i'll do Y"

and i have done X. i have (overpaid) paid your invoice (earlier than necessary). i have invited you to the chase account to ensure the transfer of the account and you have refused to.

how does that work?

the only thing remaining is signing a document that i need to make sure tommy is on board with. seems reasonable?

Resign. Tonight.

explain, why?

iMessage



Resign.  Tonight.

explain, why?

i have checked all of these boxes

why is this hour better than 12 hours from now?

what's the difference?

Because at 8:30am I will making this call. Not a minute later.

you're a real laugh.

incredible. you can't explain why?

you demand X and i have done 2 of the 3 items and the third item is coming.

explain why it's important it happens tonight vs 12 hours from now?

what's the difference?

you want me to work with you after this?

Don't push me or it will happen at 7am.

explain why now and now 12 hours from now. give me one good reason.

iMessage



explain why now and now 12 hours from now. give me one good reason.

not* 12 hours from now

nothing?

Tommy is no longer relevant. And no one need you to do anything to convince him to stay. We got it covered. We need you to sign the papers and transfer the bank accounts.

i'll sign the papers.

why haven't you accepted the transfer of the chase account?

I told you why.

it's bizarre for you to complain so much about something when i initiated that 12 hours ago.

you haven't talked to iris. speak with iris and complete the transfer... ?

We will. Resign first.

can you explain why?

In fact do this. Resign. Send the resignation letter to Iris, and note in the

iMessage



10:44

JA

Joe >

In fact do this. Resign. Send the resignation letter to Iris, and note in the email (copy me) that I will be taking over the account first thing tomorrow.

All before 8:30.

I would like to see this email go out today. Before midnight.

lol

Fine. It's 7am tomorrow.

And test me a little more. The hot line is manned 24/7.

So to recap. 7am tomorrow morning I am reporting to the FBI that I am a CFO of a company whose CFO is amd has been masterminding racketeering. I will give them names and contact info if the victims.

*of

*CEO (but you got the idea).

interesting strategy.

I think it will get their attention. Don't you?

iMessage



JA

Joe ›

I think it will get their attention. Don't you?

no, it's absurd.

i'm working on my side to address your concerns.

i'm stunned this is the foot you want to get off on with someone you've deemed important going forward. all seems ill-advised.

i haven't seen a job offer or any mention of my role after signing a deal. what do i have here?

what should i expect after resigning? tell me what to expect.

You have been offered a job. Chief Revenue Officer.

For your reading tonight:



  iMessage 

       



i have not been offered a job

grow up. stop with the threats. we're trying to work together. why is this your approach?

And you better roll up your sleeves. We have a lot of money to pay back.

No threats. Just a plan I am sharing with you.

You wouldn't want this to be a surprise no?

the only surprise here is that you expect me to work with you after a conversation like this

I don't expect anything from you any more. I am sharing my plan with you.

so i don't have to continue on as CRO?

Have to?

or do you want me? do you need me?

i haven't received a job offer or any clarity. all i know is that you feel i did X, Y, Z, and you aren't working along with me during this transition.

how am i supposed to feel given that?

iMessage

If you think you can help save this company and your own self by helping get it back on its feet and paying people back, sure. That would be great.

are you saying i don't have to?

I am not saying anything outside of what I said.

Your choices, as I see it, are these: work as hard as possible to get your stakeholders paid back, or go to jail.

(Or, just go to jail)

well, your position is clear. thanks for the clarity. your personal opinions aside, i'll do what makes best sense for me and for the company.

talk to you soon.

Ok. In that case I will be calling the FBI at 7am. You are going to jail Andrew. Federal jail.
10 years at least.

Best of luck to you.

when i say i'll do what makes best sense for me and the company, what makes you think that's my decision?

iMessage



when i say i'll do what makes best sense for me and the company, what makes you think that's my decision?

you really need to change your mindset if we're going to be working together. stop.

this is not the relationship i want to have. i can't imagine it's the relationship you want to have.

we'll talk soon.

I don't think so.

You really underestimate me. That's yhe biggest mistake you made when you hired me.

you don't think what?

you don't think we'll talk soon?

That we will talk soon. No. I doubt it. Not after my call tomorrow.

huh?

Huh!

if i'm signing the docs and i've done everything else the group has asked for, and you are asking me to be CRO, why wouldn't we talk?

iMessage

JA

Joe >

Huh!

if i'm signing the docs and i've done everything else the group has asked for, and you are asking me to be CRO, why wouldn't we talk?

Sign. Send to Chase. Tonight.

Then we will talk.

After 7am tomorrow I don't think there will be any point on talking do you?

stop with the stupid threats

you've made your point

Fair enough. You know the timeline.

Midnight

Docs signed ; letter to Chase.

44 min.

joe, i'm blocking your number because you're just harassing me at this point. any future correspondence can occur via e-mail to andrew@benja.co or andrew@chapin.io

iMessage

# EXHIBIT



# Professional Services Agreement

1. **RECITALS**

   This Agreement made this 1ˢᵗ day of May 2020, between **CFOS 2 GO** ®, a California Corporation, (hereinafter referred to as "CFOs") and **BENJA INCORPORATED** (hereinafter referred to as "Company").

   WHEREAS, CFOs operates a company doing business in the areas of financial management services and operations consulting; and

   WHEREAS, Company desires to employ CFOs services as specified below and for an agreed upon fee;

   NOW THEREFORE, in consideration of their mutual promises made herein, and for other good and valuable consideration, the parties hereby agree as follows:

2. **SCOPE**

   Company hereby engages CFOs, and CFOs hereby accepts such engagement, to perform the services specified in Attachment "A", attached hereto and incorporated fully herein by reference.

   CFOs shall use his skills and best efforts to perform all services in a timely manner, and, shall provide Company upon request and with reasonable notice, a "timeline" indicating the volume of work remaining and an estimated time of completion.

   Company shall cooperate with CFOs in supplying CFOs with documentation, access to facilities, personnel and other such materials and resources so as to allow CFOs to perform such services as specified above. Company understands and acknowledges that any delay in providing CFOs with the information and/or resources necessary for CFOs to perform the agreed upon services may result in a delay in the completion of any and all projects. Should this occur, CFOs will bear no liability for such delays.

3. **INDEPENDENT CONTRACTOR RELATIONSHIP**

   The parties intend that this Agreement create an independent contractor relationship between them. Company is interested only in the results, reports and/or recommendations of CFOs; the manner of achieving such results, reports and recommendations is the responsibility of CFOs. CFOs is an independent entity and not the agent, employee or representative of Company. Company is not, therefore, responsible for deducting from payments to CFOs any amounts for withholding tax, FICA, insurance or other similar items relating to CFOs. CFOs shall be solely responsible, and hold Company harmless there from, any such payments or deductions.

500 YGNACIO VALLEY ROAD, STE #410 | WALNUT CREEK, CA 94596 | TEL 925-299-4450 | FAX 925-935-1342



4.  **COMPENSATION FOR SERVICES**

Upon execution of this Agreement, Company shall pay to CFOs a retainer deposit the sum of $**2,500.00** as and for an advance on future fees earned and, which payment CFOs shall apply to the final invoice billing for services provided.

Thereafter, Company shall pay to CFOs as and for compensation for the services specified herein and for time actually expended. Company further understands that, from time to time, CFOs may employ others to assist in the performance of this Agreement.

CFOs attaches hereto as Exhibit "B" and incorporates fully herein by reference a compensation schedule which specifies any and all fees to be charged by CFOs in the performance of this Agreement.

CFOs shall invoice Company on a weekly, monthly or quarterly basis as specified in the aforementioned Exhibit "B", payable upon presentation.

5.  **OTHER COSTS AND EXPENSES**

Company further agrees that it will reimburse CFOs for actual and reasonable costs and expenses incurred, upon proof, as a result of this Agreement. Said costs and expenses shall be added to the aforementioned invoices and are payable at the time of presentation.

6.  **INFORMATION**

From time to time as requested by CFOs, Company shall furnish to CFOs all information which is reasonably necessary to perform the terms of this Agreement. Company shall pay for the costs of furnishing this information. Delays in furnishing this information will delay CFOs performance of this Agreement. CFOs shall not disclose any personal or confidential information furnished to it by Company unless such disclosure is reasonably necessary in performing the services specified herein.

7.  **INDEMNIFY/HOLD HARMLESS**

Company understands and acknowledges that in the performance of this Agreement Company shall indemnify and CFOs shall be held harmless from any and all liability that may accrue as a result of the services performed by CFOs or any of his employees, agents or authorized representatives. Company agrees, therefore, that it shall bear the cost of any defense should such defense be necessary, in any action or claim against CFOs, his agents, employees or authorized representatives that should arise as a result of any services performed by CFOs pursuant this Agreement.

8.  **NO LIMITATION ON CFOs SERVICES**

Company acknowledges that CFOs provides services to other companies, corporations, individuals and entities. Company agrees that CFOs shall not be prevented from continuing to provide services to anyone who now or in the future may desire CFOs services, whether or not performing such


services may be considered a conflict of interest and whether or not such entities are related or opposed in any way to Company or its divisions and subsidiaries.

9. **NO WARRANTY ON ACCURACY OF INFORMATION PROVIDED TO CFOs**

As Company shall furnish any and all information to CFOs necessary to allow CFOs to perform under this Agreement, CFOs shall assume no responsibility for the accuracy of such information and in no way warrants that such information is true, correct or accurate. Company therefore understands and acknowledges that CFOs recommendations, findings and reports are based solely on the information furnished by Company and the skill, experience and expertise of CFOs.

10. **MATERIALS OWNED BY CFOs**

Any compilation of data, work product and other material provided or obtained by CFOs in performing under this Agreement shall be the property of CFOs, except for confidential information about Company which is furnished to CFOs by Company, or, unless otherwise mutually agreed in writing between the parties.

11. **TERMS**

This Agreement commences as of May 1, 2020 and shall continue until terminated by either party upon thirty (30) days written notice to the other party unless otherwise agreed.

12. **ENTIRE AGREEMENT**

This document represents the full and final expression of the parties' intent in reaching this Agreement. In the event that any of the provisions of this Agreement are deemed to be invalid or unenforceable, the same shall be deemed severable for the remainder of said Agreement and shall not cause the invalidity or unenforceability of the remainder of this Agreement.

13. **JURISDICTION TO ENFORCE**

In the event of any dispute arising out of any provision of this Agreement, any court of competent jurisdiction located within Contra Costa County, California, shall be deemed the appropriate court.

14. **ATTORNEY'S FEES AND COSTS**

In the event that either party to this Agreement is required to bring an action against the other to obtain any performance by the other hereunder, that party shall be entitled, if the action is determined in that party's favor, to receive from the other reasonable attorney's fees and actual costs.



IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date first written above.

**CFOs 2 GO ®**
A California Corporation


by:   _____
            Robert W. Weis, President


**Benja Incorporated**

by:   _____
            Andrew J. Chapin, Co-Founder & CEO
            andrew@benjaminapp.co
            415-326-4167
            845 Market St. - #450A
            San Francisco, CA 94103

---

**CFOs2GO** is a hand-picked team of leading practicing CFO consultants who customize and provide financial management solutions for client companies.  The company was founded and is still managed by a former CFO. Each of the consultants have, in addition to themselves and the other consultants, access to specialty financial management executive search and placement services to assist in quickly fulfilling on client company requests both in the U.S. and abroad.



## EXHIBIT "A"

**Scope of Task**

Corporate Finance Consulting

**CFOs2GO** is a hand-picked team of leading practicing CFO consultants who customize and provide financial management solutions for client companies.   The company was founded and is still managed by a former CFO. Each of the consultants have, in addition to themselves and the other consultants, access to specialty financial management executive search and placement services to assist in quickly fulfilling on client company requests both in the U.S. and abroad.



500 YGNACIO VALLEY ROAD, STE #410 | WALNUT CREEK, CA 94596 | TEL 925-299-4450 | FAX 925-935-1342



# EXHIBIT "B"

Chief Financial Officer          (CFO)

Joe Alouf                    $250.00 per hour

To be billed weekly (Payment due upon receipt)

**CFOs2GO** is a hand-picked team of leading practicing CFO consultants who customize and provide financial management solutions for client companies. The company was founded and is still managed by a former CFO. Each of the consultants have, in addition to themselves and the other consultants, access to specialty financial management executive search and placement services to assist in quickly fulfilling on client company requests both in the U.S. and abroad.



# EXHIBIT E

You are not complying with the requests that have been laid out for weeks. We are done waiting. You have been delaying us for weeks.

