THIS INSTRUMENT AND ANY SECURITIES ISSUABLE PURSUANT HERETO HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.

**COMPANY NAME. - XRC FUND III, LLC**
**SAFE**
**(Simple Agreement for Future Equity)**

THIS CERTIFIES THAT in exchange for the payment by XRC Fund III, LLC (the "**Investor**") of fifty thousand dollars ($50,000) (the "**Purchase Amount**") on or about December 9th, 2016, **EPHE CORP, a Delaware corporation** (the "**Company**"), hereby issues to the Investor the right to certain shares of the Company's capital stock, subject to the terms set forth below.

1.     *Events*

    (a)     **Equity Financing**. If there is an Equity Financing before the expiration or termination of this instrument, the Company will automatically issue to the Investor a number of shares of Preferred Stock sold in the Equity Financing that are equal to six percent (6%) (the "Stock Percentage") of the total number of issued and outstanding shares of Capital Stock the Company, calculated on a fully diluted, post-Equity Financing basis. By way of clarification, the number of shares of Preferred Stock to be issued to Investor will be 6% of the Company's total number of issued and outstanding shares of all classes of Capital Stock, preferred and common, calculated on a parri passu basis with the purchasers of all shares in the Equity Financing, the conversion of convertible notes, the exercise of options and warrants and the shares of stock that have been reserved pursuant to an employee stock option or incentive plan, as of the completion of Equity Financing.

    In connection with the issuance of such shares of Preferred Stock to the Investor pursuant to this Section 1(a):

    (i)     The Investor will execute and deliver to the Company all transaction documents related to the Equity Financing; *provided,* that such documents are the same documents to be entered into with the purchasers of Preferred Stock, and *provided further,* that such documents have customary exceptions to any drag-along applicable to the Investor, including, without limitation, limited representations and warranties and limited liability and indemnification obligations on the part of the Investor; and

    (ii)     The Investor and the Company will execute a Pro Rata Rights Agreement, unless the Investor is already included in such rights in the transaction documents related to the Equity Financing.

    (b)     **Liquidity Event**. If there is a Liquidity Event before the expiration or termination of this instrument, the Investor will, at its option, either (i) receive a cash payment equal to the Purchase Amount (subject to the following paragraph), or (ii) automatically receive from the Company a number of shares of Common Stock equal to the Stock Percentage, calculated at the time of the Liquidity Event (the "**Liquidity Price**").

    In connection with Section (b)(i), the Purchase Amount will be due and payable by the Company to the Investor immediately prior to, or concurrent with, the consummation of the Liquidity Event. If there

are not enough funds to pay the Investor and holders of other Safes (collectively, the "**Cash-Out Investors**") in full, then all of the Company's available funds will be distributed with equal priority and *pro rata* among the Cash-Out Investors in proportion to their Purchase Amounts, and the Cash-Out Investors will automatically receive the number of shares of Common Stock equal to the remaining unpaid Purchase Amount divided by the Liquidity Price. In connection with a Change of Control intended to qualify as a tax-free reorganization, the Company may reduce, *pro rata*, the Purchase Amounts payable to the Cash-Out Investors by the amount determined by its board of directors in good faith to be advisable for such Change of Control to qualify as a tax-free reorganization for U.S. federal income tax purposes, and in such case, the Cash-Out Investors will automatically receive the number of shares of Common Stock equal to the remaining unpaid Purchase Amount divided by the Liquidity Price.

(c)     If there is a Dissolution Event before this instrument expires or terminates, the Company will pay an amount equal to the Purchase Amount, due and payable to the Investor immediately prior to, or concurrent with, the consummation of the Dissolution Event. The Purchase Amount will be paid prior and in preference to any Distribution of any of the assets of the Company to holders of outstanding Capital Stock by reason of their ownership thereof. If immediately prior to the consummation of the Dissolution Event, the assets of the Company legally available for distribution to the Investor and all holders of all other Safes (the "**Dissolving Investors**"), as determined in good faith by the Company's board of directors, are insufficient to permit the payment to the Dissolving Investors of their respective Purchase Amounts, then the entire assets of the Company legally available for distribution will be distributed with equal priority and *pro rata* among the Dissolving Investors in proportion to the Purchase Amounts they would otherwise be entitled to receive pursuant to this Section 1(c).

(d)     <u>**Termination**</u>.  This instrument will expire and terminate (without relieving the Company of any obligations arising from a prior breach of or non-compliance with this instrument) upon either (i) the issuance of stock to the Investor pursuant to Section 1(a) or Section 1(b)(ii); or (ii) the payment, or setting aside for payment, of amounts due the Investor pursuant to Section 1(b)(i) or Section 1(c).

2.     *Definitions*

"**Capital Stock**" means the capital stock of the Company, including, without limitation, the "**Common Stock**" and the "**Preferred Stock**."

"**Change of Control**" means (i) a transaction or series of related transactions in which any "person" or "group" (within the meaning of Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), becomes the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended), directly or indirectly, of more than 50% of the outstanding voting securities of the Company having the right to vote for the election of members of the Company's board of directors, (ii) any reorganization, merger or consolidation of the Company, other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity or (iii) a sale, lease or other disposition of all or substantially all of the assets of the Company.

"**Distribution**" means the transfer to holders of Capital Stock by reason of their ownership thereof of cash or other property without consideration whether by way of dividend or otherwise, other than dividends on Common Stock payable in Common Stock, or the purchase or redemption of Capital Stock by the Company or its subsidiaries for cash or property other than: (i) repurchases of Common Stock held by employees, officers, directors or consultants of the Company or

its subsidiaries pursuant to an agreement providing, as applicable, a right of first refusal or a right to repurchase shares upon termination of such service provider's employment or services; or (ii) repurchases of Capital Stock in connection with the settlement of disputes with any stockholder.

"**Dissolution Event**" means (i) a voluntary termination of operations, (ii) a general assignment for the benefit of the Company's creditors or (iii) any other liquidation, dissolution or winding up of the Company (**excluding** a Liquidity Event), whether voluntary or involuntary.

"**Equity Financing**" means a bona fide transaction or series of transactions with the principal purpose of raising capital, pursuant to which the Company issues and sells shares of Preferred Stock at a fixed pre-money valuation with an aggregate sales price of not less than $250,000 (excluding all Subsequent Convertible Securities).

"**Initial Public Offering**" means the closing of the Company's first firm commitment underwritten initial public offering of Common Stock pursuant to a registration statement filed under the Securities Act.

"**Liquidity Event**" means a Change of Control or an Initial Public Offering.

"**Pro Rata Rights Agreement**" means a written agreement between the Company and the Investor (and holders of other Safes, as appropriate) giving the Investor a right to purchase its *pro rata* share of private placements of securities by the Company **occurring after the Equity Financing**, subject to customary exceptions. *Pro rata* for purposes of the Pro Rata Rights Agreement will be calculated based on the ratio of (1) the number of shares of Capital Stock owned by the Investor immediately prior to the issuance of the securities to (2) the total number of shares of outstanding Capital Stock on a fully diluted basis, calculated as of immediately prior to the issuance of the securities.

"**Safe**" means an instrument containing a future right to shares of Capital Stock, similar in form and content to this instrument, purchased by investors for the purpose of funding the Company's business operations.

"**Subsequent Convertible Securities**" means convertible securities that the Company may issue after the issuance of this instrument with the principal purpose of raising capital, including but not limited to, other Safes, convertible debt instruments and other convertible securities. Converting Securities excludes: (i) options issued pursuant to any equity incentive or similar plan of the Company; (ii) convertible securities issued or issuable to (A) banks, equipment lessors, financial institutions or other persons engaged in the business of making loans pursuant to a debt financing or commercial leasing or (B) suppliers or third party service providers in connection with the provision of goods or services pursuant to transactions; and (iii) convertible securities issued or issuable in connection with sponsored research, collaboration, technology license, development, OEM, marketing or other similar agreements or strategic partnerships.

3. "*MFN*"*Amendment Provision*. If the Company issues any Subsequent Convertible Securities prior to termination of this instrument, the Company will promptly provide the Investor with written notice thereof, together with a copy of all documentation relating to such Subsequent Convertible Securities and, upon written request of the Investor, any additional information related to such Subsequent Convertible Securities as may be reasonably requested by the Investor.  In the event the Investor determines that the terms of the Subsequent Convertible Securities are preferable to the terms of this instrument, the Investor will notify the Company in writing. Promptly after receipt of such written notice from the Investor, the Company agrees to amend and restate this instrument to be identical to the instrument(s) evidencing the Subsequent Convertible Securities.

4. ***Company Representations***

(a)    The Company is a corporation duly organized, validly existing and in good standing under the laws of the state of its incorporation, and has the power and authority to own, lease and operate its properties and carry on its business as now conducted.

