Stephen D. Finestone (SBN 125675)
Jennifer C. Hayes (SBN 197252)
Ryan A. Witthans (SBN 301432)
FINESTONE HAYES LLP
456 Montgomery St., 20th Floor
San Francisco, California 94104
Telephone No.: 415.414.0466
Fax No.: 415.398.2830
sfinestone@fhlawllp.com
jhayes@fhlawllp.com

Attorneys for Kyle Everett,
Trustee in Bankruptcy

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re<br><br>BENJA INCORPORATED, aka EPHE CORPORATION,<br><br>Debtor. | Case No. 20-30819 DM<br>Chapter 7<br>Hon. Dennis Montali |
| KYLE EVERETT,<br>TRUSTEE IN BANKRUPTCY,<br><br>Plaintiff,<br><br>v.<br><br>MHC FINANCIAL SERVICES, INC.,<br><br>Defendant. | Adversary Proceeding No.<br><br>**COMPLAINT FOR AVOIDANCE AND RECOVERY OF PREFERENTIAL TRANSFERS, FRAUDULENT TRANSFERS, DECLARATORY RELIEF, AND DISALLOWANCE OF CLAIM** |

Plaintiff Kyle Everett, Trustee in Bankruptcy of the estate of the above Debtor ("Plaintiff" or "Trustee"), alleges as follows:

1. Benja Incorporated ("Benja") or the "Debtor") is a Delaware Corporation that filed for chapter 11 bankruptcy relief on October 15, 2020 (the "Petition Date").

2. The Trustee was appointed as the Chapter 11 trustee on November 3, 2020. The Chapter 11 case was converted to Chapter 7 on January 29, 2021 and the Trustee was appointed as Chapter 7 Trustee.

**PARTIES, JURISDICTION, AND VENUE**

3.  The Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 151, 157(b)(2), and 1334, and under Rule 5011-1 of the Bankruptcy Local Rules for the Northern District of California.

4.  This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (F), (H), and (O).

5.  Venue is proper under 28 U.S.C. § 1409.

6.  Plaintiff consents to entry of final judgment by the Bankruptcy Court.

7.  The Trustee is informed and believes that Benja held itself out as having a variety of businesses lines, including agreements with various retailers (such as, Nike, Backcountry, and Columbia) to drive consumer traffic to purchase goods from the retailers, with Benja to be compensated based on the number of impressions by consumers of Benja's advertising (the "CPM Business").

8.  Plaintiff is informed and believes that MHC Financial Services, Inc. ("MHC" or the "Defendant") is an entity incorporated in Missouri that provides financial solutions to customers, primarily those who purchase trucks through MHC's dealership network. MHC has two primary product lines: equipment finance and commercial finance.

**FACTUAL ALLEGATIONS**

9.  On or about July 19, 2019, a UCC-1 Financing Statement was recorded with the Delaware Secretary of State evidencing what the Trustee is informed and believes is a blanket security interest in Benja's assets in favor of Busey Bank as the secured party, filed as Document No. 2019 500 5348 (the "Busey Bank Lien").

10. The Trustee is informed and believes that the Busey Bank Lien is valid and enforceable and that it has never been reconveyed.

11. On or about March 13, 2020, Benja submitted a Factoring Application to MHC, purportedly signed by Andrew Chapin ("Mr. Chapin") as Chief Executive Officer and Thomas Goode ("Mr. Goode") as Chief Technology Officer. The Trustee is informed and believes that, pursuant to the application, Benja sought to obtain financing connected to its CPM Business.

12. Prior to entering into an agreement with Benja, MHC hired a third party to conduct a UCC search of Benja's assets and received and reviewed the UCC search results, which the Trustee is informed and believes were from California and Delaware. The Trustee is informed and believes that, at the time of entering into the transaction discussed below, the UCC search conducted by MHC indicated the existence of the Busey Bank Lien.

13. The Trustee is informed and believes that MHC discussed the Busey Bank Lien with Mr. Chapin and told him that, before MHC was able to purchase any accounts receivable from Benja, Busey Bank would need to terminate its lien.

