Stephen D. Finestone (125675)
Jennifer C. Hayes (197252)
Kimberly S. Fineman (184433)
Ryan A. Witthans (301432)
FINESTONE HAYES LLP
456 Montgomery Street, 20th Floor
San Francisco, California 94104
Tel. (415) 616-0466
Fax (415) 398-2820
jhayes@fhlawllp.com

Attorneys for Chapter 7 Trustee
Kyle Everett

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| In re | Case No. 20-30819-DM |
| BENJA INCORPORATED, | Chapter 7 |
| Debtor. | **DECLARATION OF KYLE EVERETT IN SUPPORT OF CHAPTER 7 TRUSTEE'S MOTION TO APPROVE COMPROMISE OF CONTROVERSY WITH MHC FINANCIAL SERVICES, LLC** |
| | [No Hearing Unless Requested; Notice and Opportunity for Hearing Filed Pursuant to B.L.R. 9014-1(b)(3)] |

I, Kyle Everett, declare as follows:

1.    I am the duly appointed Chapter 7 Trustee of the bankruptcy estate (the "Estate") of Benja Incorporated (the "Debtor") in the above-captioned case (the "Bankruptcy Case"). I was appointed as the Chapter 11 Trustee in the Bankruptcy Case on or about November 3, 2020. On or about January 29, 2021, the Bankruptcy Case was converted to Chapter 7 and I was appointed as Chapter 7 Trustee (the "Trustee").

2.    All statements in this declaration are based on my own personal knowledge and observation, or upon information and belief based upon my review of the court and business

records in this case.  If called to testify on this matter, I could and would competently testify to the matters set forth in this Declaration.

3.  I make this Declaration in support of the concurrently filed Motion to Approve Compromise of Controversy with the MHC Financial Services, LLC (the "Motion"). The Motion seeks entry of an order approving the settlement agreement (the "Settlement Agreement") reached between myself as Trustee, on the one hand, and MHC Financial Services, LLC, formerly known as MHC Financial Services, Inc. ("MHC"), on the other hand (together the Trustee and MHC are defined as the "Parties").  The Settlement Agreement, an authentic copy of which is attached as **Exhibit A**, resolves avoidable transfer claims held by the Estate and asserted against MHC (the "Avoidance Claims") in return for a net settlement payment of $2,400,000 (the "Settlement Payment") and withdrawal/waiver of MHC's claim against the bankruptcy estate.

4.  The recitals in the Settlement Agreement provide as follows, which I am informed and believe to be true:

a.  Benja Incorporated aka EPHE Corporation ("Benja" or the "Debtor") was ostensibly an e-commerce advertising startup founded by Andrew Chapin ("Chapin") in 2014.

b.  On or about March 25, 2020, MHC and Benja entered into a Factoring Services Agreement.  The Factoring Services Agreement provides, *inter alia*, for Benja to sell and assign its existing and future accounts receivable (the "Factored Accounts") from the consumer product merchandise business (the "CPM Business") and for MHC to purchase the Factored Accounts.

c.  I contend that, in reality, the Factored Accounts purportedly sold by Benja to MHC did not exist, and that the CPM Business either did not exist or did not generate sales anywhere close to what had been represented by Benja. Rather, the documents purporting to represent accounts receivable had been forged by Benja for the purposes of obtaining payment from MHC for purchase of the putative Factored Accounts. I further contend that the notice

of the alleged purchase of the Factored Accounts was never sent because the Factored Accounts did not exist. I contend that Benja used similar representations regarding the nature and extent of the CPM Business, along with doctored bank statements, to obtain loans and investments from others, too.

d.  From approximately April 2, 2020 to May 27, 2020, MHC advanced approximately $4,482,707.79 in funds to Benja for the purported purchase of the Factored Accounts Receivable.

e.  From approximately June 3, 2020 to June 23, 2020 (i.e. more than 90 days prior to the filing of Benja's Bankruptcy Case), Benja made payments to MHC totaling $1,840,627.84 (the "Alleged Fraudulent Transfer Payments").

f.  From approximately August 7, 2020 to September 25, 2020 (i.e. within 90 days of the filing of Benja's Bankruptcy Case), Benja made payments to MHC totaling $3,083,036.21 (the "Alleged Preference Payments").

g.  On October 15, 2020, Mr. Chapin caused the Debtor to file a Chapter 11 bankruptcy case (the "Bankruptcy Case"). ECF No. 1. The Court granted a motion to appoint a Chapter 11 trustee in the Bankruptcy Case on October 26, 2020. ECF Nos. 19 and 26. I was appointed as the Chapter 11 Trustee on November 3, 2020. ECF No. 45.

h.  On or about November 23, 2020, Mr. Chapin was arrested and charged in federal court with multiple counts of fraud in connection with a multi-million-dollar scheme to deceive the Debtor's investors and creditors (the "Criminal Case").

