| | |
|---|---|
| In re<br><br>BENJA INCORPORATED,<br><br>        Debtor. | Case No. 20-30819 DM<br>Chapter 7<br><br>**NOTICE AND OPPORTUNITY FOR HEARING ON CHAPTER 7 TRUSTEE'S MOTION TO APPROVE COMPROMISE OF CONTROVERSY WITH MHC FINANCIAL SERVICES, LLC**<br><br>[No Hearing Unless Requested; Filed Pursuant to B.L.R. 9014-1(b)(3)] |

**TO THE DEBTOR, CREDITORS, THE OFFICE OF THE UNITED STATES TRUSTEE, AND PARTIES IN INTEREST:**

**PLEASE TAKE NOTICE** that Kyle Everett, Chapter 7 Trustee (the "Trustee") of the bankruptcy estate (the "Estate") of Benja Incorporated (the "Debtor"), has filed a Motion to Approve Compromise of Controversy with MHC Financial Services, LLC (the "Motion"), pursuant to Bankruptcy Code section 105, Bankruptcy Rule 9019(a), and Local Bankruptcy Rule 9014-1(b)(3). The Motion seeks entry of an order approving the settlement agreement (the "Settlement Agreement") reached between the Trustee, on the one hand, and MHC Financial Services, LLC, formerly known as MHC Financial Services, Inc. ("MHC"), on the other hand. The Motion is supported by the points and authorities set forth therein and summarized below, this Notice and Opportunity for Hearing, the supporting Declaration of Kyle Everett (the "Everett Declaration"), and the proof of service. This Notice summarizes the dispute, the terms of the proposed compromise, and the procedure for filing an objection, if any. Anyone who would like a copy of the Motion and/or the Everett Declaration should contact Jennifer C. Hayes to request a copy: (415) 616-0466; jhayes@fhlawllp.com.

The Settlement Agreement resolves avoidable transfer claims held by the Estate and asserted by the Trustee against MHC (the "Avoidance Claims") in return for a net settlement payment of $2,400,000 (the "Settlement Payment") and withdrawal/waiver of MHC's claim against the bankruptcy estate, which is estimated to be equivalent of a $4,000,000 gross payment by MHC to the Bankruptcy Estate and non-withdrawal of the MHC Claim. In estimating the gross value, the Parties jointly applied certain underlying assumptions regarding the Bankruptcy Estate's assets and liabilities, including the Trustee's commission being the same amount under either the gross or net payment approach under a constructive disbursement theory. These joint calculations provide an indication that a $4,000,000 gross payment by MHC to the Bankruptcy Estate with a pari-passu distribution on the MHC Claim pursuant to section 502(h) provides general unsecured creditors approximately the same amount that they would receive under a $2,400,000.00 net payment by MHC to the Bankruptcy Estate and withdrawal of its Proof of Claim and waiver of any right to receive a distribution from the Bankruptcy Estate.

Payment of the $2,400,000 shall be made within fourteen days after the date of a final order approving the settlement, and MHC shall also withdraw its claim within fourteen days after the date of a final order approving the settlement. However, if MHC does not withdraw its Proof of Claim within fourteen days after the Order becomes final, then pursuant to the Settlement Agreement and the order approving it, the MHC proof of claim shall be deemed withdrawn and MHC shall have no right to any distribution from the Bankruptcy Estate. The Settlement Agreement is subject to, and conditioned upon, bankruptcy court approval.

-1-

## BACKGROUND

Benja Incorporated aka EPHE Corporation ("Benja" or the "Debtor") was ostensibly an e-commerce advertising startup founded by Andrew Chapin ("Chapin") in 2014.

