Stephen D. Finestone (125675)
Jennifer C. Hayes (197252)
FINESTONE HAYES LLP
456 Montgomery Street, 20th Floor
San Francisco, California 94104
Tel. (415) 616-0466
Fax (415) 398-2820
jhayes@fhlawllp.com

Attorneys for Chapter 7 Trustee
Kyle Everett

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re | Case No. 20-30819-DM |
| BENJA INCORPORATED, | Chapter 7 |
| Debtor. | **DECLARATION OF KYLE EVERETT IN SUPPORT OF CHAPTER 7 TRUSTEE'S MOTION TO APPROVE COMPROMISE OF CONTROVERSY WITH SECURITIES AND EXCHANGE COMMISSION** |
| | Date: February 23, 2024 |
| | Time: 10:00 a.m. |
| | Ctrm: Video/Tele Conference |

I, Kyle Everett, declare as follows:

1.      I am the duly appointed Chapter 7 Trustee of the bankruptcy estate (the "Estate") of Benja Incorporated (the "Debtor") in the above-captioned case (the "Bankruptcy Case"). I was appointed as the Chapter 11 Trustee in the Bankruptcy Case on or about November 3, 2020. On or about January 29, 2021, the Bankruptcy Case was converted to Chapter 7 and I was appointed as Chapter 7 Trustee (the "Trustee").

2.      All statements in this declaration are based on my own personal knowledge and observation, or upon information and belief based upon my review of the court and business

records in this case. If called to testify on this matter, I could and would competently testify to the matters set forth in this Declaration.

3. I make this Declaration in support of the concurrently filed Motion to Approve Compromise of Controversy with the Securities and Exchange Commission (the "Motion"). The settlement resolves the proof of claim filed by the SEC on behalf of investors for securities law violations, by providing for withdrawal of that claim, in exchange for the Trustee's treatment of investor claims *pari passu* with non-investor claims, notwithstanding section 510(b) and the subordination provisions in the investors' agreements with Benja Incorporated.

4. The claims filed in the case, which were all timely filed, and are set forth in the claims register are as follows:

| Claim No. | Creditor | Claim Amount/Type | Basis |
|---|---|---|---|
| 1 | Busey | $5,035,580[1] | Note |
| 2, 3 (duplicates)[2] | E-RevShare | $1,218,968 | Revenue Participation Purchase Agmt |
| 4, 5 | Priority Tax Claims | $970 (MA), $10,450 (IRS) | |
| 6 | XRC Growth Fund I | $500,000 | SAFE |
| 7 | XRC Fund III | $125,000 | SAFE |
| 8 | Sklar Family Trust | $50,000 | SAFE |
| 9 | Mike Birkel | $212,500 | SAFE |
| 10 | Benjamin Lamb | $25,000 | SAFE |
| 11 | Jonathan Lamb | $25,000 | SAFE |
| 12 | Michael Bower | $25,000 | SAFE |
| 13 | Sean Fleming | $385,000 | SAFE |
| 14 | Nick Foppe | $70,000 | SAFE |
| 15 | Rick Hoskins | $100,000 | Stock Purchase Agreement |
| 16 | David Hughes | $25,000 | SAFE |
| 17 | Kaveri Investment | $100,000 | SAFE |
| 18 | Ryba | $25,000 | SAFE |
| 19 | Daniel Schulman | $10,000 | SAFE |

---

[1] Filed as secured, which I dispute because the assets in the estate are avoidable transfer litigation claims to which the lien does not attach. This motion does not purport to address or seek resolution of this issue, which will be addressed separately.

[2] I will separately address this duplicate claim issue.

EVERETT DECL. ISO MOTION TO APPROVE COMPROMISE                2

| 20 | Polly Wong | $150,000 | SAFE |
|---|---|---|---|
| 21 | Priority Tax Claim | $20,284 | |
| 22 | Fenwick | $72,898 | Legal fees |
| 23 | Priority Tax Claim | Unknown | |
| 24 | Priority Tax Claim | $1,656 | |
| 25 | Priority UST Claim | $650 | |
| 26 | Admin Tax Claim | $800 | |
| 27 | Bodil Arlander Revocable Trust | $150,000 | SAFE |
| 28 | SEC | No less than $2,635,000 | Violations of federal securities laws |
| 29 | BB Lending | Claim withdrawn | |
| 30 | Moosylvania (Foppe) | $100,016 | Stock |
| 31[3] | Morgan Reilly | $28,751 | Wages - $7,500 claimed as priority |

5.      The SEC's Claim in the sum of $2,635,000 is based on its complaint filed prepetition against the Debtor and Andrew Chapin in federal district court.  Attached as **Exhibit A** is an authentic copy of the proof of claim filed by the Securities and Exchange Commission in the Benja bankruptcy case, with exhibits.  Attached as **Exhibit B** is an authentic copy of the complaint filed prepetition by the SEC against Benja Incorporated and Andrew Chapin.

6.      The investors' claims, which I calculate to total approximately $2,077,516 are based on stock, including stock purchase agreements and SAFE agreements (simple agreement for future equity).  Attached as **Exhibit C** is an authentic copy of Claim No. 8, with exhibits.

7.      The SEC and I have agreed that, subject to entry of a final order approving their settlement, the SEC will withdraw its proof of claim in exchange for treatment of the claims filed by the investors as timely filed general unsecured claims, pari passu with timely filed general unsecured claims filed by creditors who were not investors, but rather who lent money to the Debtor.  Although simple, I anticipate that creditors Busey and E-Rev Share/Empowerment may

---

[3] Claim No. 32 filed in September 2022 as a section 502(d) claim by MHC Financial Services has been withdrawn pursuant to a court approved settlement agreement.

oppose the settlement, on the basis that the claims of the investors and the SEC are contractually and/or legally subordinated to the claims of creditors.

8.      For the reasons stated below, I believe in my reasonable business judgment that the settlement with the SEC fulfills the *A & C Properties* factors. As set forth below, the most significant of the *A & C Properties* factors supporting approval of the settlement are the uncertainty and significant expense, inconvenience, and delay that would be created absent approval of the settlement, as well as the paramount interest of creditors favor approval of the settlement.

9.      **Probability of Success**: I believe that my probability of subordinating *both* the claims of the SEC and the claims of the investors is not strong, although this determination is ultimately a legal one, and I am not an attorney.

a.      As to the investors' claims, I believe that, absent the SEC's timely filed claim, the investor claims would be subordinated to creditor claims, because they are for damages arising from the purchase of securities.

b.      Although not reduced to judgment in the SEC's prepetition lawsuit filed against the Debtor in District Court, I am informed and believe, for the reasons set forth in the accompanying motion, that the law appears to more strongly supports a determination that the SEC's claim should be paid pari passu with general unsecured creditors rather than treated as a subordinated penalty claim.

10.     **Difficulty of Collection**: This factor does not apply.

11.     **Complexity of Litigation, Expense, Inconvenience, and Delay**: This factor strongly favors approval of the settlement. Absent a settlement with the SEC, I face litigation with the SEC and, likely, the investors. I would need to object to the claim filed by the SEC to seek to subordinate it, which I am informed and believe that the SEC would oppose. I would similarly need to object to the investors' claims as subordinated claims, which the SEC and the investors are expected to oppose. This is a Ponzi scheme case. I am informed and believe that all creditors were stolen from, whether they lent money in the usual sense, or whether they

thought they were investing in the ostensible company. In this context, and given that the SEC had filed a lawsuit for disgorgement against the Debtor prepetition, and liquidated that claim in the bankruptcy case by filing its proof of claim, and given that the SEC has agreed to withdraw its claim, which is apparently payable as a timely filed general unsecured claims, in exchange for payment of investor claims pari passu with timely filed general unsecured claims, the settled result is a result that I, in my reasonable business judgment, believe is the path of least complexity, least expense, and least delay in resolution of the claims issues in this case.

12. **Paramount Interest of Creditors**: This factor also favors settlement. This is a Ponzi scheme case. All creditors of the Debtor were stolen from, whether they lent money in the usual sense, or whether they thought they were investing in the ostensible company. In my reasonable business judgment, it is not in the interest of creditors for me to cause the bankruptcy estate to incur significant administrative expense to litigate subordination arguments with the SEC and investors, with an uncertain outcome.

13. In summary, I submit that the settlement is fair and equitable and, in my reasonable business judgment, in the best interest of the Estate.

I declare under penalty of perjury under the laws of the United States, that the foregoing is true and correct. Executed in San Francisco County, California on January 17, 2024.