On Tue, Sep 29, 2020 at 8:43 PM Andrew Chapin <andrew@benja.co> wrote:
> I don't know what you're trying to do here, other than bully me (a person who does not work for this organization) — but this movement would mean you're not working in the best interest of the shareholders or the lenders.
>
> Andrew
>
> On Tue, Sep 29, 2020 at 5:38 PM Pano Anthos <pano@xrclabs.com> wrote:
>> Sorry Andrew.
>> We are tired of waiting and dealing with more lies.
>>
>> Joe pls call the FBI. We are not interested in allowing this to continue.
>>
>> And please call the bank tomorrow am and make it clear that we cannot get a plan in place because Andrew is not cooperating with us. Tell them to out the comoany into receivership.
>>
>> Pano
>>
>> On Tue, Sep 29, 2020 at 8:27 PM Andrew Chapin <andrew@benja.co> wrote:
>>> I was away from my computer - sorry. I have no problem sharing the requested documents but will be unable to meet your deadline. Just getting settled in. I'll have them to you tonight or, at latest, tomorrow morning.
>>>
>>> I was hoping to speak with Joe about how to best load in this information for the future of the business (like if it's best to load in all contact information to Quickbooks, for example) but unless advised otherwise, I'll just move quick as I can.
>>>
>>> Best,
>>>
>>>
>>> Andrew J. Chapin
>>> Co-Founder
>>> Benja Incorporated
>>>
>>>
>>>
>>>
>>>
>>>> On Sep 29, 2020, at 4:31 PM, Pano Anthos <pano@xrclabs.com> wrote:
>>>>
>>>> The workout group at Busey has told Joe that they will give us until Friday before they move the company to receivership if we do not answer basic questions with basic documentation:
>>>>
>>>> 1. Open Invoices to customers
>>>> 2. List of the customers and their contact information
>>>> 3. Tax returns 2019
>>>>
>>>> The deadline is 5:30 tonight PM PST. If Joe does not have this information, we will have no option but to get the FBI involved and tell Busey to put the company into receivership.
>>>>
>>>> You are making an absolute mess of everything.
>>>>
>>>> Pano
>>>>
>>>> **Join the conversation on Instagram, Twitter and LinkedIn.**
>>>>
>>>> XRC Labs companies featured at NRF's Fast Track Session 2017 -- in front of 5,000+

Pano Anthos
Managing Partner
XRC Labs
www.xrclabs.com
email: pano@xrclabs.com
cell: 508-641-6570

--
**Pano Anthos**
**Managing Director**
**XRC Labs**
pano@xrclabs.com
**M:508-641-6570**
**@ptanthos**

--
**Andrew J. Chapin**
**Co-Founder & CEO, Benja Commerce Network**
**(e)** andrew@benja.co
**(d) (415) 326 4167**

--
**Pano Anthos**
**Managing Director**
**XRC Labs**
pano@xrclabs.com
**M:508-641-6570**
**@ptanthos**

# EXHIBIT

| From: | Andrew Chapin |
|---|---|
| To: | _lson, Scott_; Crawford,_radley C_; Pano Anthos; Scott Sklar; _ick_oppe; Joe Alouf; Tommy_oode |
| Cc: | TJ_raser; Tom Peters |
| cc: | Morgan Reilly; Matt_oldstein; rsp_rspollocklaw.com |
| Subject: | State of_en a |
| Date: | _ednesday, September 30, 2020 9:_:3_ AM |
| _ttac me_t_: | 2020 09 30_irector.pdf |
| | 2020 09 30 President.pdf |

All,

Writing in regards to the changes in management of the last 48 hours.

As many of you know, over the weekend, Pano Anthos and Joe Alouf lead a charge (in an e-mail thread titled_immediate action needed regarding Benja). In that thread, and over the course of the days that followed:

- Anthos falsely represented_Brian (Bjorkman) has stated unequivocally that Busey will move this company into receivership if (Chapin) (does) not step down as CEO and relinquish control of Benja to the previous board this weekend.
- Anthos falsely represented_All parties (except for Empowerment) are interested in trying to work out of this situation but not with (Chapin) as CEO.
- Anthos stated_There is no other option for you.
- Anthos threatened_(Chapin) and Tommy (_oode) will be looking at financial ruin and other consequences that go along with fraud.
- Leaving me (as an individual) with no time to consult my own counsel, the group insisted I resign and offer a course of action.
  - Alouf repeatedly insisted I resign or he will call the FBI, via text message:
    - 9_28 20, 8:52 PM:_If you don_t sign these documents and transfer control of the bank accounts, I will be calling the FBI first thing tomorrow.
    - 9_28 20, 9:10 PM:_8:30 tomorrow. I will be dialing the FBI hotline.
    - 9_28 20, 9:19 PM:_We can see. Otherwise I am not taking it on. You need to first resign. And if you lied and I am not paid tonight I am not going to engage with Benja matters with the exception of one activity. My 8:30 FBI call. Federal Racketeering. Look it up. 8:30. FBI.
    - 9_28 20, 9:25 PM:_Resign. Tonight.
    - 9_28 20, 9:27 PM:_Because at 8:30am I will making this call. Not a minute later.
    - 9_28 20, 9:28 PM:_Don_t push me or it will happen at 7am.
    - 9_28 20, 9:34 PM:_And test me a little more. The hot line is manned 24_7.
    - 9_28 20, 9:58 PM:_So to recap. 7am tomorrow morning I am reporting to the FBI that I am CFO of a company whose (CEO) is amd and has been masterminding racketeering. I will give them names and contact info (of) the victims.
    - 9_28 20, 10:01 PM:_I think it will get their attention. Don_t you
    - 9_28 20, 10:14 PM:_Your choices, as I see it are these: work as hard as possible to get your stakeholders paid back, or go to jail.
    - 9_28 20, 10:20 PM:_Ok. In that case I will be calling the FBI at 7am. You are going to jail Andrew. Federal jail. 10 years at least. Best of luck to you.
    - 9_28 20, 10:22 PM:_You really underestimate me. That_s (the) biggest mistake you made when you hired me.
    - 9_28 20, 11:16 PM:_44 minutes.

- I reluctantly resigned and offered a plan including speaking with Alouf at 7 AM the next morning to begin working on the requests. Alouf insisted he be paid (earlier than his agreement calls for, and for an amount greater than his agreement calls for) and refused to do any work until that was completed, directly obstructing the execution of the course of action. e was paid and offered evidence of that payment.
- Yesterday, at 4:31 PM in a chain titled you are making things difficult for everyone and are causing the company to move to bankruptcy, Anthos demanded a list of information. e added The deadline is 5:30 tonight PM PST. If Joe does not have the information, we will have no option but to get the FBI involved and tell Busey to put the company into receivership.
  - I was on a phone call and had not seen the e-mail. At 5:27, I replied and agreed I would be happy to respond.
  - Pano replied Sorry Andrew. We are tired of waiting and dealing with more lies. Joe pls call the FBI. We are not interested in allowing this to continue. And please call the bank tomorrow am and make it clear that we cannot get a plan in place because Andrew is not cooperating with us. Tell them to put the company into receivership.
- Yesterday, I expressed a number of concerns, including whether I was an employee of the company - I had been terminated by the board and not offered any subsequent position. I asked whether I should be acting in the best interest of the company and continue my business-related duties - booking orders for October and November, work on contract renewals, keeping calls with publishers. I further expressed concern that the employees (salaried and contractors) were not communicated with properly and were just sitting on their hands - nothing was getting done. I further expressed concern Joe insisted we not pay any contract employees, further putting the company at risk - this inaction would lead to stopped work. I clearly stated What is there for the lenders to receive if the company isn t operating Do you want my help with these things
  - Alouf responded in the negative across the board.

**In short: Anthos and Alouf seized control of the company through extortion and, in the 24 hours that followed, made deliberate steps to further disrupt operation of the company by refusing to enable operation of the business. There is no path to repaying any stakeholders without the continued operation of the business.**

As the majority shareholder, it is clearly in my interest and in the interest of the company to remove Pano Anthos as sole director of the Board of Directors and to remove Joe Alouf as Interim President of the Corporation. I have submitted resolutions to that effect this morning and will immediately work to right the ship. Those resolutions are attached.

I welcome the cooperation and assistance of the stakeholders as we navigate these waters and look forward to complete and total resolution in the weeks to come.

I am available if there are any questions or concerns.

Best,

**Andrew J. Chapin**
Co-Founder
Benja Incorporated

**BENJA INCORPORATED**

**WRITTEN CONSENT OF THE [MAJORITY OF COMMON STOCK][1]**

**September 30, 2020**

The undersigned, being the holders of the majority of the common stock (the "Majority Holders") of Benja Incorporated, a Delaware corporation (the "Corporation"), hereby consent and agree, in lieu of a special meeting of the stockholders, to the approval and adoption of the following resolutions:

1.    <u>With Respect to the Election of a Director</u>:

    **WHEREAS**, Pano Anthos resigned as the sole director of the Corporation, effective as of September 30, 2020; and

    **WHEREAS**, the Majority Holders have determined that it is in the best interest of the Corporation to appoint Andrew Chapin as the sole director of the Corporation.

    **NOW, THEREFORE, BE IT RESOLVED**, that effective as of the date hereof, Andrew Chapin be, and the same hereby is, appointed as the sole director of the Corporation, to serve until the earlier of his death, resignation or removal or until his successor shall have been duly elected and qualified.

2.    <u>Omnibus</u>:

    **RESOLVED**, that, in order to fully carry out the intent and effectuate the purposes of the foregoing resolutions, the directors and officers of the Corporation be, and each of them hereby is, individually authorized in the name and on behalf of the Corporation from time to time (i) to prepare, execute, deliver and perform, as the case may be, such agreements, amendments, applications, approvals, certificates, communications, consents, demands, directions, documents, further assurances, instruments, notices, orders, requests, resolutions, supplements or undertakings, (ii) to pay or cause to be paid on behalf of the Corporation any related costs and expenses and (iii) to take such other actions, in the name and on behalf of the Corporation, as each such director or officer, in such person's discretion, shall deem necessary or advisable to complete and effect the foregoing transactions or to carry out the intent and purposes of the foregoing resolutions and the transactions contemplated thereby, the preparation, execution, delivery and performance of any such agreements, amendments, applications, approvals, certificates, communications, consents, demands, directions, documents, further assurances,

---

[1] NTD: Please confirm.

VP/#40220907.3

Case: 20-30819   Doc# 38   Filed: 10/26/20   Entered: 10/26/20 09:44:06   Page 44 of 95

instruments, notices, orders, requests, resolutions, supplements or undertakings, the payment of any such costs or expenses and the performance of any such other acts shall be conclusive evidence of the approval of the Majority Holders thereof and all matters relating thereto.

**[SIGNATURE PAGE TO FOLLOW]**

VP/#40220907.3

Case: 20-30819   Doc# 38   Filed: 10/26/20   Entered: 10/26/20 09:44:06   Page 45 of 95

*(Signature Page to Written Consent of the Majority Holders of Benja Incorporated.)*

This written consent is made pursuant to Section 228 of the General Corporation Law of the State of Delaware, and amended, shall be effective as of the date hereof, shall have the same force and effect as a vote of the Majority Holders at a duly called meeting and shall be filed with the minutes of the Corporation in the Corporation's minute book.  A facsimile or electronic mail copy of a signature page hereto shall be deemed an original for all purposes.  This consent may be executed in two or more counterparts, each of which shall be deemed an original but all of which shall together constitute one and the same document.

Dated as of the date first written above.

**MAJORITY HOLDERS:**

By _____
Andrew Chapin

Shareholder

By _____
Name:
Its:

[_]

By _____
Name:
Its:

[_]

By _____
Name:
Its:

VP/#40220907.3

*(Signature Page to Written Consent of the Majority Holders of Benja Incorporated.)*

VP/#40220907.3

# BENJA INCORPORATED

## UNANIMOUS WRITTEN CONSENT OF THE BOARD OF DIRECTORS

### September 30, 2020

The undersigned, being the sole member of the Board of Directors (the "Board") of Benja Incorporated, a Delaware corporation (the "Corporation"), hereby consent and agree, in lieu of a special meeting of the Board, to the approval and adoption of the following resolutions:

1. <u>With Respect to the Election of a New Chief Executive Officer</u>:

    **WHEREAS**, Joe Alouf has resigned as President of the Corporation, effective as of September 30, 2020;

    **WHEREAS**, in accordance with Section 5.5 of the Bylaws of the Corporation, any vacancy occurring in any officer position of the Corporation may be filled by the Board; and

    **WHEREAS**, the Board has determined that it is in the best interest of the Corporation to appoint Andrew Chapin as Chief Executive Officer of the Corporation.

    **NOW, THEREFORE, BE IT RESOLVED**, that effective as of date hereof, Joe Alouf be, and the same hereby is, appointed as Interim President of the Corporation, to serve until the earlier of his death, resignation or removal or until his successor shall have been duly elected and qualified.