(b)    The execution, delivery and performance by the Company of this instrument is within the power of the Company and, other than with respect to the actions to be taken when equity is to be issued to the Investor, has been duly authorized by all necessary actions on the part of the Company. This instrument constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.  To the knowledge of the Company, it is not in violation of (i) its current certificate of incorporation or bylaws, (ii) any material statute, rule or regulation applicable to the Company or (iii) any material indenture or contract to which the Company is a party or by which it is bound, where, in each case, such violation or default, individually, or together with all such violations or defaults, could reasonably be expected to have a material adverse effect on the Company.

(c)    The performance and consummation of the transactions contemplated by this instrument do not and will not: (i) violate any material judgment, statute, rule or regulation applicable to the Company; (ii) result in the acceleration of any material indenture or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any lien upon any property, asset or revenue of the Company or the suspension, forfeiture, or nonrenewal of any material permit, license or authorization applicable to the Company, its business or operations.

(d)    No consents or approvals are required in connection with the performance of this instrument, other than: (i) the Company's corporate approvals; (ii) any qualifications or filings under applicable securities laws; and (iii) necessary corporate approvals for the authorization of Capital Stock issuable pursuant to Section 1.

(e)    To its knowledge, the Company owns or possesses (or can obtain on commercially reasonable terms) sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes and other intellectual property rights necessary for its business as now conducted and as currently proposed to be conducted, without any conflict with, or infringement of the rights of, others.

5. ***Investor Representations***

(a)    The Investor has full legal capacity, power and authority to execute and deliver this instrument and to perform its obligations hereunder. This instrument constitutes valid and binding obligation of the Investor, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(b)    The Investor is an accredited investor as such term is defined in Rule 501 of Regulation D under the Securities Act. The Investor has been advised that this instrument and the underlying securities have not been registered under the Securities Act, or any state securities laws and, therefore, cannot be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available. The Investor is purchasing this instrument and the securities to be acquired by the Investor hereunder for its own account

for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and the Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. The Investor has such knowledge and experience in financial and business matters that the Investor is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment without impairing the Investor's financial condition and is able to bear the economic risk of such investment for an indefinite period of time.

6. ***Miscellaneous***

(a)     Any provision of this instrument may be amended, waived or modified only upon the written consent of the Company and the Investor.

(b)     Any notice required or permitted by this instrument will be deemed sufficient when delivered personally or by overnight courier or sent by email to the relevant address listed on the signature page, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address listed on the signature page, as subsequently modified by written notice.

(c)     The Investor is not entitled, as a holder of this instrument, to vote or receive dividends or be deemed the holder of Capital Stock for any purpose, nor will anything contained herein be construed to confer on the Investor, as such, any of the rights of a stockholder of the Company or any right to vote for the election of directors or upon any matter submitted to stockholders at any meeting thereof, or to give or withhold consent to any corporate action or to receive notice of meetings, or to receive subscription rights or otherwise until shares have been issued upon the terms described herein.

(d)     Neither this instrument nor the rights contained herein may be assigned, by operation of law or otherwise, by either party without the prior written consent of the other; *provided, however*, that this instrument and/or the rights contained herein may be assigned without the Company's consent by the Investor to any other entity who directly or indirectly, controls, is controlled by or is under common control with the Investor, including, without limitation, any general partner, managing member, officer or director of the Investor, or any venture capital fund now or hereafter existing which is controlled by one or more general partners or managing members of, or shares the same management company with, the Investor; and *provided, further*, that the Company may assign this instrument in whole, without the consent of the Investor, in connection with a reincorporation to change the Company's domicile.

(e)     In the event any one or more of the provisions of this instrument is for any reason held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or in the event that any one or more of the provisions of this instrument operate or would prospectively operate to invalidate this instrument, then and in any such event, such provision(s) only will be deemed null and void and will not affect any other provision of this instrument and the remaining provisions of this instrument will remain operative and in full force and effect and will not be affected, prejudiced, or disturbed thereby.

(f)     All rights and obligations hereunder will be governed by the laws of the State of Delaware without regard to the conflicts of law provisions of such jurisdiction.

*(Signature page follows)*

IN WITNESS WHEREOF, the undersigned have caused this instrument to be duly executed and delivered.

**XRC FUND II, LLC**

By:_____
Guided Launch, Inc., Manager
By: Pano Anthos, its Managing Member
Email: pano@xrclabs.com

**COMPANY NAME.**

By:_____
Andrew J. Chapin

President & CEO, EPHE Corp.

1355 Market Street, #488

San Francisco, California 94114

Andrew@benja.co

THIS INSTRUMENT AND ANY SECURITIES ISSUABLE PURSUANT HERETO HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES.  THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.

### COMPANY NAME. - XRC FUND III, LLC
### (Simple Agreement for Future Equity)

THIS CERTIFIES THAT in exchange for the payment by XRC Fund III (the "**Investor**") of $75,000 (the "**Purchase Amount**") on or about December 9, 2016, EPHE Corp., a Delaware corporation (the "**Company**"), hereby issues to the Investor the right to certain shares of the Company's capital stock, subject to the terms set forth below.

The "**Valuation Cap**" is $4 million

The "**Discount Rate**" is 80%.

See **Section 2** for certain additional defined terms.

1. *Events*

(a) **Equity Financing**. If there is an Equity Financing before the expiration or termination of this instrument, the Company will automatically issue to the Investor a number of shares of Safe Preferred Stock equal to the Purchase Amount divided by the Conversion Price.

In connection with the issuance of Safe Preferred Stock by the Company to the Investor pursuant to this Section 1(a):

(i) The Investor will execute and deliver to the Company all transaction documents related to the Equity Financing; *provided,* that such documents are the same documents to be entered into with the purchasers of Standard Preferred Stock, with appropriate variations for the Safe Preferred Stock if applicable, and *provided further,* that such documents have customary exceptions to any drag-along applicable to the Investor, including, without limitation, limited representations and warranties and limited liability and indemnification obligations on the part of the Investor; and

(ii) The Investor and the Company will execute a Pro Rata Rights Agreement, unless the Investor is already included in such rights in the transaction documents related to the Equity Financing.

(b) **Liquidity Event**. If there is a Liquidity Event before the expiration or termination of this instrument, the Investor will, at its option, either (i) receive a cash payment equal to the Purchase Amount (subject to the following paragraph) or (ii) automatically receive from the Company a number of shares of Common Stock equal to the Purchase Amount divided by the Liquidity Price, if the Investor fails to select the cash option.

In connection with Section (b)(i), the Purchase Amount will be due and payable by the Company to the Investor immediately prior to, or concurrent with, the consummation of the Liquidity Event. If there are not enough funds to pay the Investor and holders of other Safes (collectively, the "**Cash-Out Investors**") in full, then all of the Company's available funds will be distributed with equal priority and *pro rata* among the Cash-Out Investors in proportion to their Purchase Amounts, and the Cash-Out Investors will automatically receive the number of shares of Common Stock equal to the remaining unpaid Purchase Amount divided by the Liquidity Price.  In connection with a Change of Control intended to qualify as a tax-free reorganization, the Company may reduce, *pro rata*, the Purchase Amounts payable to the Cash-Out

Investors by the amount determined by its board of directors in good faith to be advisable for such Change of Control to qualify as a tax-free reorganization for U.S. federal income tax purposes, and in such case, the Cash-Out Investors will automatically receive the number of shares of Common Stock equal to the remaining unpaid Purchase Amount divided by the Liquidity Price.

(c) **Dissolution Event**. If there is a Dissolution Event before this instrument expires or terminates, the Company will pay an amount equal to the Purchase Amount, due and payable to the Investor immediately prior to, or concurrent with, the consummation of the Dissolution Event. The Purchase Amount will be paid prior and in preference to any Distribution of any of the assets of the Company to holders of outstanding Capital Stock by reason of their ownership thereof. If immediately prior to the consummation of the Dissolution Event, the assets of the Company legally available for distribution to the Investor and all holders of all other Safes (the "**Dissolving Investors**"), as determined in good faith by the Company's board of directors, are insufficient to permit the payment to the Dissolving Investors of their respective Purchase Amounts, then the entire assets of the Company legally available for distribution will be distributed with equal priority and *pro rata* among the Dissolving Investors in proportion to the Purchase Amounts they would otherwise be entitled to receive pursuant to this Section 1(c).

(d) **Termination**. This instrument will expire and terminate (without relieving the Company of any obligations arising from a prior breach of or non-compliance with this instrument) upon either (i) the issuance of stock to the Investor pursuant to Section 1(a) or Section 1(b)(ii); or (ii) the payment, or setting aside for payment, of amounts due the Investor pursuant to Section 1(b)(i) or Section 1(c).

2. *Definitions*

"**Capital Stock**" means the capital stock of the Company, including, without limitation, the "**Common Stock**" and the "**Preferred Stock**."