14. The Trustee is informed and believes that, as of March 2020, it was MHC's custom to purchase accounts receivable only when it would be in a first priority UCC position.

15. Mr. Chapin provided a document to MHC purporting to be from the Delaware Secretary of State's records, purporting to be a recorded termination of the Busey Bank Lien. The Trustee is informed and believes that the purported endorsement stamp from the Delaware Secretary State was not a true stamp, which fact should have been evident to MHC, as said stamp differed from stamps utilized by the Delaware Secretary of State. The Trustee is also informed and believes that MHC obtained the results of a UCC search on a date subsequent to the purported termination, which search still indicated the existence of the Busey Bank Lien.

16. On or about March 25, 2020, MHC and Benja entered into a Factoring Services Agreement. The Factoring Services Agreement provides, *inter alia*:

    a. for Benja to sell and assign its existing and future accounts receivable from the CPM Business (the "Factored Accounts") and for MHC to purchase the Factored Accounts;

    b. for Benja to notify its account debtors whose account receivable was sold to MHC of the sale of its account or accounts; and

    c. for a purported first-priority security interest from Benja to MHC in specified property of Benja, including Benja's existing and future accounts receivable, general intangibles, securities, and contract rights associated with Benja's accounts receivable, proceeds of Benja's accounts receivable, and all personal property in which Benja has a

present or future interest.

17. MHC conducted due diligence on Benja prior to entry of the Factoring Servicing Agreement. It is unclear whether the Factoring Services Agreement was a legitimate purchase of accounts receivable or something else instead, such as a loan.

18. The Factoring Services Agreement was signed on behalf of MHC by Erin Murphy, Director of Factoring, and by Mr. Chapin, as President and CEO of Benja. Mr. Chapin and Mr. Goode purportedly guaranteed Benja's obligations under the Factoring Services Agreement.

19. The maximum amount of Factored Accounts MHC agreed to purchase from Benja was $5,000,000.

20. Following execution of the Factoring Services Agreement, Chapin arranged to sell and MHC agreed to buy purported accounts receivable owned by Benja related to the CPM Business. The Trustee is informed and believes that, contrary to its typical practice, MHC allowed Mr. Chapin to send notice to the purported account debtors of the Factored Accounts, informing them of the sale of their accounts receivable. MHC was not copied on those emails.

21. MHC advanced approximately $4,482,707.79 in funds to Benja on the following dates for the purported purchase of the Factored Accounts Receivable:

| Date | Amount Advanced by MHC to Benja |
|---|---|
| April 2, 2020 | $414,950.54 |
| April 6, 2020 | $1,243,604.49 |
| April 10, 2020 | $322,963.00 |
| April 29, 2020 | $994,774.76 |
| April 30, 2020 | $696,970.13 |
| May 27, 2020 | $268,872.52 |
| May 27, 2020 | $540,572.25 |
| Total | $4,482,707.79 |

22. The Trustee is informed and believes that the Factored Accounts purportedly sold by Benja to MHC did not exist, and that the CPM Business either did not exist or did not generate sales

anywhere close to what had been represented by Benja. Rather, the documents purporting to represent accounts receivable had been forged by Benja for the purposes of obtaining payment from MHC for purchase of the putative Factored Accounts. The Trustee is informed and believes that the notice of the alleged purchase of the Factored Accounts was never sent because the Factored Accounts did not exist.

23. The Trustee is informed and believes that Benja used similar representations regarding the nature and extent of the CPM Business, along with doctored bank statements, to obtain loans and investments from others, too.

24. On or about July 17, 2021, MHC transmitted a letter to Benja stating that MHC was contacting Benja with respect to uncollectible invoices for services purportedly provided to Backcountry.com, Inc., Columbia Sportswear Company, Fanatics, Inc., New Balance Inc., and Nike, Inc. by Benja, the rights to which Benja had assigned to MHC under the Factoring Services Agreement. The letter states that the total amount of these uncollectible invoices is $1,793,227.56 and the alleged accounts were being transferred back to Benja, thereby requiring Benja to pay MHC the amounts it had paid for the alleged purchase of these Factored Accounts.