i.  On January 15, 2021, I, then acting as the Chapter 11 Trustee, moved to covert the case to Chapter 7. ECF No. 67. On January 29, 2021, the Bankruptcy Case was converted to Chapter 7 and I was appointed as Chapter 7 Trustee. ECF Nos. 85 and 86.

j. On June 16, 2021, Mr. Chapin pled guilty to bank fraud, wire fraud, and securities fraud (the "Plea Agreement"). The Plea Agreement, which is lengthy, provides, *inter alia*, as follows:

During the relevant time period (June 2019 through September 2020), I looked for additional investors and credit lines for Benja. I told creditors and prospective investors that Benja generated $6,200,000 and $13,200,000 in revenue in 2018 and 2019, respectively, and had signed large contracts with numerous well-known companies including Nike, Fanatics, Patagonia, and Backcountry, to place advertisements for their excess inventory. In truth, I knew that my representations to creditors and investors were false, as I had fabricated Benja's revenue and did not have contracts with any of these companies.

To perpetuate the fraud scheme, beginning in June of 2019 and continuing until August of 2019, I made a series of false statements to Busey Bank to secure lines of credit totaling $5,000,000. For example, on June 24, 2019, I applied for a $1,000,000 line of credit for Benja with Busey Bank. I provided financial statements, a balance sheet, incorporation documents, and tax information in support of the application. I designated Benja's assets as collateral for the loan and submitted a July 2019 Aged Receivables Report listing $2,027,290 in receivables, including $1,600,000 in current receivables from Nike, Patagonia, Backcountry, and Fanatics. In truth, I falsified the aged receivables report, as I knew Benja did not have contracts with Nike, Patagonia, Backcountry, or Fanatics. In truth, I received an advance on my line of credit from Busey Bank and used most of the money to pay off other creditors and investors, to pay my personal credit cards, and transferred funds to my crypto-currency exchange account.

k. On August 5, 2021, I filed a complaint against MHC to avoid the Alleged Preferential Transfers and the Alleged Fraudulent Transfers from Benja to MHC totaling $4,923,664, *Everett v. MHC Financial Services, Inc.*, Adv. Proc. No. 21-3036 (the "Adversary Proceeding").

l. On September 7, 2021, MHC filed an answer denying the claims alleged in the Adversary Proceeding complaint and asserting numerous affirmative defenses.

m. On August 8, 2022, the Court entered an order granting my Motion for Partial Summary Judgment on the Estate's Alleged Preference Claims against MHC totaling $3,083,036.21 (ECF 37, the "Partial Summary

Judgment Order"). The remaining claims of the Estate for Alleged Fraudulent Transfers total $1,840,627.84. On September 23, 2022, MHC filed a proof of claim in the Bankruptcy Case, i.e., Claim No. 32 (the "MHC Claim"). The MHC Claim amount was undetermined and asserts that it would be in the amount paid by MHC to the Bankruptcy Estate. *See* 11 U.S.C. § 502(h).

n. On October 5, 2022, the parties caused to be filed a stipulation to participate in the Bankruptcy Dispute Resolution Program ("BDRP") for the Northern District of California (ECF 39). On January 20, 2023, the parties participated in a BDRP mediation. Following the mediation, which did not result in a settlement on the day of mediation, the parties continued to engage in protracted settlement discussions.

o. Several factors complicated the parties' analysis of an appropriate net settlement sum and significantly lengthened the settlement process. One complicating factor delaying settlement was how to handle the "netting" of MHC's liability to the Bankruptcy Estate against the Bankruptcy Estate's liability to MHC under 11 U.S.C. §502(h). Specifically, section 502(h) allows a creditor (here, MHC) to file a claim against the Bankruptcy Estate in the same amount that such creditor pays into the Bankruptcy Estate. For example, if MHC paid the Bankruptcy Estate $4,000,000, MHC would be entitled under section 502(h) to file a claim against the Bankruptcy Estate in the sum of $4,000,000 and to receive a pro-rata payment from the Bankruptcy Estate, pari-passu with other general unsecured creditors. Calculating the net gross value to the Bankruptcy Estate of a net settlement payment by MHC with a waiver of any claim of MHC against the Bankruptcy Estate (the "Netting Calculation") required careful analysis and identification of appropriate underlying assumptions, which the parties disagreed about. One part of the complex Netting Calculation was

estimating the total claims against the Bankruptcy Estate, which depended in part on the amount of estimated administrative expense claims, which in turn depended on analysis of the Trustee commission under the constructive disbursement doctrine, as well as the estimated amount of legal fees to be incurred in litigating the Bankruptcy Estate's litigation claims and the estimated payments into the Bankruptcy Estate on account of those claims. These calculations, estimations, and analyses took time, and were fundamental, complex components of the assumptions underlying the parties' settlement analyses. Another complicating factor in the analysis of an appropriate net settlement was any tax implications of a settlement. The Parties jointly analyzed the issues with their respective tax professionals.

p. In short, the parties carefully analyzed the various aspects needed to estimate the gross value of a net payment and claim waiver by MHC to the Bankruptcy Estate. The Parties have communicated regularly and shared analyses regarding settlement numbers and the assumptions upon which those numbers were based.

q. On or about June 14, 2023, the parties' ongoing efforts resulted in a settlement, subject to documentation and Bankruptcy Court approval upon appropriate notice to creditors, which settlement is memorialized by the signed Settlement Agreement.