On or about March 25, 2020, MHC and Benja entered into a Factoring Services Agreement. The Factoring Services Agreement provides, inter *alia*, for Benja to sell and assign its existing and future accounts receivable (the "Factored Accounts") from the consumer product merchandise business (the "CPM Business") and for MHC to purchase the Factored Accounts. The Trustee contends that, in reality, the Factored Accounts purportedly sold by Benja to MHC did not exist, and that the CPM Business either did not exist or did not generate sales anywhere close to what had been represented by Benja. Rather, the documents purporting to represent accounts receivable had been forged by Benja for the purposes of obtaining payment from MHC for purchase of the putative Factored Accounts. The Trustee contends that the notice of the alleged purchase of the Factored Accounts was never sent because the Factored Accounts did not exist. The Trustee further contends that Benja used similar representations regarding the nature and extent of the CPM Business, along with doctored bank statements, to obtain loans and investments from others, too.

From approximately April 2, 2020 to May 27, 2020, MHC advanced approximately $4,482,707.79 in funds to Benja for the purported purchase of the Factored Accounts Receivable.
From approximately June 3, 2020 to June 23, 2020 (i.e. more than 90 days prior to the filing of Benja's Bankruptcy Case), Benja made payments to MHC totaling $1,840,627.84 (the "Alleged Fraudulent Transfer Payments"). From approximately August 7, 2020 to September 25, 2020 (i.e. within 90 days of the filing of Benja's Bankruptcy Case), Benja made payments to MHC totaling $3,083,036.21 (the "Alleged Preference Payments").

On October 15, 2020, Mr. Chapin caused the Debtor to file a Chapter 11 bankruptcy case (the "Bankruptcy Case"). ECF No. 1. The Court granted a motion to appoint a Chapter 11 trustee in the Bankruptcy Case on October 26, 2020. ECF Nos. 19 and 26. Mr. Everett was appointed as the Chapter 11 Trustee on November 3, 2020. ECF No. 45.

On or about November 23, 2020, Mr. Chapin was arrested and charged in federal court with multiple counts of fraud in connection with a multi-million-dollar scheme to deceive the Debtor's investors and creditors (the "Criminal Case"). On January 15, 2021, Mr. Everett, then acting as the Chapter 11 Trustee, moved to convert the case to Chapter 7. ECF No. 67. On January 29, 2021, the Bankruptcy Case was converted to Chapter 7 and Mr. Everett was appointed as Chapter 7 Trustee. ECF Nos. 85 and 86.

On June 16, 2021, Mr. Chapin pled guilty to bank fraud, wire fraud, and securities fraud (the "Plea Agreement"). The Plea Agreement provides, *inter alia*, as follows:

> During the relevant time period (June 2019 through September 2020), I looked for additional investors and credit lines for Benja. I told creditors and prospective investors that Benja generated $6,200,000 and $13,200,000 in revenue in 2018 and 2019, respectively, and had signed large contracts with numerous well-known companies including Nike, Fanatics, Patagonia, and Backcountry, to place advertisements for their excess inventory. In truth, I knew that my representations to creditors and investors were false, as I had fabricated Benja's revenue and did not have contracts with any of these companies.
>
> To perpetuate the fraud scheme, beginning in June of 2019 and continuing until August of 2019, I made a series of false statements to Busey Bank to secure lines of credit totaling $5,000,000. For example, on June 24, 2019, I applied for a $1,000,000 line of credit for Benja with Busey Bank. I provided financial statements, a balance sheet, incorporation documents, and tax information in support of the application. I designated Benja's assets as collateral

for the loan and submitted a July 2019 Aged Receivables Report listing $2,027,290 in receivables, including $1,600,000 in current receivables from Nike, Patagonia, Backcountry, and Fanatics. In truth, I falsified the aged receivables report, as I knew Benja did not have contracts with Nike, Patagonia, Backcountry, or Fanatics. In truth, I received an advance on my line of credit from Busey Bank and used most of the money to pay off other creditors and investors, to pay my personal credit cards, and transferred funds to my crypto-currency exchange account.

On August 5, 2021, the Trustee filed a complaint against MHC to avoid the Alleged Preferential Transfers and the Alleged Fraudulent Transfers from Benja to MHC totaling $4,923,664, *Everett v. MHC Financial Services, Inc.*, Adv. Proc. No. 21-3036 (the "Adversary Proceeding"). On September 7, 2021, MHC filed an answer denying the Trustee's claims and asserting numerous affirmative defenses in the Adversary Proceeding.