*Kyle Everett*

Kyle Everett, Solely in my Capacity as Chapter 7 Trustee of the Benja Incorporated Bankruptcy Estate

# Exhibit A

**Fill in this information to identify the case:**

Debtor 1   Benja Incorporated

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court   **California Northern Bankruptcy Court**

Case number:  **20–30819**

FILED

**U.S. Bankruptcy Court**
**California Northern Bankruptcy Court**

3/25/2021

**Edward J. Emmons, Clerk**

Official Form 410
# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

## Part 1:   Identify the Claim

| | |
|---|---|
| **1. Who is the current creditor?** | U.S. Securities and Exchange Commission<br><br>Name of the current creditor (the person or entity to be paid for this claim)<br><br>Other names the creditor used with the debtor |
| **2. Has this claim been acquired from someone else?** | ☑ No<br>☐ Yes. From whom? |

| | | |
|---|---|---|
| **3. Where should notices and payments to the creditor be sent?**<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Where should notices to the creditor be sent?<br><br>U.S. Securities and Exchange Commission<br><br>Name<br><br>Bankruptcy Group<br>200 Vesey Street Suite 400<br>New York, NY 10281<br><br>Contact phone _____2123361100_____<br><br>Contact email _____Jacobsonn@sec.gov_____<br><br>Uniform claim identifier for electronic payments in chapter 13 (if you use one): | Where should payments to the creditor be sent? (if different)<br><br>Name<br><br><br><br>Contact phone _____<br><br>Contact email _____ |

| | |
|---|---|
| **4. Does this claim amend one already filed?** | ☑ No<br>☐ Yes. Claim number on court claims registry (if known) _____   Filed on _____<br><br>MM / DD / YYYY |
| **5. Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No<br>☐ Yes. Who made the earlier filing? |

| | |
|---|---|
| **6. Do you have any number you use to identify the debtor?** | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____ |

| | | |
|---|---|---|
| **7. How much is the claim?** | $ 0.00<br>_____ | **Does this amount include interest or other charges?**<br>☐ No<br>☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |

| | |
|---|---|
| **8. What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br>Limit disclosing information that is entitled to privacy, such as healthcare information.<br><br>Violations of the federal securities laws<br>_____ |

| | |
|---|---|
| **9. Is all or part of the claim secured?** | ☑ No<br>☐ Yes. The claim is secured by a lien on property.<br>    **Nature of property:**<br>    ☐ Real estate.   If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410–A) with this *Proof of Claim.*<br>    ☐ Motor vehicle<br>    ☐ Other. Describe: _____<br><br>    **Basis for perfection:** _____<br><br>    Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>    **Value of property:** $ _____<br><br>    **Amount of the claim that is secured:** $ _____<br><br>    **Amount of the claim that is unsecured:** $ _____   (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>    **Amount necessary to cure any default as of the date of the petition:** $ _____<br><br>    **Annual Interest Rate** (when case was filed) _____ %<br><br>    ☐ Fixed<br>    ☐ Variable |

| | |
|---|---|
| **10. Is this claim based on a lease?** | ☑ No<br>☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $ _____ |

| | |
|---|---|
| **11. Is this claim subject to a right of setoff?** | ☑ No<br>☐ Yes. Identify the property: _____ |

Case 20-30819 Claim 9-1 Filed 09/25/24 Desc Main Document Page 2 Page 8 of 46

| 12. | Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No<br>☐ Yes. *Check all that apply:* | | Amount entitled to priority |
|---|---|---|---|---|

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

$ _____

☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).

$ _____

☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).

$ _____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).

$ _____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).

$ _____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(_) that applies

$ _____

* Amounts are subject to adjustment on 4/1/22 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3:  Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157 and 3571.**

Check the appropriate box:

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date      3/25/2021

MM / DD / YYYY

/s/  /s/Neal Jacobson

Signature

Print the name of the person who is completing and signing this claim:

Name      /s/Neal Jacobson

First name      Middle name      Last name

Title      Trial Counsel

Company      Securities and Exchange Commission

Identify the corporate servicer as the company if the authorized agent is a servicer

Address      200 Vesey Street

Number  Street

New York, NY 10281

City  State  ZIP Code

Contact phone      2123361100      Email      jacobsonn@sec.gov

Case 20-30819 Doc 1931 Filed 09/25/24 Entered 10/17/24 14:38:00 Page 9 of 46

Attachment "A"

This claim in an undetermined final amount is for disgorgement in an amount of not less than $2,635,000, prejudgment interest, and penalties arising from violations of the federal securities laws. The Securities and Exchange Commission ("SEC") filed a civil injunctive action against the Debtor in the case styled *SEC v. Benja Incorporated*, No. 20-08238 (N.D. CA) (the "Civil Action"), and its claim will be determined in the Civil Action. A copy of the complaint filed in the Civil Action is attached hereto as Attachment "B."

The SEC reserves the right to amend and supplement this claim as appropriate under the circumstances.

1  ERIN E. SCHNEIDER (Cal. Bar No. 216114)
   schneidere@sec.gov
2  MONIQUE C. WINKLER (Cal. Bar No. 213031)
   winklerm@sec.gov
3  TRACY L. DAVIS (Cal. Bar No. 184129)
   davistl@sec.gov
4  SUSAN F. LAMARCA (Cal. Bar No. 215231)
   lamarcas@sec.gov
5  MARC D. KATZ (Cal. Bar No. 189534)
   katzma@sec.gov
6  MATTHEW G. MEYERHOFER (Cal. Bar No. 268559)
   meyerhoferm@sec.gov
7
   Attorneys for Plaintiff
8  SECURITIES AND EXCHANGE COMMISSION
   44 Montgomery Street, Suite 2800
9  San Francisco, CA 94104
   (415) 705-2500 (Telephone)
10 (415) 705-2501 (Facsimile)

11                     UNITED STATES DISTRICT COURT

12                   NORTHERN DISTRICT OF CALIFORNIA

13                        SAN FRANCISCO DIVISION

14

15 SECURITIES AND EXCHANGE COMMISSION,        Case No.

16              Plaintiff,
                                              **COMPLAINT**
17        vs.

18 BENJA INCORPORATED and ANDREW J.
   CHAPIN,
19
                Defendants.
20

21

22

23        Plaintiff Securities and Exchange Commission (the "SEC") alleges:

24                         **SUMMARY OF THE ACTION**

25        1.  During 2018 and 2020, Benja Incorporated ("Benja") and its Chief Executive

26 Officer, Defendant Andrew J. Chapin raised millions of dollars from investors, and banks, by

27 making false representations about Benja's business.  Benja, a San Francisco-based e-commerce

28 startup, purports to place online advertisements for major clothing brands to sell excess

1   merchandise at a discount.  In particular, Chapin and Benja falsely claimed to prospective investors

2   that Benja was profitable and had generated millions of dollars in revenue from customers that

3   supposedly included Nike, Patagonia and Fanatics.

4          2.  In reality, Benja did not have contracts with, or revenue from, the major brands it

5   claimed were its customers. Chapin maintained the illusion of Benja's commercial success through

6   a scheme that included using falsified documents in the offering of securities, forging contracts

7   with purported customers, doctoring bank statements, and impersonating customers in calls with at

8   least one investor.

9          3.  The SEC seeks an order from the Court enjoining Defendants Benja and Chapin

10  from future violations of the antifraud provisions of the securities laws; requiring Defendants to

11  each pay a civil monetary penalty, and to disgorge their respective ill-gotten gains or unjust

12  enrichment with prejudgment interest thereon; prohibiting Chapin from acting as an officer or

13  director of any public company; and providing for other appropriate relief.

14                          **JURISDICTION AND VENUE**

15         4.  The SEC brings this action pursuant to Sections 20(b) and 20(d) of the Securities

16  Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b) and 77t(d)] and Sections 21(d) and 21(e) of the

17  Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and 78u(e)].

18         5.  This Court has jurisdiction over this action pursuant to Section 22(a) of the

19  Securities Act, [15 U.S.C. § 77v(a)], and Section  27 of the Exchange Act [15 U.S.C. § 78aa].

20         6.  Defendants, directly or indirectly, made use of the means and instrumentalities of

21  interstate commerce or of the mails in connection with the acts, transactions, practices, and courses

22  of business alleged in this complaint.

23         7.  Venue is proper in this District pursuant to Section 22(a) of the Securities Act,

24  [15 U.S.C. § 77v(a)], and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)].  Acts,

25  transactions, practices, and courses of business that form the basis for the violations alleged in this

26  complaint occurred in the Northern District of California.

27         8.  Under Civil Local Rule 3-2(d), this civil action should be assigned to the San

28  Francisco Division, because a substantial part of the events or omissions which give rise to the

COMPLAINT                                    -2-                            CASE NO. _____

claims alleged herein occurred in San Francisco County; in addition, Defendant Benja's principal place of business is in San Francisco and Defendant Chapin resides in San Francisco.

## DEFENDANTS

9.    Defendant Andrew J. Chapin, age 31, resides in San Francisco, California.  Chapin is Benja's founder and CEO, and has controlled Benja from its formation at least until its bankruptcy filing.

10.    Defendant Benja Incorporated is a Delaware Corporation with is principal place of business in San Francisco, California.  Benja was founded by Chapin in June 2018, as the successor to another company, EPHE Corp., that Chapin had founded by 2015.  Chapin operated EPHE Corp. under the "Benja" name from at least December 2016 until the incorporation of Benja in June 2018.  From at least June 2018 through September 2020, Benja purported to be an e-commerce startup that places online advertisements for major clothing brands, enabling those brands to sell excess merchandise at a discount. On or about October 15, 2020, Benja filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Northern District of California.

## FACTUAL ALLEGATIONS

**A.    Chapin Deceives Investors to Obtain Early Benja Investments**

11.    In 2017, Chapin operated Benja, then known as EPHE Corp., as a start-up company.  In or around early 2017, Benja obtained operating funds through its acceptance into a New York-based "start-up accelerator," which provides funding and business guidance to small, new business ventures.