2. <u>Omnibus</u>:

    **RESOLVED**, that, in order to fully carry out the intent and effectuate the purposes of the foregoing resolutions, the directors and officers of the Corporation be, and each of them hereby is, individually authorized in the name and on behalf of the Corporation from time to time (i) to prepare, execute, deliver and perform, as the case may be, such agreements, amendments, applications, approvals, certificates, communications, consents, demands, directions, documents, further assurances, instruments, notices, orders, requests, resolutions, supplements or undertakings, (ii) to pay or cause to be paid on behalf of the Corporation any related costs and expenses and (iii) to take such other actions, in the name and on behalf of the Corporation, as each such director or officer, in such person's discretion, shall deem necessary or advisable to complete and effect the foregoing transactions or to carry out the intent and purposes of the foregoing resolutions and the transactions contemplated thereby, the preparation, execution, delivery and performance of any such agreements, amendments, applications, approvals, certificates, communications, consents, demands, directions, documents, further assurances, instruments, notices, orders, requests, resolutions, supplements or undertakings, the

payment of any such costs or expenses and the performance of any such other acts shall be conclusive evidence of the approval of the Board thereof and all matters relating thereto.

**[SIGNATURE PAGE TO FOLLOW]**

VP/#40220901

*(Signature Page to Unanimous Written Consent of the Board of Directors of Benja Incorporated.)*

This written consent is made pursuant to Section 141(f) of the General Corporation Law of the State of Delaware, and amended, shall be effective as of the date hereof, shall have the same force and effect as a vote of the Board at a duly called meeting and shall be filed with the minutes of the Corporation in the Corporation's minute book. A facsimile or electronic mail copy of a signature page hereto shall be deemed an original for all purposes. This consent may be executed in two or more counterparts, each of which shall be deemed an original but all of which shall together constitute one and the same document.

Dated as of the date first written above.

**BOARD:**

_____
Andrew J. Chapin

Case: 20-30819    Doc# 38    Filed: 10/26/20    Entered: 10/26/20 09:44:06    Page 51 of
95

# EXHIBIT

# Wire Transfer Outgoing Request



## Wire Transfer Sender Information

| Sender Name: | | | | | |
|---|---|---|---|---|---|
| ANDREW J CHAPIN | | | | | |
| Account Name: | | Street Address: | | | |
| ANDREW J CHAPIN | | 26 CRAGMONT AVE | | | |
| City: | State: | Zip: | Country: | | Daytime Phone: |
| SAN FRANCISCO | CA | 94116-1308 | USA | | 415-326-4167 / 203-695-4167 |
| Primary ID Type: | ID Issuer: | ID Number: | | ID Issue Date: | ID Exp: |
| Driver's License | CA | Y3035788 | | 07/23/2019 | 11/12/2024 |
| Secondary ID Type: | ID Issuer: | ID Number: | | ID Issue Date: | ID Exp: |

Comments:

## Wire Transfer Information

| Request Date: | Request time: | Effective date: | Wire Type: |
|---|---|---|---|
| 09/25/2020 | 03:38:50PM Eastern time | 09/25/2020 | Domestic |
| Debit Account #: | Debit Account Type: | Wire Amount (US dollars): | |
| XXXXX5257 | TOTAL CHECKING | $96,229.39 | |
| Qualifying Account #: | Qualifying Account Type: | Source of funds: | Wire Fee: |
| | | Checking | $35.00 |
| Currency type to be sent: | Exchange rate: | Foreign currency amount: | Amount to Collect (USD): |
| US Dollars | N/A | N/A | $96,264.39 |
| FX Contract Number: | | | |

## Recipient Account Information

| Account Name: | | | | |
|---|---|---|---|---|
| MHC Financial Services | | | | |
| Street Address: | | Account Number: | | |
| | | 9872224221 | | |
| | | City: | State: | Zip: | Country: |
| Text to Recipient: | | | | |

## Receiving Bank Information

| Bank Name: | | | | |
|---|---|---|---|---|
| UMB Bank, National Association | | | | |
| Street Address: | | Bank ABA/SWIFT Code: | | |
| 730 Citadel Dr East | | 101000695 | | |
| | | City: | State: | Zip: | Country: |
| | | Colorado Springs | CO | 80909 | USA |
| Intermediary Bank Name: | | | | |
| Street Address: | | Intermediary Bank ABA: | | |
| | | City: | State: | Zip: | Country: |
| Text to Receiving Bank: | | | | |

Case: 20-30819    Doc# 38    Filed: 10/26/20    Entered: 10/26/20 09:44:06    Page 53 of 95

**5. Future Dated Wire Transfers.**

You may request a future dated (one -time) domestic wire transfer, up to 10 business days from the current business day's cutoff time. You cannot cancel a future dated wire transfer once it has been requested.

**6. Foreign Exchange Transfer.**

It is our discretion in which foreign currencies we will send wire transfers, and these can change at any time. If you send a wire transfer in a foreign currency, you authorize us to deduct the amount from your account at the exchange rate we offered at the time you requested it. The foreign exchange rates we use are determined by us in our sole discretion.

The exchange rate we use will include a spread and may include commissions or other costs that we, our affiliates, or our vendors may charge in providing foreign currency exchange to you. The exchange rate may vary among customers depending on your relationship, products with us or the type of transaction being conducted, the dollar amount, type of currency, and the date and the time of the exchange. You should expect that these rates will be less favorable than rates quoted online or in publications.

If the funds are returned or payment cannot be made for any reason, we will not be liable for more than the amount of the wire transfer at our exchange rate at the time we return the funds to you, less charges taken by any other bank involved in the wire transfer. If you cancel a funds transfer request, other than a cancellation of a Consumer International Funds Transfer within 30 minutes after you authorized us to send it, and it causes a loss or cost to us, we may subtract funds from your account to cover these losses. If your initial request is returned, cancelled or changed, your new wire transfer request will be subject to a new exchange rate.

If the wire transfer is not in the currency of the recipient's account, the recipient's bank or another processing bank may reject the wire transfer or convert it. If converted, you agree the wire transfer may be converted to a different currency at their exchange rate and may subtract additional fees.

**7. Fees and Payment Route.**

We may charge a fee when you use this service. Please refer to your account agreement or product information for fees that may apply. We may use any funds transfer system we believe reasonable to complete your request, regardless of any instructions you might give us. If we also are the recipient's bank, we may complete your request using an internal transfer. You are responsible for all fees and taxes, including our fees and any fees charged by other funds transfer systems or banks involved in the transfer.

**8. Wire Transfer System Rules and Laws.**

The use of this service is subject to all applicable U.S. federal and state laws, regulations, rules and wire transfer arrangements, including the respective state's Uniform Commercial Code Article 4A, as may be applicable. If you make a Consumer International Wire Transfer, it is also subject to additional federal laws and regulations which, in the event of a conflict with this Agreement, will govern. All of your wire transfers must comply with U.S. laws, including the regulations and economic sanctions administered by the U.S. Treasury Department's Office of Foreign Asset Control and other applicable laws.

**9. Indemnification.**

You will indemnify us for all claims, expenses, liabilities, and losses (including reasonable legal fees) if you or a third party makes a claim against us for any of our actions or services in this Agreement, unless they prove gross negligence or willful misconduct. You understand this section will survive even if you close your account or this Agreement is terminated.

**10. Failure to Perform; Limitation of Liability.**

We are only responsible for performing the services specified in this Agreement. We will not be liable for the failure or delay of any wire transfer or for failing to meet other obligations in the Agreement because of circumstances or causes beyond our control, including governmental, legal or regulatory restrictions or prohibitions, third party actions, natural disasters, equipment or system failures, labor disputes, wars or riots. We are not liable for any indirect, special or consequential damages.

Any provision of this Agreement that limits the bank's liability does not negate the bank's duty (if any) under applicable law to act in good faith and with reasonable care.

**11. Changes to the Agreement**

We may change the terms of this Agreement, including fees and features of this service, at any time. If any change would adversely affect you, we will notify you in advance, unless the change is necessary to comply with a legal requirement.

We may direct you to a branch or to your Chase Private Client banker for the content of any changes or the revised Agreement unless the law requires a different method. Your use of this service after we have made such changes available will be considered your agreement to the change.

---

By providing your signature as authorization, you agree to these terms and conditions, that the wire transfer information in this document is accurate and you authorize us to process this wire transfer.

Recipient Bank's Identifier (ABA/SWIFT): 101000695     Recipient's Account Number: 9872224221

Sender's Signature: _____     Date: _____

Email Address: andrew@benja.co

Transaction Number (Contact ID): 774579591210001

The Email Address and Transaction Number provided will be used for communication purposes.

Case: 20-30819    Doc# 38    Filed: 10/26/20    Entered: 10/26/20 09:44:06    Page 54 of 95

**Branch / Department Information**

Initiated by: LONDON CHING      Initiating Branch: Market and 8th - 741 Phone: 415-241-8700    Request Time: 03:38:50PM

Wire Transfer: ☐ Approved ☐ Declined    Approved/Declined by (Print): _____

Approved/Declined by (Signature): _____ Date: _____

Decline Reason: _____ Comments: _____

Approving Manager (wire amount over limit) _____

Method of Approval (attach required supporting documentation) ☐ Phone call ☐ Email ☐ Other (explain)_____

Wire Tracking Information
FX Contract Number (if applicable) _____ .

Case: 20-30819   Doc# 38   Filed: 10/26/20   Entered: 10/26/20 09:44:06   Page 55 of 95

# Wire Transfer Outgoing Request

## CHASE ○

## Wire Transfer Sender Information

| Sender Name: | | | | | |
|---|---|---|---|---|---|
| ANDREW J CHAPIN | | | | | |

| Account Name: | | Street Address: | | | |
|---|---|---|---|---|---|
| ANDREW J CHAPIN | | 26 CRAGMONT AVE | | | |

| City: | State: | Zip: | Country: | | Daytime Phone: |
|---|---|---|---|---|---|
| SAN FRANCISCO | CA | 94116-1308 | USA | | 415-326-4167 |
| | | | | | 203-695-4167 |

| Primary ID Type: | ID Issuer: | ID Number: | ID Issue Date: | ID Exp: |
|---|---|---|---|---|
| Driver's License | CA | Y3035788 | 07/23/2019 | 11/12/2024 |

| Secondary ID Type: | ID Issuer: | ID Number: | ID Issue Date: | ID Exp: |
|---|---|---|---|---|
| Chase or Bank Issued Credit/Debit Card | Chase | XXXXXXXXXXX4927 | | 05/30/2022 |

| Comments: |
|---|
| |

## Wire Transfer Information

| Request Date: | Request time: | Effective date: | Wire Type: |
|---|---|---|---|
| 09/25/2020 | 03:41:55PM Eastern time | 09/25/2020 | Domestic |

| Debit Account #: | Debit Account Type: | Wire Amount (US dollars): | |
|---|---|---|---|
| XXXXX5257 | TOTAL CHECKING | $250,000.00 | |

| Qualifying Account #: | Qualifying Account Type: | Source of funds: | Wire Fee: |
|---|---|---|---|
| | | Checking | $35.00 |

| Currency type to be sent: | Exchange rate: | Foreign currency amount: | Amount to Collect (USD): |
|---|---|---|---|
| US Dollars | N/A | N/A | $250,035.00 |

| FX Contract Number: |
|---|
| |

## Recipient Account Information

| Account Name: |
|---|
| RBC Capital Markets Corp. |

| Street Address: | Account Number: | | | |
|---|---|---|---|---|
| | 160230097208 | | | |
| | City: | State: | Zip: | Country: |
| | | | | |

| Text to Recipient: |
|---|
| Further credit: Thomas Peters, #30691428 |

## Receiving Bank Information

| Bank Name: |
|---|
| U.S. Bank, National Association |

| Street Address: | Bank ABA/SWIFT Code: | | | |
|---|---|---|---|---|
| 101 Broadway E | 091000022 | | | |
| | City: | State: | Zip: | Country: |
| | Little Falls | MN | 56345 | USA |

| Intermediary Bank Name: |
|---|
| |

| Street Address: | Intermediary Bank ABA: | | | |
|---|---|---|---|---|
| | | | | |
| | City: | State: | Zip: | Country: |
| | | | | |

| Text to Receiving Bank: |
|---|
| |

**5. Future Dated Wire Transfers.**

You may request a future dated (one –time) domestic wire transfer, up to 10 business days from the current business day's cutoff time. You cannot cancel a future dated wire transfer once it has been requested.

**6. Foreign Exchange Transfer.**

It is our discretion in which foreign currencies we will send wire transfers, and these can change at any time. If you send a wire transfer in a foreign currency, you authorize us to deduct the amount from your account at the exchange rate we offered at the time you requested it. The foreign exchange rates we use are determined by us in our sole discretion.

The exchange rate we use will include a spread and may include commissions or other costs that we, our affiliates, or our vendors may charge in providing foreign currency exchange to you. The exchange rate may vary among customers depending on your relationship, products with us or the type of transaction being conducted, the dollar amount, type of currency, and the date and the time of the exchange. You should expect that these rates will be less favorable than rates quoted online or in publications.

If the funds are returned or payment cannot be made for any reason, we will not be liable for more than the amount of the wire transfer at our exchange rate at the time we return the funds to you, less charges taken by any other bank involved in the wire transfer. If you cancel a funds transfer request, other than a cancellation of a Consumer International Funds Transfer within 30 minutes after you authorized us to send it, and it causes a loss or cost to us, we may subtract funds from your account to cover these losses. If your initial request is returned, cancelled or changed, your new wire transfer request will be subject to a new exchange rate.