"**Change of Control**" means (i) a transaction or series of related transactions in which any "person" or "group" (within the meaning of Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), becomes the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended), directly or indirectly, of more than 50% of the outstanding voting securities of the Company having the right to vote for the election of members of the Company's board of directors, (ii) any reorganization, merger or consolidation of the Company, other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity or (iii) a sale, lease or other disposition of all or substantially all of the assets of the Company.

"**Company Capitalization**" means the **sum**, as of immediately prior to the Equity Financing, of: (**1**) all shares of Capital Stock (on an as-converted basis) issued and outstanding, assuming exercise or conversion of all outstanding vested and unvested options, warrants and other convertible securities, but excluding (A) this instrument, (B) all other Safes, and (C) convertible promissory notes; **and** (**2**) all shares of Common Stock reserved and available for future grant under any equity incentive or similar plan of the Company, and/or any equity incentive or similar plan to be created or increased in connection with the Equity Financing.

"**Conversion Price**" means the either: (1) the Safe Price or (2) the Discount Price, whichever calculation results in a greater number of shares of Safe Preferred Stock.

"**Discount Price**" means the price per share of the Standard Preferred Stock sold in the Equity Financing multiplied by the Discount Rate.

-2-

"**Distribution**" means the transfer to holders of Capital Stock by reason of their ownership thereof of cash or other property without consideration whether by way of dividend or otherwise, other than dividends on Common Stock payable in Common Stock, or the purchase or redemption of Capital Stock by the Company or its subsidiaries for cash or property other than: (i) repurchases of Common Stock held by employees, officers, directors or consultants of the Company or its subsidiaries pursuant to an agreement providing, as applicable, a right of first refusal or a right to repurchase shares upon termination of such service provider's employment or services; or (ii) repurchases of Capital Stock in connection with the settlement of disputes with any stockholder.

"**Dissolution Event**" means (i) a voluntary termination of operations, (ii) a general assignment for the benefit of the Company's creditors or (iii) any other liquidation, dissolution or winding up of the Company (**excluding** a Liquidity Event), whether voluntary or involuntary.

"**Equity Financing**" means a bona fide transaction or series of transactions with the principal purpose of raising capital, pursuant to which the Company issues and sells Preferred Stock at a fixed pre-money valuation.

"**Initial Public Offering**" means the closing of the Company's first firm commitment underwritten initial public offering of Common Stock pursuant to a registration statement filed under the Securities Act.

"**Liquidity Capitalization**" means the number, as of immediately prior to the Liquidity Event, of shares of Capital Stock (on an as-converted basis) outstanding, assuming exercise or conversion of all outstanding vested and unvested options, warrants and other convertible securities, but **excluding**: (i) shares of Common Stock reserved and available for future grant under any equity incentive or similar plan; (ii) this instrument; (iii) other Safes; and (iv) convertible promissory notes.

"**Liquidity Event**" means a Change of Control or an Initial Public Offering.

"**Liquidity Price**" means the price per share equal to the Valuation Cap divided by the Liquidity Capitalization.

"**Pro Rata Rights Agreement**" means a written agreement between the Company and the Investor (and holders of other Safes, as appropriate) giving the Investor a right to purchase its *pro rata* share of private placements of securities by the Company **occurring after the Equity Financing**, subject to customary exceptions. *Pro rata* for purposes of the Pro Rata Rights Agreement will be calculated based on the ratio of (1) the number of shares of Capital Stock owned by the Investor immediately prior to the issuance of the securities to (2) the total number of shares of outstanding Capital Stock on a fully diluted basis, calculated as of immediately prior to the issuance of the securities.

"**Safe**" means an instrument containing a future right to shares of Capital Stock, similar in form and content to this instrument, purchased by investors for the purpose of funding the Company's business operations.

"**Safe Preferred Stock**" means the shares of a series of Preferred Stock issued to the Investor in an Equity Financing, having the identical rights, privileges, preferences and restrictions as the shares of Standard Preferred Stock, other than with respect to: (i) the per share liquidation preference and the conversion price for purposes of price-based anti-dilution protection, which will equal the Conversion Price; and (ii) the basis for any dividend rights, which will be based on the Conversion Price.

"**Safe Price**" means the price per share equal to the Valuation Cap divided by the Company Capitalization.

"**Standard Preferred Stock**" means the shares of a series of Preferred Stock issued to the investors investing new money in the Company in connection with the initial closing of the Equity Financing.

Case: 20-30819    Doc# 39-1    Filed: 10/26/20    Entered: 10/26/20 10:53:01    Page 9 of 35

3. **Company Representations**

(a) The Company is a corporation duly organized, validly existing and in good standing under the laws of the state of its incorporation, and has the power and authority to own, lease and operate its properties and carry on its business as now conducted.

(b) The execution, delivery and performance by the Company of this instrument is within the power of the Company and, other than with respect to the actions to be taken when equity is to be issued to the Investor, has been duly authorized by all necessary actions on the part of the Company. This instrument constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity. To the knowledge of the Company, it is not in violation of (i) its current certificate of incorporation or bylaws, (ii) any material statute, rule or regulation applicable to the Company or (iii) any material indenture or contract to which the Company is a party or by which it is bound, where, in each case, such violation or default, individually, or together with all such violations or defaults, could reasonably be expected to have a material adverse effect on the Company.

(c) The performance and consummation of the transactions contemplated by this instrument do not and will not: (i) violate any material judgment, statute, rule or regulation applicable to the Company; (ii) result in the acceleration of any material indenture or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any lien upon any property, asset or revenue of the Company or the suspension, forfeiture, or nonrenewal of any material permit, license or authorization applicable to the Company, its business or operations.

(d) No consents or approvals are required in connection with the performance of this instrument, other than: (i) the Company's corporate approvals; (ii) any qualifications or filings under applicable securities laws; and (iii) necessary corporate approvals for the authorization of Capital Stock issuable pursuant to Section 1.

(e) To its knowledge, the Company owns or possesses (or can obtain on commercially reasonable terms) sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes and other intellectual property rights necessary for its business as now conducted and as currently proposed to be conducted, without any conflict with, or infringement of the rights of, others.

4. **Investor Representations**

(a) The Investor has full legal capacity, power and authority to execute and deliver this instrument and to perform its obligations hereunder. This instrument constitutes valid and binding obligation of the Investor, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(b) The Investor is an accredited investor as such term is defined in Rule 501 of Regulation D under the Securities Act. The Investor has been advised that this instrument and the underlying securities have not been registered under the Securities Act, or any state securities laws and, therefore, cannot be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available. The Investor is purchasing this instrument and the securities to be acquired by the Investor hereunder for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and the Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. The Investor has such knowledge and experience in financial and business matters that the Investor is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment without impairing the Investor's financial condition and is able to bear the economic risk of such investment for an indefinite period of time.

-4-

5.  ***Miscellaneous***

(a)  Any provision of this instrument may be amended, waived or modified only upon the written consent of the Company and the Investor.

(b)  Any notice required or permitted by this instrument will be deemed sufficient when delivered personally or by overnight courier or sent by email to the relevant address listed on the signature page, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address listed on the signature page, as subsequently modified by written notice.

(c)  The Investor is not entitled, as a holder of this instrument, to vote or receive dividends or be deemed the holder of Capital Stock for any purpose, nor will anything contained herein be construed to confer on the Investor, as such, any of the rights of a stockholder of the Company or any right to vote for the election of directors or upon any matter submitted to stockholders at any meeting thereof, or to give or withhold consent to any corporate action or to receive notice of meetings, or to receive subscription rights or otherwise until shares have been issued upon the terms described herein.

(d)  Neither this instrument nor the rights contained herein may be assigned, by operation of law or otherwise, by either party without the prior written consent of the other; *provided, however*, that this instrument and/or the rights contained herein may be assigned without the Company's consent by the Investor to any other entity who directly or indirectly, controls, is controlled by or is under common control with the Investor, including, without limitation, any general partner, managing member, officer or director of the Investor, or any venture capital fund now or hereafter existing which is controlled by one or more general partners or managing members of, or shares the same management company with, the Investor; and *provided, further*, that the Company may assign this instrument in whole, without the consent of the Investor, in connection with a reincorporation to change the Company's domicile.

(e)  In the event any one or more of the provisions of this instrument is for any reason held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or in the event that any one or more of the provisions of this instrument operate or would prospectively operate to invalidate this instrument, then and in any such event, such provision(s) only will be deemed null and void and will not affect any other provision of this instrument and the remaining provisions of this instrument will remain operative and in full force and effect and will not be affected, prejudiced, or disturbed thereby.

(f)  All rights and obligations hereunder will be governed by the laws of the State of Delaware, without regard to the conflicts of law provisions of such jurisdiction.