25. On or about July 21, 2021, Mr. Chapin, on behalf of Benja, transmitted a document to MCH titled "Promise to Pay." This document states that Benja expressly promises to pay $3,018,389.80 to MHC, and that this amount will be paid by wire on order before July 31, 2020.

26. On or about August 7, 2020, MHC and Benja entered into a Forbearance and Standstill Agreement (the "Forbearance Agreement"). Pursuant to the Forbearance Agreement:

    a. Benja acknowledged owing MHC the principal sum of $3,582,333.72 (the "Repurchase Balance").

    b. Benja agreed to make the following payments to MHC, with each such payment to be applied against the Repurchase Balance:

        i. $2,191,298.12 on or before August 14, 2020; and

        ii. $657,656.89 on or before August 21, 2020.

    c. Upon receipt of the two payments from Benja, MHC would then apply the security reserve it held pursuant to the Factoring Agreement, in the amount of

$563,943.92 against the Repurchase Balance and Benja agreed after that to pay the remaining amount outstanding, calculated at $69,434.79.

27. The Trustee is informed and believes that, on September 15, 2020, Seigfreid Bingham, as counsel for Benja, sent a letter to Benja notifying it of its breaches of the Forbearance Agreement.

28. Benja made the following payments to MHC on the following dates, following MHC's payment demands:

a. Payments from Benja to MHC outside the 90 days prior to the Petition Date:

| Date | Amount | Source, if Known |
| --- | --- | --- |
| June 3, 2020 | $102,018.25 | Benja's account at Busey Bank |
| June 3, 2020 | $380,281.86 | Benja's account at Busey Bank |
| June 5, 2020 | $212,473.85 | Benja's account at Busey Bank |
| June 5, 2020 | $324,805.50 | Benja's account at Busey Bank |
| June 5, 2020 | $462,183.93 | Benja's account at Busey Bank |
| June 9, 2020 | $255,000.00 | Benja's account at Busey Bank |
| June 22, 2020 | $90,864.45 | |
| June 23, 2020 | $13,000.00 | |
| Total | $1,840,627.84 | |

The payments totaling $1,840,627.84 from June 3, 2020 to June 23, 2020, made prior to July 16, 2020, are collectively defined as the "Fraudulent Transfers."

b. Payments from Benja to MHC within 90 days of the Petition Date:

| Date | Amount | Source, if Known |
| --- | --- | --- |
| August 7, 2020 | $100,000.00 | Benja's account at Busey Bank |
| August 20, 2020 | $1,941,298.12 | Benja's account at Busey Bank |
| August 27, 2020 | $10,000.00 | Benja's account at Busey Bank |
| August 28, 2020 | $2,500.00 | Benja's account at Busey Bank |

| | | |
|---|---|---|
| September 2, 2020 | $25,000.00 | Benja's account at Busey Bank |
| September 2, 2020 | $75,000.00 | Benja's account at Busey Bank |
| September 2, 2020 | $475,000.00 | Benja's account at Busey Bank |
| September 4, 2020 | $10,000.00 | Benja's account at Busey Bank |
| September 11, 2020 | $50,000.00 | Benja's account at Busey Bank |
| September 11, 2020 | $78,008.70 | Benja's account at Busey Bank |
| September 18, 2020 | $200,000.00 | Benja's account at Busey Bank |
| September 22, 2020 | $20,000.00 | Benja's account at Busey Bank |
| September 25, 2020 | $96,229.39 | |
| Total | $3,083,036.21 | |

The payments totaling $3,083,036.21, made on or after July 16, 2020, are collectively defined as the "Preferential Transfers."