5. As set forth more fully in the Settlement Agreement,[1] key terms of the Settlement Agreement, which is subject to this Court's approval, are as follows:

- **Settlement Payment**. MHC will: (a) pay to the Bankruptcy Estate, c/o me as Trustee, the total sum of $2,400,000.00 (the "**Settlement Payment**"); and (b) withdraw the MHC Claim and waive its right to obtain payment from the

---

[1] If there is a discrepancy between this Motion and the Settlement Agreement, the Settlement Agreement shall control.

EVERETT DECL. ISO MOTION TO APPROVE COMPROMISE     6

Bankruptcy Estate under section 502(h) (or otherwise).[2] The Settlement Payment will be made within 14 days after the date of a final order approving the settlement. The Settlement Payment shall be made by check payable to "Kyle Everett, Chapter 7 Trustee for Benja Incorporated" and shall be delivered to DSI, Attn: Kyle Everett, 150 Post Street, Suite 400, San Francisco, CA 94108 or by wire transfer pursuant to written instructions to be provided separately by counsel for the Trustee.

- **Withdrawal of MHC Proof of Claim**. MHC will withdraw its Proof of Claim within 14 days after the Order becomes final. If MHC does not withdraw its Proof of Claim within 14 days after the Order becomes final, then pursuant to this settlement agreement and any order approving it, the MHC Proof of Claim shall be deemed withdrawn and MHC shall have no right to any distribution from the Bankruptcy Estate.

- **No Claims by MHC Against the Bankruptcy Estate**. MHC waives any and all other claims against the Bankruptcy Estate.

- **Mutual Release**. The Estate and MHC mutually release each other from all claims and obligations except those under the Settlement Agreement.

- **No admission of liability**. Nothing in the Settlement Agreement shall constitute or be construed as an admission of liability.

- **Settlement Agreement Conditioned Upon Bankruptcy Court Approval.** The Settlement Agreement is conditioned upon the approval of the Bankruptcy Court. The Parties agree to a waiver of the 14-day stay as set forth in Bankruptcy Rule 6004 with respect to the effectiveness of the Order.

---

[2] Based upon the parties' analysis, the net settlement payment of $2,400,000.00 and withdrawal of the MHC Claim is estimated to be equivalent of a $4,000,000.00 gross payment by MHC to the Bankruptcy Estate and non-withdrawal of the MHC Claim. In estimating the gross value, the Parties jointly applied certain underlying assumptions regarding the Bankruptcy Estate's assets and liabilities, including the Trustee commission being the same amount under either the gross or net payment approach under a constructive disbursement theory. These joint calculations provide an indication that a $4,000,000.00 gross payment by MHC to the Bankruptcy Estate with a pari-passu distribution on the MHC Claim pursuant to section 502(h) provides general unsecured creditors approximately the same amount that they would receive under a $2,400,000.00 net payment by MHC to the Bankruptcy Estate and withdrawal of its Proof of Claim and waiver of any right to receive a distribution from the Bankruptcy Estate. In fact, applying the same assumptions regarding the total amount of the Bankruptcy Estate's assets and liabilities shows that, under the net payment and withdrawal-of-claim approach, general unsecured creditors are estimated to receive .38% more on their claims than if MHC paid the gross amount to the Bankruptcy Estate and did not withdraw its Proof of Claim. The Parties agree that the analysis and assumption stated herein is provided for background purposes only and the accuracy or precision of the assumptions and analysis shall in no manner affect the validity or finality of this Agreement or increase or decrease the obligations of MHC hereunder, including its obligations under Section 2 of this Agreement.

6. By this Motion, and in my capacity as Trustee of the Benja bankruptcy estate, I seek approval of the Settlement Agreement.

7. For the reasons stated below, I believe in my reasonable business judgment that the Settlement Agreement fulfills the *A & C Properties* factors set forth in *Martin v. Kane (In re A & C Properties)*, 784 F.2d 1377, 1380-81 (9th Cir. 1986); *cert. den. sub nom Martin v. Robinson*, 479 U.S. 854 (1986). As set forth below, the most significant of the *A & C Properties* factors supporting approval of the settlement are the uncertainty and significant expense, inconvenience, and delay that would be created absent approval of the Settlement Agreement, as well as the paramount interest of creditors strongly favor approval of the Settlement Agreement.