On August 8, 2022, the Court entered an order granting the Trustee's Motion for Partial Summary Judgment on the Estate's Alleged Preference Claims against MHC totaling $3,083,036.21 (ECF 37, the "Partial Summary Judgment Order"). The remaining claims of the Estate for Alleged Fraudulent Transfers total $1,840,627.84.

On September 23, 2022, MHC filed a proof of claim in the Bankruptcy Case, i.e. Claim No. 32 (the "MHC Claim"). The MHC Claim amount was undetermined, and asserts that it would be in the amount paid by MHC to the Bankruptcy Estate. *See* 11 U.S.C. § 502(h).

On October 5, 2022, the parties filed a stipulation to participate in the local Bankruptcy Dispute Resolution Program ("BDRP") (ECF 39). On January 20, 2023, the parties participated in a BDRP mediation. Following the mediation, which did not result in a settlement on the day of mediation, the parties continued to engage in protracted settlement discussions.

Several factors complicated the parties' analysis of an appropriate net settlement sum and significantly lengthened the settlement process. One complicating factor delaying settlement was how to handle the "netting" of MHC's liability to the Bankruptcy Estate against the Bankruptcy Estate's liability to MHC under 11 U.S.C. §502(h). Specifically, section 502(h) allows a creditor (here, MHC) to file a claim against the Bankruptcy Estate in the same amount that such creditor pays into the Bankruptcy Estate. For example, if MHC paid the Bankruptcy Estate $4,000,000, MHC would be entitled under section 502(h) to file a claim against the Bankruptcy Estate in the sum of $4,000,000 and to receive a pro-rata payment from the Bankruptcy Estate, pari-passu with other general unsecured creditors. Calculating the net gross value to the Bankruptcy Estate of a net settlement payment by MHC with a waiver of any claim of MHC against the Bankruptcy Estate (the "Netting Calculation") required careful analysis and identification of appropriate underlying assumptions, which the parties disagreed about. One part of the complex Netting Calculation was estimating the total claims against the Bankruptcy Estate, which depended in part on the amount of estimated administrative expense claims, which in turn depended on analysis of the Trustee's commission under the constructive disbursement doctrine, as well as the estimated amount of legal fees to be incurred in litigating the Bankruptcy Estate's litigation claims and the estimated payments into the Bankruptcy Estate on account of those claims. These calculations, estimations, and analyses took time, and were fundamental, complex components of the assumptions underlying the parties' settlement analyses. Another complicating factor in the analysis of an appropriate net settlement was any tax implications of a settlement. The Parties jointly analyzed the issues with their respective tax professionals.

In short, the parties carefully analyzed the various aspects needed to estimate the gross value of a net payment and claim waiver by MHC to the Bankruptcy Estate. The Parties have communicated regularly and shared analyses regarding settlement numbers and the assumptions upon which those numbers were based.

On or about June 14, 2023, the parties' ongoing efforts resulted in a settlement in principle, subject to documentation and Bankruptcy Court approval upon appropriate notice to creditors, which settlement is memorialized by a signed settlement agreement ("the Settlement Agreement), dated August 3, 2023, an authentic copy of which is attached as **Exhibit A** to the concurrently filed Everett Declaration.

**SETTLEMENT AGREEMENT TERMS**

As set forth more fully in the Settlement Agreement,[1] the key terms of the Settlement Agreement, which is subject to this Court's approval, are as follows:

- **Settlement Payment**. MHC will: (a) pay to Trustee the total sum of $2,400,000.00 (the "**Settlement Payment**"); and (b) withdraw the MHC Claim and waive its right to obtain payment from the Bankruptcy Estate under section 502(h) (or otherwise).[2] The Settlement Payment will be made within 14 days after the date of a final order approving the settlement. The Settlement Payment shall be made by check payable to "Kyle Everett, Chapter 7 Trustee for Benja Incorporated" and shall be delivered to DSI, Attn: Kyle Everett, 150 Post Street, Suite 400, San Francisco, CA 94108 or by wire transfer pursuant to written instructions to be provided separately by counsel for the Trustee.