12.    Through Benja's participation in the accelerator, in or around November 2017 Chapin was introduced to a venture capital investor from San Francisco.  During the spring of 2018, Chapin and the venture capital investor discussed the potential for an investment in Benja.

13.    To entice the San Francisco venture capital investor to make an investment, Chapin made claims to the investor about Benja's business that were not true.  In particular, Chapin told the investor that Benja was a profitable company, whose customers included famous brands, including Fanatics, Backcountry.com, and Patagonia.

14.   In or around June 2018, Chapin provided to the San Francisco venture capital investor a slide deck, which represented that Nike, Patagonia, and Backcountry.com were all Benja customers of Benja's "merchandise ad network," which purportedly sold advertisement impressions across web, mobile, and social channels.  The slide deck, which described Benja as a "group of scrappy hustlers," further claimed that up to that point in 2018, Nike had spent $275,000 with Benja, Patagonia had spent $161,500 with Benja, and Backcountry.com had spent $170,000 with Benja.

15.   The representations contained in the slide deck, and made verbally by Chapin to the venture capital investor, were false.  Neither Fanatics, Backcountry, Patagonia, or Nike had signed agreements with Benja, nor had any of these companies spent any money with Benja as Defendants had claimed.

16.   As the San Francisco venture capital investor and Chapin continued to discuss a potential investment, the investor told Chapin that it would be important to his decision-making to hear from another institutional investor that had also committed to investing in Benja.  The investor wanted assurances that another sophisticated investor had vetted Benja as an investment.

17.   Soon afterwards, Chapin told the San Francisco venture capital investor that another institutional investor had decided to make a $1 million investment in Benja.  In particular, Chapin identified the supposed institutional investor, which was another venture capital firm located in Saint Louis, Missouri, which manages funds that make "early-stage" investments in startup companies.

18.   The San Francisco venture capital investor requested to speak with someone from the Saint Louis venture capital firm about their expected investment in Benja.  Accordingly, in or around October 23, 2018, Chapin arranged a call between the San Francisco venture capital investor and an individual whom Chapin introduced by name, and who was supposedly the founder and general partner of the Saint Louis venture capital firm. After this call, on or about October 26, 2018, the San Francisco venture capital investor purchased 1,278 shares of Benja common stock for $100,000.  The investor wired his $100,000 investment into a bank account owned by Chapin.

19.   In reality, the Saint Louis venture capital firm did not invest in Benja.  In addition, in or around September 2020, the San Francisco venture capital investor directly contacted the founder and general partner of the Saint Louis venture capital firm, whom he had supposedly spoken with in 2018 in the call arranged by Chapin.  The founder and general partner of the Saint Louis firm denied that he had ever taken part in the call or invested in Benja.

20.   In early November 2018, the San Francisco venture capital investor introduced an acquaintance of his to Chapin, for the purpose of considering an investment in Benja. On or around November 9, 2018, Chapin spoke with the acquaintance and described Benja's purported business to him. During the discussion, Chapin falsely represented to the acquaintance that Benja's customers included Nike and Fanatics.

21.   The acquaintance of the San Francisco venture capital investor also told Chapin that the participation of an institutional investor was important to his investment decision.  The acquaintance also wanted assurances that another sophisticated investor had vetted Benja as an investment.  Chapin represented to the acquaintance that the same Saint Louis venture capital firm that he had described to the San Francisco investor, and which Chapin identified by name, had recently invested in Benja.  At the request of the acquaintance, Chapin arranged a similar call between the acquaintance and a person purportedly associated with the Saint Louis venture capital firm.

22.   During the call, which occurred on or around December 1, 2018, an individual that Chapin introduced by name, who was purportedly the founder and general partner of the Saint Louis venture capital firm, described the work the Saint Louis firm had supposedly performed to investigate Benja to determine whether to make an investment. The individual further confirmed to the acquaintance that the Saint Louis firm had invested in Benja.  In reality, the Saint Louis venture capital firm did not invest in Benja.

23.   On or about December 14, 2018, the acquaintance of the San Francisco venture capital investor purchased 1,278 shares of Benja common stock for $100,000.  The acquaintance wired his $100,000 investment into a bank account owned by Chapin.

24.   In addition, the San Francisco venture capital investor introduced Chapin to one or

1   more other persons whom he knew, who also made investments in Benja.

2   **B.      Chapin Fraudulently Solicits Additional Investments in Benja During 2020**

3   25.    In or around March 2020, Chapin contacted another venture capital firm, located in

4   New York, which funds startup companies that have recurring revenues.  Chapin described

5   Benja's supposed business to the principal of the New York venture capital firm.

6   26.    The principal of the New York venture capital firm sought from Chapin

7   information regarding Benja to allow him to determine whether his firm would make an

8   investment in Benja.  In response, Chapin gave the principal of the New York firm multiple

9   documents that purported to show revenue that Benja received from well-known retail brands,

10  including Fanatics, Nike, Patagonia, Zappos, and other companies.  According to the documents,

11  Benja was then generating approximately $2 million per month from these and other purported

12  Benja customers.  In reality, the revenue reflected in the documents from Fanatics, Nike,

13  Patagonia, Zappos and others was falsified.

14  27.    Chapin also provided to the principal of the New York venture capital firm forged

15  agreements between Benja and these companies purporting to show that the companies agreed to

16  purchase advertising space on Benja's commerce network, which purportedly included mobile

17  applications, online publishers, web advertisements, and social media networks.  In addition,

18  Chapin provided to the principal Benja's bank statements, which had been doctored to falsely

19  show payments from these companies.

20  28.    Chapin also invited the principal of the New York venture capital firm to

21  participate in two phone calls, one purportedly with a representative of Nike, and the other

22  purportedly with a representative of Fanatics.  Chapin introduced the principal to the two

23  purported representatives by name.  However, in reality, neither Nike nor Fanatics (nor any

24  persons employed by them) participated in the calls; instead, Chapin arranged for an associate of

25  his to impersonate the representatives of the companies.

26  29.    Chapin further told the principal of the New York venture capital firm that Benja

27  would use the proceeds from the New York firm's investment to continue developing Benja's

28  technology and to purchase advertising space.

COMPLAINT                                  -6-                            CASE NO. _____

30.  On the basis of these fraudulent statements and deceptions, the New York venture capital firm entered into an investment agreement with Benja, and it advanced $1 million to Benja on or about June 4, 2020.  The agreement provided, among other things, that the New York firm would be entitled to share in Benja's revenue, and it included a grant to the New York firm of warrants to purchase Benja's common stock.

31.  Contrary to the representations Chapin made to the principal of the New York firm about the uses of the proceeds, rather than using the money to develop Benja's technology or purchase advertising, Benja immediately used the money to pay back, in part, a particular Benja creditor.

32.  The creditor who was partially repaid in or around June 2020 with the proceeds from the investment by the New York venture capital firm was a financing company from whom Benja had obtained approximately $4.5 million in or around April 2020 and May 2020.  The financing company had advanced Benja the funds under an arrangement in which Benja purported to sell certain of its accounts receivables.  To obtain the financing, Chapin sent the financing company fake invoices that falsely represented that Benja had outstanding receivables, incurred between February 2020 and May 2020, from companies with well-known brands, including Patagonia, Nike, Fanatics, and Backcountry.com.  In reality, those receivables did not exist.  By July 2020, the financing company learned that the purported receivables did not exist and demanded repayment from Benja.

33.  After Benja received the $4.5 million from the financing company, Chapin wired the money out of Benja's account, and sent a portion of it to Chapin's own bank account and to pay off credit card expenses.

34.  In May 2020, Chapin again began discussing a possible additional investment in Benja with the original San Francisco venture capital investor.  In furtherance of those negotiations, in or around August 2020, Chapin sent the investor a memorandum regarding a planned capital raise that again falsely represented that Nike was one of Benja's customers.

35.  The same memorandum that Chapin provided to the San Francisco venture capital investor also stated, falsely, that Benja had entered into an agreement with Spotify to place

1    advertisements in Spotify podcasts and that "Benja [would] be the exclusive e-commerce partner

2    of Spotify North America for a period of three years."  In reality, Spotify never had any such

3    agreement with Benja.  Chapin told the investor that the proceeds from the investment would be

4    used to purchase advertising space.  Contrary to those representations, as soon as the investment

5    was made, Benja used these funds to re-pay, in part, the financing company.

6         36.    Based on these false representations and other representations about the purported

7    success of Benja's business, on or about September 2, 2020, the San Francisco venture capital

8    investor wired $50,000 to Benja. In return, the investor obtained from Benja a security called a

9    "Simple Agreement for Future Equity." That security provided that the investor would, subject to

10   certain conditions, receive shares of Benja common stock in the future.

11        37.    In August 2020, Chapin also began to discuss with the New York-based accelerator

12   a potential additional investment in Benja.  Chapin sent the New York firm the same written

13   representations he had sent to the San Francisco venture capital investor, which included the false

14   representations about Benja's purported relationships with Nike and with the well-known music

15   streaming service, Spotify.  Chapin informed a person associated with the New York-based

16   accelerator that the money invested would be used to hire new software developers and to

17   purchase advertising space with Spotify and the well-known video platform, TikTok. Contrary to

18   those representations, as soon as the investment was made, Benja used these funds to re-pay, in

19   part, the financing company.