If the wire transfer is not in the currency of the recipient's account, the recipient's bank or another processing bank may reject the wire transfer or convert it. If converted, you agree the wire transfer may be converted to a different currency at their exchange rate and may subtract additional fees.

**7. Fees and Payment Route.**

We may charge a fee when you use this service. Please refer to your account agreement or product information for fees that may apply. We may use any funds transfer system we believe reasonable to complete your request, regardless of any instructions you might give us. If we also are the recipient's bank, we may complete your request using an internal transfer. You are responsible for all fees and taxes, including our fees and any fees charged by other funds transfer systems or banks involved in the transfer.

**8. Wire Transfer System Rules and Laws.**

The use of this service is subject to all applicable U.S. federal and state laws, regulations, rules and wire transfer arrangements, including the respective state's Uniform Commercial Code Article 4A, as may be applicable. If you make a Consumer International Wire Transfer, it is also subject to additional federal laws and regulations which, in the event of a conflict with this Agreement, will govern. All of your wire transfers must comply with U.S. laws including the regulations and economic sanctions administered the U.S. Treasury Department's Office of Foreign Asset Control and other applicable laws.

**9. Indemnification.**

You will indemnify us for all claims, expenses, liabilities, and losses (including reasonable legal fees) if you or a third party makes a claim against us for any of our actions or services in this Agreement, unless they prove gross negligence or willful misconduct. You understand this section will survive even if you close your account or this Agreement is terminated.

**10. Failure to Perform; Limitation of Liability.**

We are only responsible for performing the services specified in this Agreement. We will not be liable for the failure or delay of any wire transfer or for failing to meet other obligations in the Agreement because of circumstances or causes beyond our control, including governmental, legal or regulatory restrictions or prohibitions, third party actions, natural disasters, equipment or system failures, labor disputes, wars or riots. We are not liable for any indirect, special or consequential damages.

Any provision of this Agreement that limits the bank's liability does not negate the bank's duty (if any) under applicable law to act in good faith and with reasonable care.

**11. Changes to the Agreement**

We may change the terms of this Agreement, including fees and features of this service, at any time. If any change would adversely affect you, we will notify you in advance, unless the change is necessary to comply with a legal requirement.

We may direct you to a branch or to your Chase Private Client banker for the content of any changes or the revised Agreement unless the law requires a different method. Your use of this service after we have made such changes available will be considered your agreement to the change.

By providing your signature as authorization, you agree to these terms and conditions, that the wire transfer information in this document is accurate and you authorize us to process this wire transfer.

Recipient Bank's Identifier (ABA/SWIFT): 091000022

Recipient's Account Number: 160230097208

Sender's Signature: _____

Date: _____

Email Address: andrew@benja.co

Transaction Number (Contact ID): 734579413830001

The Email Address and Transaction Number provided will be used for communication purposes.

Case: 20-30819    Doc# 38    Filed: 10/26/20    Entered: 10/26/20 09:44:06    Page 57 of 95

**Branch / Department Information**

Initiated by: LONDON CHING

Wire Transfer: ☐ Approved ☐ Declined

Initiating Branch: Market and 8th - 741 Phone: 415-241-8700 Request Time: 03:41:55PM

Approved/Declined by (Signature): _____ Approved/Declined by (Print): _____

Date: _____

Decline Reason: _____ Comments: _____

Approving Manager (wire amount over limit) _____

Method of Approval (attach required supporting documentation) ☐ Phone call ☐ Email ☐ Other (explain) _____

Wire Tracking Information

FX Contract Number (if applicable) _____

Case: 20-30819    Doc# 38    Filed: 10/26/20    Entered: 10/26/20 09:44:06    Page 58 of 95

# EXHIBIT H

| From: | Andrew Chapin |
| To: | Ricke, Patrick |
| Cc: | Joe Alouf; Pano Anthos |
| Subject: | State of  en a |
| Date: | Thursday,  ctober 1, 2020 9:  :  AM |

Patrick,

As you are likely aware, there were a few management changes at Benja the last few days.

A long story made short — I am writing to inform you the move made early in the week (appointing Pano Anthos to the Board of Directors and Joe Alouf as Interim President) has been undone by vote of the majority of shareholders. I have returned to each of those roles effective yesterday.

Mr. Anthos and Mr. Alouf are no longer authorized to speak on behalf of Benja as it relates to this matter.

I would like to discuss the state of affairs between Benja and Busey. I come bearing a plan for resolution - and the sooner we can connect, the sooner we can put this in motion.

I'm available at (203) 695 4167 or (415) 326 4167.   ive me a call, would be good to touch base briefly before a call with the full group.

Best,

**Andrew J. Chapin**
**Co-Founder**
**Benja Incorporated**

# EXHIBIT I

I have not engaged in fraudulent activity, nor am I actively.

If my resignation documents (which acknowledged I am the majority shareholder as only my action and signature was necessary), so were my reappointment documents. They are in complete compliance with the Bylaws of the company.

Joe, you have been terminated and I advise you cease this reach-out and activity immediately.

**Andrew J. Chapin**
**Co-Founder**
**Benja Incorporated**

> On Oct 2, 2020, at 10:53 AM, Joe Alouf <alouf@benja.co> wrote:
>
> WS R:
>
> Please feel free to reach out to me. I can also give you contact info at edder and Fenwick. Andrew resigned, and does not have the voting rights, nor did he call a shareholder meeting to reinstate himself. **Andrew has and continues to engage in fraudulent acti ity**. I am asking you that at the minimum, you alert that bank to maintain a hold on the account for a day or two until this is sorted out to your satisfaction.
>
>> On Fri, Oct 2, 2020 at 10:31 AM Joe Alouf <alouf@benja.co> wrote:
>> WS R:
>>
>> Please be advised that Beja, over the course of the past two weeks has been fired, twice, by our law firms, edder Price and Fennwick. Andrew was reported to the FBI two days ago. Andrew has been involved and continues to be engaged in fraudulent activities.
>>
>>> On Fri, Oct 2, 2020 at 10:23 AM Andrew Chapin <andrew@benja.co> wrote:
>>> Today is your last day. As CEO, I hereby terminate your position with the company.
>>>
>>> Please hand over all Benja-related records, confidential information, and access to all accounts immediately. It has come to my attention that you have used other e-mail addresses for work related to Benja so please be sure to include records and activity from your non-Benja account(s) as well. You may do so through e-mail or Dropbox, whichever is preferred.
>>>
>>> Best,

**Andrew J. Chapin**
Co-Founder
Benja Incorporated

# EXHIBIT

Before I can answer your text, I need you to send me an email releasing me from any claims you may have against me.     nown or unknown.  Simple email will be sufficient.

**Joe Alouf, CPA**

**From:** Andrew Chapin <andrew@benja.co>
**Sent:** Wednesday, September 30, 2020 5:51:07 PM
**To:** Joe Alouf <alouf@benja.co>
**Subject:** Immediate Action

Joe,

As you know, you have been removed as Interim President.  I will look forward to working with you to determine your title, role, and responsibility moving forward.     ntil we formalize a new role for you, please note that effectively immediately you will have no agency or authority to enter into legal agreements or other transactions or to take any actions on behalf of the Company without my prior approval.  This applies to all matters in which you have any involvement, including Empowerment, Busey, Brett Buerck Taco Corp, and any other partner or institution with which you have worked on or engaged with during your employment with Benja to date.

Also: please immediately return access to the    usto account. You will need to log in, deactivate two-factor authentication in your account settings (if you set it up), then provide the username and password. This is especially important as your alouf@benja.co account currently owns my personal employee profile.

Best,

**Andrew J. Chapin**
**Co-Founder**
**Benja Incorporated**

| From: | uie, James |
| To: | Andrew Chapin |
| Cc: | Pan, ris ; enn, leanor ; Scullin, eema J ; im, James |
| Subject: | R : raudulent Account Activity JA |
| Date: | riday, ctober 2, 2020 1:3 :06 PM |

Hi JPMorgan team,

We would like to restore access for Andrew. What steps do we need to reinstate his access?

Best regards,

James Huie

650-862-7965

**From:** Joe Alouf <alouf@benja.co>
**Sent:** Friday, October 2, 2020 10:39 AM
**To:** Andrew Chapin <andrew@benja.co>
**Cc:** Pan, Iris H <iris.h.pan@jpmorgan.com>; Fenn, Eleanor K <eleanor.k.fenn@jpmorgan.com>;
Scullin, Deema J <deema.j.scullin@jpmorgan.com>; Huie, James <jhuie@wsgr.com>
**Subject:** Re: Fraudulent Account Activity BENJA

[External]

Please be advised, and copying Benja's new corporate counsel.

Andrew has resigned from the company as you have previously been notified. There is ongoing fraud, which is part of why he resigned. Please do not allow access to the account until Corporate Counsel, copied here, confirms for you that this is legitimate.

On Fri, Oct 2, 2020 at 10:28 AM Andrew Chapin <andrew@benja.co> wrote:

> Iris & Eleanor,
>
> You may contact our counsel, James Huie at WSGR, to confirm that Mr. Alouf has been terminated by the company and holds no authority to request such a move.
>
> Further, as I provided yesterday, I was re-appointed as CEO and director of the Board of Directors on Wednesday.
>
> I am here to answer any other questions you might have at (203) 695 4167.
>
> Best,
>
> **Andrew J. Chapin**
> Co-Founder
> Benja Incorporated

On Oct 2, 2020, at 10:26 AM, Joe Alouf <alouf@benja.co> wrote:

Chase, as you know, Andrew resigned a few days ago. You were provided with specific instructions by him to transfer the account responsibilities to me. **Andrew has been reported to the FBI. I am instructing you to put a hold on the account until you receive further instructions, authenticated by legal counsel or court order to freeze any access to the account.**

On Fri, Oct 2, 2020 at 10:21 AM Andrew Chapin <andrew@benja.co> wrote:

> Iris, Eleanor,
>
> Mr. Alouf is not the CFO of Benja and has no authority to request such a hold.
>
> **Andrew J. Chapin**
> Co-Founder
> Benja Incorporated
>
>
> > On Oct 2, 2020, at 10:19 AM, Joe Alouf <alouf@benja.co> wrote:
> >
> > Andrew,
> >
> > I have alerted Chase that there is fraudulent activity on the account and to put an immediate hold.
> >
> > **As the CFO of Benja, I am hereby instructing Chase not to release the hold without my prior authorization.**
> >
> > --
> > Joe Alouf, CPA
> > Chief Financial Officer
> > 415-395-6867
> > alouf@benja.co
> > www.benja.co
> >
> > 

T

I

| From: | _enn,_ _leanor_ |
| To: | Andrew Chapin; Joe Alouf |
| Cc: | _saacson, Annette_; _evall, Ryan J_; Stevens, _awrence_; _huie_ _wsgr_com |
| Subject: | en a nc Accounts |
| Date: | riday, ctober 2, 2020 3:02:32 PM |

Mr. Chapin and Mr. Alouf,

We have received communications from both of you regarding the corporate and management status of Benja Incorporated, a Delaware corporation ("Benja"). These communications include but are not limited to allegations relating to whether Mr. Chapin has resigned as CEO of the corporation and whether a new Director has been elected.

As you both are aware, JPMorgan Chase Bank, N.A. provides bank account and related services to Benja. As is evident from your communications, there is clearly a dispute between the two of you regarding these issues and, consequently, who is entitled to be an authorized signer on the account.

We respectfully request that these issues be resolved independent of the Bank. We would expect that all signers will conduct themselves in accordance with the obligations and duties required as fiduciaries of Benja. If there is an agreement to resolve these issues or a judicial determination as to who is empowered to operate the account, please forward to our attention.

In the interim, as we continue to review the matter, we reserve all of our rights and remedies, which include refusing to pay out any money from the account (freezing the account) until this matter is resolved.

If you have any questions or concerns please do not hesitate to contact me.

Best Regards,

Eleanor

**Eleanor Fenn** | Vice President | Technology & Disruptive Commerce | **J.P. Morgan** | 560 Mission Street, 4th Floor, San Francisco, CA 94105 | eleanor.k.fenn@jpmorgan.com

**This message is confidential and subject to terms at: https: www.jpmorgan.com emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.**

# EXHIBIT K



BENJA
INCORPORATED

**Tuesday, September 22, 2020**

K R U Z E
Accounting, Finance & HR for Startups

www.KruzeConsulting.com & www.KruzeTax.com

333 Kearny St., FL 4          Phone:    415-601-6967
San Francisco, CA 94108       Fax:       415-868-3440          vanessa@kruzeconsulting.com

This Services Agreement ("Agreement") under which Kruze Consulting (or "Kruze", "we", or "us") will perform certain tax, accounting, and financial services for BENJA INCORPORATED (or "Client" or "you") located at 845 Market Street, 450A, San Francisco, CA 94103 is entered into between the parties as of the date it is signed by a Client representative. This Agreement is effective as of the date that Kruze Consulting begins to perform any services for Client ("September 22, 2020").