(*Signature page follows*)

Case: 20-30819    Doc# 39-1    Filed: 10/26/20    Entered: 10/26/20 10:53:01    Page 11 of 35

IN WITNESS WHEREOF, the undersigned have caused this instrument to be duly executed and delivered.

EPHE Corp.

By: _____

Andrew J. Chapin
President & CEO

Address: 1355 Market Street, #488,

San Francisco, California, 94114

Email: Andrew@benja.co

**INVESTOR:**

By: _____

Name: Pano Anthos

Title: Managing Director

Address: 68 Fifth Avenue, NY NY 10011

Email: pano@xrclabs.com

THIS INSTRUMENT AND ANY SECURITIES ISSUABLE PURSUANT HERETO HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED IN THIS SAFE AND UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.

**BENJA INCORPORATED**

**SAFE**
**(Simple Agreement for Future Equity)**

THIS CERTIFIES THAT in exchange for the payment by XRC Growth Fund I, L.P. (the "**Investor**") of $500,000.00 (the "**Purchase Amount**") on or about September 2, 2020, Benja Incorporated, a Delaware corporation (the "**Company**"), issues to the Investor the right to certain shares of the Company's Capital Stock, subject to the terms described below.

The "**Pre-Money Valuation Cap**" is $20,000,000.

The "**Discount Rate**" is 75%.

See Section 2 for certain additional defined terms.

1.  *Events*

    (a) **Equity Financing**. If there is an Equity Financing before the termination of this Safe, on the initial closing of such Equity Financing, this Safe will automatically convert into the number of shares of Safe Preferred Stock equal to the Purchase Amount divided by the Conversion Price.

    In connection with the automatic conversion of this Safe into shares of Safe Preferred Stock, the Investor will execute and deliver to the Company all of the transaction documents related to the Equity Financing; *provided,* that such documents (i) are the same documents to be entered into with the purchasers of Standard Preferred Stock, with appropriate variations for the Safe Preferred Stock if applicable, and (ii) have customary exceptions to any drag-along applicable to the Investor, including (without limitation) limited representations, warranties, liability and indemnification obligations for the Investor.

    (b) **Liquidity Event**. If there is a Liquidity Event before the termination of this Safe, this Safe will automatically be entitled (subject to the liquidation priority set forth in Section 1(d) below) to receive a portion of Proceeds, due and payable to the Investor immediately prior to, or concurrent with, the consummation of such Liquidity Event, equal to the greater of (i) the Purchase Amount <u>multiplied by</u> 1.5 (the "**Cash-Out Amount**") or (ii) the amount payable on the number of shares of Common Stock equal to the Purchase Amount divided by the Liquidity Price (the "**Conversion Amount**"). If any of the Company's securityholders are given a choice as to the form and amount of Proceeds to be received in a Liquidity Event, the Investor will be given the same choice, *provided* that the Investor may not choose to receive a form of consideration that the Investor would be ineligible to receive as a result of the Investor's failure to satisfy any requirement or limitation generally applicable to the Company's securityholders, or under any applicable laws.

    Notwithstanding the foregoing, in connection with a Change of Control intended to qualify as a tax-free reorganization, the Company may reduce the cash portion of Proceeds payable to the Investor by the amount determined by its board of directors in good faith for such Change of Control to qualify as a tax-free reorganization for U.S. federal income tax purposes, provided that such reduction (A) does not reduce the total Proceeds payable to such Investor and (B) is applied in the same manner and on a pro rata basis to all securityholders who have equal priority to the Investor under Section 1(d).

    (c) **Dissolution Event**. If there is a Dissolution Event before the termination of this Safe, the Investor will automatically be entitled (subject to the liquidation priority set forth in Section 1(d) below) to receive a portion of Proceeds equal to the Cash-Out Amount, due and payable to the Investor immediately prior to the consummation of the Dissolution Event.

(d) **Liquidation Priority**. In a Liquidity Event or Dissolution Event, this Safe is intended to operate like standard non-participating Preferred Stock. The Investor's right to receive its Cash-Out Amount is:

(i) Junior to payment of outstanding indebtedness and creditor claims, including contractual claims for payment and convertible promissory notes (to the extent such convertible promissory notes are not actually or notionally converted into Capital Stock);

(ii) On par with payments for other Safes and/or Preferred Stock, and if the applicable Proceeds are insufficient to permit full payments to the Investor and such other Safes and/or Preferred Stock, the applicable Proceeds will be distributed pro rata to the Investor and such other Safes and/or Preferred Stock in proportion to the full payments that would otherwise be due; and

(iii) Senior to payments for Common Stock.

The Investor's right to receive its Conversion Amount is (A) on par with payments for Common Stock and other Safes and/or Preferred Stock who are also receiving Conversion Amounts or Proceeds on a similar as-converted to Common Stock basis, and (B) junior to payments described in clauses (i) and (ii) above (in the latter case, to the extent such payments are Cash-Out Amounts or similar liquidation preferences).

(e) **Termination**. This Safe will automatically terminate (without relieving the Company of any obligations arising from a prior breach of or non-compliance with this Safe) immediately following the earliest to occur of: (i) the issuance of Capital Stock to the Investor pursuant to the automatic conversion of this Safe under Section 1(a); or (ii) the payment, or setting aside for payment, of amounts due the Investor pursuant to Section 1(b) or Section 1(c).

2. *Definitions*

"**Capital Stock**" means the capital stock of the Company, including, without limitation, the "**Common Stock**" and the "**Preferred Stock**."

"**Change of Control**" means (i) a transaction or series of related transactions in which any "person" or "group" (within the meaning of Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), becomes the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended), directly or indirectly, of more than 50% of the outstanding voting securities of the Company having the right to vote for the election of members of the Company's board of directors, (ii) any reorganization, merger or consolidation of the Company, other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity or (iii) a sale, lease or other disposition of all or substantially all of the assets of the Company.

"**Company Capitalization**" is calculated as of immediately prior to the Equity Financing and (without double-counting, in each case calculated on an as-converted to Common Stock basis):

- Includes all shares of Capital Stock issued and outstanding;
- Includes all (i) issued and outstanding Options and (ii) Promised Options;
- Excludes the Unissued Option Pool, including any increase to the Unissued Option Pool in connection with the Equity Financing except with respect to Promised Options; and
- Excludes all Converting Securities.

"**Conversion Price**" means either: (1) the Safe Price or (2) the Discount Price, whichever calculation results in a greater number of shares of Safe Preferred Stock.

"**Converting Securities**" includes this Safe and other convertible securities issued by the Company, including but not limited to: (i) this Safe; (ii) other Safes; and (iii) convertible promissory notes and other convertible debt instruments.

"**Direct Listing**" means the Company's initial listing of its Common Stock (other than shares of Common Stock not eligible for resale under Rule 144 under the Securities Act) on a national securities exchange by means of an effective

registration statement on Form S-1 filed by the Company with the SEC that registers shares of existing capital stock of the Company for resale, as approved by the Company's board of directors. For the avoidance of doubt, a Direct Listing shall not be deemed to be an underwritten offering and shall not involve any underwriting services.

"**Discount Price**" means the price per share of the Standard Preferred Stock sold in the Equity Financing multiplied by the Discount Rate.

"**Dissolution Event**" means (i) a voluntary termination of operations, (ii) a general assignment for the benefit of the Company's creditors or (iii) any other liquidation, dissolution or winding up of the Company (**excluding** a Liquidity Event), whether voluntary or involuntary.

"**Dividend Amount**" means, with respect to any date on which the Company pays a dividend on its outstanding Common Stock, the amount of such dividend that is paid per share of Common Stock multiplied by (x) the Purchase Amount divided by (y) the Liquidity Price (treating the dividend date as a Liquidity Event solely for purposes of calculating such Liquidity Price).

"**Equity Financing**" means a bona fide transaction or series of transactions with the principal purpose of raising capital, pursuant to which the Company issues and sells Preferred Stock at a fixed valuation, including but not limited to, a pre-money or post-money valuation.

"**Initial Public Offering**" means the closing of the Company's first firm commitment underwritten initial public offering of Common Stock pursuant to a registration statement filed under the Securities Act.

"**Liquidity Capitalization**" is calculated as of immediately prior to the Liquidity Event, and (without double-counting, in each case calculated on an as-converted to Common Stock basis):

- Includes all shares of Capital Stock issued and outstanding;
- Includes all (i) issued and outstanding Options and (ii) to the extent receiving Proceeds, Promised Options;
- Excludes all Converting Securities; and
- Excludes the Unissued Option Pool.

"**Liquidity Event**" means a Change of Control, a Direct Listing or an Initial Public Offering.

"**Liquidity Price**" means the price per share equal to the Pre-Money Valuation Cap divided by the Liquidity Capitalization.

"**Options**" includes options, restricted stock awards or purchases, RSUs, SARs, warrants or similar securities, vested or unvested.