29. The grand total of payments made by Busey to MHC is $4,923,664.05.

30. In making the Fraudulent Transfer payments, the Trustee is informed and believes that Benja represented to MHC that source of the funds to make such payments came from payments Benja received from account debtors in payment of their accounts receivable owed to Benja, which accounts receivable MHC had purchased. The Trustee is informed and believes that this representation by Benja to MHC was false, and that the actual source of the funds was money Benja had borrowed from Busey Bank.

31. The Trustee is informed and believes that the Benja's payment of the Fraudulent Transfers was pursuant to a Ponzi scheme and not related to a legitimate factoring arrangement.

**FIRST CLAIM FOR RELIEF**
**Avoidance and Recovery of Preferential Transfers**
**11 U.S.C. § 547(b)**

32. Plaintiff realleges the allegations set forth in paragraphs 1 through 31 above and incorporates them by reference.

33. The Preferential Transfers were made within the 90 days before the voluntary petition was filed by the Debtor.

34. The Preferential Transfers were the transfer of an interest of the Debtor in property, was made to or for the benefit of the Defendant who was a creditor of the Debtor, were made on account of antecedent debt owed by the Debtor to the Defendant before the Preferential Transfers were made, were made while the Debtor was insolvent, and enabled the Defendant to receive more than it would have received if the Preferential Transfers had not been made, and the Defendant had received payment as provided by the Bankruptcy Code.

Based on the foregoing, Plaintiff requests judgment as set forth below.

**SECOND CLAIM FOR RELIEF**
**Avoidance and Recovery of Fraudulent Transfers**
**11 U.S.C. § 548(a)(1)(A)**

35. Plaintiff realleges the allegations set forth in paragraphs 1 through 31 above and incorporates them by reference.

36. Plaintiff is informed and believes that the Fraudulent Transfers were made in an intentional effort to hinder, delay, and defraud creditors. *Hayes v. Palm Seedlings Partners-A (In re Agric. Research & Tech. Grp., Inc.)*, 916 F.2d 528 (9th Cir. 1990) ("[T]he debtor's intent to hinder, delay or defraud its creditors may be inferred from the mere existence of a Ponzi scheme. . . . knowledge that a transaction will operate to the detriment of creditors is sufficient for actual intent").

37. Plaintiff alleges that the Debtor made the Fraudulent Transfers within two years of the filing of the Debtor's Chapter 7 petition, and that those transfers were transfers of interests of the Debtor in property, and were made with actual intent to hinder, delay, or defraud any entity to which the Debtor was indebted or became indebted on or after the date the transfers were made.

Based on the foregoing, Plaintiff requests judgment as set forth below.

**THIRD CLAIM FOR RELIEF**
**Avoidance and Recovery of Fraudulent Transfers**
**11 U.S.C. § 548(a)(1)(B)**

38. Plaintiff realleges the allegations set forth in paragraphs 1 through 31 above and incorporates them by reference.

39. Plaintiff alleges that the Debtor made the Fraudulent Transfers within two years before the date on which the Debtor filed his Chapter 7 petition and that the Transfers were transfers

of interests of the Debtor in property.

40. Plaintiff alleges that the Debtor received less than a reasonably equivalent value in exchange for the Fraudulent Transfers, that the Debtor was insolvent on the dates the Fraudulent Transfers were made, or became insolvent as a result of the transfers, or was engaged in a business or a transaction or was about to engage in a business or a transaction for which any property remaining with the Debtor was an unreasonably small capital, or the Debtor intended to incur or believed that he would incur debts that would be beyond his ability to pay if such debts matured.

Based on the foregoing, Plaintiff requests judgment as set forth below.

**FOURTH CLAIM FOR RELIEF**
**Avoidance and Recovery of Fraudulent Transfers**
**11 U.S.C. § 544(b); Cal. Civ. Code §§ 3934 et seq.**

41. Plaintiff realleges the allegations set forth in paragraphs 1 through 31 above and incorporates them by reference.

42. Plaintiff alleges that the Fraudulent Transfers were transfers of interests of the Debtor in property and were made within four years of the date on which the Debtor filed his bankruptcy petition.