8. **Probability of Success:** The probability of establishing liability on the estate's claims against MHC is high as to the Alleged Preference Claims, as to which I have already obtained summary judgment. As to the Alleged Fraudulent Transfer Claims, the probability of success is much less clear. I contend that the evidence strongly supports the avoidance of some of transfers as received via actual fraud under a Ponzi scheme orchestrated by Mr. Chapin, who pled guilty to crimes related to his fraud in operating the Debtor and deceiving investors and lenders with fabricated accounts receivable and financial statements. I am informed and believe that case law provides a presumption of actual fraud when, as here, there is a criminal plea establishing the elements of a Ponzi scheme and when the transfers were made in the course of such Ponzi scheme. Despite this presumption, however, I still bear the burden of establishing that the transfers made to MHC were part of a Ponzi scheme orchestrated by Mr. Chapin, which MHC strenuously disputes. Thus, absent settlement, the parties would need to litigate the Estate's Alleged Fraudulent Transfer Claims.

On balance, I believe that my probability of establishing liability on the estate's claims against MHC, in at least the amount of the Alleged Preference Payments is strong and that his probability of establishing liability on the Alleged Fraudulent Transfer Payments is considerably weaker, with the odds of success on those claims a toss-up. Thus, this factor at

least partially favors approval of the Settlement Agreement, at least as to the Alleged Fraudulent Transfer Claims.

9.     **Difficulty of Collection**: The difficulty of collection element appears to be neutral.  Although the banking industry has been in turmoil this year, I am unaware of any evidence to suggest that MHC would be unable to pay a judgment against it.

10.     **Complexity of Litigation, Expense, Inconvenience, and Delay**: This factor strongly favors approval of the Settlement Agreement.  I estimate that it would require at least $300,000 in attorneys' fees and costs to reach a judgment against MHC on account of the Alleged Fraudulent Transfer Claims.  In addition, achieving a litigated judgment against MHC would come at significant inconvenience, delay, and risk to the Estate.  Moreover, absent a settlement, I anticipate that MHC would appeal the Partial Summary Judgment Order, which found in favor of the Estate on the Alleged Preference Claims.  Although I am confident that the Estate would prevail on appeal, defending the Partial Summary Judgment Order on appeal would be expensive and time consuming, and would add an estimated one to three years of delay or more, depending on whether the expected appeal ended with the Bankruptcy Appellate Panel, or went to the Ninth Circuit Court of Appeals after the BAP, and depending on whether the appellate court(s) remanded any issues to the Bankruptcy Court.

11.     **Paramount Interest of Creditors:** This factor strongly favors settlement. The Settlement Payment alone, albeit netted from a gross payment to a net payment, which requires the Parties to make educated assumptions about the estate's assets and liabilities, represents a full recovery on account of the Estate's Alleged Preference Claims and an estimated 50% recovery on the Estate's Alleged Fraudulent Transfer Claims—without incurring the anticipated substantial costs to the Estate if these claims were to be litigated.  A key part of the netting of MHC's payment into the Estate against the Estate's obligation to MHC under section 502(h) is the withdrawal of the MHC Claim, and waiver of MHC's creditor rights against the Estate, including MHC's appeal rights as to the Partial Summary Judgment Order.

1    12.    In summary, I submit that the Settlement Agreement is fair and equitable, within

2  the range of reasonableness, and, in the Trustee's reasonable business judgment, in the best

3  interest of the Estate.

4         I declare under penalty of perjury under the laws of the United States, that the foregoing

5  is true and correct.  Executed in ___San Francisco___County, California on August _7_, 2023.

6

7                                                        *Kyle Everett*

8                                              _____
                                             Kyle Everett, Solely in my Capacity as
9                                              Chapter 7 Trustee of the Benja Incorporated
                                             Bankruptcy Estate

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case: 20-30819    Doc# 170-1    Filed: 08/07/23    Entered: 08/07/23 18:17:50    Page 10 of 21

# Exhibit A

# Exhibit A

# SETTLEMENT AGREEMENT AND RELEASE

**THIS SETTLEMENT AGREEMENT AND RELEASE** ("**Agreement**") is made and entered into on the last date set forth on the signature pages below ("**Execution Date**"), by and between Kyle Everett, in his capacity as the Chapter 7 Trustee for the bankruptcy estate (the "**Bankruptcy Estate**") of Benja Incorporated ("**Trustee**") on the one hand, and MHC Financial Services, LLC, formerly known as MHC Financial Services, Inc. on the other hand ("**MHC**"). For purposes of this Agreement, Trustee and MHC may be referred to individually as a "**Party**" and collectively as the "**Parties**."

## RECITALS

A.   Benja Incorporated aka EPHE Corporation ("**Benja**" or the "**Debtor**") was ostensibly an e-commerce advertising startup founded by Andrew Chapin ("**Chapin**") in 2014.

B.   On or about March 25, 2020, MHC and Benja entered into a Factoring Services Agreement. The Factoring Services Agreement provides, *inter alia*, for Benja to sell and assign its existing and future accounts receivable from Benja (the "**Factored Accounts**") and for MHC to purchase the Factored Accounts.

C.   The Trustee contends that the Factored Accounts purportedly sold by Benja to MHC did not exist, and that Benja either did not exist or did not generate sales anywhere close to what had been represented by Benja. Rather, the Trustee contends that the documents purporting to represent accounts receivable had been forged by Benja for the purposes of obtaining payment from MHC for purchase of the putative Factored Accounts. The Trustee further contends that Benja used similar representations regarding the nature and extent of Benja, along with doctored bank statements, to obtain loans and investments from others, too.