- **Withdrawal of MHC Proof of Claim**. MHC will withdraw its Proof of Claim within 14 days after the Order becomes final. If MHC does not withdraw its Proof of Claim within 14 days after the Order becomes final, then pursuant to this settlement agreement and any order approving it, the MHC Proof of Claim shall be deemed withdrawn and MHC shall have no right to any distribution from the Bankruptcy Estate.

- **No Claims by MHC Against the Bankruptcy Estate**. MHC waives any and all other claims against the Bankruptcy Estate.

- **Mutual Release**. The Estate and MHC mutually release each other from all claims and obligation except those under the Settlement Agreement.

- **No admission of liability**. Nothing in the Settlement Agreement shall constitute or be construed as an admission of liability.

---

[1] If there is a discrepancy between this Notice and the Settlement Agreement, the Settlement Agreement shall control.

[2] Based upon the parties' analysis, the net settlement payment of $2,400,000.00 and withdrawal of the MHC Claim is estimated to be equivalent of a $4,000,000.00 gross payment by MHC to the Bankruptcy Estate and non-withdrawal of the MHC Claim. In estimating the gross value, the Parties jointly applied certain underlying assumptions regarding the Bankruptcy Estate's assets and liabilities, including the Trustee's commission being the same amount under either the gross or net payment approach under a constructive disbursement theory. These joint calculations provide an indication that a $4,000,000.00 gross payment by MHC to the Bankruptcy Estate with a pari-passu distribution on the MHC Claim pursuant to section 502(h) provides general unsecured creditors approximately the same amount that they would receive under a $2,400,000.00 net payment by MHC to the Bankruptcy Estate and withdrawal of its Proof of Claim and waiver of any right to receive a distribution from the Bankruptcy Estate. In fact, applying the same assumptions regarding the total amount of the Bankruptcy Estate's assets and liabilities shows that, under the net payment and withdrawal-of-claim approach, general unsecured creditors are estimated to receive .38% more on their claims than if MHC paid the gross amount to the Bankruptcy Estate and did not withdraw its Proof of Claim. The Parties agree that the analysis and assumption stated herein is provided for background purposes only and the accuracy or precision of the assumptions and analysis shall in no manner affect the validity or finality of this Agreement or increase or decrease the obligations of MHC hereunder, including its obligations under Section 2 of this Agreement.

-4-

Case: 20-30819    Doc# 171    Filed: 08/07/23    Entered: 08/07/23 18:19:08    Page 4 of 7

- **Settlement Agreement Conditioned Upon Bankruptcy Court Approval.** The Settlement Agreement is conditioned upon the approval of the Bankruptcy Court. The Parties agree to a waiver of the 14-day stay as set forth in Bankruptcy Rule 6004 with respect to the effectiveness of the Order.

## LEGAL ARGUMENT

By his Motion, the Trustee seeks approval of the Settlement Agreement pursuant to Bankruptcy Code § 105(a), B.L.R. 9014-1(b)(3), and Bankruptcy Rule 9019(a), which provides:

> On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement.

"The purpose of a compromise agreement is to allow the trustee and the creditors to avoid the expenses and burdens associated with litigating sharply contested and dubious claims." *Martin v. Kane (In re A & C Properties)*, 784 F.2d 1377, 1380-81 (9th Cir. 1986); *cert. den. sub nom Martin v. Robinson*, 479 U.S. 854 (1986). The bankruptcy court has great latitude in approving compromise agreements. *Woodson v. Fireman's Fund Insurance Co.* (*In re Woodson*), 839 F.2d 610, 620 (9th Cir. 1988). However, the court's discretion is not unlimited. The court may approve a compromise only if it is "fair and equitable." *A & C Properties* at 1381. In approving a proposed compromise in bankruptcy proceedings, the court must consider:

> (a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

*Id.* at 1381 (citations omitted).