20        38.    On or about September 2, 2020, the New York-based accelerator made a $500,000

21   investment in Benja, and in exchange obtained a Simple Agreement for Future Equity.

22        39.    In making the above-described false and misleading statements to persons to solicit

23   investments, and in engaging in the above-described deceptive conduct and deceptive course of

24   business, Chapin and Benja acted knowingly or recklessly.  For instance, when Chapin made the

25   above-described series of statements about the existence of Benja's purported other investors,

26   customers, revenue and receivables, supposedly related to well-known brands and businesses, he

27   did so on behalf of Benja and he knew, or was reckless in not knowing, that his statements were

28   false and misleading.

COMPLAINT                              -8-                        CASE NO. _____

1      40.   Chapin engaged in knowing or reckless falsehoods and deceptions on behalf of

2  Benja, and he acted on behalf of Benja in his intent to deceive investors.

3                   **FIRST CLAIM FOR RELIEF**

4      ***Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder***

5      41.   The SEC re-alleges and incorporates by reference Paragraph Nos. 1 through 40.

6      42.   By engaging in the conduct described above, Defendants Benja and Chapin each,

7  directly or indirectly, in connection with the purchase or sale of securities, by the use of means or

8  instrumentalities of interstate commerce, or the mails, with scienter:

9          (a)     Employed devices, schemes, or artifices to defraud;

10        (b)     Made untrue statements of material fact or omitted to state material facts

11                  necessary in order to make the statements made, in the light of the

12                  circumstances under which they were made, not misleading; and

13        (c)     Engaged in acts, practices, or courses of business which operated or would

14                  operate as a fraud or deceit upon other persons, including purchasers and

15                  sellers of securities.

16      43.   By reason of the foregoing, Defendants Benja and Chapin violated, and unless

17  restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C.

18  § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

19                 **SECOND CLAIM FOR RELIEF**

20      ***Violations of Sections 17(a)(1), (2), and (3) of the Securities Act***

21      44.   The SEC re-alleges and incorporates by reference Paragraph Nos. 1 through 40.

22      45.   By engaging in the conduct described above, Defendants Benja and Chapin,

23  directly or indirectly, in the offer or sale of securities, by use of the means or instruments of

24  transportation or communication in interstate commerce or by use of the mails:

25        (a)     With scienter, employed devices, schemes, or artifices to defraud;

26        (b)     Obtained money or property by means of untrue statements of material fact

27                  or by omitting to state a material fact necessary in order to make the

28

1                      statements made, in light of the circumstances under which they were

2                      made, not misleading; and

3        (c)       Engaged in transactions, practices, or courses of business which operated or

4                      would operate as a fraud or deceit upon purchasers.

5        46.   By reason of the foregoing, Defendants Benja and Chapin violated, and unless

6 restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C.

7 § 77q(a)].

8                             **PRAYER FOR RELIEF**

9        WHEREFORE, the SEC respectfully requests that this Court:

10                                 **I.**

11        Permanently enjoin Defendants Benja and Chapin from directly or indirectly violating

12 Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R.

13 § 240.10b-5], and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

14                                **II.**

15        Issue an order requiring Defendants Benja and Chapin to disgorge the ill-gotten gains or

16 unjust enrichment each of them obtained or derived from such violations, and to pay a civil

17 monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and

18 Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

19                                **III.**

20        Prohibit Defendant Chapin from serving as an officer or director of any entity having a

21 class of securities registered with the SEC pursuant to Section 12 of the Exchange Act [15 U.S.C.

22 § 78*l*] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C.

23 § 78o(d)], pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2)

24 of the Exchange Act [15 U.S.C. § 78u(d)(2)].

25                                **IV.**

26        Retain jurisdiction of this action in accordance with the principles of equity and the Federal

27 Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees

28

1    that may be entered, or to entertain any suitable application or motion for additional relief within

2    the jurisdiction of this Court.

3                                          **V.**

4        Grant such other and further relief as this Court may determine to be just and necessary.

5

6    Dated: November 23, 2020               Respectfully submitted,

7

8

9                                       */s/ Matthew G. Meyerhofer*

10                                        MATTHEW G. MEYERHOFER
                                        Attorney for Plaintiff

11                                          SECURITIES AND EXCHANGE COMMISSION

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT                              -11-                               CASE NO. _____

# Exhibit B

1    ERIN E. SCHNEIDER (Cal. Bar No. 216114)
     schneidere@sec.gov
2    MONIQUE C. WINKLER (Cal. Bar No. 213031)
     winklerm@sec.gov
3    TRACY L. DAVIS (Cal. Bar No. 184129)
     davistl@sec.gov
4    SUSAN F. LAMARCA (Cal. Bar No. 215231)
     lamarcas@sec.gov
5    MARC D. KATZ (Cal. Bar No. 189534)
     katzma@sec.gov
6    MATTHEW G. MEYERHOFER (Cal. Bar No. 268559)
     meyerhoferm@sec.gov

7

8    Attorneys for Plaintiff
   SECURITIES AND EXCHANGE COMMISSION
   44 Montgomery Street, Suite 2800
9    San Francisco, CA 94104
   (415) 705-2500 (Telephone)
10   (415) 705-2501 (Facsimile)

11             **UNITED STATES DISTRICT COURT**

12           **NORTHERN DISTRICT OF CALIFORNIA**

13              **SAN FRANCISCO DIVISION**

14

| | |
|---|---|
| 15   SECURITIES AND EXCHANGE COMMISSION, | Case No. |
| 16          Plaintiff, | |
| 17       vs. | **COMPLAINT** |
| 18   BENJA INCORPORATED and ANDREW J. CHAPIN, | |
| 19         Defendants. | |
| 20 | |

21

22

23       Plaintiff Securities and Exchange Commission (the "SEC") alleges:

24             **SUMMARY OF THE ACTION**

25       1.  During 2018 and 2020, Benja Incorporated ("Benja") and its Chief Executive

26 Officer, Defendant Andrew J. Chapin raised millions of dollars from investors, and banks, by

27 making false representations about Benja's business.  Benja, a San Francisco-based e-commerce

28 startup, purports to place online advertisements for major clothing brands to sell excess

1   merchandise at a discount.  In particular, Chapin and Benja falsely claimed to prospective investors

2   that Benja was profitable and had generated millions of dollars in revenue from customers that

3   supposedly included Nike, Patagonia and Fanatics.

4           2.  In reality, Benja did not have contracts with, or revenue from, the major brands it

5   claimed were its customers. Chapin maintained the illusion of Benja's commercial success through

6   a scheme that included using falsified documents in the offering of securities, forging contracts

7   with purported customers, doctoring bank statements, and impersonating customers in calls with at

8   least one investor.

9           3.  The SEC seeks an order from the Court enjoining Defendants Benja and Chapin

10  from future violations of the antifraud provisions of the securities laws; requiring Defendants to

11  each pay a civil monetary penalty, and to disgorge their respective ill-gotten gains or unjust

12  enrichment with prejudgment interest thereon; prohibiting Chapin from acting as an officer or

13  director of any public company; and providing for other appropriate relief.

14                          **JURISDICTION AND VENUE**

15          4.  The SEC brings this action pursuant to Sections 20(b) and 20(d) of the Securities

16  Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b) and 77t(d)] and Sections 21(d) and 21(e) of the

17  Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and 78u(e)].

18          5.  This Court has jurisdiction over this action pursuant to Section 22(a) of the

19  Securities Act, [15 U.S.C. § 77v(a)], and Section  27 of the Exchange Act [15 U.S.C. § 78aa].

20          6.  Defendants, directly or indirectly, made use of the means and instrumentalities of

21  interstate commerce or of the mails in connection with the acts, transactions, practices, and courses

22  of business alleged in this complaint.

23          7.  Venue is proper in this District pursuant to Section 22(a) of the Securities Act,

24  [15 U.S.C. § 77v(a)], and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)].  Acts,

25  transactions, practices, and courses of business that form the basis for the violations alleged in this

26  complaint occurred in the Northern District of California.

27          8.  Under Civil Local Rule 3-2(d), this civil action should be assigned to the San

28  Francisco Division, because a substantial part of the events or omissions which give rise to the

COMPLAINT                                   -2-                        CASE NO. _____

claims alleged herein occurred in San Francisco County; in addition, Defendant Benja's principal place of business is in San Francisco and Defendant Chapin resides in San Francisco.

## DEFENDANTS

9. Defendant Andrew J. Chapin, age 31, resides in San Francisco, California. Chapin is Benja's founder and CEO, and has controlled Benja from its formation at least until its bankruptcy filing.

10. Defendant Benja Incorporated is a Delaware Corporation with is principal place of business in San Francisco, California. Benja was founded by Chapin in June 2018, as the successor to another company, EPHE Corp., that Chapin had founded by 2015. Chapin operated EPHE Corp. under the "Benja" name from at least December 2016 until the incorporation of Benja in June 2018. From at least June 2018 through September 2020, Benja purported to be an e-commerce startup that places online advertisements for major clothing brands, enabling those brands to sell excess merchandise at a discount. On or about October 15, 2020, Benja filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Northern District of California.