## 1. Responsibilities of the Client and of Kruze Consulting

## a. Responsibilities of the Client

(i) The Client shall cooperate with Kruze Consulting in the performance by Kruze Consulting of the services, including, without limitation, providing Kruze Consulting with reasonable facilities and timely access to data, information and personnel of the Client. The Client shall be responsible for the performance by its personnel and agents, for the timeliness, accuracy and completeness of all data, documents, signatures and information (including all financial information and statements) provided to Kruze Consulting by or on behalf of the Client and for the implementation of any advice provided as part of the Services. Kruze Consulting may use and rely on the accuracy, veracity and completeness of the information, documents, signatures and data furnished by the Client or others without verification. Kruze Consulting's performance shall be dependent upon the timely, complete and accurate fulfilment of the Client's responsibilities in accordance with the Agreement and timely decisions and approvals of the Client in connection with the Services. Kruze Consulting shall be entitled to rely on all decisions and approvals of the Client.

(ii) In particular the Client must be aware that the scope of Kruze Consulting's engagement does not involve bringing to light errors that are the result of incorrect, misleading or incomplete information.

(iii) Except as otherwise provided herein, the Client shall be solely responsible for, among other things:

> (A) Making all management decisions and performing all management functions;
> (B) Designating one or more individuals who possess suitable skills, knowledge, and/or experience, preferably within senior management to oversee the Services;
> (C) Evaluating the adequacy and results of the Services;
> (D) Accepting responsibility for the results of the Services; and
> (E) Establishing and maintaining internal controls, including, without limitation, monitoring ongoing activities.

(iv) Client agrees to wire transfer required funds requested by Kruze Consulting by specified dates and times to facilitate remittance of tax payments, which date shall not be earlier than 72 hours prior to the time payment is to be made by Kruze Consulting to the relevant taxing authority.

(v) An Officer of the Client corporation has the final responsibility for the corporate income tax returns and must carefully review the tax returns prior to signing them to ensure they are complete and accurate to the best of their knowledge. We will provide Client with a copy of the final return(s) for review prior to electronic filing of the returns. An Officer of the Client will be responsible for signing and returning the applicable e-filing authorization forms indicating that they have reviewed the return, it is

correct to the best of their knowledge, and Client authorizes us to submit them electronically. This will allow us to electronically file the corporate tax returns on behalf of Client, which upon successful acceptance from the appropriate taxing authorities, our engagement will be complete. The services provided under this engagement are not intended for the benefit of any third party.

(vi) A taxpayer's tax liability is the sole responsibility of the taxpayer. If and when Client is assessed a tax deficiency, a tax authority may impose penalties and/or interest, which are also the sole responsibility of the Client. In the event that taxes are due with the return, Kruze Consulting will provide the Client with payment instructions and a payment voucher (if required) to be mailed to the taxing authority. The Client agrees that the Client is responsible for its tax liability and any such penalties and/or interest and that Kruze Consulting is not responsible for any such amounts.

(vii) Kruze Consulting will not be responsible for e-filing tax returns for any period in which Client has failed to transfer all necessary data or the full amount of the tax preparation fees. Moreover, under no circumstances will Kruze Consulting remit Client's tax returns prior to verified receipt of the full amount of funds requested by Kruze Consulting, even if Client has notified Kruze Consulting that funds have been transferred. If Client transfers data or funds later than the dates and times specified herein but prior to the statutory filing dates, Kruze Consulting will use commercially reasonable efforts to process Client's work in a timely fashion. Kruze Consulting's efforts to process Client's work and meet statutory requirements if Client has not met its responsibilities for submission of data or funds as outlined herein shall not release Client from its liability to any taxing authority for penalties and/or interest.

## b.  Responsibilities of Kruze Consulting

(i) The Services provided are not binding for federal, regional or local authorities and/or tribunals and courts and shall not constitute a declaration, warranty or guarantee that said authorities and/or tribunals and courts will concur with Kruze Consulting's advice or opinion. Any Services provided by Kruze Consulting will be based upon the legislation, regulations, cases, previous rulings, and other sources of information available at the time specific Services are provided. Subsequent changes to the aforementioned sources (for which Kruze Consulting shall have no responsibility to advise the Client) may result in the Services provided by Kruze Consulting being rendered invalid or inappropriate.

(ii) Kruze Consulting will not be responsible for dealing with any matters other than those which specifically form part of this engagement letter.

(iii) In formulating any advice as part of the Services, Kruze Consulting may discuss ideas with the Client verbally or show the Client drafts of such advice. This is only binding for Kruze Consulting if drafts of this type or verbal advice are definitively confirmed to the Client in writing. As a consequence, Kruze Consulting may not be held liable if the Client or another party decides to rely upon or act on the basis of a non-definitive draft or verbal advice.

## 2. Fees, Expenses and Payment of Invoices

Case: 20-30819    Doc# 38    Filed: 10/26/20    Entered: 10/26/20 09:44:06    Page 73 of 95

(a)

- o **Monthly Close Process (MCP) Work:** The Client will be invoiced in arrears for the previous month of delivered Premium Monthly Service. The invoice is due and payable upon the date of the invoice. (e.g. the December Close Process, where work is performed in January, will be charged on February 1st).
- o **Onboarding Work:** The client will immediately be invoiced the full quoted onboarding fee upon full execution of this agreement. The invoice is due and payable upon full execution of the agreement.
- o **Consulting Work:** All Consulting work completed through hourly charges or fixed-fee projects will be added to the Client's monthly invoice, or invoiced as outlined in the specific project's pre-approved statement of work.
- o **Financial Modeling Work:** All Financial Modeling work will be individually invoiced and payable upon completion, or as outlined and agreed to in that project's scope of work.
- o **Tax Work:** All Tax work on fixed-fee projects will be individually invoiced and payable upon completion or added to the Client's monthly invoice.
- o **Expense Reimbursements**: All approved expenses incurred by Kruze on behalf of the Client in preparation of work will be added to the Client's monthly invoice and due upon receipt.

Kruze will automatically process payments via Stripe, Bank ACH or via other payment method.

If Client chooses to pay an invoice via Credit Card, Kruze Consulting will add a 3% credit card fee surcharge.

Any disputes regarding line item charges must be addressed and resolved within 30 days after the issue date of the invoice.

If for some unforeseen reason, a client's Stripe or Bank ACH auto-payment is not available to Kruze Consulting, and Kruze is not able to process payment within thirty (30) calendar days of the invoice date, (i) interest shall accrue automatically and without serving notice at a rate of 12% rate per annum and (ii) Kruze Consulting shall be entitled to charge a lump sum indemnity of 10% on the unpaid amount. Without limiting its other rights or remedies, Kruze Consulting shall have the right to suspend or terminate the Services entirely or in part if payment is not received on the due date of an invoice.

The Client shall be responsible for all taxes, such as VAT, sales and use tax, gross receipts tax, withholding tax, and any similar tax, imposed on or in connection with the Services.

(b) The Client acknowledges and agrees that Kruze Consulting shall be entitled, without formal notice or judicial ruling, at any time to set off all claims it has on the Client (whether due or not and without regard to their origin), against all claims the Client has vis-à-vis Kruze Consulting (whether due or not

4

and without regard to their origin), notwithstanding any transfer, seizure or any other act of alienation or disposition of the rights with regard to the set-off. This set-off shall be enforceable, notwithstanding any bankruptcy or other insolvency proceedings, seizure or any other situation of concursus creditorum. Kruze Consulting shall hereafter notify the Client in writing of this set-off.

(c) Performance of the Services or payment of invoices, in whole or in part, implies acceptance of the terms of business and of the content of this agreement. The fees and invoices are deemed accepted if they are not contested within a period of thirty (30) calendar days after receipt.

(d) Kruze Consulting may adjust its fees at any time with 30 days prior notice to the Client.

(e) Client shall reimburse Kruze Consulting for all expenses incurred while serving the Client. Reimbursable expenses include but are not limited to mileage (at the current IRS rate), travel time (at the consultant's current hourly rate), hotels and meals when traveling, parcel services including messengers, Federal Express, UPS and USPS when necessary, document copying and eFiling fees. Kruze Consulting will request written permission for expense reimbursement before incurring any expenses of $150 or more.

(f) Where applicable, client shall provide Kruze Consulting with an upfront reserve fund equal to 1 month projected spend to be used to cover the costs of services, registrations, renewals and/or other incidental items. Kruze Consulting will make periodic follow-up requests to replenish this reserve fund as it is drawn down. Kruze Consulting agrees to refund to Client any unused portion of this reserve fund at the termination of this Agreement.

(g) Failure by Client to transfer funds or fees as outlined hereunder will constitute a material breach under this Agreement. Kruze Consulting reserves the right to terminate this Agreement immediately and cease rendering any Service should Client fail to pay Kruze Consulting's invoice(s).

(h) . There is a fixed monthly fee for the Premium Monthly Service and the Client agrees to the agreed-upon fixed monthly charge for the Premium Monthly Service. The Client will be charged in arrears for the previous month of delivered Premium Monthly Service, beginning the period referenced Exhibit A. The Client invoice will be due and payable upon the invoice date.

i)      There is a quoted onboarding fee referenced in Exhibit A, with an associated Statement of Work. That fee will be invoiced and is due and payable to Kruze Consulting upon the date of full execution of this agreement.

ii)     Kruze Consulting shall invoice the Client for all other service performed as outlined subsequently in this agreement.

## 3. Term and Termination
With respect to the duration of this Agreement, the terms of this Agreement shall apply without prejudice of the following:

Case: 20-30819    Doc# 38    Filed: 10/26/20    Entered: 10/26/20 09:44:06    Page 75 of 95

(a) Should the Client terminate this Agreement before the Services have been fully provided, client will compensate Kruze Consulting in accordance with the terms of the Agreement for the Services performed, and expenses incurred through the effective date of termination.

(b) Each party may terminate this Agreement, in whole or in part, with immediate effect upon written notice to the other party. Upon notification of the termination of the Agreement, Kruze Consulting may agree, in its sole discretion, to continue service and assist in other transition requests for 30 days provided client makes such a request at the time of notification and all of the Client's previous invoices are fully paid and current.

(c) 3 Strikes Policy: Kruze is blessed to have a wonderful team that cares deeply about delivering high quality financials and advice. Mutual respect is a core value of Kruze and 99.9% of our client interactions are a pleasure. However, if a pattern of negative/rude behavior emerges from a client towards Kruze Staff, then after three documented incidents we will disengage immediately.

Upon termination of the Agreement by either party, the Client will compensate Kruze Consulting under the terms of the agreement for the Services performed and expenses incurred until the effective date of termination.

## 4. Non-Solicitation

Client and Consultant and its agents agree not to solicit other's employees or contractors or service providers without the other's prior written consent. If an employee or contractor should resign from one party and become employed or contracted by the other party, within the 90-day period following such employee's or contractor's effective date of resignation, then the hiring party will be deemed to have breached its obligations hereunder. The parties agree that in such event, the hiring party will pay the other party, for such breach, an amount equal to one-fourth (1/4) of the terminated employee's or contractor's first year's targeted cash compensation, offered by the hiring party, or $30,000, whichever is greater.

## 5. Ownership of Kruze Consulting Property & Work Products

(a) To the extent that Kruze Consulting utilizes or develops any of its assets (whether tangible or intangible) in connection with the Agreement, such assets, including work documents, shall remain the property of Kruze Consulting. On payment of all of Kruze Consulting's fees in connection with the Agreement, the Client shall only obtain a non-exclusive, non-transferable, revocable license to use within the Client, subject to the other provisions of the Agreement, any work to be carried out or work for the purpose for which the work to be carried out or work product were provided. Kruze Consulting shall have ownership (including, without limitation, copyright and other intellectual property rights) and all rights to use and disclose its ideas, concepts, know-how, methods, techniques, processes and skills, and adaptations thereof in conducting its business, and the Client shall not assert or cause to be asserted against Kruze Consulting or its personnel any prohibition or restraint from so doing.

Case: 20-30819   Doc# 38   Filed: 10/26/20   Entered: 10/26/20 09:44:06   Page 76 of 95

(b) Any intellectual property and proprietary rights that are included in the data and information that Kruze Consulting received from the Client shall remain the property of the Client.

## 6. Limitation on Damages

(a) Kruze Consulting and its personnel, (including independent contractors retained by Kruze Consulting) shall not be liable to the Client for any claims, liabilities, losses, damages, costs or expenses relating to the Agreement or the Services ("Claims") for an aggregate amount in excess of two times the fees payable by the Client to Kruze Consulting for the engagement which led to the damage and in the case where an engagement of longer than 12 months is involved, then for a total amount not in excess of two times the amounts which were paid in the last 12 months except where it is finally judicially determined that they are primarily the result of willful misconduct by Kruze Consulting.