"**Proceeds**" means cash and other assets (including without limitation stock consideration) that are proceeds from the Liquidity Event or the Dissolution Event, as applicable, and legally available for distribution.

"**Promised Options**" means promised but ungranted Options that are the greater of those (i) promised pursuant to agreements or understandings made prior to the execution of, or in connection with, the term sheet or letter of intent for the Equity Financing or Liquidity Event, as applicable (or the initial closing of the Equity Financing or consummation of the Liquidity Event, if there is no term sheet or letter of intent), (ii) in the case of an Equity Financing, treated as outstanding Options in the calculation of the Standard Preferred Stock's price per share, or (iii) in the case of a Liquidity Event, treated as outstanding Options in the calculation of the distribution of the Proceeds.

"**Safe**" means an instrument containing a future right to shares of Capital Stock, similar in form and content to this instrument, purchased by investors for the purpose of funding the Company's business operations. References to "this Safe" mean this specific instrument.

"**Safe Preferred Stock**" means the shares of the series of Preferred Stock issued to the Investor in an Equity Financing, having the identical rights, privileges, preferences and restrictions as the shares of Standard Preferred Stock,

other than with respect to: (i) the per share liquidation preference and the initial conversion price for purposes of price-based anti-dilution protection, which will equal the Conversion Price; and (ii) the basis for any dividend rights, which will be based on the Conversion Price.

"**Safe Price**" means the price per share equal to the Pre-Money Valuation Cap divided by the Company Capitalization.

"**Standard Preferred Stock**" means the shares of the series of Preferred Stock issued to the investors investing new money in the Company in connection with the initial closing of the Equity Financing.

"**Subsequent Convertible Securities**" means convertible securities that the Company may issue after the issuance of this instrument with the principal purpose of raising capital, including but not limited to, other Safes, convertible debt instruments and other convertible securities. Subsequent Convertible Securities excludes: (i) options issued pursuant to any equity incentive or similar plan of the Company; (ii) convertible securities issued or issuable to (A) banks, equipment lessors, financial institutions or other persons engaged in the business of making loans pursuant to a debt financing or commercial leasing or (B) suppliers or third party service providers in connection with the provision of goods or services pursuant to transactions; and (iii) convertible securities issued or issuable in connection with sponsored research, collaboration, technology license, development, OEM, marketing or other similar agreements or strategic partnerships.

"**Unissued Option Pool**" means all shares of Capital Stock that are reserved, available for future grant and not subject to any outstanding Options or Promised Options (but in the case of a Liquidity Event, only to the extent Proceeds are payable on such Promised Options) under any equity incentive or similar Company plan.

**3.** "*MFN*" *Amendment Provision*. If the Company issues any Subsequent Convertible Securities prior to termination of this Safe, the Company will promptly provide the Investor with written notice thereof, together with a copy of all documentation relating to such Subsequent Convertible Securities and, upon written request of the Investor, any additional information related to such Subsequent Convertible Securities as may be reasonably requested by the Investor. In the event the Investor determines that the terms of the Subsequent Convertible Securities are preferable to the terms of this instrument, the Investor will notify the Company in writing. Promptly after receipt of such written notice from the Investor, the Company agrees to amend and restate this instrument to be identical to the instrument(s) evidencing the Subsequent Convertible Securities.

**4.** *Company Representations*

(a) The Company is a corporation duly organized, validly existing and in good standing under the laws of its state of incorporation, and has the power and authority to own, lease and operate its properties and carry on its business as now conducted.

(b) The execution, delivery and performance by the Company of this Safe is within the power of the Company and has been duly authorized by all necessary actions on the part of the Company (subject to Section 4(d)). This Safe constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity. To its knowledge, the Company is not in violation of (i) its current certificate of incorporation or bylaws, (ii) any material statute, rule or regulation applicable to the Company or (iii) any material debt or contract to which the Company is a party or by which it is bound, where, in each case, such violation or default, individually, or together with all such violations or defaults, could reasonably be expected to have a material adverse effect on the Company.

(c) The performance and consummation of the transactions contemplated by this Safe do not and will not: (i) violate any material judgment, statute, rule or regulation applicable to the Company; (ii) result in the acceleration of any material debt or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any lien on any property, asset or revenue of the Company or the suspension, forfeiture, or nonrenewal of any material permit, license or authorization applicable to the Company, its business or operations.

(d) No consents or approvals are required in connection with the performance of this Safe, other than: (i) the Company's corporate approvals; (ii) any qualifications or filings under applicable securities laws; and (iii) necessary corporate approvals for the authorization of Capital Stock issuable pursuant to Section 1.

(e) To its knowledge, the Company owns or possesses (or can obtain on commercially reasonable terms) sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes and other intellectual property rights necessary for its business as now conducted and as currently proposed to be conducted, without any conflict with, or infringement of the rights of, others.

**5.** *Investor Representations*

(a) The Investor has full legal capacity, power and authority to execute and deliver this Safe and to perform its obligations hereunder. This Safe constitutes valid and binding obligation of the Investor, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(b) The Investor is an accredited investor as such term is defined in Rule 501 of Regulation D under the Securities Act, and acknowledges and agrees that if not an accredited investor at the time of an Equity Financing, the Company may void this Safe and return the Purchase Amount. The Investor has been advised that this Safe and the underlying securities have not been registered under the Securities Act, or any state securities laws and, therefore, cannot be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available. The Investor is purchasing this Safe and the securities to be acquired by the Investor hereunder for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and the Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. The Investor has such knowledge and experience in financial and business matters that the Investor is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment without impairing the Investor's financial condition and is able to bear the economic risk of such investment for an indefinite period of time.

(c) By purchasing this Safe, Investor acknowledges and agrees that the Company has fully complied with any and all pro rata rights, participation rights, or other similar rights Investor may have (including any notice provisions related thereto) in connection with the sale of this Safe and any other Safes with the same Pre Money Valuation Cap and Discount Rate.

**6.** *Miscellaneous*

(a) Any provision of this Safe may be amended, waived or modified by written consent of the Company and either (i) the Investor or (ii) the majority-in-interest of all then-outstanding Safes with the same "Pre-Money Valuation Cap" and "Discount Rate" as this Safe; *provided that* with respect to clause (ii): (A) the Purchase Amount may not be amended, waived or modified in this manner, and (B) such amendment, waiver or modification treats all such holders in the same manner. "**Majority-in-interest**" refers to the holders of the applicable group of Safes whose Safes have a total Purchase Amount greater than 50% of the total Purchase Amount of all of such applicable group of Safes.

(b) Any notice required or permitted by this Safe will be deemed sufficient when delivered personally or by overnight courier or sent by email to the relevant address listed on the signature page, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address listed on the signature page, as subsequently modified by written notice.

(c) The Investor is not entitled, as a holder of this Safe, to vote or be deemed a holder of Capital Stock for any purpose other than tax purposes, nor will anything in this Safe be construed to confer on the Investor, as such, any rights of a Company stockholder or rights to vote for the election of directors or on any matter submitted to Company stockholders, or to give or withhold consent to any corporate action or to receive notice of meetings, until shares have been issued on the terms described in Section 1. However, if the Company pays a dividend on outstanding shares of Common Stock (that is not payable in shares of Common Stock) while this Safe is outstanding, the Company will pay the Dividend Amount to the Investor at the same time.

(d)  Neither this Safe nor the rights in this Safe are transferable or assignable, by operation of law or otherwise, by either party without the prior written consent of the other; *provided, however*, that this Safe and/or its rights may be assigned without the Company's consent by the Investor (i) to the Investor's estate, heirs, executors, administrators, guardians and/or successors in the event of Investor's death or disability, or (ii) to any other entity who directly or indirectly, controls, is controlled by or is under common control with the Investor, including, without limitation, any general partner, managing member, officer or director of the Investor, or any venture capital fund now or hereafter existing which is controlled by one or more general partners or managing members of, or shares the same management company with, the Investor; and *provided, further*, that the Company may assign this Safe in whole, without the consent of the Investor, in connection with a reincorporation to change the Company's domicile.

(e)  In the event any one or more of the provisions of this Safe is for any reason held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or in the event that any one or more of the provisions of this Safe operate or would prospectively operate to invalidate this Safe, then and in any such event, such provision(s) only will be deemed null and void and will not affect any other provision of this Safe and the remaining provisions of this Safe will remain operative and in full force and effect and will not be affected, prejudiced, or disturbed thereby.

(f)  All rights and obligations hereunder will be governed by the laws of the State of Delaware, without regard to the conflicts of law provisions of such jurisdiction.

(g)  The parties acknowledge and agree that for United States federal and state income tax purposes this Safe is, and at all times has been, intended to be characterized as stock, and more particularly as common stock for purposes of Sections 304, 305, 306, 354, 368, 1036 and 1202 of the Internal Revenue Code of 1986, as amended.  Accordingly, the parties agree to treat this Safe consistent with the foregoing intent for all United States federal and state income tax purposes (including, without limitation, on their respective tax returns or other informational statements).