43. Plaintiff alleges that the Debtor received less than a reasonably equivalent value in exchange for the Fraudulent Transfers.

44. Plaintiff alleges that the Debtor was insolvent on the dates the Fraudulent Transfers were made or became insolvent as a result of the Fraudulent Transfers, or was engaged in a business or transaction or was about to engage in a business or transaction for which any property remaining with the Debtor was unreasonably small capital.

Based on the foregoing, Plaintiff requests judgment as set forth below.

**FIFTH CLAIM FOR RELIEF**
**Avoidance and Recovery of Fraudulent Transfers**
**11 U.S.C. § 544(b); Cal. Civ. Code §§ 3934 et seq.**

45. Plaintiff realleges the allegations set forth in paragraphs 1 through 31 above and incorporates them by reference.

46. Plaintiff alleges that the Fraudulent Transfers were transfers of interests of the Debtor in property and were made within four years of the date on which the Debtor filed his bankruptcy

petition.

47. Plaintiff alleges that the Debtor made the Fraudulent Transfers and incurred obligations relating to those transfers with actual intent to hinder, delay, or defraud any creditor of the Debtor.

48. Based on the foregoing, Plaintiff requests judgment as set forth below.

**SIXTH CLAIM FOR RELIEF**
**Declaratory Relief**

49. Plaintiff realleges the allegations set forth in paragraphs 1 through 31 above and incorporates them by reference.

50. An actual controversy has arisen and now exists between Plaintiff and Defendant concerning whether Benja was operated as a Ponzi scheme.

51. Plaintiff alleges that Benja was operated as a Ponzi scheme. Defendant disputes this contention.

52. An actual controversy has arisen and now exists between Plaintiff and Defendant concerning whether Benja was operated as a Ponzi scheme.

53. Plaintiff desires a judicial determination and declaration of whether Benja was operated as a Ponzi scheme. Such a judicial determination is necessary and appropriate at this time given the controversy between Plaintiff and Defendant.

**SEVENTH CLAIM FOR RELIEF**
**(Disallowance of Claim)**
**11 U.S.C. § 502(d)**

54. Plaintiff realleges the allegations set forth in Paragraphs 1 through 31 above and incorporates them by reference.

55. Plaintiff objects to any claim or claims which the Defendant has filed or may file or has asserted or may assert in this bankruptcy case until the transfer identified in the above claim for relief is returned to the Plaintiff.

**REQUEST FOR RELIEF**

Plaintiff requests judgment as follows:

A. On the first claim for relief, for a judgment against the Defendant avoiding and recovering

the Preferential Transfers under 11 U.S.C. §§ 547(b) and 550 and preserving the Transfer for the benefit of the estate under 11 U.S.C. § 551.

      B.     On Plaintiff's second and third claims for relief, for judgment against Defendant avoiding and recovering for the benefit of the estate the Transfers and any other transfer that may be proved at trial, under 11 U.S.C. §§ 548 and 550, and preserving those transfers for the benefit of the estate under 11 U.S.C. § 551.

      C.     On Plaintiff's fourth and fifth claims for relief, for a judgment against Defendant avoiding the Transfers and any other transfer to the Defendant that may be proved under 11 U.S.C. §§ 544(b) and 550, and California Civil Code Sections 3439 *et seq.*, and preserving those transfers for the benefit of the estate under 11 U.S.C. § 551.

      D.     On Plaintiff's sixth claim for relief, for equitable relief in the form of a judgment against Defendant declaring that Benja was a Ponzi scheme.

      E.     On Plaintiff's seventh claim for relief, for disallowance of any claim in favor of the Defendant in the Debtor's case until the Transfers identified above are returned to the estate.

      F.     For prejudgment interest and costs of suit.

      G.     For such other relief the Court deems appropriate.

Dated: August 5, 2021               FINESTONE HAYES LLP

By:    *Jennifer C. Hayes*
      Jennifer C. Hayes
      Attorneys for Kyle Everett,
      Plaintiff