D.   From approximately April 2, 2020 to May 27, 2020, MHC advanced approximately $4,482,707.79 in funds to Benja for the purported purchase of the Factored Accounts Receivable.

E.   From approximately June 3, 2020 to June 23, 2020 (i.e. more than 90 days prior to the filing of Benja's Bankruptcy Case, see below, Recital L), Benja made payments to MHC totaling $1,840,627.84.

F.   From approximately August 7, 2020 to September 25, 2020 (i.e. within 90 days of the filing of Benja's Bankruptcy Case, see below, Recital L), Benja made payments to MHC totaling $3,083,036.21.

G.   On October 15, 2020, Mr. Chapin caused the Debtor to file a Chapter 11 bankruptcy case (the "**Bankruptcy Case**"). ECF No. 1. The Court granted a motion to appoint a Chapter 11 trustee in the Bankruptcy Case on October 26, 2020. ECF Nos. 19 and 26. Mr. Everett was appointed as the Chapter 11 Trustee on November 3, 2020. ECF No. 45.

H.   On or about November 23, 2020, Mr. Chapin was arrested and charged in federal court with multiple counts of fraud in connection with a multi-million-dollar scheme to deceive the Debtor's investors and creditors (the "**Criminal Case**").

1

DocuSign Envelope ID: 8836FB72-1039-49C5-B1EA-970CEB4892C0

I.    On January 15, 2021, Mr. Everett, then acting as the Chapter 11 Trustee, moved to convert the case to Chapter 7.  ECF No. 67.  On January 29, 2021, the Bankruptcy Case was converted to Chapter 7 and Mr. Everett was appointed as Chapter 7 Trustee. ECF Nos. 85 and 86.

J.    On August 5, 2021, the Trustee filed a complaint against MHC to avoid alleged preferential transfers and fraudulent transfers from Benja to MHC totaling $4,923,664.00, *Everett v. MHC Financial Services, Inc.*, Adv. Proc. No. 21-3036 (the "**Adversary Proceeding**").

K.    On September 7, 2021, MHC filed an answer denying the Trustee's claims and asserting numerous affirmative defenses in the Adversary Proceeding.

L.    On August 8, 2022, the Court entered an order granting the Trustee's Motion for Partial Summary Judgment on the Bankruptcy Estate's preferential transfer claims against MHC totaling $3,083,036.21 (ECF 37).  The remaining claims of the Bankruptcy Estate for fraudulent transfer total $1,840,627.84.

M.    On October 5, 2022, the parties filed a stipulation to participate in the Bankruptcy Dispute Resolution Program ("**BDRP**") for the Northern District of California (ECF 39). On January 20, 2023, the parties participated in a BDRP mediation.  Following the mediation, which did not result in a settlement on the day of mediation, the parties continued to engage in settlement discussions.

N.    Several factors complicated the parties' analysis of an appropriate net settlement sum and significantly lengthened the settlement process.  One complicating factor delaying settlement was how to handle the "netting" of MHC's liability to the Bankruptcy Estate against the Bankruptcy Estate's liability to MHC under 11 U.S.C. §502(h).  Specifically, section 502(h) allows a creditor (here, MHC) to file a claim against the Bankruptcy Estate in the same amount that such creditor pays into the Bankruptcy Estate.  For example, if MHC paid the Bankruptcy Estate $4,000,000.00, MHC would be entitled under section 502(h) to file a claim against the Bankruptcy Estate in the sum of $4,000,000.00 and to receive a pro-rata payment from the Bankruptcy Estate, pari-passu with other general unsecured creditors.  Calculating the net gross value to the Bankruptcy Estate of a net settlement payment by MHC with a waiver of any claim of MHC against the Bankruptcy Estate (hereinafter, the "**Netting Calculation**") required careful analysis and identification of appropriate underlying assumptions, which the parties disagreed about.  One part of the complex Netting Calculation was estimating the total claims against the Bankruptcy Estate, which depended in part on the amount of estimated administrative expense claims, which in turn depended on analysis of the Trustee's commission under the constructive disbursement doctrine, as well as the estimated amount of legal fees to be incurred in litigating the Bankruptcy Estate's litigation claims and the estimated payments into the Bankruptcy Estate on account of those claims.  These calculations, estimations, and analyses took time, and were fundamental, complex components of the assumptions underlying the parties' settlement analyses.  Another complicating factor in the analysis of an appropriate net settlement was any tax implications of a settlement.  The Parties jointly analyzed the issues with their respective tax professionals.

O.    In short, the parties carefully analyzed the various aspects needed to estimate the gross value of a net payment and claim waiver by MHC to the Bankruptcy Estate.  The Parties have communicated regularly and shared analyses regarding settlement numbers and the assumptions upon which those numbers were based.