"It is not necessary to satisfy each of these factors provided that the factors as a whole favor approving the settlement." *In re Pacific Gas & Elec. Co.*, 304 B.R. 395, 417 (Bankr. N.D. Cal. 2004). The Court's role in considering a proposed compromise is "to canvas the issues and see whether the settlement falls below the lowest point in the range of reasonableness." *Id.* at 417 citing *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 493, 496-97 (Bankr. S.D.N.Y. 1991). Although the Trustee bears the burden of persuasion, "a court generally gives deference to a trustee's business judgment in deciding whether to settle a matter." *Goodwin v. Mickey Thompson Entm't. Group, Inc.* (*In re Mickey Thompson Entm't Group, Inc.*), 292 B.R. 415, 420 (9th Cir. BAP 2003).

For the reasons stated below, the Trustee believes in his reasonable business judgment that the Settlement Agreement fulfills the *A & C Properties* factors. Everett Declaration at ¶ 7. As set forth below, the most significant of the *A & C Properties* factors supporting approval of the settlement are the uncertainty and significant expense, inconvenience, and delay that would be created absent approval of the Settlement Agreement, as well as the paramount interest of creditors strongly favor approval of the Settlement Agreement.

**Probability of Success**

The Trustee's probability of establishing liability on his claims against MHC is high as to the Alleged Preference Claims, as to which the Trustee has already obtained summary judgment. As to the Alleged Fraudulent Transfer Claims, the probability of success is much less clear. The Trustee contends that the evidence strongly supports the avoidance of some of transfers as received via actual fraud under a Ponzi scheme orchestrated by Mr. Chapin, who pled guilty to crimes related to his fraud in operating the Debtor and deceiving investors and lenders with fabricated accounts receivable and financial statements. Everett Declaration at ¶ 8. Case law provides a presumption of actual fraud when, as here, there is a criminal plea establishing the elements of a Ponzi scheme and when the transfers were made in the course of such Ponzi scheme. *Santa Barbara Capital Mgmt v. Neilson* (*In re Slatkin*), 525 F.3d 805, 814 (9th Cir. 2008); *see Kasolas v. Nicholson (In re Fox Ortega Enterprises, Inc.)*, 631 B.R. 425 (Bankr. N.D. Cal. 2021). Despite this presumption, however, the Trustee still bears the burden of establishing that the transfers made to MHC were part of a Ponzi scheme orchestrated by Mr. Chapin, which

MHC strenuously disputes. *Fox Ortega* at 449-50, 456. Thus, absent settlement, the parties would need to litigate the Estate's Alleged Fraudulent Transfer Claims.

On balance, the Trustee believes that his probability of establishing liability on his claims against MHC, in at least the amount of the Alleged Preference Payments is strong and that his probability of establishing liability on his Alleged Fraudulent Transfer Payments is considerably weaker, with the odds of success on those claims a toss-up. Thus, this factor at least partially favors approval of the Settlement Agreement, as to the Alleged Fraudulent Transfer Claims. Everett Declaration at ¶8.

### Difficulty of Collection
The difficulty of collection element appears to be neutral. Although the banking industry has been in turmoil this year, there is no evidence to suggest that MHC would be unable to pay a judgment against it. Everett Declaration at ¶ 9.

### Complexity of Litigation, Expense, Inconvenience, and Delay
This factor strongly favors approval of the Settlement Agreement. The Trustee estimates that it would require at least $300,000 in attorneys' fees and costs to reach a judgment against MHC on account of the Alleged Fraudulent Transfer Claims. In addition, achieving a litigated judgment against MHC would come at significant inconvenience, delay, and risk to the Estate. Moreover, absent a settlement, the Trustee anticipates that MHC would appeal the Partial Summary Judgment Order, which found in favor of the Estate on the Alleged Preference Claims. Everett Declaration at ¶10. Although the Trustee is confident that the Estate would prevail on appeal, defending the Partial Summary Judgment Order on appeal would be expensive and time consuming, and would add an estimated one to three years of delay or more, depending on whether the expected appeal ended with the Bankruptcy Appellate Panel, or went to the Ninth Circuit Court of Appeals after the BAP, and depending on whether the appellate court(s) remanded any issues to the Bankruptcy Court.