## FACTUAL ALLEGATIONS

### A. Chapin Deceives Investors to Obtain Early Benja Investments

11. In 2017, Chapin operated Benja, then known as EPHE Corp., as a start-up company. In or around early 2017, Benja obtained operating funds through its acceptance into a New York-based "start-up accelerator," which provides funding and business guidance to small, new business ventures.

12. Through Benja's participation in the accelerator, in or around November 2017 Chapin was introduced to a venture capital investor from San Francisco. During the spring of 2018, Chapin and the venture capital investor discussed the potential for an investment in Benja.

13. To entice the San Francisco venture capital investor to make an investment, Chapin made claims to the investor about Benja's business that were not true. In particular, Chapin told the investor that Benja was a profitable company, whose customers included famous brands, including Fanatics, Backcountry.com, and Patagonia.

COMPLAINT                                                                     CASE NO. _____

-3-

14.  In or around June 2018, Chapin provided to the San Francisco venture capital investor a slide deck, which represented that Nike, Patagonia, and Backcountry.com were all Benja customers of Benja's "merchandise ad network," which purportedly sold advertisement impressions across web, mobile, and social channels.  The slide deck, which described Benja as a "group of scrappy hustlers," further claimed that up to that point in 2018, Nike had spent $275,000 with Benja, Patagonia had spent $161,500 with Benja, and Backcountry.com had spent $170,000 with Benja.

15.  The representations contained in the slide deck, and made verbally by Chapin to the venture capital investor, were false.  Neither Fanatics, Backcountry, Patagonia, or Nike had signed agreements with Benja, nor had any of these companies spent any money with Benja as Defendants had claimed.

16.  As the San Francisco venture capital investor and Chapin continued to discuss a potential investment, the investor told Chapin that it would be important to his decision-making to hear from another institutional investor that had also committed to investing in Benja.  The investor wanted assurances that another sophisticated investor had vetted Benja as an investment.

17.  Soon afterwards, Chapin told the San Francisco venture capital investor that another institutional investor had decided to make a $1 million investment in Benja.  In particular, Chapin identified the supposed institutional investor, which was another venture capital firm located in Saint Louis, Missouri, which manages funds that make "early-stage" investments in startup companies.

18.  The San Francisco venture capital investor requested to speak with someone from the Saint Louis venture capital firm about their expected investment in Benja.  Accordingly, in or around October 23, 2018, Chapin arranged a call between the San Francisco venture capital investor and an individual whom Chapin introduced by name, and who was supposedly the founder and general partner of the Saint Louis venture capital firm. After this call, on or about October 26, 2018, the San Francisco venture capital investor purchased 1,278 shares of Benja common stock for $100,000.  The investor wired his $100,000 investment into a bank account owned by Chapin.

COMPLAINT

-4-

CASE NO. _____

19.   In reality, the Saint Louis venture capital firm did not invest in Benja.  In addition, in or around September 2020, the San Francisco venture capital investor directly contacted the founder and general partner of the Saint Louis venture capital firm, whom he had supposedly spoken with in 2018 in the call arranged by Chapin.  The founder and general partner of the Saint Louis firm denied that he had ever taken part in the call or invested in Benja.

20.   In early November 2018, the San Francisco venture capital investor introduced an acquaintance of his to Chapin, for the purpose of considering an investment in Benja. On or around November 9, 2018, Chapin spoke with the acquaintance and described Benja's purported business to him. During the discussion, Chapin falsely represented to the acquaintance that Benja's customers included Nike and Fanatics.

21.   The acquaintance of the San Francisco venture capital investor also told Chapin that the participation of an institutional investor was important to his investment decision.  The acquaintance also wanted assurances that another sophisticated investor had vetted Benja as an investment.  Chapin represented to the acquaintance that the same Saint Louis venture capital firm that he had described to the San Francisco investor, and which Chapin identified by name, had recently invested in Benja.  At the request of the acquaintance, Chapin arranged a similar call between the acquaintance and a person purportedly associated with the Saint Louis venture capital firm.

22.   During the call, which occurred on or around December 1, 2018, an individual that Chapin introduced by name, who was purportedly the founder and general partner of the Saint Louis venture capital firm, described the work the Saint Louis firm had supposedly performed to investigate Benja to determine whether to make an investment. The individual further confirmed to the acquaintance that the Saint Louis firm had invested in Benja.  In reality, the Saint Louis venture capital firm did not invest in Benja.

23.   On or about December 14, 2018, the acquaintance of the San Francisco venture capital investor purchased 1,278 shares of Benja common stock for $100,000.  The acquaintance wired his $100,000 investment into a bank account owned by Chapin.

24.   In addition, the San Francisco venture capital investor introduced Chapin to one or

1    more other persons whom he knew, who also made investments in Benja.

2          **B.     Chapin Fraudulently Solicits Additional Investments in Benja During 2020**

3          25.   In or around March 2020, Chapin contacted another venture capital firm, located in

4    New York, which funds startup companies that have recurring revenues.  Chapin described

5    Benja's supposed business to the principal of the New York venture capital firm.

6          26.   The principal of the New York venture capital firm sought from Chapin

7    information regarding Benja to allow him to determine whether his firm would make an

8    investment in Benja.  In response, Chapin gave the principal of the New York firm multiple

9    documents that purported to show revenue that Benja received from well-known retail brands,

10   including Fanatics, Nike, Patagonia, Zappos, and other companies.  According to the documents,

11   Benja was then generating approximately $2 million per month from these and other purported

12   Benja customers.  In reality, the revenue reflected in the documents from Fanatics, Nike,

13   Patagonia, Zappos and others was falsified.

14         27.   Chapin also provided to the principal of the New York venture capital firm forged

15   agreements between Benja and these companies purporting to show that the companies agreed to

16   purchase advertising space on Benja's commerce network, which purportedly included mobile

17   applications, online publishers, web advertisements, and social media networks.  In addition,

18   Chapin provided to the principal Benja's bank statements, which had been doctored to falsely

19   show payments from these companies.

20         28.   Chapin also invited the principal of the New York venture capital firm to

21   participate in two phone calls, one purportedly with a representative of Nike, and the other

22   purportedly with a representative of Fanatics.  Chapin introduced the principal to the two

23   purported representatives by name.  However, in reality, neither Nike nor Fanatics (nor any

24   persons employed by them) participated in the calls; instead, Chapin arranged for an associate of

25   his to impersonate the representatives of the companies.

26         29.   Chapin further told the principal of the New York venture capital firm that Benja

27   would use the proceeds from the New York firm's investment to continue developing Benja's

28   technology and to purchase advertising space.

COMPLAINT                                         -6-                              CASE NO. _____

30.   On the basis of these fraudulent statements and deceptions, the New York venture capital firm entered into an investment agreement with Benja, and it advanced $1 million to Benja on or about June 4, 2020.  The agreement provided, among other things, that the New York firm would be entitled to share in Benja's revenue, and it included a grant to the New York firm of warrants to purchase Benja's common stock.

31.   Contrary to the representations Chapin made to the principal of the New York firm about the uses of the proceeds, rather than using the money to develop Benja's technology or purchase advertising, Benja immediately used the money to pay back, in part, a particular Benja creditor.

32.   The creditor who was partially repaid in or around June 2020 with the proceeds from the investment by the New York venture capital firm was a financing company from whom Benja had obtained approximately $4.5 million in or around April 2020 and May 2020.  The financing company had advanced Benja the funds under an arrangement in which Benja purported to sell certain of its accounts receivables.  To obtain the financing, Chapin sent the financing company fake invoices that falsely represented that Benja had outstanding receivables, incurred between February 2020 and May 2020, from companies with well-known brands, including Patagonia, Nike, Fanatics, and Backcountry.com.  In reality, those receivables did not exist.  By July 2020, the financing company learned that the purported receivables did not exist and demanded repayment from Benja.

33.   After Benja received the $4.5 million from the financing company, Chapin wired the money out of Benja's account, and sent a portion of it to Chapin's own bank account and to pay off credit card expenses.

34.   In May 2020, Chapin again began discussing a possible additional investment in Benja with the original San Francisco venture capital investor.  In furtherance of those negotiations, in or around August 2020, Chapin sent the investor a memorandum regarding a planned capital raise that again falsely represented that Nike was one of Benja's customers.

35.   The same memorandum that Chapin provided to the San Francisco venture capital investor also stated, falsely, that Benja had entered into an agreement with Spotify to place

1    advertisements in Spotify podcasts and that "Benja [would] be the exclusive e-commerce partner

2    of Spotify North America for a period of three years."  In reality, Spotify never had any such

3    agreement with Benja.  Chapin told the investor that the proceeds from the investment would be

4    used to purchase advertising space.  Contrary to those representations, as soon as the investment

5    was made, Benja used these funds to re-pay, in part, the financing company.

6         36.   Based on these false representations and other representations about the purported

7    success of Benja's business, on or about September 2, 2020, the San Francisco venture capital

8    investor wired $50,000 to Benja. In return, the investor obtained from Benja a security called a

9    "Simple Agreement for Future Equity." That security provided that the investor would, subject to

10   certain conditions, receive shares of Benja common stock in the future.