(b) In no event shall Kruze Consulting or its personnel be liable for any loss of use, Agreements, data, goodwill, revenues or profits (whether or not deemed to constitute direct Claims) or any consequential, special, indirect, incidental, punitive or exemplary loss, damage or expense relating to the Agreement or the Services. In circumstances where all or any portion of the provisions of this paragraph are definitively judicially determined to be unavailable, the aggregate liability of Kruze Consulting and its personnel for any Claim shall not exceed an amount that is proportional to the relative fault that its conduct bears to all other conduct giving rise to such Claim.

(c) The liability cap in this Section applies in aggregate to each and all Claims which from time to time arise under or in connection with the Agreement and the Services, whether such Claims are made at the same or different times or by one or more members of the Client and/or other persons.

## 7. Limitation on Actions

No action, regardless of form, arising under or relating to this Agreement or the Services, may be brought by either party more than one (1) year after the cause of action has accrued, except that an action for non-payment of any invoice may be brought by a party not later than two (2) years following the due date of the concerned invoice.

## 8. Force Majeure

Neither party shall be liable for any delays or non-performance resulting from circumstances or causes beyond its reasonable control, including, without limitation, acts or omissions or the failure to cooperate by the other party (including, without limitation, entities or individuals under its control, or any of their respective officers, directors, employees, other personnel and representatives), fire or other casualty, internet interruptions, electricity interruptions, electronic attacks or hacks, electronic viruses, act of God, epidemic (including for the avoidance of doubt, pandemic influenza attack), strike or labor dispute, war or other act of violence, or any law, order, or requirement of any governmental agency or authority.

## 9. Confidentiality

Case: 20-30819   Doc# 38   Filed: 10/26/20   Entered: 10/26/20 09:44:06   Page 77 of 95

(a) To the extent that, in connection with the Agreement, Kruze Consulting comes into possession of any confidential information such as trade secrets or other proprietary information regarding the Client which is either designated by the disclosing party as confidential or is by its nature clearly confidential (the "Confidential Information"), Kruze Consulting shall not disclose such Confidential Information to any third party without the Client's consent save where prohibited by applicable laws. The Client hereby consents to Kruze Consulting disclosing such Confidential Information (i) to any Kruze Consulting employees and independent contractors, (ii) to legal advisors, accountants, insurers or as may be required by law, regulation, judicial or administrative process, or in accordance with applicable professional regulations, or in connection with a possible difference; or (iii) to the extent such Confidential Information (A) shall have otherwise become publicly available (including, without limitation, any information filed with any governmental agency and available to the public) other than as the result of a disclosure by Kruze Consulting in breach hereof, (B) becomes available to Kruze Consulting on a non-confidential basis from a source other than the Client which Kruze Consulting believes is not prohibited from disclosing such information to Kruze Consulting by obligation to the Client, (C) is known by Kruze Consulting prior to its receipt from the Client without any obligation of confidentiality with respect thereto, or (D) is developed by Kruze Consulting independently of any disclosures made by the Client to Kruze Consulting of such information.

(b) The Client shall not disclose to any third party the advice, opinions, reports or other work product of Kruze Consulting provided hereunder without the express written consent of Kruze Consulting, except (i) where applicable laws, regulations, professional rules and obligations prohibit limitations on disclosure, (ii) to legal advisors, accountants, insurers, current or potential investors of the Client that are bound by a confidentiality agreement with Client and subject to the limitations of section 9(c) below; (iii) in the event that the Client or its affiliates have securities registered with the United States Securities and Exchange Commission and Kruze Consulting is the auditor of the Client or any of its affiliates, in which case there are no restrictions or limitations on the disclosure of Kruze Consulting's advice, opinions, reports and other work product provided hereunder, or (iv) to the extent the United States Internal Revenue Code and applicable Internal Revenue Service guidance relating to confidential tax shelters (or comparable legislation or guidance from other taxing authorities) apply, in which case there are no restrictions or limitations on the disclosure of Kruze Consulting's advice, opinions, reports and other services.

(c) Client shall use the advice, opinions, reports or other work product of Kruze Consulting solely for the purposes specified in this Agreement and, in particular, shall not, without the prior written consent of Kruze Consulting, use any advice, opinion, report or other work product of Kruze Consulting for advertising purposes. The Services are intended exclusively for the Client. Any disclosure of any advice, opinion, report or other work product of Kruze Consulting to any third party in no way gives rise to a relationship between Kruze Consulting and such third party. The mere receipt of any advice, opinions, reports or other work product by a third party is not intended to create any duty of care, professional relationship or any present or future liability between third parties and Kruze Consulting. If copies of the advice, opinions, reports or other work product (or information derived from it) are subsequently given

Case: 20-30819   Doc# 38   Filed: 10/26/20   Entered: 10/26/20 09:44:06   Page 78 of 95

to third parties, Kruze Consulting is not bound by any obligation regarding them or any other third party which acknowledged it.

(d) Client authorizes that any and all information (i) furnished to Kruze Consulting for or in connection with the preparation of Client's tax returns under this Agreement, (ii) derived or generated by Kruze Consulting from the information described in (i) above, or (iii) associated with prior years' tax return information in the possession of Kruze Consulting may, for a period of up to ten (10) years from the date of this Agreement, be disclosed to and considered and used by Kruze Consulting, in each case, engaged directly or indirectly in providing Services under this Agreement, tax planning or preparation of tax returns, audited financial statements or other financial statements or financial information as required by a government authority, municipality or regulatory body. Disclosures under this paragraph may consist of all information contained in Client's tax returns; if Client wishes to request a more limited disclosure of tax return information, Client must inform Kruze Consulting beforehand.

(e) In addition, the Client acknowledges and agrees that any information that Kruze Consulting becomes aware of while carrying out its engagement may be used by Kruze Consulting for responding to its professional obligations as an accountant and/or tax adviser and the rules of independence that apply to it.

## 10. Use of International Employees and Contractors

Kruze Consulting and its employees and independent contractors will not knowingly or recklessly disclose client's financial information or tax return information to any third party. Client agrees and acknowledges that Kruze Consulting may share client's tax return information with its employees and independent contractors, some of whom may reside outside the United States. Client expressly acknowledges and consents that a tax return preparer working for Kruze Consulting may make a disclosure to another tax return preparer working for Kruze Consulting located outside the United States for the use in preparing, assisting in preparing, or providing auxiliary services in connection with preparing a tax return, and that the services provided by the tax return preparer located outside the United States may include substantive determinations or advice affecting the tax liability reported by the client.

## 11. Assignment

Neither party may assign or otherwise transfer the Agreement without the prior express written consent of the other.

## 12. Indemnification

The Client shall indemnify and safeguard Kruze Consulting and its personnel from all third-party Claims, except to the extent definitively judicially determined to have resulted primarily from willful misconduct on the part of Kruze Consulting.

## 13. Governing Law and Dispute Resolution via Arbitration

Case: 20-30819    Doc# 38    Filed: 10/26/20    Entered: 10/26/20 09:44:06    Page 79 of 95

(a) The Agreement shall be governed by, and construed in accordance with, California Law without giving effect to the choice of law rules thereof.

(b) The parties agree to attempt in good faith and without delay to resolve any dispute or claim arising out of or in connection with the Agreement promptly through negotiations between senior management. If no solution is found within thirty (30) days following the notification of the dispute by the complainant to the other party, either party may submit the case to binding arbitration. All disputes and claims between Client and Kruze Consulting shall be resolved through binding arbitration administered by JAMS, under its rules governing commercial transactions (the "Rules"). The dispute shall be heard before a single arbiter mutually selected by the parties or, if the parties are unable to agree on an arbiter, according to the Rules. The arbitration shall take place in San Francisco, California. The arbiter's decision will be final and binding on the parties. Each party shall bear its own arbitration costs and legal fees. The parties hereby irrevocably consent to the jurisdiction of the state and federal courts sitting in San Francisco, California but for the sole purpose of giving effect to and enforcing the arbiter's decision.

(c) Notwithstanding the foregoing paragraph, and only if the amount sought by the complaining party is $5,000 or less, either party may bring an action in Small Claims Court in San Francisco County Superior Court only.

## 14. Electronic Communications

(a) Except as instructed otherwise in writing, each party may assume that the other approves of appropriate fax, e-mail and voicemail communication of both sensitive and non-sensitive documents and other communications concerning the Agreement, as well as other means of communication used or accepted by the other.

(b) It is recognized that the internet is inherently insecure, and that data can become corrupted, communications are not always delivered promptly (or at all), and that other methods of communication may be appropriate. Electronic communications are also prone to contamination by viruses. Each party will be responsible for protecting its own systems and interests and, to the fullest extent permitted by applicable legislation, will not be responsible to the other on any basis (Agreement, tort or otherwise) for any loss, damage or omission in any way arising from the use of the Internet or from access by Kruze Consulting personnel to networks, applications, electronic data or other systems of the Client.

(c) The Client is responsible for maintaining and archiving all original documents that the Client must maintain or archive in order to meet all relevant legal, statutory, regulatory or professional rules. If Kruze Consulting is to maintain original documents at the express request of the Client, Kruze Consulting is not liable for it.

## 15. Entire Agreement, Survival Modification and Effectiveness

Unless otherwise specified in the Agreement, that which was discussed prior to the execution of this Agreement did not give rise to the Agreement and neither does it form part of it. The Agreement supersedes any previous agreement, understanding or communication, written or verbal, relating to its subject matter. No change to the Agreement is effective unless it is documented in writing and is signed by the authorized representatives of both parties. If Kruze Consulting has already started work (e.g., by gathering information, project planning or giving initial advice) then the Client agrees that the Agreement is effective from the date of the start of such work. If any provision of this Agreement is found by a court of competent jurisdiction or arbitrators to be unenforceable, such provision shall not affect the other provisions, but such unenforceable provision shall be deemed modified to the extent necessary to render it enforceable, preserving to the fullest extent   permissible the intent of the parties set forth in this Agreement. Rights and obligations accrued prior to termination shall survive termination of this Agreement. Sections 2, 4-8, 9-11, 13, 14, and 16 shall also survive termination.

## 16. Limitation on Warranties
The Agreement is an agreement for the provision of services and thus contains an obligation of means. Kruze Consulting guarantees that it will carry out the Agreement in good faith and with the appropriate degree of care. Kruze Consulting rejects all other warranties, either express or implied.

## 17. Marketing and Use of the Client Name and Client Data
(a) Kruze Consulting may use the name of the Client and the performance of the Services in marketing and publicity materials, as an indication of its experience, and in internal data systems. Kruze Consulting also uses company data in internal data systems and for the purposes of Kruze Consulting public research studies and other analysis.

(b) If a Client passes on information to Kruze Consulting regarding the Client, it accepts that these data will be archived in the data banks, the handling of which is automated and may be used by Kruze Consulting while taking into account the fact that Kruze Consulting performs all legal provisions that apply to it.

## 18. Mutual Respect & Communication
(a) **Call Monitoring:** All calls will be recorded for documentations, training, and quality assurance purposes.  Kruze is committed to ensuring that all client requests and communication are well documented via Zoom, Zendesk, and Eva by Voicea (also a Kruze Client :)).

(b) **Last Minute Appointment Cancelation:** While we understand that life as a Startup CEO can be hectic, if there is a pattern of repeated last-minute cancellations of scheduled appointments (within 24 hours), we reserve the right to charge the full time of the meeting at the Consultant's hourly rate.

## 19. Turnaround Times and Surge Pricing
(a) **Surge Pricing:** If work is needed urgently and/or requires that 1) we move other client obligations

2) work nights or weekends, Kruze will charge 2x the regular rate.

(b) **Board of Directors and Fundraising Preparation:** Please notify us at least 30 days in advance if you have a BOD or fundraising event. These documents require care and 100% accuracy and cannot be rushed. We encourage you to utilize your complimentary monthly call so that open items are addressed in real time.

(c) **M&A Due Diligence:** M&A Due Diligence can be stressful with short timelines and late nights. It's energizing work for Kruze with a big payoff for clients. However, if Kruze must 1) move other client obligations 2) work nights or weekends, then Kruze will charge 2x the regular rate.

(d) **Work Turnaround Time:** Please allow for at minimum 3 business days to turn around general work requests, depending on the volume and complexity of task requested. We will make every effort to do it as fast as possible.

---

I, **Andrew Chapin**, represent that I have authority to bind the organization that owns the bank accounts and credit cards, and to authorize all transactions to the accounts that are initiated through any viable payment means. I acknowledge that transactions initiated to the accounts must comply with the provisions of U.S. law. This authorization will remain in effect until the organization notifies Kruze Consulting, Inc. in writing to cancel it in such time as to afford Kruze Consulting, Inc. and the bank reasonable opportunity to act on it.

_____  
Kruze Consulting, Inc.

By: _____  
Date: _____

_Andrew J. Chapin_  
Andrew J. Chapin (Sep 22, 2020 14:04 PDT)  
_____  
BENJA INCORPORATED

By: Andrew J. Chapin _____  
Date: Sep 22, 2020 _____

## Ex. A: Statement of Work

### 1. Description of Services to be Performed by Kruze Consulting

Beginning September 22, 2020 Kruze Consulting shall perform accounting and other bookkeeping services requested by Client that are mutually agreed to by the parties.