*(Signature page follows)*

DocuSign Envelope ID: DD530190-CF6F-464E-8A4F-E8BB4F0D2026

IN WITNESS WHEREOF, the undersigned have caused this Safe to be duly executed and delivered.

**COMPANY:**

**BENJA INCORPORATED**

By:

            Andrew J. Chapin

            Chief Executive Officer

Address:

**INVESTOR:**

By:

Name: Pano Anthos

Title: Managing Partner

Address: 68 Fifth Avenue, New York, NY 10011

Email: pano@xrclabs.com

**From:** **Pano Anthos**  pano@xrc abs.com  ⬛
**Subject:** Fwd: Benja Investor Update - Q2 20
**Date:** October 21, 2020 at 9:53 AM
**To:** Esq. Steven Sou os  ssou os@ awnynj.com

PA

---------- Forwarded message ---------
**From:** **Andrew Chapin** <andrew@benja.co>
Date: Fr , Ju  24, 2020 at 1:24 PM
Subject: Benja Investor Update - Q2 20
To:

A ,

Hope th s e-ma  finds you we . See our Benja  nvestor update for Q2 20, attached  n PDF. A great quarter, exceed ng targets across the board, that sets the scene for an even better Q3.

As a ways, I m here  f you have any quest ons or comments.

Best,

**Andrew J. Chapin**
Co-Founder & CEO
Benja Incorporated
--
Pano Anthos
Manag ng D rector
XRC Labs
pano@xrc abs.com
M:508-641-6570
@ptanthos



Q2 Investor
Update.pdf



Commerce Network
Investor Update, Q2 2020

This Investor Update and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this e-mail in error, please notify the sender immediately. This Investor Update and e-mail contain confidential information that is intended only for key stakeholders of Benja Incorporated. If you are not the intended recipient you are notified that disclosing, copying, distributing, or taking any action in reliance on the contents of this Investor Update is strictly prohibited.

Enclosed:

- Performance Summary

- Financial Performance vs. Budget

- Product Development

- Additional Projects Update

- Team Development

- How You Can Help

## Performance Summary

As was shared in the 2019 Annual Update, the story of 2019 was scale, highlighted but he launch of new distribution deals with Tik Tok and Spotify. And just as the organization set to make another significant stride in regards to reach, COVID-19 hit.

A few weeks in to the global pandemic, we issued guidance on how Benja would position itself for the coming months and highlighted the following points: "our book (brands) is strong," "our discount deals are about to get a lot stronger," and "we have the resources to buy more publisher inventory right as demand softens - and that means our CPM cost is about to shrink, too." We logged a $2.1m revenue month in March (295% increase year over year) and shared the expectation that we would be able to grow through this.

We did.

As you'll see in the financial performance section of this update, we totaled more than $7m in top-line revenue in Q2 2020, up 12.8% from Q1 2020 and up 280% from the same period in 2019. We're on budget and on-track for our target 2020 performance. Along the way, our sales pipeline heated up, our publisher relationships strengthened, and we continued development on some exciting new extensions of our product.

## Financial Performance vs. Budget

As illustrated on the following page, the company has solidly out-performed top-line revenue targets (by 4-14% monthly) as well as net income goals.

At the end of Q2, Benja held $2.7m in cash on hand and $5.5m in Accounts Receivable for Total Assets of $8.2m, up from $4.05m in Total Assets for the same period in 2019.

In Q3, Benja expects to exceed budgeted revenue goals ($6.48m) by 12% or greater.

| | Apr-20 | | | May-20 | | | Jun-20 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Budget | Actual | AvB | Budget | Actual | AvB | Budget | Actual | AvB |
| Revenue | | | | | | | | | |
| Sales - Impressions | $2,138,699.99 | $2,238,578.67 | | $2,160,086.99 | $2,333,264.77 | | $2,181,687.86 | $2,501,036.56 | |
| Total Revenue | $2,138,699.99 | $2,238,578.67 | **104.7%** | $2,160,086.99 | $2,333,264.77 | **108.0%** | $2,181,687.86 | $2,501,036.56 | **114.6%** |
| | | | | | | | | | |
| Less Cost of Sales | | | | | | | | | |
| Placements | $1,648,948.00 | $1,655,211.39 | | $1,665,437.48 | $1,776,728.43 | | $1,682,091.85 | $1,824,290.33 | |
| Total Cost of Sales | $1,648,948.00 | $1,655,211.39 | | $1,665,437.48 | $1,776,728.43 | | $1,682,091.85 | $1,824,290.33 | |
| | | | | | | | | | |
| Gross Profit | $ 489,751.99 | $ 583,367.28 | **119.1%** | $ 494,649.51 | $ 556,536.34 | **112.5%** | $ 499,596.01 | $ 676,746.23 | **135.5%** |
| | | | | | | | | | |
| Other Income and Expense | | | | | | | | | |
| Rent & Office | $ (3,000.00) | $ 0.00 | | $ 0.00 | $ 0.00 | | $ 0.00 | $ 0.00 | |
| Technology & Supplies | $ (81,083.07) | $ (76,715.43) | | $ (81,893.90) | $ (79,198.13) | | $ (82,712.84) | $ (98,364.57) | |
| Wages, Salaries, Benefits & Taxes | $ (124,332.29) | $ (124,332.29) | | $ (124,332.29) | $ (124,332.29) | | $ (146,512.29) | $ (146,520.33) | |
| Total Other Income and expense | $ (208,415.36) | $ (201,047.72) | | $ (206,226.19) | $ (203,530.42) | | $ (229,225.13) | $ (244,884.90) | |
| | | | | | | | | | |
| EBITDA | $ 281,336.63 | $ 382,319.56 | **135.9%** | $ 288,423.32 | $ 353,005.92 | **122.4%** | $ 270,370.88 | $ 431,861.33 | **159.7%** |

## Product Performance

| | Web | Social | Mobile | E-Mail |
|---|---|---|---|---|
| **Impressions (Q1 '20)** | 468,962,695 | 159,923,451 | 38,438,565 | 54,600 |
| **Percentage Mix (Q1 '20)** | 70.3% | 24.0% | 5.8% | 0.0% |
| **Impressions (Q2 '20)** | 445,898,956 | 284,452,782 | 46,127,478 | 122,200 |
| **Percentage Mix (Q2 '20)** | 57.4% | 36.6% | 5.9% | 0.0% |
| **Sell-Through Rate (Sales/1k, Q2 '20)** | 16.5 | 21.2 | 24.6 | 26.3 |

## Additional Projects Update

As was described in the 2019 Annual Update, Benja launched an e-mail-based initiative to offer a stoppable media widget for e-mail newsletters. Our Benja-owned e-mail newsletter, Baseball.FYI, has served as a strong test case for this effort (despite there being no Major League Baseball games during this period). Our newsletter stands just shy of 10,000 subscribers and offers an effective CPM rate of $4.40, falling in-line with our standard bill-rate of $10.00. Results have been good - we're now looking at additional e-mail newsletter opportunities.

During Q2, Benja spoke with Jomboy Media about opportunities to get in front of their rich media audiences, building upon our standard display advertisement agreements. One concept our involves advertising during their game-day live chat, where Jomboy social media personalities (broadcast only) group chat during game day action to audiences that average 100,000 simultaneous viewers. The level to which we integrate is TBD but we are actively exploring a widget or the development of an add-on to Slack that would allow us to deliver a Benja widget or experience in a chat format.

## Team Development

We are thrilled to share we've onboarded a new fractional CFO, Joe Alouf, during Q2. Joe has extensive experience with designing and managing finance, accounting, legal and HR departments with companies of our size (and much larger). He'll become a more regular contributor during Q3 and I expect will be a core part of future investor updates.

In Q3, we will bring in a Brand Account Manager and Publisher Relationship Manager. We will circulate short job descriptions in the next week or two and would appreciate any guidance or introductions you may have.

**How You Can Help**

- Help us find a Brand Account Manager and Publisher Relationship Manager - job descriptions to come.

- We are seeking new web publisher audiences and e-mail newsletters. Please let us know if there is anything we can do to make for an easier introduction in that area.

- We are working to tighten up some public-facing materials including pages on social media and elsewhere. The job description e-mail will also include some specific action items for how you can help - liking or sharing pages, that sort of thing.