P.    On September 23, 2022, MHC filed a proof of claim in the Bankruptcy Case, i.e. Claim No. 32 (the "**MHC Claim**").  The MHC Claim amount was undetermined, and asserts that it would be in the amount paid by MHC to the Bankruptcy Estate.  *See* 11 U.S.C. § 502(h).

Q.    On or about June 14, 2023, the parties' ongoing efforts resulted in a settlement, subject to Bankruptcy Court approval upon appropriate notice to creditors, which settlement is memorialized by this Agreement.

## **AGREEMENT**

Based on the foregoing, in consideration of the promises and the mutual covenants of the Parties stated in this Agreement, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.    **Bankruptcy Court Approval**.  This Agreement is conditioned upon the approval of the Bankruptcy Court.  In connection with obtaining approval of the Bankruptcy Court, within 30 business days of the full execution of this Agreement, Trustee shall file a motion under Rule 9019 of the Federal Rules of Bankruptcy Procedure and provide notice of that motion, as required by Rule 2002 of the Federal Rules of Bankruptcy Procedure.  The Parties agree to cooperate in obtaining approval of such motion.  This Agreement shall become effective on the date the order of the Bankruptcy Court approving this Agreement ("**Order**") becomes final (the "**Effective Date**").  The Parties agree to a waiver of the 14-day stay as set forth in Bankruptcy Rule 6004 with respect to the effectiveness of the Order.

2.    **Terms**.  As full and final settlement of the Adversary Proceeding, including without limitation all claims that were asserted or which could have been asserted in the Adversary Proceeding, the MHC Claim, and all appeal rights, the Parties agree as follows:

2.1.    **Settlement Payment**.  MHC will: (a) pay to Trustee the total sum of $2,400,000.00 (the "**Settlement Payment**"); and (b) withdraw the MHC Claim and waive its right to obtain payment from the Bankruptcy Estate under section 502(h) (or otherwise).[1]  The

---

[1] Based upon the parties' analysis, the net settlement payment of $2,400,000.00 and withdrawal of the MHC Claim is estimated to be equivalent of a $4,000,000.00 gross payment by MHC to the Bankruptcy Estate and non-withdrawal of the MHC Claim.  In estimating the gross value, the Parties jointly applied certain underlying assumptions regarding the Bankruptcy Estate's assets and liabilities, including the Trustee's commission being the same amount under either the gross or net payment approach under a constructive disbursement theory.  These joint calculations provide an indication that a $4,000,000.00 gross payment by MHC to the Bankruptcy Estate with a pari-passu distribution on the MHC Claim pursuant to section 502(h) provides general unsecured creditors approximately the same amount that they would receive under a $2,400,000.00 net payment by MHC to the Bankruptcy Estate and withdrawal of its Proof of Claim and waiver of any right to receive a distribution from the Bankruptcy Estate.  In fact, applying the same assumptions regarding the total amount of the Bankruptcy Estate's assets and liabilities shows that, under the net payment and withdrawal-of-claim approach, general unsecured creditors are estimated to receive .38% more on their claims than if MHC paid the gross amount to the Bankruptcy Estate and did not withdraw its Proof of Claim.  The Parties agree that the analysis and assumption stated herein is provided for background purposes only and the accuracy or precision of the assumptions and analysis shall in no manner affect the validity or finality of this Agreement or increase or decrease the obligations of MHC hereunder, including its obligations under Section 2 of this Agreement.

3

Settlement Payment will be made within 14 days after the date of a final order approving the settlement.   The Settlement Payment shall be made by check payable to "Kyle Everett, Chapter 7 Trustee for Benja Incorporated" and shall be delivered to DSI, Attn: Kyle Everett, 150 Post Street, Suite 400, San Francisco, CA 94108 or by wire transfer pursuant to written instructions to be provided separately by counsel for the Trustee.

2.2 **Withdrawal of MHC Proof of Claim**. MHC will withdraw its Proof of Claim within 14 days after the Order becomes final.   If MHC does not withdraw its Proof of Claim within 14 days after the Order becomes final, then pursuant to this settlement agreement and any order approving it, the MHC Proof of Claim shall be deemed withdrawn and MHC shall have no right to any distribution from the Bankruptcy Estate.

2.3 **No Claims by MHC Against the Bankruptcy Estate**. MHC waives any and all other claims against the Bankruptcy Estate.

2.4 **Dismissal of Adversary Proceeding**. The parties shall file a stipulation to dismiss with prejudice the Adversary Proceeding within 14 days of the withdrawal or deemed withdrawal of MHC's Proof of Claim.

3.    **Release by Trustee.**  Except as otherwise set forth in this Agreement, in consideration of the promises, covenants and agreements set forth herein and for other good and valuable consideration, Trustee, and his affiliates, successors and/or assigns, on behalf of the Bankruptcy Estate ("**Plaintiff Releasor**") hereby waives, remises, releases, acquits, satisfies, and forever discharges MHC, its parent, subsidiaries and related persons and entities, as well as all of their past, present and future owners, shareholders, members, officers directors, employees, agents, professionals, attorneys, accountants, predecessors, successors and assigns (the "**MHC Released Parties**") of and from all manner of action and actions, cause and causes of action, suits, debts, sums of money, accounts, covenants, contracts, controversies, agreements, promises, trespasses, damages, judgments, executions, claims, and demands whatsoever, in law or in equity including, without limitation, all claims which were made or could have been asserted in the Adversary Proceeding, with the exception of the Parties' obligations under this Agreement.