### Paramount Interest of Creditors
This factor strongly favors settlement. The Settlement Payment alone, albeit netted from a gross payment to a net payment, which requires the parties to make educated assumptions about the estate's assets and liabilities, represents a full recovery on account of the Estate's Alleged Preference Claims and an estimated 50% recovery on the Estate's Alleged Fraudulent Transfer Claims—without incurring the anticipated substantial costs to the Estate if these claims were to be litigated. A key part of the netting of MHC's payment into the Estate against the Estate's obligation to MHC under section 502(h) is the withdrawal of the MHC Claim, and waiver of MHC's creditor rights against the Estate, including MHC's appeal rights as to the Partial Summary Judgment Order. Everett Declaration at ¶11.

In summary, the Trustee submits the Settlement Agreement is fair and equitable, within the range of reasonableness, and, in the Trustee's reasonable business judgment, in the best interest of the Estate. *Id.* at ¶ 12. , which is attached as **Exhibit A** to the concurrently filed and supporting Everett Declaration.

### WAIVER OF RULE 6004(h) AND RELATED STAY PROVISIONS
The Motion also requests that the order granting the Motion provide: "This Order is effective upon entry, and the stay otherwise imposed by Rule 62(a) of the Federal Rules of Civil Procedure and/or Bankruptcy Rule 6004(h) shall not apply."

**PLEASE TAKE FURTHER NOTICE** that Local Rule 9014-1 of United States Bankruptcy Court for the Northern District of California prescribes the procedures to be followed with respect to any objection to the proposed settlement or any request for hearing thereon.

> Any objection to the requested relief, or a request for hearing on the matter, must be filed and served upon the initiating party within 21 days of mailing the notice;
>
> Any objection or request for a hearing must be accompanied by any declarations or memoranda of law any requesting party wishes to present in support of its position;
>
> If there is no timely objection to the requested relief or a request for hearing, the court may enter an order granting the relief by default.
>
> In the event of a timely objection or request for hearing, the initiating party will give at least seven days written notice of the hearing to the objecting or requesting party, and to any trustee or committee appointed in the case.

**PLEASE TAKE FURTHER NOTICE** that all interested parties should consult the Bankruptcy Court's website at http://canb.uscourts.gov for information about the Bankruptcy Court's operations during the COVID-19 pandemic. The Bankruptcy Court's website provides information regarding how to arrange a telephonic or video appearance. If you have question regarding how to appear at a court hearing, you may contact the Bankruptcy Court by calling 888-821-7606 or by using the Live Chat feature on the Bankruptcy Court's website.

**PLEASE TAKE FURTHER NOTICE** that as of January 1, 2005, electronic filing became mandatory in the United States Bankruptcy Court for the Northern District of California. Those persons who may wish to object but are not qualified to filed documents electronically with the Bankruptcy Court should check with the Bankruptcy Court's website (www.canb.uscourts.gov) for guidance.

Dated: August 7, 2023　　　　　　　　　　　FINESTONE HAYES LLP

　　　　　　　　　　　　　　　　　　　　　*Jennifer C. Hayes*
　　　　　　　　　　　　　　　　　　　　　Jennifer C. Hayes
　　　　　　　　　　　　　　　　　　　　　Attorneys for Kyle Everett, solely in his capacity as
　　　　　　　　　　　　　　　　　　　　　Chapter 7 Trustee of the Benja Incorporated bankruptcy
　　　　　　　　　　　　　　　　　　　　　estate

Jennifer C. Hayes (197252)
FINESTONE HAYES LLP
456 Montgomery Street, 20th Floor
San Francisco, California 94104
Tel. (415) 616-0466
Fax (415) 398-2820
jhayes@fhlawllp.com