11        37.   In August 2020, Chapin also began to discuss with the New York-based accelerator

12   a potential additional investment in Benja.  Chapin sent the New York firm the same written

13   representations he had sent to the San Francisco venture capital investor, which included the false

14   representations about Benja's purported relationships with Nike and with the well-known music

15   streaming service, Spotify.  Chapin informed a person associated with the New York-based

16   accelerator that the money invested would be used to hire new software developers and to

17   purchase advertising space with Spotify and the well-known video platform, TikTok. Contrary to

18   those representations, as soon as the investment was made, Benja used these funds to re-pay, in

19   part, the financing company.

20        38.   On or about September 2, 2020, the New York-based accelerator made a $500,000

21   investment in Benja, and in exchange obtained a Simple Agreement for Future Equity.

22        39.   In making the above-described false and misleading statements to persons to solicit

23   investments, and in engaging in the above-described deceptive conduct and deceptive course of

24   business, Chapin and Benja acted knowingly or recklessly.  For instance, when Chapin made the

25   above-described series of statements about the existence of Benja's purported other investors,

26   customers, revenue and receivables, supposedly related to well-known brands and businesses, he

27   did so on behalf of Benja and he knew, or was reckless in not knowing, that his statements were

28   false and misleading.

40.   Chapin engaged in knowing or reckless falsehoods and deceptions on behalf of Benja, and he acted on behalf of Benja in his intent to deceive investors.

## FIRST CLAIM FOR RELIEF

### *Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder*

41.   The SEC re-alleges and incorporates by reference Paragraph Nos. 1 through 40.

42.   By engaging in the conduct described above, Defendants Benja and Chapin each, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or the mails, with scienter:

(a)   Employed devices, schemes, or artifices to defraud;

(b)   Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

(c)   Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

43.   By reason of the foregoing, Defendants Benja and Chapin violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

### *Violations of Sections 17(a)(1), (2), and (3) of the Securities Act*

44.   The SEC re-alleges and incorporates by reference Paragraph Nos. 1 through 40.

45.   By engaging in the conduct described above, Defendants Benja and Chapin, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails:

(a)   With scienter, employed devices, schemes, or artifices to defraud;

(b)   Obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the

statements made, in light of the circumstances under which they were

made, not misleading; and

(c)    Engaged in transactions, practices, or courses of business which operated or

would operate as a fraud or deceit upon purchasers.

46.  By reason of the foregoing, Defendants Benja and Chapin violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that this Court:

**I.**

Permanently enjoin Defendants Benja and Chapin from directly or indirectly violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**II.**

Issue an order requiring Defendants Benja and Chapin to disgorge the ill-gotten gains or unjust enrichment each of them obtained or derived from such violations, and to pay a civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**III.**

Prohibit Defendant Chapin from serving as an officer or director of any entity having a class of securities registered with the SEC pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

**IV.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees

1 that may be entered, or to entertain any suitable application or motion for additional relief within

2 the jurisdiction of this Court.

3 **V.**

4 Grant such other and further relief as this Court may determine to be just and necessary.

5

6 Dated: November 23, 2020                    Respectfully submitted,

7

8

9                                                          */s/ Matthew G. Meyerhofer*
                                                           MATTHEW G. MEYERHOFER
10                                                         Attorney for Plaintiff
                                                           SECURITIES AND EXCHANGE COMMISSION
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT                                          -11-                              CASE NO. _____

JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

SECURITIES AND EXCHANGE COMMISSION

**DEFENDANTS**

BENJA INCORPORATED and ANDREW J. CHAPIN

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  SAN FRANCISCO
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

(see attached)

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

[X] 1  U.S. Government
Plaintiff

[ ] 3  Federal Question
*(U.S. Government Not a Party)*

[ ] 2  U.S. Government
Defendant

[ ] 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| | | [ ] 370 Other Fraud | [ ] 710 Fair Labor Standards Act | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 371 Truth in Lending | [ ] 720 Labor/Management Relations | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 380 Other Personal Property Damage | | | [ ] 485 Telephone Consumer Protection Act |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 385 Property Damage Product Liability | [ ] 740 Railway Labor Act | **SOCIAL SECURITY** | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury - Medical Malpractice | | [ ] 751 Family and Medical Leave Act | [ ] 861 HIA (1395ff) | [X] 850 Securities/Commodities/ Exchange |
| [ ] 196 Franchise | | | [ ] 790 Other Labor Litigation | [ ] 862 Black Lung (923) | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 791 Employee Retirement Income Security Act | [ ] 863 DIWC/DIWW (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | | [ ] 864 SSID Title XVI | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | | [ ] 865 RSI (405(g)) | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | [ ] 896 Arbitration |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | **IMMIGRATION** | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 950 Constitutionality of State Statutes |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | [ ] 462 Naturalization Application | | |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions | | |
| | | [ ] 550 Civil Rights | | | |
| | | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

[X] 1  Original Proceeding

[ ] 2  Removed from State Court

[ ] 3  Remanded from Appellate Court

[ ] 4  Reinstated or Reopened

[ ] 5  Transferred from Another District *(specify)*

[ ] 6  Multidistrict Litigation - Transfer

[ ] 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. §§ 77t(b), 77t(d), and 15 U.S.C. §§ 78u(d) and 78u(e)

Brief description of cause:
Securities fraud

## VII. REQUESTED IN COMPLAINT:

[ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ 

CHECK YES only if demanded in complaint:

JURY DEMAND:   [ ] Yes   [X] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____

DOCKET NUMBER _____

DATE
November 23, 2020

SIGNATURE OF ATTORNEY OF RECORD /s/ Matthew G. Meyerhofer

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

ATTACHMENT TO CIVIL COVER SHEET

Securities and Exchange Commission, Plaintiff

v.

BENJA INCORPORATED and

ANDREW J. CHAPIN, Defendants.

I. (c) Attorneys

*Attorneys for Plaintiff*

ERIN E. SCHNEIDER (Cal. Bar No. 216114)
MONIQUE C. WINKLER (Cal. Bar No. 213031)
TRACY L. DAVIS (Cal. Bar No. 184129)
SUSAN F. LAMARCA (Cal. Bar No. 215231)
MARC D. KATZ (Cal. Bar No. 189534)
MATTHEW G. MEYERHOFER (Cal. Bar No. 268559)


SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, 28th Floor
San Francisco, California  94104
Telephone:  (415) 705-2500
Facsimile:  (415) 705-2501

ATTACHMENT TO CIVIL COVER SHEET

# Exhibit C

| | |
|---|---|
| Debtor 1 | In re: Benja Incorporated |
| Debtor 2 (Spouse, if filing) | |

United States Bankruptcy Court for the: Northern District of California

Case number 20-30819

## Official Form 410

# Proof of Claim

04/19

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309)** that you received.

## Part 1: Identify the Claim

| | |
|---|---|
| 1. Who is the current creditor? | **2007 Sklar Family Trust** <br> Name of the current creditor (the person or entity to be paid for this claim) <br><br> Other names the creditor used with the debtor _____ |
| 2. Has this claim been acquired from someone else? | ☑ No <br> ☐ Yes. From whom? _____ |

| 3. Where should notices and payments to the creditor be sent? | **Where should notices to the creditor be sent?** | **Where should payments to the creditor be sent?** (if different) |
|---|---|---|
| Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Steven Soulios c/o Ruta Soulios & Stratis LLP <br> Name <br><br> 211 E. 43rd Street, 24th Floor <br> Number     Street <br><br> New York          NY          10017 <br> City          State          ZIP Code <br><br> Contact phone 212-997-4500 <br><br> Contact email ssoulios@lawnynj.com | Name <br><br> Number     Street <br><br> City          State          ZIP Code <br><br> Contact phone _____ <br><br> Contact email _____ |
| | Uniform claim identifier for electronic payments in chapter 13 (if you use one): <br><br> __ __ __ __ __ — __ __ __ __ — __ __ __ __ — __ __ __ __ | |

| 4. Does this claim amend one already filed? | ☑ No <br> ☐ Yes. Claim number on court claims registry (if known) _____     Filed on ___/___/_____ <br> MM / DD / YYYY |
|---|---|
| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☑ No <br> ☐ Yes. Who made the earlier filing? _____ |

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |

6. **Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

7. **How much is the claim?** $_____50,000.00 **Does this amount include interest or other charges?**

☐ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

money invested pursuant to SAFE and stock purchase agreement

9. **Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

   **Nature of property:**

   ☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

   ☐ Motor vehicle

   ☐ Other. Describe: _____

   **Basis for perfection:** _____

   Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

   **Value of property:** $_____

   **Amount of the claim that is secured:** $_____

   **Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

   **Amount necessary to cure any default as of the date of the petition:** $_____

   **Annual Interest Rate** (when case was filed) _____%

   ☐ Fixed

   ☐ Variable

10. **Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

11. **Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

Official Form 410          Proof of Claim          page 2

| | |
|---|---|
| **12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☑ No |
| | ☐ Yes. *Check one:* |

| | | Amount entitled to priority |
|---|---|---|
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3:  Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box:

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   12/04/2020
                          MM / DD / YYYY

_____
Signature

Print the name of the person who is completing and signing this claim:

| | |
|---|---|
| Name | Steven Soulios |
| | First name          Middle name          Last name |
| Title | Partner |
| Company | Ruta Soulios & Stratis LLP |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 211 E. 43rd Street, 24th Floor |
| | Number        Street |
| | New York                                 NY            10017 |
| | City                                          State         ZIP Code |
| Contact phone | 212-997-4500                    Email  ssoulios@lawnynj.com |

Case 20-30819 Doc 1331 Filed 01/15/2024 Entered 01/17/24 14:38:10 Page 39
Case 20-30819 Claim 31 Filed 12/15/20 Desc Main Document Page 3 of 46

Official Form 410                                              Proof of Claim                                              page 3

DocuSign Envelope ID: 1CC7E65E-F02D-4B15-986F-A2117A9DC6A6

THIS INSTRUMENT AND ANY SECURITIES ISSUABLE PURSUANT HERETO HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED IN THIS SAFE AND UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.