**Monthly Close Process (MCP) / Premium Monthly Service : $1,250.00/month Fixed Fee Agreement** (based on volume, complexity, and services desired by the client at the time of quote) billed in arrears with the payment to be charged and receipt sent on the first day of the month following financial delivery. The MCP price is subject to change and review by Kruze Consulting if the Client's Monthly Close Process increases in volume, complexity, or if the Client requests additional services, at which point Kruze will come back to discuss the appropriate price change. MCP excludes AP, AR, HR, special requests, etc. Additional work and requests will be quoted through an additional Statement of Work for written approval. As your company grows, hires more people, and eventually generates revenue, your bill will grow with us.

**Onboarding Fee:  $3,000 .00**

- *Scope of Work* (Period of Time Covered): 01/01/2020 - 09/30/2020
- **First Premium Monthly Service Period:** October 2020
- *Statement of Work*
    - Utilize 2019 Tax Return / Xero to post 2019 Opening Balance within QuickBooks
    - Set up a standardized chart of accounts and numbering system.
    - QBO Reconciliation through **09/30/2020**
- **Tax Compliance checks and due diligence.**
    - Our team does not make estimated tax payments on your behalf. Our tax team can assist in generating vouchers and providing instructions on how to make the appropriate payments, once calculated for your prior year tax liability.
- **Bill.com set up to help with AP management.**
    - We offer an additional monthly service to fully manage Bill.com.
        - Billed at $10/bill (minimum $400 Monthly) *only if Kruze is managing Bill.com A/P processing -
        - This is a *recommended solution, but not required*. We highly prefer utilizing this as an A/P solution.
        - *You will not be billed for the service if Client is managing Bill.com payment process internally.*
- **Expensify setup, if necessary etc.**
- Set you up with Brex for Corporate CCs

Below we've outlined a **few of the key issues that we'll be addressing during the onboarding:**

Case: 20-30819    Doc# 38    Filed: 10/26/20    Entered: 10/26/20 09:44:06    Page 83 of 95

- We'll ensure and banks, CCs, Paypal accounts, etc. are connected to QBO through their APIs, and reconciled to the statement(s) as of 09/30/2020
- We'll sync your payroll provider (Gusto) with QBO and ensure that wages and taxes are mapped to the correct accounts, and break-out payroll by employee
- Review State, Local & Federal tax filings to check compliance status.
  - If any additional work or registrations/filings are required, we'll reach out to you with an additional SOW.
- Set you up with Accrual-based accounting
  - Recognize expenses when they are incurred (not when paid), and recognize revenue when earned (not when cash rec'd)
  - We'll review 2020 transactions and ensure that they're properly recognized and categorized.
  - Create a Tax Payable account to estimate your monthly federal tax obligation as you are net income positive
- Reconcile your equity section to your cap table
  - Make sure all notes are properly broken out, and interest is accrued for properly (if applicable).
  - Allocate the opening balance equity amongst the correct accounts based on the 2019 tax return.
  - Break-out funding by round.
- Balance Sheet Accounts
  - The bank account in QBO is currently negative 11M most likely as a result of duplicate and/or missing transactions. We will reconcile the opening balance and verify that it matches the current amount in the bank.
  - The Accounts Receivable balance is sitting at 17M which also is most likely a result of missing transactions and misapplied payments. We'll reconcile the opening balance and review deposits to match against open invoices.
  - Review loan documents for the Line of Credit and Loan Payable accounts to ensure proper interest accruals and repayment schedule are recorded.
- Capital One CC
  - Currently the Capital One credit card expenses in QBO are expensed as the aggregate CC payment. We'll connect this account to QuickBooks and categorize each separate expense with the proper classification.
- Revenue & COGS
  - Review the imported invoices with you to ensure Display Impressions revenue is recorded in the month earned.
  - We'll review and discuss the payment terms for your placement fees to ensure that these are expensed in the month incurred and not just the payout month. This will provide you with a clearer understanding of your margins.
- Three 30-minute check-in calls with Onboarding Manager included
- Brex Credit cards

- We'd want to set you up with Brex for Credit Cards
  - No personal or founder guarantee: 5 minute application with instant virtual cards.
  - Higher credit limits: 10-20X higher than competitors with no fees whatsoever
  - 50k reward point sign-up bonus, once you spend $1,000 on the card
  - Tailored rewards: Highest cash back ROI on credit card spending through cash rewards, like $5,000 in AWS credits and 7x back on ride share
  - Automated expense management : Integrated dashboard to make managing a corporate card program seamless (best-in-class ERP integrations, SMS/email receipt capture)

Client is fully on-boarded once a set of financials covering the stated 'Scope of Work' period is delivered; Kruze will note that the onboarding is considered completed. Additional requests not specifically covered in the Statement of Work will be billed at an additional fixed fee on a separate Statement of Work, e.g. unforeseen revenue accruals, cap table reconciliations, or missing payroll tax forms.

**Tax Returns & R&D Tax Credits** are quoted separately according to Section 2C below.

2. Service Lines & Fee Structure
Kruze Consulting provides the four following service lines. Each service line has customized pricing.

A. The Monthly Close Process (MCP):
B. Consulting/Accounting/Finance:
C. Tax Advisory & Tax Prep:
D. 409A Valuations

- The Monthly Close Process (MCP):

Kruze offers three different pricing plans for the Monthly Close Process based on the volume, complexity, and services desired by the Client. Not all services are available (or included) in the monthly fee for each plan, and some plans offer additional services a la carte, should the Client so desire.

- Basic Bookkeeping Monthly Service
- Founder Timesaver Monthly Service
- Premium Monthly Service

The MCP is a Fixed Fee agreement based on volume, complexity, and services desired by the client, assessed at the time of the quote. The MCP price is subject to change and review by Kruze Consulting if the Client's Monthly Close Process increases in volume, complexity, or if the Client requests additional services, at which point Kruze will come back to discuss the appropriate price change.

<u>Basic Bookkeeping Monthly Service</u>

**What is included in MCP (Monthly Close Process) Fixed Fee:**

- Reconcile banks and credit cards to month-end statements.
- Reconcile Balance Sheet accounts - "the bookkeeping".
- Add vendor names on all expense transactions.
- Maintain supporting schedules for balance sheet accounts.
- Accrual-basis Accounting, in accordance with GAAP principles.
- Basic revenue recognition.
- Two levels of review.
- A monthly financial statement packet delivered by the promise date.

**Required Services to be used (if using others, requires upgrade to Premium Monthly Service):**

- **Accounts Payable:** Bill.com.
- **Expense Reimbursements:** Expensify.
- **Payroll:** Gusto, Trinet, Rippling, Justworks.

**What IS NOT included in MCP (Monthly Close Process) Fixed Fee:**

- Inventory Accounting.
- International Tax Compliance.
- Custom Pay Period Support (2x/month pay periods are required).
- Tax Compliance (Requires upgrade to Founder Timesaver or Premium Monthly Service plan).
- Annual Tax Filing (ask about pricing).
- R&D Tax Credit (ask about pricing).
- Customization of Chart of Accounts - Kruze Standard Chart of Accounts template to be used.
    - Upgrade to Premium Monthly Service for customization ability.
- Classes and/or Department tracking.
- Free monthly call with Account Manager.
- HR assistance (setting up payroll, 401k setup & advisory, hiring & firing documents).
    - Requires upgrade to Founder Timesaver or Premium Monthly Service.
- Full GAAP accounting.
- Advanced revenue recognition.

- Financial Modeling.
- M&A, Investor, Audit, or Fundraising Due Diligence projects and reporting.
- Consolidation reports for Foreign Parent or Subsidiary companies.
- Stock Option Expense (ASC 718).
- Calculating APIC/Common Stock/ Preferred Stock allocations.
- Audit Readiness Reporting.
- 409a reporting or advisory.
- Budget to Actual reporting.
- SBIR/NIH/NSF Budget to Actual Reporting.

## Founder Timesaver Monthly Service

**What is included in MCP (Monthly Close Process) Fixed Fee:**

- Reconcile banks and credit cards to month-end statements.
- Reconcile Balance Sheet accounts – "the bookkeeping".
- Maintain supporting schedules for balance sheet accounts.
- Add vendor names on all expense transactions.
- Accrual-basis Accounting, in accordance with GAAP Principles.
- Basic revenue recognition.
- Two levels of review on monthly financials.
- Tax Compliance Assistance (up to 2 States).
  - \*\*Any tax compliance needs identified, will be billed separately via a separate SOW.
- A monthly financial statement packet delivered by the promise date.

**Required Services to be used (if using others, requires upgrade to Premium Monthly Service):**

- **Accounts Payable:** Bill.com.
- **Expense Reimbursements:** Expensify.
- **Payroll:** Gusto, Trinet, Rippling, Justworks.

**What IS NOT included in MCP (Monthly Close Process) Fixed Fee:**

- Inventory Accounting.
- Tax Compliance (> 2 States).
  - You'll be upgraded to the Premium Monthly Service if you have compliance needs in > 2 States.
- Annual Tax Filing (ask about pricing).
- Custom Pay Period Support (2x/month pay periods are required).
- R&D Tax Credit (ask about pricing).

Case: 20-30819   Doc# 38   Filed: 10/26/20   Entered: 10/26/20 09:44:06   Page 87 of 95

- Customization of Chart of Accounts - Kruze Standard Chart of Accounts template to be used.
- Upgrade to Premium Monthly Service for customization ability.
- Classes and/or Department tracking.
- Free monthly call with Account Manager.
- HR assistance (setting up payroll, 401k setup & advisory, hiring & firing documents).
  - Ask about pricing! Any assistance will be billed via an additional SOW.
- Full GAAP accounting.
- Advanced revenue recognition.
- Financial Modeling.
- M&A, Investor, Audit, or Fundraising Due Diligence projects and reporting.
- Consolidation reports for Foreign Parent or Subsidiary companies.
- Stock Option Expense (ASC 718).
- Calculating APIC/Common Stock/ Preferred Stock allocations.
- Audit Readiness Reporting.
- 409a reporting or advisory.
- Budget to Actual reporting.
- SBIR/NIH/NSF Budget to Actual Reporting.

### Premium Monthly Service

**What is included in MCP (Monthly Close Process) Fixed Fee:**

- Reconcile banks and credit cards to month-end statements.
- Reconcile Balance Sheet accounts - "the bookkeeping".
- Add vendor names on all expense transactions.
- Maintain supporting schedules for balance sheet accounts.
- Accrual-basis Accounting, in accordance with GAAP principles.
- Advanced revenue recognition.
- Three levels of review.
- Customization ability available for Chart of Accounts.
- Customization may increase your Monthly Fixed Fee.
- Implementation of Customization will be billed on a fixed fee basis via a separate SOW.
- Classes and/or Department tracking ability available.
  - This may increase your Monthly Fixed Fee.
- Implementation of Classes and/or Departments will be billed on a fixed fee basis via a separate SOW.
- A monthly packet delivered by the promise date.
- Tax Compliance Assistance (> 2 States).
  - Any tax compliance needs identified, will be billed separately via a separate SOW.
- **Complimentary 30 min Monthly Calls:** We encourage our clients to meet with their Account Manager on a monthly basis.  This call is part of the monthly MCP Fixed Fee, and clients will

not be charged for this time.  However, if additional Consulting work is requested as a result of the call, a separate Statement of Work will be presented for the client's approval.  The complimentary call expires at month but of course you will have another free call the next month.

## What IS NOT included in MCP (Monthly Close Process) Fixed Fee:

- Inventory Accounting (ask about pricing).
- International Tax Compliance.
- Annual Tax Filing (ask about pricing).
- R&D Tax Credit (ask about pricing).
- HR assistance (setting up payroll, 401k setup & advisory, hiring & firing documents).
  - Ask for pricing!
- Full GAAP accounting.
- Financial Modeling.
- M&A, Investor, Audit, or Fundraising Due Diligence projects and reporting.
  - Ask to schedule a free consultation with our FP&A team!
- Consolidation reports for Foreign Parent or Subsidiary companies.
- Stock Option Expense (ASC 718).
- Calculating APIC/Common Stock/ Preferred Stock allocations.
- Audit Readiness Reporting.
- 409a reporting or advisory.
- Budget to Actual reporting.
- SBIR/NIH/NSF Budget to Actual Reporting (ask about pricing).
  - Implementation cost to be billed via a separate statement of work.