# Income Statement

Benja Incorporated
For the month ended 31 December 2018

| | Dec-18 | Nov-18 | Oct-18 | Sep-18 | Aug-18 | Jul-18 | Jun-18 | May-18 | Apr-18 | Mar-18 | Feb-18 | Jan-18 | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | | | | | |
| Sales - Impressions | 702,820 | 616,886 | 611,641 | 585,801 | 562,809 | 460,233 | 565,525 | 565,435 | 651,705 | 417,195 | 258,253 | 286,217 | 6,284,518 |
| **Total Revenue** | **702,820** | **616,886** | **611,641** | **585,801** | **562,809** | **460,233** | **565,525** | **565,435** | **651,705** | **417,195** | **258,253** | **286,217** | **6,284,518** |
| **Less Cost of Sales** | | | | | | | | | | | | | |
| Cost of revenues | - | - | - | - | - | - | 2,940 | 12,858 | 44,293 | 25,921 | 2,891 | 1,512 | 90,415 |
| Placements | 363,340 | 320,950 | 396,210 | 381,914 | 387,064 | 279,814 | 377,314 | 381,252 | 358,858 | 273,713 | 155,477 | 437,863 | 4,113,766 |
| **Total Cost of Sales** | **363,340** | **320,950** | **396,210** | **381,914** | **387,064** | **279,814** | **380,254** | **394,110** | **403,151** | **299,634** | **158,368** | **439,375** | **4,204,181** |
| **Gross Profit** | **339,480** | **295,936** | **215,430** | **203,887** | **175,746** | **180,420** | **185,272** | **171,325** | **248,554** | **117,561** | **99,884** | **(153,158)** | **2,080,337** |
| **Operating Income / (Loss)** | **339,480** | **295,936** | **215,430** | **203,887** | **175,746** | **180,420** | **185,272** | **171,325** | **248,554** | **117,561** | **99,884** | **(153,158)** | **2,080,337** |
| **Other Income and Expense** | | | | | | | | | | | | | |
| Accounting fees | - | (3,000) | - | - | - | - | - | (8,350) | - | - | - | (5,000) | (16,350) |
| Rent & Office | (2,800) | (2,800) | (2,800) | (2,800) | (2,800) | (2,800) | (2,800) | (2,800) | (2,800) | (2,800) | (2,800) | (4,200) | (35,000) |
| Technology & Supplies | (21,455) | (20,542) | (17,879) | (17,042) | (16,433) | (16,890) | (15,977) | (15,216) | (10,195) | (8,217) | (11,624) | (33,142) | (204,610) |

Case: 20-30819   Doc# 39-1   Filed: 10/26/20   Entered: 10/26/20 10:53:01   Page 26 of 35

# Income Statement

| | Dec-18 | Nov-18 | Oct-18 | Sep-18 | Aug-18 | Jul-18 | Jun-18 | May-18 | Apr-18 | Mar-18 | Feb-18 | Jan-18 | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Wages, Salaries, Benefits & Taxes | (30,958) | (30,958) | (30,958) | (33,958) | (33,958) | (33,958) | (23,104) | (26,401) | (22,398) | (21,729) | (21,729) | (21,729) | (331,841) |
| **Total Other Income and Expense** | **(55,213)** | **(57,300)** | **(51,637)** | **(53,800)** | **(53,192)** | **(53,648)** | **(41,881)** | **(52,767)** | **(35,393)** | **(32,746)** | **(36,153)** | **(64,071)** | **(587,801)** |
| **Net Income / (Loss) before Tax** | **284,267** | **238,636** | **163,793** | **150,087** | **122,554** | **126,772** | **143,391** | **118,558** | **213,161** | **84,815** | **63,731** | **(217,229)** | **1,492,536** |
| **Net Income** | **284,267** | **238,636** | **163,793** | **150,087** | **122,554** | **126,772** | **143,391** | **118,558** | **213,161** | **84,815** | **63,731** | **(217,229)** | **1,492,536** |
| **Total Comprehensive Income** | **284,267** | **238,636** | **163,793** | **150,087** | **122,554** | **126,772** | **143,391** | **118,558** | **213,161** | **84,815** | **63,731** | **(217,229)** | **1,492,536** |

Case: 20-30819   Doc# 39-1   Filed: 10/26/20   Entered: 10/26/20 10:53:01   Page 27 of 35

# Income Statement

Benja Incorporated
For the month ended 31 December 2019

| | Dec-19 | Nov-19 | Oct-19 | Sep-19 | Aug-19 | Jul-19 | Jun-19 | May-19 | Apr-19 | Mar-19 | Feb-19 | Jan-19 | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | | | | | |
| Sales - Impressions | 1,907,203 | 1,711,373 | 1,525,598 | 1,337,646 | 1,228,581 | 1,164,511 | 974,156 | 797,557 | 752,884 | 712,978 | 695,148 | 664,078 | 13,471,716 |
| **Total Revenue** | **1,907,203** | **1,711,373** | **1,525,598** | **1,337,646** | **1,228,581** | **1,164,511** | **974,156** | **797,557** | **752,884** | **712,978** | **695,148** | **664,078** | **13,471,716** |
| **Less Cost of Sales** | | | | | | | | | | | | | |
| Placements | 1,329,448 | 1,260,378 | 1,173,857 | 1,073,789 | 1,031,259 | 861,207 | 673,188 | 480,851 | 478,327 | 447,260 | 407,997 | 369,364 | 9,586,925 |
| **Total Cost of Sales** | **1,329,448** | **1,260,378** | **1,173,857** | **1,073,789** | **1,031,259** | **861,207** | **673,188** | **480,851** | **478,327** | **447,260** | **407,997** | **369,364** | **9,586,925** |
| **Gross Profit** | **577,755** | **450,995** | **351,741** | **263,857** | **197,323** | **303,304** | **300,968** | **316,706** | **274,557** | **265,719** | **287,151** | **294,714** | **3,884,790** |
| **Operating Income / (Loss)** | **577,755** | **450,995** | **351,741** | **263,857** | **197,323** | **303,304** | **300,968** | **316,706** | **274,557** | **265,719** | **287,151** | **294,714** | **3,884,790** |
| **Other Income and Expense** | | | | | | | | | | | | | |
| Rent & Office | (3,325) | (3,325) | (3,150) | (3,150) | (2,800) | (2,800) | (2,800) | (2,800) | (2,800) | (2,800) | (2,800) | (2,800) | (35,350) |
| Technology & Supplies | (59,248) | (47,588) | (37,628) | (35,166) | (32,382) | (25,916) | (26,866) | (25,879) | (22,522) | (21,819) | (22,700) | (22,876) | (380,590) |
| Wages, Salaries, Benefits & Taxes | (105,165) | (41,159) | (40,409) | (42,641) | (37,708) | (37,708) | (37,708) | (37,708) | (33,958) | (33,958) | (30,958) | (30,958) | (510,041) |
| **Total Other Income** | **(167,737)** | **(92,073)** | **(81,188)** | **(80,957)** | **(72,890)** | **(66,424)** | **(67,375)** | **(66,387)** | **(59,280)** | **(58,578)** | **(56,458)** | **(56,635)** | **(925,981)** |

Case: 20-30819    Doc# 39-1    Filed: 10/26/20    Entered: 10/26/20 10:53:01    Page 28 of 35

# Income Statement

| | Dec-19 | Nov-19 | Oct-19 | Sep-19 | Aug-19 | Jul-19 | Jun-19 | May-19 | Apr-19 | Mar-19 | Feb-19 | Jan-19 | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **and Expense** | | | | | | | | | | | | | |
| **Net Income / (Loss) before Tax** | 410,018 | 358,922 | 270,553 | 182,900 | 124,433 | 236,880 | 233,593 | 250,319 | 215,277 | 207,141 | 230,693 | 238,079 | 2,958,809 |
| **Net Income** | 410,018 | 358,922 | 270,553 | 182,900 | 124,433 | 236,880 | 233,593 | 250,319 | 215,277 | 207,141 | 230,693 | 238,079 | 2,958,809 |
| **Total Comprehensive Income** | 410,018 | 358,922 | 270,553 | 182,900 | 124,433 | 236,880 | 233,593 | 250,319 | 215,277 | 207,141 | 230,693 | 238,079 | 2,958,809 |

Case: 20-30819   Doc# 39-1   Filed: 10/26/20   Entered: 10/26/20 10:53:01   Page 29 of 35