4.    **Release by MHC**.  Except as otherwise set forth in this Agreement, in consideration of the promises, covenants and agreements set forth herein and for other good and valuable consideration, MHC, and its affiliates, successors, and/or assigns hereby waive, remise, release, acquit, satisfy, and forever discharge Trustee, Trustee's professionals, including but not limited to his attorneys and accountants, and the Bankruptcy Estate, as well as their agents, representatives, predecessors, successors, spouses, and assigns (the "**Bankruptcy Estate Released Parties**"), of and from all manner of action and actions, cause and causes of action, suits, debts, sums of money, accounts, covenants, contracts, controversies, agreements, promises, trespasses, damages, judgments, executions, claims, and demands whatsoever, in law or in equity including, without limitation, all claims which were made or could have been asserted in the Adversary Proceeding, with the exception of the Parties' obligations under this Agreement.

5.    **Release of Unknown Claims**.  The Parties specifically waive and relinquish all rights and benefits afforded by Section 1542 of the California Civil Code, which provides as follows:

4

DocuSign Envelope ID: 8836FB72-1039-49C5-B1EA-970CEB4892C0

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

The Parties' waiver of all rights and benefits afforded by Section 1542 is done with their understanding and acknowledgement of the significance of such a specific waiver of Section 1542. Notwithstanding the provisions of Section 1542, and for the purpose of implementing a full and complete release and discharge of each and all the Parties hereto, the Parties expressly acknowledge that this Agreement is intended to include in its effect (without limitation) all claims the Parties know or suspects to exist in their respective favor, and all claims the Parties do not know or suspect to exist in their respective favor at the time each Party executes this Agreement, which contemplates the extinguishment of any such claims. This waiver also applies to any other relevant re-codification or similar laws implemented hereafter substantially covering the subject matter of Section 1542.

6. **Representations and Warranties**. MHC represents and warrants to Trustee that it is not aware of any third-party or organization claiming to have or having any interest in the MHC Claim or any claim against the Bankruptcy Estate released by MHC hereunder and that it is the sole owner and holder of the claims released herein. Additionally, MHC represents and warrants to Trustee that it has not assigned, hypothecated, or otherwise transferred any interest in the claims and causes of action resolved by this Agreement, including the MHC Claim. MHC represents and warrants to Trustee that it is not aware of any third party or organization which has asserted or may assert a claim or lien against the proceeds of the settlement memorialized by this Agreement, other than the creditors of the Bankruptcy Estate (i.e., MHC is not providing encumbered funds to the Bankruptcy Estate). Trustee represents and warrants that he is authorized to release all claims held by the Bankruptcy Estate, including any claim that Benja Incorporated or EPHE Corporation may have had prior to commencement of the bankruptcy proceedings.

7. **No Admission of Liability**. Nothing in this Agreement shall constitute or be construed as an admission of liability on behalf of Trustee or MHC, or their respective agents, affiliates, assigns, parents, successors, subsidiaries, and/or successors, or an admission as to the validity of the allegations in the Lawsuit. It is also understood and agreed to by the Parties that this Agreement does not constitute an order or finding of any violation of law related to fraudulent, manipulative, or deceptive conduct.

8. **Voluntary Agreement/Attorney Representation**. The Parties represent that in the execution and negotiation of this Agreement, they are represented by counsel of their choice and that said attorneys advised their respective clients with respect to the advisability of making the settlement and release provided herein and of executing this Agreement; or if they are not represented by counsel, that they had the opportunity to consult legal counsel of their own selection and the decision not to be represented by counsel is a decision that the Parties have freely made. The Parties further represent and warrant that they are fully aware of the terms contained in this Agreement, made any desired changes, and have voluntarily and without coercion, duress, or undue influence of any kind, entered into this Agreement and the documents executed in connection with this Agreement.

9. **No Third-Party Beneficiaries**. There are no third-party beneficiaries to this Agreement, and no claims are released other those expressly identified herein.

10. **Entire Agreement**. This Agreement constitutes the sole and entire agreement between the Parties and supersedes all prior and contemporaneous statements, promises, understandings or agreements, whether written or oral.

11. **Amendments**. This Agreement may be amended, modified or altered at any time upon the approval of the Parties; however, any such amendment must be in writing and signed by all Parties in order for such amendment to be of any force and effect.

12. **Partial Invalidity**. In the event that any provision of this Agreement is declared by any court of competent jurisdiction or any administrative judge to be void or otherwise invalid, all of the other terms, conditions and provisions of this Agreement shall remain in full force and effect to the same extent as if that part declared void or invalid had never been incorporated in the Agreement and in such form, the remainder of the Agreement shall continue to be binding upon the Parties.