## BENJA INCORPORATED

## SAFE
## (Simple Agreement for Future Equity)

THIS CERTIFIES THAT in exchange for the payment by 2007 Sklar Family Trust (the "**Investor**") of $50,000.00 (the "**Purchase Amount**") on or about September 2, 2020, Benja Incorporated, a Delaware corporation (the "**Company**"), issues to the Investor the right to certain shares of the Company's Capital Stock, subject to the terms described below.

The "**Pre-Money Valuation Cap**" is $20,000,000.

The "**Discount Rate**" is 75%.

See Section 2 for certain additional defined terms.

1. *Events*

(a) **Equity Financing**. If there is an Equity Financing before the termination of this Safe, on the initial closing of such Equity Financing, this Safe will automatically convert into the number of shares of Safe Preferred Stock equal to the Purchase Amount divided by the Conversion Price.

In connection with the automatic conversion of this Safe into shares of Safe Preferred Stock, the Investor will execute and deliver to the Company all of the transaction documents related to the Equity Financing; *provided,* that such documents (i) are the same documents to be entered into with the purchasers of Standard Preferred Stock, with appropriate variations for the Safe Preferred Stock if applicable, and (ii) have customary exceptions to any drag-along applicable to the Investor, including (without limitation) limited representations, warranties, liability and indemnification obligations for the Investor.

(b) **Liquidity Event**. If there is a Liquidity Event before the termination of this Safe, this Safe will automatically be entitled (subject to the liquidation priority set forth in Section 1(d) below) to receive a portion of Proceeds, due and payable to the Investor immediately prior to, or concurrent with, the consummation of such Liquidity Event, equal to the greater of (i) the Purchase Amount multiplied by 1.5 (the "**Cash-Out Amount**") or (ii) the amount payable on the number of shares of Common Stock equal to the Purchase Amount divided by the Liquidity Price (the "**Conversion Amount**"). If any of the Company's securityholders are given a choice as to the form and amount of Proceeds to be received in a Liquidity Event, the Investor will be given the same choice, *provided* that the Investor may not choose to receive a form of consideration that the Investor would be ineligible to receive as a result of the Investor's failure to satisfy any requirement or limitation generally applicable to the Company's securityholders, or under any applicable laws.

Notwithstanding the foregoing, in connection with a Change of Control intended to qualify as a tax-free reorganization, the Company may reduce the cash portion of Proceeds payable to the Investor by the amount determined by its board of directors in good faith for such Change of Control to qualify as a tax-free reorganization for U.S. federal income tax purposes, provided that such reduction (A) does not reduce the total Proceeds payable to such Investor and (B) is applied in the same manner and on a pro rata basis to all securityholders who have equal priority to the Investor under Section 1(d).

(c) **Dissolution Event**. If there is a Dissolution Event before the termination of this Safe, the Investor will automatically be entitled (subject to the liquidation priority set forth in Section 1(d) below) to receive a portion of Proceeds equal to the Cash-Out Amount, due and payable to the Investor immediately prior to the consummation of the Dissolution Event.

DocuSign Envelope ID: 1CC7E65E-F02D-4B15-986F-A2117A9DC6A6

(d) **Liquidation Priority**. In a Liquidity Event or Dissolution Event, this Safe is intended to operate like standard non-participating Preferred Stock. The Investor's right to receive its Cash-Out Amount is:

(i) Junior to payment of outstanding indebtedness and creditor claims, including contractual claims for payment and convertible promissory notes (to the extent such convertible promissory notes are not actually or notionally converted into Capital Stock);

(ii) On par with payments for other Safes and/or Preferred Stock, and if the applicable Proceeds are insufficient to permit full payments to the Investor and such other Safes and/or Preferred Stock, the applicable Proceeds will be distributed pro rata to the Investor and such other Safes and/or Preferred Stock in proportion to the full payments that would otherwise be due; and

(iii) Senior to payments for Common Stock.

The Investor's right to receive its Conversion Amount is (A) on par with payments for Common Stock and other Safes and/or Preferred Stock who are also receiving Conversion Amounts or Proceeds on a similar as-converted to Common Stock basis, and (B) junior to payments described in clauses (i) and (ii) above (in the latter case, to the extent such payments are Cash-Out Amounts or similar liquidation preferences).

(e) **Termination**. This Safe will automatically terminate (without relieving the Company of any obligations arising from a prior breach of or non-compliance with this Safe) immediately following the earliest to occur of: (i) the issuance of Capital Stock to the Investor pursuant to the automatic conversion of this Safe under Section 1(a); or (ii) the payment, or setting aside for payment, of amounts due the Investor pursuant to Section 1(b) or Section 1(c).

2. *Definitions*

"**Capital Stock**" means the capital stock of the Company, including, without limitation, the "**Common Stock**" and the "**Preferred Stock**."

"**Change of Control**" means (i) a transaction or series of related transactions in which any "person" or "group" (within the meaning of Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), becomes the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended), directly or indirectly, of more than 50% of the outstanding voting securities of the Company having the right to vote for the election of members of the Company's board of directors, (ii) any reorganization, merger or consolidation of the Company, other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity or (iii) a sale, lease or other disposition of all or substantially all of the assets of the Company.

"**Company Capitalization**" is calculated as of immediately prior to the Equity Financing and (without double-counting, in each case calculated on an as-converted to Common Stock basis):

- Includes all shares of Capital Stock issued and outstanding;
- Includes all (i) issued and outstanding Options and (ii) Promised Options;
- Excludes the Unissued Option Pool, including any increase to the Unissued Option Pool in connection with the Equity Financing except with respect to Promised Options; and
- Excludes all Converting Securities.

"**Conversion Price**" means either: (1) the Safe Price or (2) the Discount Price, whichever calculation results in a greater number of shares of Safe Preferred Stock.

"**Converting Securities**" includes this Safe and other convertible securities issued by the Company, including but not limited to: (i) this Safe; (ii) other Safes; and (iii) convertible promissory notes and other convertible debt instruments.

"**Direct Listing**" means the Company's initial listing of its Common Stock (other than shares of Common Stock not eligible for resale under Rule 144 under the Securities Act) on a national securities exchange by means of an effective

registration statement on Form S-1 filed by the Company with the SEC that registers shares of existing capital stock of the Company for resale, as approved by the Company's board of directors. For the avoidance of doubt, a Direct Listing shall not be deemed to be an underwritten offering and shall not involve any underwriting services.

"**Discount Price**" means the price per share of the Standard Preferred Stock sold in the Equity Financing multiplied by the Discount Rate.

"**Dissolution Event**" means (i) a voluntary termination of operations, (ii) a general assignment for the benefit of the Company's creditors or (iii) any other liquidation, dissolution or winding up of the Company (**excluding** a Liquidity Event), whether voluntary or involuntary.

"**Dividend Amount**" means, with respect to any date on which the Company pays a dividend on its outstanding Common Stock, the amount of such dividend that is paid per share of Common Stock multiplied by (x) the Purchase Amount divided by (y) the Liquidity Price (treating the dividend date as a Liquidity Event solely for purposes of calculating such Liquidity Price).

"**Equity Financing**" means a bona fide transaction or series of transactions with the principal purpose of raising capital, pursuant to which the Company issues and sells Preferred Stock at a fixed valuation, including but not limited to, a pre-money or post-money valuation.

"**Initial Public Offering**" means the closing of the Company's first firm commitment underwritten initial public offering of Common Stock pursuant to a registration statement filed under the Securities Act.

"**Liquidity Capitalization**" is calculated as of immediately prior to the Liquidity Event, and (without double-counting, in each case calculated on an as-converted to Common Stock basis):

- Includes all shares of Capital Stock issued and outstanding;
- Includes all (i) issued and outstanding Options and (ii) to the extent receiving Proceeds, Promised Options;
- Excludes all Converting Securities; and
- Excludes the Unissued Option Pool.

"**Liquidity Event**" means a Change of Control, a Direct Listing or an Initial Public Offering.

"**Liquidity Price**" means the price per share equal to the Pre-Money Valuation Cap divided by the Liquidity Capitalization.

"**Options**" includes options, restricted stock awards or purchases, RSUs, SARs, warrants or similar securities, vested or unvested.

"**Proceeds**" means cash and other assets (including without limitation stock consideration) that are proceeds from the Liquidity Event or the Dissolution Event, as applicable, and legally available for distribution.

"**Promised Options**" means promised but ungranted Options that are the greater of those (i) promised pursuant to agreements or understandings made prior to the execution of, or in connection with, the term sheet or letter of intent for the Equity Financing or Liquidity Event, as applicable (or the initial closing of the Equity Financing or consummation of the Liquidity Event, if there is no term sheet or letter of intent), (ii) in the case of an Equity Financing, treated as outstanding Options in the calculation of the Standard Preferred Stock's price per share, or (iii) in the case of a Liquidity Event, treated as outstanding Options in the calculation of the distribution of the Proceeds.