## Additional Notes (All Service Tiers):

- We update and review the books just once per month, so if you go into QuickBooks mid-month, there will be pending items.
- Please refrain from making changes in QuickBooks. We have a highly regimented process, which we're happy to review with you. If you'd like to make changes, or if you have questions, we're happy to discuss. We just need to document your preferences and share with our team, so that we don't unwittingly undo what you wanted changed!
- **If changes are made and we need to revert, we will bill you for this time spent. **
- If we do not receive answers to pending questions from a prior month's close, there may be data in your financials that is inaccurate or improperly categorized, until we receive responses from you. **This may require an additional hourly charge. **

## We don't support these services at all (All Service Tiers):
- Our Engagement is limited to entity that we signed an Engagement Letter with; we do not

support subsidiaries, SMLLCs, or any other related party unless there is a separate EL for that entity.
- AR (Collections, marking invoices as paid in real time).
- Running payroll on a biweekly or regular basis. We don't support this function because Gusto, Trinet, Justworks and many other payroll platforms "auto-pilot" features that made our manual payroll runs obsolete. If you're not on an "auto-pilot" payroll provider, you should consider moving. We can however assist with a bonus or off cycle payroll. Just ask and we'll quote it out.
- Opening mail, bank deposits.
- Note that we cannot be added to your Slack/GChat or any other communication channels. 1) it is important that we maintain strong audit trails on communications (which is why we cc archiverecords@kruzeconsultng.com on our emails) 2) it is important that all members of the designated team are aware of requests and 3) we cannot support 250+ Slack channels.Dissolutions. While we're happy to prep a Final Tax Return, but we're not equipped to wind down the company or close accounts with taxing agencies or otherwise. This is best handled by your legal team.

B.    **Consulting/Accounting/Finance:**

When a request that falls outside of the Monthly Close Process, we will ask for a budget approval through a separate Statement of Work. Consulting Projects will be quoted as service is requested through the following template:

> **Project EXAMPLE: Wells Fargo Payroll to Gusto Payroll migration**
> Budget: $750
> Deadline: 11/30
> Charge Code: Consulting
>
> Approved by CLIENT? Date & Name: _____

**Projects, requests or inquiries that take less than 1 hour, we won't ask for permission / a budget.** Note that each individual request will be billed with a 10-minute minimum, and at 10-minute increments, rounded up to the nearest 10th/hour.

**A few examples of Consulting work include:**

- Financial Modeling
- M&A, Investor, Audit, or Fundraising Due Diligence projects
- HR items: setting up payroll, 401K setup & advisory, hiring & firing documents
- AP (Bill Pay) - this is charged separately as volume varies week to week
- Creating new supporting schedules - when a new account/process is requested, it will be

Case: 20-30819    Doc# 38    Filed: 10/26/20    Entered: 10/26/20 09:44:06    Page 90 of 95

quoted out separately as a Consulting Project
- Finance/Tax/Consulting work (see more below, these are quoted as requested)
- Stock Option Expense (ASC 718)
- Complicated revenue recognition analysis
- Budget to Actual reporting
- SBIR/NIH/NSF Budget to Actual reporting
- Foreign entity reporting / Consolidations
- Creating departments and or classes - it will be quoted out separately as a Consulting Project.
  - Addition of departments and/or classes may increase the cost of the monthly service fixed fee.
- Inventory Tracking / creating COGS accounts / Inventory or WIP builds
- And more... just ask!

## Hourly Rates for Consulting/Accounting/Finance

- **$85/hour for Staff Accountant** and bookkeeping functions including but not limited to data entry, reconciliations, entering bills and invoices, and maintaining accounting files.
- **$110/hour for Senior Staff Accountant** functions including but not limited to first review of reconciliations, initial compliance review, and direct reporting to the Controller.
- **$140/hour for Controller** functions including but not limited to payroll, HR, monthly financials review, board meeting preparation, and actual Services performed by Kruze Consulting on behalf of Client hereunder.
- **$180/hour for Junior Financial Analyst** functions including but not limited to forecasting, budgeting and excel modeling.
- **$300/hour for Senior Financial Modeling** functions including but not limited to forecasting, budgeting and excel modeling.
- **$300/hour for CFO & Fundraising Consulting** functions including but not limited to investor presentation review and suggestions, investor or lender introductions, term sheet analysis, board book summaries for financing offers and documentation reviews.

Time is billed in 10-minute increments, rounded up. Each Client work request will be billed at 10-minute minimums.

If a client cancels a scheduled appointment at the last minute (within 3 hours of appointment), Kruze reserves the right to charge for the appointment time.

## C. Tax Advisory & Tax Prep:

**Tax preparation is charged for separately.** Kruze Consulting Tax Return Preparation Rates vary based on the client's stage, complexity and industry. Other key variables include number of transactions per month, number of employees, number of states the company has employees in, number of

Case: 20-30819   Doc# 38   Filed: 10/26/20   Entered: 10/26/20 09:44:06   Page 91 of 95

states the company pays rent or has assets in and the number of states the company has Sales.

Kruze Consulting has developed an online Tax Prep Cost Calculator to allow clients to broadly estimate what a Tax Return may cost (please note that our fee quote may vary, based on our knowledge of your particular tax and financial situation, or other variables not considered in the tax estimate calculator):

https://www.kruzeconsulting.com/startup_calculators/how-much-does-a-startup-tax-return-cost.

Please confirm your calculated estimate with Kruze, as there are several factors that go into tax prep that you might not be aware of.

Upon completion of your year-end financial statements, Kruze Consulting will provide you a quote via email for the Federal, State(s), and Local tax returns for that corresponding year end. You will have **30 business days** to either **OPT OUT** of the tax return process or request a delay due to any unresolved issues on your financial statements, otherwise we will proceed with the preparation of the tax returns based on the fee quote provided.

Please note, for the quoted fee, we will only provide one draft of a tax return and one iteration of the tax return (2nd draft). By accepting this agreement, and either (i) expressly accepting the tax fee quote or (ii) failing to respond to the quote within 30 business days, the Client represents that the financial statements are complete and finalized for tax return preparation. Should the Client choose to present different or new financial data after the tax return process has begun, we reserve the right to charge you fee of 50% of the original quoted price for work already performed, and we may revise the fee quote based on the new financial or tax data presented. However, routine questions and answers that clarify any items on the Clients financials would not constitute "new financial data" for purposes of this clause.

**We are not responsible for FBAR filings or penalties related to FBAR filings.** The corporation has sole responsibility to file Federal FinCEN Form 114, Report of Foreign Bank and Financial Accounts (FBAR). Failure to file a required FBAR carries a minimum civil penalty of $10,000 penalty for non-willful violation, and up to a maximum of $100,000 or 50% of the value of the foreign bank account (whichever is greater).

**We are not responsible for penalties related to late or missing foreign corporation reporting including Forms 5471 and 5472.** If you have foreign shareholders or foreign subsidiaries, you must provide this information to us so that we may complete the applicable information returns that must be attached to your return (Forms 5471 & 5472). Missing or late filed foreign information returns are automatically assessed a $10,000 penalty by the IRS. We are not responsible for this penalty.

**We will not prepare any foreign country tax filings.** You are responsible for meeting all foreign country

Case: 20-30819   Doc# 38   Filed: 10/26/20   Entered: 10/26/20 09:44:06   Page 92 of
95

tax filing requirements.

**R&D Tax Credit analysis and preparation is charged for separately.** We charge a fixed fee of 15% of the anticipated captured credit amount with a minimum fee of $2,000. This fee includes up to four quarters of coordination with your payroll provider to capture the credit on your employment tax returns. Billing for this service will be deferred until the first quarterly payroll return containing R&D credit amounts have been processed.

**Kruze does file some (but not all) State and Local Tax Filings.** If Kruze is handling a specific State and Local Tax filing, an email will be sent 30-45 days before the due date that will alert the client to the nature of the filing and the price we will charge. If we don't hear back from the client that they would like to "OPT OUT" we will proceed with the filing. Our services include only the filing requirements for the state taxing authorities identified during our onboarding process. Accordingly, our services covered by this engagement letter do not include a determination of whether the corporation has filing requirements in additional taxing jurisdictions. If you would like to engage us to perform a multistate nexus study or analyze nexus in a particular state to determine if the corporation has additional state filing requirements, it would be billed either as a sperate engagement or as Tax Advisory Services (see below).

We will use professional judgement in resolving questions where tax law is unclear or where there are conflicts between taxing authorities' interpretations of the law. Unless otherwise instructed by you, we will resolve such questions in your favor where possible.

The law provides various penalties that may be imposed when taxpayers understate their tax liability. If you would like information on the amount or the circumstances of these penalties, please contact us. Your returns may be selected for review by the taxing authorities. Any proposed adjustments by the examining agent are subject to certain rights of appeal. In the event of such government tax examination, we will be available upon request to represent you and will render additional invoices for the time and expenses incurred.

**Tax Advisory Services** are charged at the Consultant's hourly rate. Tax services include but are not limited to tax strategy & planning, nexus determination, advising on estimated tax payments, special/isolated tax form preparation, and consulting on other tax issues. For MCP, or "Monthly Close Process" clients, our Tax Advisory Services are charged hourly, without a minimum fee. If you are not an MCP client, our Tax Advisory Services are charged hourly with a $6,000 per year minimum, or as agreed upon for specific projects to be outlined in a separate engagement letter or as a written addendum to this engagement letter.

- $85/hour for Administrative
- $145/hour for Tax Analyst

- $195/hour for Tax Senior Analyst
- $295/hour for Tax Manager
- $395/hour for VP of Tax / CEO

**D. 409A Valuation:**

*Subject to change depending on the complexity of the company's financing round.*

• Seed Stage Company is $1,500.
• Series A Company pricing is $2,000
• Series B Company pricing is $2,500
• Series C Company pricing is $3,000

## 3. Expenses

Client shall reimburse Kruze Consulting for all expenses incurred while serving the Client. Reimbursable expenses include but are not limited to software services, government filings fees and taxes (Federal, State and Municipal), mileage (at the current IRS rate), travel time (at the consultant's current hourly rate), hotels and meals when traveling, parcel services including messengers, Federal Express, UPS and USPS when necessary, document copying and eFiling fees. Bill.com, Expensify, and Track1099 will be set up upon engagement: these programs are free of cost if you don't use them or have a minimal monthly fee but keep your Kruze bill low should you need to use them. Kruze Consulting will request written permission for expense reimbursement before incurring any expenses of $150 or more.

## 4. Billing & Payment

Kruze Consulting shall invoice Client for all Services performed in the following manner:

i) **Monthly Close Process / Premium Monthly Service:** The Client will be invoiced in arrears for the previous month of delivered Premium Monthly Service. The invoice is due and payable upon the date of the invoice. (e.g. the December Close Process, where work is performed in January, will be charged on February 1st).

ii) **Onboarding Work:** The client will be invoiced immediately upon full execution of this agreement. The invoice is due and payable immediately upon execution of the agreement.

iii) **Consulting Work:** All Consulting work completed through hourly charges or fixed-fee projects will be added to the Client's monthly invoice, or invoiced as outlined in the specific project's pre-approved statement of work.

iv) **Financial Modeling Work:** All Financial Modeling work will be individually invoiced and payable upon completion, or as outlined and agreed to in that project's scope of work.

Case: 20-30819   Doc# 38   Filed: 10/26/20   Entered: 10/26/20 09:44:06   Page 94 of 95

> v) **Tax Work:** All Tax work on fixed-fee projects will be individually invoiced and payable upon completion or added to the Client's monthly invoice.
>
> vi) **Expense Reimbursements**: All approved expenses incurred by Kruze on behalf of the Client in preparation of work will be added to the Client's monthly invoice and due upon receipt.

As set forth in Section 2a of the Agreement, Kruze will automatically process payments via Stripe, Bank ACH or via other payment method upon thirty (30) calendar days after invoice issue date. For expense reimbursements alone, Kruze will process payment one (1) day after invoice issue date. If Client chooses to pay an invoice via Credit Card, Kruze Consulting will add a 3% credit card fee surcharge.

By signing this form, I hereby authorize Kruze Consulting, Inc. on behalf of BENJA INCORPORED to make a payment through Stripe or Bank ACH on behalf of Client's account on the due date of the applicable invoice. For Kruze to debit the correct account, Client should include the following information:

Client's Bank Name: <u>Busey Bank</u>
Last Four Digits of the Bank Account to be ACH-ed: <u>4766</u>
Client's EIN Number: <u>83-0962890</u>

Any disputes regarding line item charges must be addressed and resolved within 30 days after the issue date of the invoice. I also authorize Kruze Consulting to initiate adjustments for any transactions credited or debited in error in the same manner. I represent that I have authority to bind the organization that owns the bank accounts and credit cards, and to authorize all transactions to the accounts that are initiated through any viable payment means. I acknowledge that transactions initiated to the accounts must comply with the provisions of U.S. law. This authorization will remain in effect until the organization notifies Kruze Consulting, Inc. in writing to cancel it in such time as to afford Kruze Consulting, Inc. and the bank reasonable opportunity to act on it.

_____
Kruze Consulting, Inc.

By: _____
Date: _____

*Andrew J. Chapin*
Andrew J. Chapin (Sep 22, 2020 13:04 PDT)
_____
BENJA INCORPORATED

By: <u>Andrew J. Chapin</u>
Date: <u>Sep 22, 2020</u>