# Income Statement

## Benja Incorporated
## For the month ended 31 July 2020

| | Jul-20 | Jun-20 | May-20 | Apr-20 | Mar-20 | Feb-20 | Jan-20 | YTD |
|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | |
| Sales - Impressions | 2,759,403 | 2,501,037 | 2,333,265 | 2,238,579 | 2,105,824 | 2,057,430 | 2,046,872 | 16,042,408 |
| **Total Revenue** | **2,759,403** | **2,501,037** | **2,333,265** | **2,238,579** | **2,105,824** | **2,057,430** | **2,046,872** | **16,042,408** |
| **Less Cost of Sales** | | | | | | | | |
| Placements | 2,317,917 | 1,824,290 | 1,776,728 | 1,655,211 | 1,632,600 | 1,553,106 | 1,532,516 | 12,292,369 |
| **Total Cost of Sales** | **2,317,917** | **1,824,290** | **1,776,728** | **1,655,211** | **1,632,600** | **1,553,106** | **1,532,516** | **12,292,369** |
| **Gross Profit** | **441,486** | **676,746** | **556,536** | **583,367** | **473,223** | **504,324** | **514,356** | **3,750,039** |
| **Operating Income / (Loss)** | **441,486** | **676,746** | **556,536** | **583,367** | **473,223** | **504,324** | **514,356** | **3,750,039** |
| **Other Income and Expense** | | | | | | | | |
| Rent & Office | - | - | - | - | (3,325) | (3,325) | (3,325) | (9,975) |
| Technology & Supplies | (95,509) | (98,365) | (79,198) | (76,715) | (79,837) | (70,009) | (62,810) | (562,444) |
| Wages, Salaries, Benefits & Taxes | (146,520) | (146,520) | (124,332) | (124,332) | (124,332) | (113,782) | (163,782) | (943,602) |
| **Total Other Income and Expense** | **(242,030)** | **(244,885)** | **(203,530)** | **(201,048)** | **(207,494)** | **(187,116)** | **(229,918)** | **(1,516,021)** |
| **Net Income / (Loss) before Tax** | **199,456** | **431,861** | **353,006** | **382,320** | **265,730** | **317,208** | **284,438** | **2,234,018** |
| **Net Income** | **199,456** | **431,861** | **353,006** | **382,320** | **265,730** | **317,208** | **284,438** | **2,234,018** |
| **Total Comprehensive Income** | **199,456** | **431,861** | **353,006** | **382,320** | **265,730** | **317,208** | **284,438** | **2,234,018** |

Case: 20-30819    Doc# 39-1    Filed: 10/26/20    Entered: 10/26/20 10:53:01    Page 30 of 35

---------- Forwarded message ---------
From: **Andrew Chapin** <andrew@benja.co>
Date: Wed, Aug 26, 2020 at 4:22 AM
Subject: Benja Growth Initiatives + Bridge Raise
To: Pano Anthos <pano@xrclabs.com>


Write-up on recent performance and the growth initiatives we want to undertake with this $1m bridge amount. Would love your thoughts.

AJC

--
Pano Anthos
Managing Director
XRC Labs
pano@xrclabs.com
M:508-641-6570
@ptanthos



Benja Growth
Initiativ...ise.pdf



Commerce Network

This report and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this e-mail in error, please notify the sender immediately. This report and e-mail contain confidential information that is intended only for key stakeholders of Benja Incorporated. If you are not the intended recipient you are notified that disclosing, copying, distributing, or taking any action in reliance on the contents of this report is strictly prohibited.

**RE: Benja Growth Initiatives and Related Bridge Raise**
August 2020

## Background

The Benja Commerce Network is a leading shoppable media solution, enabling on-page and in-feed checkout for top-tier brands like Nike, Columbia Sportswear, Lululemon Athletica, and others. By enabling checkout where the end-user lives and spends time online, Benja is able to achieve segment-leading results: in 2019, the company turned $13.4 million in brand spend into $259 million in gross merchandise volume ("GMV"), and in 2020, the company will turn approximately $30 million in brand spend into more than $570 million in gross merchandise volume.

What began as a consumer shopping app has become a full-fledged, world-class network, partnering with top-tier publishers like Conde Nast to deliver e-commerce inside of online display advertising, enabling on-page checkout. In 2019, the company launched a new effort to integrate its commerce widget inside of major consumer applications, delivering in-feed e-commerce and checkout on Pinterest, Flipboard, and NextDoor. In 2020, the company has continued this effort, launching pilots with Spotify and Tik Tok, with another pilot with Strava set to begin later this year.

## Performance Summary

|  | 2017 Actual | 2018 Actual | 2019 Actual | 2020 Actual + Forecast |
|---|---|---|---|---|
| Revenue | $2.12m | $6.28m | $13.47m | $31.29m |
| EBITDA | (0.02m) | $1.49m | $2.95m | $3.71m |
| GMV | $36m | $119m | $259m | $570m |

# Growth Initiatives

## Spotify

In 2019, Spotify engaged in an initiative to introduce rich advertising inside of its podcast platform. Previously, podcast advertising was "flat" – the same advertisement would play for every listener, regardless of background, profile, or interest. Spotify enabled a dynamic injection that would, based on the profile data of the user, inject a relevant advertisement – advertising running shoes for runners, for example.



Though dynamic advertising was a true improvement, Spotify recognized its dynamic injection of an advertisement was not improving sell-through rate, recall, or ad performance due to the lack of a clear call to action: more than 62% of podcast listeners listen while driving or exercising, activities where the listener is not in a position to take action on an advertisement. When the listener has completed driving or exercising, the majority of listeners could not recall who the advertisers were, what the advertised deal was, or what the coupon code was they were provided during the advertisement.

In January 2020, Benja introduced an e-commerce experience that paired with audio ads played on a limited set of podcasts.

When a listener receives an ad for running shoes, Benja injects a pop-in window that offers those shoes for sales. In the event the listener has the screen up, it plays as if it's any other Benja commerce widget, as shown on the right. In the even the listener is preoccupied with a drive or exercise, the pop-in window will be waiting for them when they have completed their activity – giving the ad a fair shot at performance.

For the period running for seven months, January 2020 through July 2020, Benja-enabled podcast advertisements improved performance (sale or coupon use) 11-fold, generating more than $10 million in gross merchandise volume off of just over a half-million in ad spend by Spotify's advertisers.

Benja and Spotify have agreed to graduate the deal from pilot to a full engagement, effective immediately. As part of this arrangement, Benja will be the exclusive e-commerce partner of Spotify North America for a period of three years, enabling commerce advertisements on the thousands of Spotify-hosted podcasts on their platform in 2020, and exploring wider adoption for a music-based solution in early 2021. Spotify has an estimated 26 million podcast listeners in North America, representing an enormous opportunity for Benja to expand the reach of its network.

Benja anticipates an ad spend on Spotify's platform around $1 million in Q4 2020, generating an incremental $1.37 million in Benja revenue. Further, Benja anticipates a trickle-down improvement to performance in its email newsletter (targeting those who have completed a transaction on Bejnja's platform) and other Benja-owned properties that may improve revenue.

## Inventory Ownership

Benja currently operates with an impression-based business model: for $10, the company offers the opportunity for brands to get in front of 1,000 qualified buyers. On average, 7 of those 1,000 complete a purchase, earning a return of $193. This means Benja earns ~5% of the gross merchandise volume sold on its platform.

An impression-based model has served the company well but management believes it may not be the most effective model. Management seeks $250,000 to test inventory ownership and fulfillment.

The company will purchase wholesale apparel inventory from the same top brand partners, warehouse it with Distribution Management (a partner and investor in Benja), and seek to sell the merchandise (through the existing Benja network and channels) at an approximate 20-40% mark-up. This would represent a 4-8x improvement in gross profit. A successful test period may lead the company to a hybrid model (mixture of both impression and inventory) or an eventual changeover of all brand agreements.

In addition to a potential improvement in financial performance, the company believes such a switch may lead to additional opportunities to work with traditional off-price retailers like Kohl's, as a model that matches their existing operations removes a potential barrier to partnership.

## Software Development Kit

Benja plans the development of a Software Development Kit (SDK) and related documentation to shrink the on-boarding process for major consumer applications like Spotify, NextDoor, and others. This is an effort that requires hiring of two new technical hires, a new project manager, and a sales person, an investment that will shorten the consumer application onboarding process from 6-9 months to 60 days.

Given an average consumer app spend ~$2 million annually and Benja's standard margin, Benja expects to earn an average of $2.7 million in revenue for each new consumer application. Enabling the onboarding of six new consumer applications in the first year the SDK is live (vs. 2 without, best-case), this development will have a clear and direct impact on the bottom line.

## Summary

With $1 million in additional resources to maximize the Spotify relationship between now and the end of the calendar year, launch the inventory ownership program, and complete development of the Software Development Kit, Benja anticipates it would issue a revision to its '20 forecast, increasing top-line revenue from $31.29 million to $33.01 million and '21 top-line revenue from ~$45-55 million to $60-65 million.

On Wed, Sep 2, 2020 4:03 PM, Kirsten Horning kirsten@xrclabs.com wrote:
Looping in Kelly who is sending.

On Wed, Sep 2, 2020 3:37 PM, Andrew Chapin andrew@benja.co wrote:
Kirsten,

Are you the one setting the wire?

Can you please let me know as soon as you send? We're eager to sign the engagement with Tik Tok - and every minute counts - but can only do so once we confirm it's on the way.

Best,

**Andrew J. Chapin**
Co-Founder & CEO
Benja Incorporated

**Kirsten Horning**
Principal
XRC Labs
www.xrclabs.com
email: kirsten@xrclabs.com