13. **Survival**. All representations and warranties contained herein shall survive the execution and delivery of this Agreement, and the execution and delivery of any other document or instrument referred to herein.

14. **Applicable Law**. This Agreement shall be subject to and governed by the laws of the State of California, without regard to conflict of law rules.

15. **Attorneys' Fees and Costs**. In the event of a dispute regarding this Agreement and/or its terms, the prevailing party in such dispute is entitled to reasonable attorneys' fees and costs, upon approval of same by the Bankruptcy Court. Unless otherwise provided in this Agreement, each of the Parties has agreed to bear his or its own attorneys' fees and costs with respect to the Adversary Proceeding, and all claims made therein, and the preparation of any and all documents necessary to enter into this Agreement.

16. **Counterparts**. This Agreement may be signed and executed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one Agreement. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or email shall be effective as delivery of an originally executed counterpart of this Agreement.

17. **No Adverse Construction**. The Parties acknowledge that this Agreement has been prepared by each of them through counsel. In the event any part of this Agreement is found to be ambiguous, such ambiguity shall not be construed against any Party.

18. **Agreement is Not Evidence**. This Agreement shall not be used as evidence in any proceeding other than one to enforce this Agreement, or one seeking damages arising from a breach of this Agreement.

19. **Authority**. The Parties represent and warrant to each other that each is the sole and

6

DocuSign Envelope ID: 8836FB72-1039-49C5-B1EA-970CEB4892C0

lawful owner of all right, title, and interest in and to every claim and other matter which each releases in this Agreement.  In the event that such representation is false, and any such claim or matter is asserted against either Party by anyone who is the assignee or transferee of such a claim or matter, then the Party who assigned or transferred such claim or matter shall fully indemnify, defend, and hold harmless the Party against whom such claim or matter is asserted and its successors from and against such claim or matter.

20.  **Further Assurances**. The Parties shall perform such further acts and things and execute and deliver such additional agreements, powers and instruments, as may reasonably be required or reasonably deem advisable to carry into effect the purposes of this Agreement.

21.  **Jury Waiver**. TO THE FULLEST EXTENT PERMITTED UNDER CALIFORNIA LAW, THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT.

22.  **Choice of Forum; Personal Jurisdiction**.  Subsequent to the Effective Date, the Parties agree that any claim or dispute between them regarding the enforcement or interpretation of this Agreement must be resolved by the Bankruptcy Court.  The Parties expressly submit to the personal jurisdiction of the Bankruptcy Court for the purpose of litigating all such claims and disputes and consent to entry of final judgment by the Bankruptcy Court with respect to this Agreement and all related matters.

**[THE REMAINDER OF THIS PAGE INTENTIONALLY BLANK.
SIGNATURE PAGE(S) TO FOLLOW.]**

**BY SIGNING BELOW, THE PARTIES ACKNOWLEDGE THAT THEY HAVE READ AND UNDERSTAND THE TERMS OF THIS AGREEMENT AND EXPRESSLY CONSENT THERETO.**

The Parties have executed this Agreement as of the date set forth below.

DATED: ___7/27/2023___

**BENJA INCORPORATED**

By: _Kyle Everett_
Name: Kyle Everett
Title: Chapter 7 Trustee

DATED: _____

**MHC FINANCIAL SERVICES, LLC f/k/a MHC FINANCIAL SERVICES, INC.**

By: _____
Name:
Title:

**APPROVED AS TO FORM**:

DATED: ___07/27/2023___

**FINESTONE HAYES LLP**

By: _Jennifer C. Hayes_
Name: Jennifer C. Hayes, Attorneys for the Chapter 7 Trustee

DATED: _____

**SEIGFREID BINGHAM, P.C.**

By: _____
Name:
Attorneys for MHC Financial Services, LLC, f/k/a MHC Financial Services, Inc.

8

**BY SIGNING BELOW, THE PARTIES ACKNOWLEDGE THAT THEY HAVE READ AND UNDERSTAND THE TERMS OF THIS AGREEMENT AND EXPRESSLY CONSENT THERETO.**

The Parties have executed this Agreement as of the date set forth below.

DATED: _____          **BENJA INCORPORATED**

By: _____
Name: Kyle Everett
Title: Chapter 7 Trustee


DATED: _____          **MHC FINANCIAL SERVICES, LLC**
                                    **f/k/a MHC FINANCIAL SERVICES, INC.**

By: _____
Name: Jeffrey W. Johnson
Title: CFO


**APPROVED AS TO FORM:**


DATED: _____          **FINESTONE HAYES LLP**

By: _____
Name: Jennifer C. Hayes, Attorneys for the
Chapter 7 Trustee


DATED: _____          **SEIGFREID BINGHAM, P.C.**

By: _____
Name: Greg Gassner
Attorneys for MHC Financial Services,
LLC, f/k/a MHC Financial Services, Inc.

8

1992478v3