"**Safe**" means an instrument containing a future right to shares of Capital Stock, similar in form and content to this instrument, purchased by investors for the purpose of funding the Company's business operations. References to "this Safe" mean this specific instrument.

"**Safe Preferred Stock**" means the shares of the series of Preferred Stock issued to the Investor in an Equity Financing, having the identical rights, privileges, preferences and restrictions as the shares of Standard Preferred Stock,

DocuSign Envelope ID: 1CC7E65E-F02D-4B15-986F-A2117A9DC6A6

other than with respect to: (i) the per share liquidation preference and the initial conversion price for purposes of price-based anti-dilution protection, which will equal the Conversion Price; and (ii) the basis for any dividend rights, which will be based on the Conversion Price.

"**Safe Price**" means the price per share equal to the Pre-Money Valuation Cap divided by the Company Capitalization.

"S**tandard Preferred Stock**" means the shares of the series of Preferred Stock issued to the investors investing new money in the Company in connection with the initial closing of the Equity Financing.

"**Subsequent Convertible Securities**" means convertible securities that the Company may issue after the issuance of this instrument with the principal purpose of raising capital, including but not limited to, other Safes, convertible debt instruments and other convertible securities. Subsequent Convertible Securities excludes: (i) options issued pursuant to any equity incentive or similar plan of the Company; (ii) convertible securities issued or issuable to (A) banks, equipment lessors, financial institutions or other persons engaged in the business of making loans pursuant to a debt financing or commercial leasing or (B) suppliers or third party service providers in connection with the provision of goods or services pursuant to transactions; and (iii) convertible securities issued or issuable in connection with sponsored research, collaboration, technology license, development, OEM, marketing or other similar agreements or strategic partnerships.

"**Unissued Option Pool**" means all shares of Capital Stock that are reserved, available for future grant and not subject to any outstanding Options or Promised Options (but in the case of a Liquidity Event, only to the extent Proceeds are payable on such Promised Options) under any equity incentive or similar Company plan.

**3.** "*MFN*" *Amendment Provision*. If the Company issues any Subsequent Convertible Securities prior to termination of this Safe, the Company will promptly provide the Investor with written notice thereof, together with a copy of all documentation relating to such Subsequent Convertible Securities and, upon written request of the Investor, any additional information related to such Subsequent Convertible Securities as may be reasonably requested by the Investor. In the event the Investor determines that the terms of the Subsequent Convertible Securities are preferable to the terms of this instrument, the Investor will notify the Company in writing. Promptly after receipt of such written notice from the Investor, the Company agrees to amend and restate this instrument to be identical to the instrument(s) evidencing the Subsequent Convertible Securities.

**4.** *Company Representations*

(a) The Company is a corporation duly organized, validly existing and in good standing under the laws of its state of incorporation, and has the power and authority to own, lease and operate its properties and carry on its business as now conducted.

(b) The execution, delivery and performance by the Company of this Safe is within the power of the Company and has been duly authorized by all necessary actions on the part of the Company (subject to Section 4(d)). This Safe constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity. To its knowledge, the Company is not in violation of (i) its current certificate of incorporation or bylaws, (ii) any material statute, rule or regulation applicable to the Company or (iii) any material debt or contract to which the Company is a party or by which it is bound, where, in each case, such violation or default, individually, or together with all such violations or defaults, could reasonably be expected to have a material adverse effect on the Company.

(c) The performance and consummation of the transactions contemplated by this Safe do not and will not: (i) violate any material judgment, statute, rule or regulation applicable to the Company; (ii) result in the acceleration of any material debt or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any lien on any property, asset or revenue of the Company or the suspension, forfeiture, or nonrenewal of any material permit, license or authorization applicable to the Company, its business or operations.

DocuSign Envelope ID: 1CC7E65E-F02D-4B15-986F-A2117A9DC6A6

(d)  No consents or approvals are required in connection with the performance of this Safe, other than: (i) the Company's corporate approvals; (ii) any qualifications or filings under applicable securities laws; and (iii) necessary corporate approvals for the authorization of Capital Stock issuable pursuant to Section 1.

(e)  To its knowledge, the Company owns or possesses (or can obtain on commercially reasonable terms) sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes and other intellectual property rights necessary for its business as now conducted and as currently proposed to be conducted, without any conflict with, or infringement of the rights of, others.

## 5.  *Investor Representations*

(a)  The Investor has full legal capacity, power and authority to execute and deliver this Safe and to perform its obligations hereunder. This Safe constitutes valid and binding obligation of the Investor, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(b)  The Investor is an accredited investor as such term is defined in Rule 501 of Regulation D under the Securities Act, and acknowledges and agrees that if not an accredited investor at the time of an Equity Financing, the Company may void this Safe and return the Purchase Amount. The Investor has been advised that this Safe and the underlying securities have not been registered under the Securities Act, or any state securities laws and, therefore, cannot be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available. The Investor is purchasing this Safe and the securities to be acquired by the Investor hereunder for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and the Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. The Investor has such knowledge and experience in financial and business matters that the Investor is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment without impairing the Investor's financial condition and is able to bear the economic risk of such investment for an indefinite period of time.

(c)  By purchasing this Safe, Investor acknowledges and agrees that the Company has fully complied with any and all pro rata rights, participation rights, or other similar rights Investor may have (including any notice provisions related thereto) in connection with the sale of this Safe and any other Safes with the same Pre Money Valuation Cap and Discount Rate.

## 6.  *Miscellaneous*

(a)  Any provision of this Safe may be amended, waived or modified by written consent of the Company and either (i) the Investor or (ii) the majority-in-interest of all then-outstanding Safes with the same "Pre-Money Valuation Cap" and "Discount Rate" as this Safe; *provided that* with respect to clause (ii): (A) the Purchase Amount may not be amended, waived or modified in this manner, and (B) such amendment, waiver or modification treats all such holders in the same manner. "**Majority-in-interest**" refers to the holders of the applicable group of Safes whose Safes have a total Purchase Amount greater than 50% of the total Purchase Amount of all of such applicable group of Safes.

(b)  Any notice required or permitted by this Safe will be deemed sufficient when delivered personally or by overnight courier or sent by email to the relevant address listed on the signature page, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address listed on the signature page, as subsequently modified by written notice.

(c)  The Investor is not entitled, as a holder of this Safe, to vote or be deemed a holder of Capital Stock for any purpose other than tax purposes, nor will anything in this Safe be construed to confer on the Investor, as such, any rights of a Company stockholder or rights to vote for the election of directors or on any matter submitted to Company stockholders, or to give or withhold consent to any corporate action or to receive notice of meetings, until shares have been issued on the terms described in Section 1.  However, if the Company pays a dividend on outstanding shares of Common Stock (that is not payable in shares of Common Stock) while this Safe is outstanding, the Company will pay the Dividend Amount to the Investor at the same time.

DocuSign Envelope ID: 1CC7E65E-F02D-4B15-986F-A2117A9DC6A6

(d)  Neither this Safe nor the rights in this Safe are transferable or assignable, by operation of law or otherwise, by either party without the prior written consent of the other; *provided, however*, that this Safe and/or its rights may be assigned without the Company's consent by the Investor (i) to the Investor's estate, heirs, executors, administrators, guardians and/or successors in the event of Investor's death or disability, or (ii) to any other entity who directly or indirectly, controls, is controlled by or is under common control with the Investor, including, without limitation, any general partner, managing member, officer or director of the Investor, or any venture capital fund now or hereafter existing which is controlled by one or more general partners or managing members of, or shares the same management company with, the Investor; and *provided, further*, that the Company may assign this Safe in whole, without the consent of the Investor, in connection with a reincorporation to change the Company's domicile.

(e)  In the event any one or more of the provisions of this Safe is for any reason held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or in the event that any one or more of the provisions of this Safe operate or would prospectively operate to invalidate this Safe, then and in any such event, such provision(s) only will be deemed null and void and will not affect any other provision of this Safe and the remaining provisions of this Safe will remain operative and in full force and effect and will not be affected, prejudiced, or disturbed thereby.

(f)  All rights and obligations hereunder will be governed by the laws of the State of Delaware, without regard to the conflicts of law provisions of such jurisdiction.

(g)  The parties acknowledge and agree that for United States federal and state income tax purposes this Safe is, and at all times has been, intended to be characterized as stock, and more particularly as common stock for purposes of Sections 304, 305, 306, 354, 368, 1036 and 1202 of the Internal Revenue Code of 1986, as amended.  Accordingly, the parties agree to treat this Safe consistent with the foregoing intent for all United States federal and state income tax purposes (including, without limitation, on their respective tax returns or other informational statements).

(*Signature page follows*)

IN WITNESS WHEREOF, the undersigned have caused this Safe to be duly executed and delivered.

**COMPANY:**

**BENJA INCORPORATED**

By: _____
          Andrew J. Chapin
          Chief Executive Officer

Address:

**INVESTOR:**

By: _____

Name: Scott Sklar

Title: Manager

Address: _____

_____

Email: scottsklar1@comcast.net